1                  UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3    _____

4    UNITED STATES OF AMERICA,

5                      Plaintiff,            Criminal Action
                                             No. 16-CR-10343-ADB
6    v.
                                             February 11, 2019
7    MICHAEL J. GURRY, RICHARD M.            Pages 1 to 235
     SIMON, SUNRISE LEE, JOSEPH A.
8    ROWAN, and JOHN KAPOOR,

9                      Defendants.

10   _____

11

12

13          TRANSCRIPT OF JURY TRIAL -- DAY 16
        BEFORE THE HONORABLE ALLISON D. BURROUGHS
14            UNITED STATES DISTRICT COURT
            JOHN J. MOAKLEY U.S. COURTHOUSE
15               ONE COURTHOUSE WAY
                 BOSTON, MA   02210

16

17

18

19

20

21

22            JOAN M. DALY, RMR, CRR
             RACHEL M. LOPEZ, CRR
23            Official Court Reporter
         John J. Moakley U.S. Courthouse
24       One Courthouse Way, Room 5507
             Boston, MA   02210
25          joanmdaly62@gmail.com

1    APPEARANCES:

2
     FOR THE GOVERNMENT:
3
             FRED WYSHAK
4            K. NATHANIEL YEAGER
             DAVID G. LAZARUS
5            Assistant U.S. Attorneys
             United States Attorney's Office
6            John Joseph Moakley Federal Courthouse
             1 Courthouse Way
7            Suite 9200
             Boston, Massachusetts 02210
8            617.748.3100
             fred.wyshak@usdoj.gov
9            nathaniel.yeager@usdoj.gov
             david.lazarus2@usdoj.gov
10

11   FOR THE DEFENDANT MICHAEL J. GURRY:

12           TRACY A. MINER
             MEGAN A. SIDDALL
13           Demeo LLP
             200 State Street
14           Boston, Massachusetts 02109
             617.263.2600
15           tminer@demeollp.com
             msiddall@demeollp.com
16

17   FOR THE DEFENDANT RICHARD M. SIMON:

18           STEVEN A. TYRRELL
             PATRICK J. O'TOOLE, JR.
19           Weil, Gotshal & Manges LLP
             100 Federal Street
20           Boston, Massachusetts 02110
             617.772.8365
21           steven.tyrrell@weil.com
             patrick.otoole@weil.com
22

23

24

25

1    <u>APPEARANCES</u> (continued):

2

3    FOR THE DEFENDANT SUNRISE LEE:

           PETER C. HORSTMANN
4          Law Offices of Peter Charles Horstmann
           450 Lexington Street
5          Suite 101
           Newton, Massachusetts 02466
6          617.723.1980
           pete@horstmannlaw.com
7

8    FOR THE DEFENDANT JOSEPH A. ROWAN:

9          MICHAEL KENDALL
           ALEXANDRA I. GLIGA
10         White & Case, LLP
           75 State Street
11         Boston, Massachusetts 02109
           617.939.9310
12         michael.kendall@whitecase.com
           alexandra.gliga@whitecase.com
13

14   FOR THE DEFENDANT JOHN KAPOOR:

15         BETH WILKINSON
           KOSTA S. STOJILKOVIC
16         Wilkinson Walsh Eskovitz
           2001 M Street NW
17         Washington, D.C. 20036
           202.847.4000
18         bwilkinson@wilkinsonwalsh.com
           kstojilkovic@wilkinsonwalsh.com
19
           AARON M. KATZ
20         BRIEN T. O'CONNOR
           Ropes & Gray
21         Prudential Tower
           800 Boylston Street
22         Boston, Massachusetts 02199
           617.951.7385
23         aaron.katz@ropesgray.com
           boconnor@ropesgray.com
24

25

1          **TABLE OF CONTENTS**

2

3          **TRIAL WITNESSES**

4     On behalf of the Plaintiff:                    Page

5     KIM FORDHAM

6          By Ms. Miner                               22

7          By Mr. Lazarus                             61

8          By Ms. Miner                               68

9     HEATHER ALFONSO

10         By Mr. Lazarus                             70

11

12

13          **EXHIBITS**

14                                                Admitted

15    Number 1836 and 1836.2                        101

16    Number 1837                                    109

17    Number 1838                                    104

18    Number 1839 and 1839.2                          98

19    Number 6114                                      59

20    Number 6118                                      28

21    Number 6125                                      60

22    Number 6126                                      24

23    Number 6127                                      27

24    Number 6129                                      69

25

1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3      before the Honorable Allison D. Burroughs, United States

4      District Judge, United States District Court, District of

5      Massachusetts, at the John J. Moakley United States

6      Courthouse, One Courthouse Way, Boston, Massachusetts, on

7      February 11, 2019.)

8              MR. WYSHAK:  So Your Honor, I think it became

9      apparent on Friday that the defendants are in possession of

10     certain materials, which are privileged, which corporations

11     claim to privilege.  And I only raise this in the context of

12     how their position regarding our ability to call witnesses

13     like Cellestini, Zacks, and Danielle Davis, they're claiming

14     that they don't have these materials and it would be a burden

15     upon them to get up to speed with these materials, in order

16     to cross-examine these witnesses.

17             So I'm asking that we get an accurate statement

18     from the defense regarding the extent of their possession of

19     these privileged materials.

20             THE COURT:  It does seem that you had some of the

21     materials from the internal investigation on Friday.

22             MS. WILKINSON:  That's not true, Your Honor.  From

23     the questions that I was asking, you mean?

24             THE COURT:  No, Mr. Katz represented -- I think it

25     was Mr. Katz.  Somebody represented that what they told the

1    corporation during these interviews was different than what

2    they were testifying to on the stand.

3              MS. WILKINSON:  Okay.

4              MR. STOJILKOVIC:  I can address that, Your Honor.

5    We have some materials that, by just kind of the happenstance

6    of what was disclosed to particular defendants at the time.

7    We do not have anywhere near a comprehensive set of materials

8    that the company has claimed to be privileged, either with

9    respect to an internal investigation or with respect to other

10   advice that was received at the time.  And also, it was not

11   my intent to get in with the witness the substance of

12   anything she had said, other than just to note that it was

13   generally different than what she had told us here, which

14   Your Honor sustained.  So we didn't get there.

15             But we are far from having a complete universe.  We

16   do -- because certain things were transmitted to various

17   individuals of the company, including Dr. Kapoor, we do have

18   access to some material that the company deems privileged.

19             MR. WYSHAK:  Well, I'm going to ask that they

20   provide a list of the materials.  They don't have to give the

21   substance, but it's hard for the Government to know what the

22   universe is and how much of that universe they actually have.

23   And I think this is going to assist the Court in ruling

24   regarding the extent to which we can question some of these

25   witnesses when they take the stand.  I think that it's only

1  fair, based upon their written position in their papers, that

2  they have not had access to these materials and it would be

3  prejudicial for them to try to get up to speed on this, that

4  we know exactly what they have.

5          THE COURT:  Why do they need to get up to speed on

6  it, if there's no waiver?

7          MR. WYSHAK:  Well, that's what they're claiming.

8  They're claiming that to the extent that we call witnesses

9  and ask these witnesses questions about conversations that

10 they've had, I assume that they're going to try to assert

11 that these are privileged.  And if they have had access to

12 those materials -- I mean, as you know, Mr. Hobart did appear

13 with these witnesses, when they were being interviewed, and

14 asserted the privilege where he thought the assertion was

15 appropriate.  So the only information we have is information

16 provided by the witnesses, where Mr. Hobart, on behalf of the

17 company, did not assert a privilege.  So it's our position

18 that the information that we have produced to the defense,

19 which they are objecting to, is not privileged and,

20 therefore, we should be able to use it.

21          They are, obviously, pushing back on that, saying

22 it is privileged and it would be too hard for them to examine

23 these witnesses, because they have not had access to these

24 materials.  And we can't address that argument, because we

25 don't know what they have and what they don't have, and I

1   think to some extent, if they could give us a written

2   description of the materials they have, it could help in

3   determining the validity of their objections.

4          MR. TYRRELL:  Your Honor, may I raise one point, as

5   well.  I confess, I'm not certain what there actually is.

6   But I know Dr. Kapoor remained with the company for a period

7   of time while some of the legal advice may have been

8   rendered, or while some of the internal investigation could

9   have been conducted.  So it could be that the other

10  defendants are not similarly situated with regard to this

11  information, as they wouldn't have had access by virtue of

12  their positions with the company.  And you know, we can

13  confer, obviously, and get back to you, but I just want to

14  make sure that we're not lumped together where it's not

15  necessarily --

16         THE COURT:  Well, I find -- I don't know what they

17  have access to, but I find it hard to believe that some of

18  you have access to some materials and the others of you

19  don't, but we will cross that bridge --

20         MS. WILKINSON:  Well, that's true, Your Honor.

21  That's very true.

22         THE COURT:  Well, it's a crappy joint defense

23  agreement, then, right?

24         MS. WILKINSON:  No, no, Your Honor.  We don't have

25  the --

1           THE COURT:  So --

2           MR. TYRRELL:  It may not be materials; it may be

3    information.  Someone would have been briefed about something

4    and that doesn't mean that we've discussed everything that

5    someone may have been briefed about in 2015, two years before

6    the indictment was returned, or a year and a half before the

7    indictment was returned.  I just don't think that you can

8    automatically put us all together with regard to this issue,

9    respectfully.

10          THE COURT:  I don't think you're cross-examining

11   that witness based on information in your head, right?  You

12   have an interview report about what happened during that

13   internal investigation, I'm assuming.

14          MR. TYRRELL:  Not me.

15          MS. MINER:  Not from the Government.

16          THE COURT:  Not from the Government?

17          MS. MINER:  No, from the Government.  That's all we

18   have.

19          MR. STOJILKOVIC:  Can I clarify a few things?  So

20   Your Honor, first of all, we are not -- I mean, to the extent

21   that we have some materials that were provided in realtime to

22   our client, pursuant to, you know, legal advice or

23   investigation at -- for the company, that's how we have them.

24   In other words, this is not, you know -- at the time, for the

25   relevant time, he was the chairman of the board and he did,

1    from time to time, receive certain materials.  That is far

2    from -- and you know, a complete universal set of the

3    materials that implicate Insys's privilege.  And moreover, it

4    doesn't -- you know, our concern is when it comes to these

5    witnesses who were providing legal advice, Leslie Zacks,

6    Cellestini, Danielle Davis, in some respects, you know, we

7    don't have their materials, because the company has largely

8    asserted privilege over those materials and so we don't have

9    a basis to effectively cross-examine them on those issues,

10   nor has the company waived the privilege.

11            Now, the fact that we may have an occasional

12   interview report or some materials, we didn't put those in

13   our exhibit list.  We're not looking to admit those.  We're

14   not looking to pierce the privilege.  We never have been, but

15   that's the lay of the land.

16            MR. WYSHAK:  But obviously trying to use those

17   materials not only as a shield, but as a sword.  And I

18   suggest to the Court that Mr. Kapoor, in his position as the

19   founder of the company and chairman of the board of directors

20   and then CEO, probably had access to all the materials.  And

21   just like the materials that we sought to obtain by subpoena

22   regarding his written -- handwritten notes, I suggest to the

23   Court, possesses those materials, has shared those materials

24   with his defense team and this universe that they claim

25   exists is probably the universe of materials that they do

 1   have.  I just find it hard to believe that Mr. Kapoor didn't

 2   keep or maintain these records and provide them to his

 3   defense team, and now they seek, as we saw on Friday, to use

 4   these materials as a sword, as well as a shield.

 5          THE COURT:  Well, they're not going to use them in

 6   that way.  What I'm more concerned about is the idea that

 7   Mr. Hobart has asserted a privilege and they don't have a

 8   basis for evaluating whether it's a valid assertion of the

 9   privilege.

10          MR. STOJILKOVIC:  Your Honor, we are not

11   questioning the assertion of the privilege by Mr. Hobart and

12   by the company, and it is the company's call.  I mean, even

13   though at the time our client was the chairman of the board,

14   the company retains the privilege decision and obviously he's

15   not in that position anymore.  What --

16          What we object to and what our concern has always

17   been is to get these witnesses who, even though the company

18   has asserted the privilege, and even though I represent to

19   the Court, we do not, by any stretch of the imagination, have

20   some complete universe of privileged materials, we don't --

21   for those witnesses to come and testify on matters that

22   implicate the legal advice they were giving, we're not in a

23   situation to fully cross them and I don't -- you know, I

24   don't think, you know, some interview reports from, you know,

25   fact witnesses who were interviewed as part of an internal

1    investigation goes to that.

2         Our questions really are going to be what was --

3    you know, if that testimony is allowed, what was the legal

4    advice given, why was it given, what did Zacks, Davis, and

5    others tell the board, and why did they hold something back,

6    and that's where we do not have the full information and I

7    think that's reasonable under the circumstances.

8         And also, in terms of production, I would just say

9    that both the Insys production, but also the EJF, the kind of

10   corporate entity associated with Dr. Kapoor, did produce

11   electronic records to the Government, you know, subject to,

12   you know, and that wasn't -- that wasn't done by our firm.

13   It was done by their own separate counsel, you know, subject

14   to privilege review and subject to relevance review.  But so

15   what -- subject to that process, records were turned over

16   from EJ Financial, obviously, as well as from Insys, but both

17   of those entities respected the privilege.

18        MR. WYSHAK:  All we're asking for is a list of

19   records that the defense has, which they believe were

20   privileged, to rebut the claim that they cannot prepare

21   properly to cross-examine these witnesses.  I think that will

22   assist the Court in argument on this particular issue.

23        THE COURT:  I just don't see that I have any basis

24   for requiring them to produce that.

25        MR. WYSHAK:  Well, I think when they come before

 1    the Court and say that these -- there's a universe of

 2    privileged materials out there and they seek to suppress the

 3    testimony of Government witnesses because those materials

 4    have not been produced to them by the Government.  And that

 5    if they were produced at this late date, it would prejudice

 6    them, because there's no way they could get up to speed to

 7    cross-examine these witnesses, I do think that you have

 8    authority to find out exactly what it is and how much they do

 9    have.  Because if, in fact, they have materials that are

10    relevant to the cross-examination of those witnesses, then

11    they cannot claim prejudice.

12           MR. TYRRELL:  Your Honor, I'm just going to say one

13    more time, with all due respect to Mr. Wyshak, I just don't

14    think it's appropriate to say "they" in this context.  I

15    think Ms. Wilkinson has made clear that Dr. Kapoor, as

16    chairman of the board, rightly would have had access to

17    certain things that were happening at that time, may have

18    information in his head, or materials that he rightly

19    retained.  That doesn't mean that the rest of the defendants

20    have them, that doesn't mean that they've been shared, and

21    that doesn't mean --

22           THE COURT:  I got it.  I got it, Mr. Tyrrell.  I

23    got it.

24           MR. TYRRELL:  Thank you.

25           MS. WILKINSON:  Your Honor, if I can just give one

1    example.  The Government produced to us recently notes from

2    Mr. Zacks that he kept about advice he gave to the board,

3    which we think are privileged.  I think that was the -- we

4    have never seen that.  We don't even know how many materials

5    there are that we have not seen, but what we're talking about

6    are some interview memos and the only point there was -- and

7    anyone could have done that, you didn't tell the truth when

8    you were asked about what you had done.  That was really the

9    only point.  That's the only thing that we know.  I don't

10   know -- that's not the same issue as, I think, the Government

11   is trying to raise with you, which is did we know the advice

12   that was given by all the lawyers at any particular time to

13   the company?  We don't have access to all of that information

14   and I don't even know how we would know whether we did or

15   not, since Mr. Hobart withheld it from production to the

16   Government, withheld it from production to us, and hasn't

17   ever told us what the world, or you know, kind of the realm

18   of documents are that would reflect that kind of legal advice

19   to the company.

20          MR. WYSHAK:  This is a facetious argument.  I would

21   suggest to the Court that --

22          MS. WILKINSON:  Your Honor, can we stop with the

23   accusations?

24          MR. WYSHAK:  I have -- report to the board of

25   directors.  Mr. Kapoor has it and his lawyers have it, and

1    that's what the reality is here.  We can argue that they, you

2    know, we don't know what the universe is.  I suggest that --

3                MS. WILKINSON:  What is it that we have, Your

4    Honor?

5                THE COURT:  But there is a report to the board, is

6    it privileged?

7                MR. WYSHAK:  Well, we don't have it and I think --

8    I believe Mr. Hobart has asserted privilege.

9                THE COURT:  Well, then they can't use it and you

10   can't use it.

11               MR. WYSHAK:  Well, I'm not saying that we want to

12   use it.  All I'm saying is that we are going to call

13   witnesses who we believe have -- can testify to a certain

14   extent about business advice that they gave to the board and

15   Mr. Kapoor specifically, and the defense is claiming

16   prejudice because, surprise, lack of knowledge.  There's no

17   way they can get up to speed because they have not had access

18   to this universe of materials.  And I suggest that they have

19   done and that that claim is -- is disingenuous.  That's all.

20   I'm just asking --

21               And you know something, if they want to produce it

22   ex parte to the Court, that's fine.  A list of documents that

23   they currently possess that's privileged, so that the Court

24   can make adequate evidentiary rulings when Mr. Zacks or

25   Ms. Davis or Ms. Cellestini take the witness stand.

1          THE COURT:  Well, I guess -- maybe I'm being dense

2     about this, but I'm just not sure how that list of documents

3     is going to help me.

4          Lynn, can you come on up for --

5          Go ahead.

6          MR. STOJILKOVIC:  Your Honor, I just want to -- I

7     don't want to belabor the issue further --

8          THE COURT:  Hold on a second.  Hold on.

9          (The Court and IT confer.)

10         THE COURT:  Sorry.  Thank you.

11         Okay.  Go ahead.

12         MR. STOJILKOVIC:  Your Honor, we agree with what

13    you said, which is that if it's privileged, it's privileged.

14    And if the Court's ruling is that neither party gets to

15    invade Insys's privilege, we respect that.  And our issue is

16    that if these witnesses are called and they're testifying to

17    things that implicate privilege, that's the problem.  And

18    there's no -- the solution to that is we just respect the

19    privilege.

20         MR. WYSHAK:  Well, we've turned over the interview

21    reports.  They have the statements of those witnesses.  Are

22    they going to assert that any of that information that was

23    provided by those witnesses is privileged?  It's a simple

24    question.  And if they're not, then this issue is moot, but

25    if they are, then I think it becomes a question of whether

1   the admissibility of that evidence, at this time, prejudices

2   them, because they didn't have underlying documents or

3   adequate time to prepare, which is, I think, part of what

4   they're asserting.  So if they're not going to object on the

5   basis of privilege to the testimony of any of those

6   witnesses, based upon the materials that have been provided

7   to them already by the Government, then I agree, the issue is

8   moot.

9           MR. STOJILKOVIC:  Your Honor, we do object, and we

10   outlined in our papers and I'm happy to revisit this as those

11   witnesses get noticed up, because your ruling was to kind of

12   take it as it comes, but again, using Mr. Zacks as an

13   example, he literally met with the Government, turned over

14   handwritten notes about his legal advice to the board and

15   talked about what he advised the board on how to deal with

16   the subpoena in a way that would make prosecutors happy.  And

17   that's where our discomfort with Insys's position is, they

18   haven't said -- they've waived the privilege, but they've

19   allowed very late, within the last couple of months, folks

20   like Mr. Zacks to meet with the Government and disclose that

21   kind of information, whereas for the previous two years they

22   had steadily been claiming privilege on it.

23           THE COURT:  So are you going to try and use those

24   notes?

25           MR. WYSHAK:  Yes.

1          THE COURT:  You're taking the position that they're

2     not privileged, because they were turned over to you?

3          MR. WYSHAK:  Yes, because Mr. Hobart, to the extent

4     that he made a legal decision as counsel for the company that

5     these were not privileged materials, I assume he waived

6     whether this was legal advice or business advise, he made

7     that decision and he produced it.

8              It's not their privilege to assert, number one.  So

9     what their claim is, not that -- that they can assert that

10    privilege.  Their claim is this is prejudicial to us, because

11    we're surprised and unable to prepare, because we haven't had

12    access to these privileged materials.  So what I'm saying is,

13    I think they have, and I think that they have, if not all, a

14    large number of this universe of materials.  And so their

15    claim of prejudice is -- is disingenuous.  And that's all I'm

16    asking is that if they could make a -- a statement or a

17    written submission regarding the extent of their position,

18    their possession of these materials, it will be helpful

19    regarding a claim of prejudice or surprise, when the

20    witnesses take the stand.  It's our position that whatever

21    the witnesses have told us, what the -- with the permission

22    of Mr. Hobart, is nonprivileged.  He's the lawyer, he made

23    the call.

24         THE COURT:  Well, I think that their problem is if

25    Mr. Hobart makes a decision that a particular interaction is

1   not privileged, they're saying they need to know what

2   happened on either side of that, right?

3         MR. WYSHAK:  And if they know.

4         THE COURT:  Well, let's just say they know.  Let's

5   say they give me a list of 20 things.  How do we know that

6   those 20 things are the only things and there's not 80

7   things?

8         MR. WYSHAK:  Well, Your Honor, I -- I don't know

9   what the answer to the next question is, but I think that it

10   would be a helpful start if we, at least, knew what they do

11   have.  And I don't know how much -- I guess we could give

12   that list to Mr. Hobart and try to discern how much

13   additional material there might be that they haven't

14   received, but I suggest that, as the founder and CEO and

15   chairman of the board of this company, Mr. Kapoor has all

16   these documents and he shared them with his counsel.  He

17   would be a fool not to have done so.

18         MR. STOJILKOVIC:  Your Honor, I just want to make

19   one thing clear for the record.  Insys is cooperating with

20   the Government.  Insys is adverse to the defendants in this

21   point.  And that -- and we have seen a drastic shift in

22   Insys's position.  And what we have seen, for instance, is

23   where Insys had its employees previously invoking privilege.

24   For instance, Danielle Davis, another witness covered by

25   this, had a deposition in a civil case, invoked privilege

1    about 200 times.  Within the last couple of months, now

2    Mr. Hobart tells Ms. Davis, go ahead and meet with the

3    Government and answer their questions on the very same

4    issues.  It is --

5          Now, Insys has their own deals to make and they've

6    got a lot riding on it.  But because of that, we vigorously

7    object to Insys's counsel, who has a long, preexisting

8    relationship with Mr. Wyshak and whose company has ever

9    reason now to be the Government's friend and not the

10    defendant's friend, to make selective decisions that

11    basically say go ahead, we're going to call this legal advice

12    to the board, not privilege, so that the Government can

13    present that.  That's our objection.

14          MR. WYSHAK:  But they can't make that argument.

15    They can't claim privilege.  Okay.  What they're claiming is

16    some kind of prejudice --

17          THE COURT:  I get it.  Okay, listen, the jury is

18    ready.  We can take this up later, none of them are being

19    called today, right?

20          MR. STOJILKOVIC:  No.

21          MS. MINER:  I'll just go get them.

22          THE COURT:  Go where you're going.

23          We have bad weather coming in tomorrow.  Do you

24    guys want me to offer the jury 9:00 to 1:00 tomorrow instead

25    of 10:00 to 4:00?

1          MR. WYSHAK:  I think that would be --

2          THE COURT:  I don't want to lose the day.  So I'm

3   just thinking if they know they can get out earlier, it might

4   make them happier.

5          MR. STOJILKOVIC:  We agree, Your Honor.

6          MR. WYSHAK:  Yes.  Thank you, Your Honor.

7          (The jury enters the courtroom.)

8          THE CLERK:  Court is in session, please be seated.

9          THE COURT:  Good morning, everybody.  I hope you

10  all had a good weekend.  Thank you for being here on time.

11  I, myself, am cranky, because I had a miserable commute on

12  the Pike.  So anybody else who was on the Pike with me, I

13  especially appreciate you being here on time.

14         We -- I think you -- probably some of you know

15  there's bad weather coming in for tomorrow, so at the break,

16  let me know if you prefer to sit 9:00 to 1:00 tomorrow, which

17  will get you out of here ahead of it, I hope.  We're

18  scheduled for 10:00 to 4:00.  I'm more than happy to do 10:00

19  to 4:00, but I also want -- I know some of you are coming

20  from far away, so if 9:00 to 1:00 makes a difference to you

21  tomorrow, let us know.  We'll be sitting 9:00 to 1:00 on

22  Wednesday, anyway, and my intention is to sit 10:00 to 4:00

23  on Friday, so if anyone has a major problem with that, so you

24  can hash all that out during the break.  And that's why I try

25  to keep a little bit of flexibility, you know, a few weeks in

 1   advance, because now we have the weather.  So -- but think

 2   about what works for you and let us know at some point after

 3   lunch.

 4             You are still under oath from Friday.

 5             Ms. Miner, when you're ready.

 6             MS. MINER:  Thank you, Your Honor.

 7                           **KIM FORDHAM**

 8     having been previously duly sworn, testified as follows:

 9        **CROSS-EXAMINATION BY COUNSEL FOR DEFENDANT GURRY**

10   BY MS. MINER:

11   **Q.**  Ms. Fordham, you've spoken to representatives of the

12   Government before Friday; isn't that fair?

13   **A.**  Yes.

14   **Q.**  You gave a sworn statement or a deposition back in June

15   of 2015, correct?

16   **A.**  Yes.

17   **Q.**  And Mr. Yeager here questioned you during that deposition

18   or sworn statement, right?

19   **A.**  Yes.

20   **Q.**  Did you meet with Mr. Yeager or any other member of the

21   Government before you gave that statement?

22   **A.**  No.

23   **Q.**  And you have given telephone interviews to Mr. Lazarus in

24   the last few months, isn't that fair?

25   **A.**  Telephone interview?

1    **Q.**  Yes, do you recall speaking to Mr. Lazarus on the phone

2    in December of last year?

3    **A.**  Possibly.  I don't recall.

4    **Q.**  And you met with them last Wednesday night, right?

5    **A.**  Yes.

6    **Q.**  Or late afternoon, right?  And do you know how long that

7    was?

8    **A.**  I don't, because I was so tired from flying in.

9    **Q.**  Did you meet with them since Wednesday at all or talk

10   with them on the phone?

11   **A.**  Yes.

12   **Q.**  And when was the last time you met with them?

13   **A.**  Thursday.

14   **Q.**  And how long did you meet with them on Thursday?

15   **A.**  Maybe two hours.

16   **Q.**  And have you met or talked to them since Thursday?

17   **A.**  No.

18   **Q.**  Now, on Friday, when we broke, you testified that you did

19   not have any -- before you came to Insys, you did not have

20   any experience with prior authorizations, correct?

21   **A.**  Correct.

22   **Q.**  You did however represent that you had that experience,

23   did you not?

24   **A.**  No.

25   **Q.**  We have Exhibit 6126 on the screen for counsel and if we

1   go to the second page.

2            Ms. Fordham, do you recall providing a resume to

3   Insys before you applied for the job?

4   **A.**   Yes.

5   **Q.**   And do you recognized this as your resume?

6   **A.**   Yes.

7            MS. MINER:  I'd offer its admission.

8            MR. LAZARUS:  No objection.

9            THE COURT:  It's admitted.

10           (Exhibit No. 6126 admitted into evidence.)

11  BY MS. MINER:

12  **Q.**   If we could go to the second page of the exhibit.

13  Coventry Healthcare.  What's Coventry Healthcare?

14  **A.**   It's an insurance company, it's a PBM.

15  **Q.**   And you see the third bullet point, provided co-pays and

16  prior authorization information to providers?

17  **A.**   Correct.

18  **Q.**   So you did work with prior authorizations at Coventry?

19  **A.**   I did not obtain prior authorizations.  I provided prior

20  authorization numbers to the pharmacy.

21  **Q.**   You were on the other side, right?  You weren't getting

22  prior authorizations, people were calling you for them,

23  correct?

24  **A.**   They were calling for information on how to adjudicate

25  their prescription claims that are being denied.  There's a

1    completely difference.

2    **Q.**   But they related to prior authorizations.  That's at

3    least what you put on your resume, isn't that fair?

4    **A.**   Yes, because I'm relaying information that's already been

5    processed.

6    **Q.**   And the same thing with respect to CIGNA Healthcare, if

7    we could go down.  Again, you say the same thing, what is

8    CIGNA Healthcare?

9    **A.**   It's an insurance company.

10   **Q.**   And again, you said you provided co-pays and prior

11   authorization information to providers, correct?

12   **A.**   Correct.  It was a call center.

13   **Q.**   And you go down a little farther.  On education, you

14   say -- you list Rio Salado Community College.  Do you see

15   that?

16   **A.**   Yes.

17   **Q.**   And that's a certified pharmacy benefit management?

18   **A.**   Yes.

19   **Q.**   Does that relate to medicine in any way?

20   **A.**   That was a training course through Caremark that we did,

21   that we just got certification for taking the training for

22   the position.

23   **Q.**   And it related to medicines, right?

24   **A.**   To prescriptions, yes.

25   **Q.**   And on Paradise Valley Community College, you list

1   nursing, correct?

2   **A.**   Didn't we already cover this?

3   **Q.**   You list nursing on your resume, isn't that fair?

4   **A.**   Yes, it was a program that I was enrolled into.

5   **Q.**   Now, you've testified, when you got to Insys, you did not

6   receive any training.  Is that fair?

7   **A.**   The training we received was side by side training.

8   **Q.**   Did you receive any formal training?

9   **A.**   No.

10  **Q.**   Did you receive HIPAA training through the computer

11  module?

12  **A.**   It was a ways down the road.

13  **Q.**   When you say "a ways down the road," what do you mean?

14  **A.**   It was, at least, I want to say a couple months after we

15  started.

16  **Q.**   Do you recall when you started?

17  **A.**   Back in April.

18          MS. MINER:  Could I have Exhibit 6127 on the screen

19  for counsel and the witness only.

20  BY MS. MINER:

21  **Q.**   Do you recognize this document as an e-mail from Mike

22  Gurry to you?

23  **A.**   Yes.

24  **Q.**   And it's dated April 29, 2013, shortly after you started

25  work?

**A.**   Yes.

MS. MINER:  I'd offer it.

MR. LAZARUS:  No objection.

THE COURT:  Admitted.

(Exhibit No. 6127 admitted into evidence.)

MS. MINER:  If we could have it published, please.

BY MS. MINER:

**Q.**   If you see the first -- again, this was shortly after you were hired by Insys, right?

**A.**   Yeah.  It was a couple of weeks after.

**Q.**   Same month, right?  Fair enough?

**A.**   Yes.

**Q.**   And Mr. Gurry tells you that, as part of the Insys training, all members of the IRC are required to take an online HIPAA course.  Do you see that?

**A.**   Correct.

**Q.**   And he asked if you could complete this by the end of the week, correct?

**A.**   Yes.

**Q.**   And you did complete that course; isn't that right?

**A.**   I don't recall.

MS. MINER:  Could we have Exhibit 6118 for the witness and counsel.

BY MS. MINER:

**Q.**   Do you recognize that as a certificate?

1    **A.**   Yes.

2    **Q.**   That you received for the HIPAA training?

3    **A.**   Correct.

4              MS. MINER:  I'd offer it.

5              MR. LAZARUS:  No objection.

6              THE COURT:  It's admitted.

7              (Exhibit No. 6118 admitted into evidence.)

8              MS. MINER:  And published.

9    BY MS. MINER:

10   **Q.**   And so you received a certificate of completion of the

11   HIPAA training on May 2, 2013.  Is that fair?

12   **A.**   Yes.

13   **Q.**   Shortly after you were hired, correct?

14   **A.**   The following month, yes.

15   **Q.**   Do you recall any other computer module training that you

16   received at Insys for the 18 months that you were there?

17   **A.**   It would have been adverse event training.

18   **Q.**   And when was that?

19   **A.**   I don't recall the dates.

20   **Q.**   Do you recall the year?

21   **A.**   I don't.  We're talking five years ago.

22   **Q.**   Fair enough.  Now, when you started, your job was to call

23   insurance companies and attempt to get prior authorizations.

24   Is that fair?

25   **A.**   Yes.

1  **Q.**  And the way the process started is you would receive what

2  was called an opt-in form, correct?

3  **A.**  Yes.

4  **Q.**  And the opt-in forms had basic information about the

5  patient and the doctor.  Fair enough?

6  **A.**  Yes.

7  **Q.**  And the opt-in forms were signed by the doctor, correct?

8  **A.**  Yes.

9  **Q.**  And you were trained that you couldn't work an opt-in,

10  unless it was signed by the doctor.  Isn't that right?

11  **A.**  That's what we were told, yes.

12  **Q.**  And the opt-in forms would be faxed into the IRC from the

13  doctor's office, correct?

14  **A.**  We knew they were faxed in, where they came from.  We

15  don't know.  It was supposed to be from the doctor's office.

16  **Q.**  It was supposed to be from the doctor's office, fair

17  enough?

18  **A.**  Correct.

19  **Q.**  And sometimes you would receive medical records with an

20  opt-in form; is that right?

21  **A.**  Yes.

22  **Q.**  And that was either because the insurance company you

23  were dealing with required them, or the doctor just wanted

24  you to have them.  Is that fair enough?

25  **A.**  Yes.

1  **Q.**  And one insurance company, I believe you mentioned on

2  direct, that wanted medical records was Blue Cross Blue

3  Shield of Alabama.  Do you recall that?

4  **A.**  Yes.

5  **Q.**  And there were others like that, as well.  Isn't that

6  fair?

7  **A.**  Yes.

8  **Q.**  And for the companies that wanted medical records, did

9  you look at the medical records before you sent them off?

10  **A.**  Sometimes.  Sometimes we just faxed them.

11  **Q.**  And if they wanted medical records, did they also ask you

12  questions over the phone about those medical records?

13  **A.**  The ones that we had to submit medical records were

14  normally via form and we had to fax that in.

15  **Q.**  Okay.  So some insurance companies had a separate form

16  they wanted filled out, correct?

17  **A.**  Yes.

18  **Q.**  And you, as a prior authorization specialist, would fill

19  out what you could, based on the opt-in, correct?

20  **A.**  Yes.

21  **Q.**  Get it signed by the doctor, correct?

22  **A.**  Yes.

23  **Q.**  And then fax it, the whole package, into the insurers?

24  **A.**  Correct.

25  **Q.**  So for those insurers, they had whatever the doctor had,

1    correct?

2    **A.**   Yes.

3    **Q.**   And some insurance companies were easier to get approvals

4    through than others.   Isn't that fair?

5    **A.**   Yes.

6    **Q.**   And I believe you testified on direct, no matter what

7    insurance company it was, every insurance company asked if

8    the patient had cancer.   Is that right?

9    **A.**   The majority of them, yes.

10   **Q.**   So not every one, right?

11   **A.**   Not that I can recall, but I'm pretty sure not every

12   single one of them did.

13   **Q.**   And, in fact, Express Scripts, towards the end, didn't

14   even ask that question, did they?   Does that refresh your

15   recollection?

16   **A.**   I don't recall.

17   **Q.**   Do you recall giving a sworn statement --

18   **A.**   Yes.

19   **Q.**   -- in this case?

20           MS. MINER:  Could I have a copy.

21           May I approach, Your Honor?

22           THE COURT:  You may.

23           MR. LAZARUS:  On what page?

24           MS. MINER:  I'm sorry, page 58.

25           (Discussion off the record.)

1  BY MS. MINER:

2  **Q.**  Could you just read lines 13 to 17 -- or 13 to 18 to

3  yourself, ma'am.

4          MR. LAZARUS:  Your Honor, I would just object and

5  ask for a foundation as to what exactly the witness needs

6  refreshing on.

7          THE COURT:  Well, she asked her if she recalled

8  giving a sworn statement and she said she didn't recall.

9          MR. LAZARUS:  So whether or not she gave a sworn

10  statement is what she didn't recall, Your Honor?  Thank you.

11          THE COURT:  That's my assumption.

12  BY MS. MINER:

13  **Q.**  Do you recall whether some insurance companies didn't ask

14  the patient -- didn't even ask if the patient had cancer?

15  **A.**  In reading this, yes.

16  **Q.**  And Express Scripts was one of those companies, correct?

17  **A.**  Yeah, it looks like -- sorry -- in the beginning they did

18  and then it looks like towards the end they started just

19  asking if it was breakthrough treatment -- sorry, treatment

20  of breakthrough pain.

21  **Q.**  Now, the time it took to get a prior authorization either

22  allowed or denied varied with respect to insurance companies.

23  Isn't that fair?

24  **A.**  Yes.

25  **Q.**  Sometimes you could do it as quickly as 10 minutes?

1    **A.**   Yes.

2    **Q.**   And other times it took hours, right?

3    **A.**   It could.

4    **Q.**   Because sometimes you were put on hold for a long time,

5    right?

6    **A.**   Yes.

7    **Q.**   And other times they asked for information you didn't

8    have and you had to go back and get the information, right?

9    **A.**   Correct.

10   **Q.**   Now, you did get a fair amount of denials from insurance

11   companies on Subsys, did you not?

12   **A.**   Yes.

13   **Q.**   And you had an entire appeals department that dealt with

14   the denials once they were denied, right?

15   **A.**   Yes.

16   **Q.**   And sometimes cancer patients were denied, were they not?

17   **A.**   I don't recall, but possible.

18   **Q.**   And sometimes for cancer patients, insurers also required

19   that they have tried and failed a number of medicines.  Isn't

20   that right?

21   **A.**   Yes.

22   **Q.**   And if they hadn't tried and failed those medicines, they

23   would deny it, even though it was a cancer patient, correct?

24   **A.**   Yes.

25   **Q.**   And some other insurance companies wouldn't cover cancer

1    unless the patient had dysphagia.  Do you recall that?

2    **A.**   Yes.

3    **Q.**   Now, on direct examination, you testified that

4    approximately 99 percent of the charts you handled were for

5    noncancer patients?

6    **A.**   About, yes.

7    **Q.**   That's not right, is it?

8    **A.**   Well, I'm not a mathematician, but if I had to guess -- I

9    went off what was given to me by Elizabeth Gurrieri.  I

10   wasn't given all cancer patient charts.

11   **Q.**   I understand that.  Of the charts that you were given by

12   Ms. Gurrieri, isn't it true that at least 25 percent of them

13   were cancer patients?

14   **A.**   Not that I can recall it being that high, no.

15   **Q.**   Do you recall giving a deposition relating to Subsys?

16   **A.**   Yes.

17   **Q.**   Just last year?

18   **A.**   Yes.

19   **Q.**   Do you recall testifying -- in that deposition, you swore

20   to tell the truth, right?

21   **A.**   Yes.

22   **Q.**   The same oath that you took here today -- Friday and

23   today?

24   **A.**   Yes.

25   **Q.**   And do you recall testifying at that deposition that at

1  least 25 percent of the patients you dealt with had cancer?

2  **A.**  I was estimating.  Again, I'm not a mathematician and I

3  don't know how many charts were cancer and noncancer.  I was

4  giving an estimate.

5  **Q.**  And then you estimated 25 percent.  Do you recall that?

6  **A.**  Well, when you start thinking about it and the work that

7  I did for a year and a half, I still have to estimate.  It's

8  not exact.

9  **Q.**  I understand that, ma'am.  I'm just asking, last year, in

10  a deposition, when you were under oath, did you not estimate

11  that it was 25 percent?

12  **A.**  It's possible.  Does it also state on there it was also

13  under pain medication at the time of the deposition, in which

14  they notated that.  So I can't exactly recall everything that

15  was said.

16        MS. MINER:  Can we have a copy of the deposition,

17  please.

18        Can I approach, Your Honor?

19        THE COURT:  You may.

20        MS. MINER:  Page 126.

21        MR. LAZARUS:  126?

22        MS. MINER:  Pardon?

23        MR. LAZARUS:  126?

24        MS. MINER:  126.

25        MR. LAZARUS:  Thank you.

```
 1    BY MS. MINER:
 2    Q.   I'm handing you a copy of your deposition transcript and
 3    you can look at lines 15 to 21.  And in your deposition last
 4    year, when asked the question, "But at least 25 percent did
 5    have cancer?"
 6              You answered, "I would say about 25 percent."
 7              Isn't that right?
 8              MR. LAZARUS:  Your Honor, I'm going to object and
 9    ask that the full question and answer series be read,
10    starting earlier on the page, including whether the witness
11    could give an estimate.
12              THE COURT:  Can you do that, please?
13              MS. MINER:  Pardon?
14              THE COURT:  Can you do that, give the context, give
15    the questions on either side?
16              MS. MINER:  Oh, certainly.
17    BY MS. MINER:
18    Q.   If we start from the beginning of that page, you
19    testified -- the question was:
20              "I believe earlier today you also said that a good
21    amount did not have cancer; is that correct?"
22              "ANSWER:  Yes.
23              "QUESTION:  And when you say 'a good amount,' can
24    you give me an estimate?
25              "ANSWER:  Maybe 50 to 75 percent.
```

1           "QUESTION:  Meaning 50 to 75 percent perhaps did
2    not have cancer, correct?
3           "ANSWER:  50 to 75 did not have cancer, correct.
4           "QUESTION:  But at least 25 percent you believe did
5    have cancer?
6           "ANSWER:  I would say about 25 percent.
7           "QUESTION:  So a good amount would have cancer?
8           "ANSWER:  Yes."
9           That's how you testified last year, isn't that
10   right?
11   **A.**  If that's what's written here, then yes.
12   **Q.**  And you testified that you were on pain meds when you
13   gave this deposition, correct?
14   **A.**  Yes.
15   **Q.**  Well, they asked you if that would interfere with your
16   ability to tell the truth.  Do you recall that?
17   **A.**  I do recall that.
18   **Q.**  And you said it wouldn't, right?
19   **A.**  Correct.
20   **Q.**  You went forward with the deposition, right?
21   **A.**  I had no choice.  I was subpoenaed.
22   **Q.**  Well, they asked you if the medication that you were
23   taking would affect your ability to tell the truth, correct?
24   **A.**  Yes.
25   **Q.**  And if it did, you could answer -- you could have said

1    yes, it would, right?

2    **A.**   Maybe.

3    **Q.**   Did you have any doubt that you could tell the truth at

4    that deposition?

5    **A.**   No, because I'm going off of what I can recall.  And

6    again, I'm not a mathematician, so percentages is not my

7    strong suit.

8    **Q.**   So fair enough, you don't know what percentage had

9    cancer; isn't that fair?

10   **A.**   I can tell you I didn't see a lot of charts that had

11   cancer.  Is that good enough?

12   **Q.**   Whatever is the truth, ma'am.

13   **A.**   The majority of what I worked was not cancer patients.

14   **Q.**   And you can't give a percentage, correct?

15   **A.**   No.

16   **Q.**   Fair enough.  Now, you testified on direct that,

17   initially, Liz Gurrieri instructed you to say that you were

18   calling from a doctor's office if asked by the insurance

19   company, correct?

20   **A.**   Yes.

21   **Q.**   And you said until compliance came in, you would tell

22   insurance companies 100 percent of the time that you were

23   calling from a doctor's office.  Isn't that right?

24   **A.**   Yes.

25   **Q.**   And then when compliance came in, they told you to say

1   that you were calling with a doctor, correct?

2   **A.**  Correct.

3   **Q.**  And compliance came in at around May of 2014.  Isn't that

4   right?

5   **A.**  Somewhere between the beginning of May.

6   **Q.**  Do you still have -- do you remember when they came in?

7   **A.**  Specifically, no.  Again, that was five years ago.

8   **Q.**  I understand, ma'am.

9          You have your sworn statement up there.  If you

10  could turn to page 76 and just read to yourself lines 1 to 5.

11  **A.**  Of which one?

12  **Q.**  The sworn statement, ma'am.  I can come up and hand it to

13  you, if that's easier.

14          MS. MINER:  May I approach?

15          THE COURT:  You may.

16          THE WITNESS:  And what lines?

17          MS. MINER:  1 to -- excuse me.  1 to 5.

18          THE WITNESS:  Okay.

19  BY MS. MINER:

20  **Q.**  Now, you gave this sworn statement in June of 2015,

21  correct?

22  **A.**  Correct.

23  **Q.**  And does that refresh your recollection that you -- and

24  that was closer in time, right, to the events?

25  **A.**  Yeah.

1    **Q.**  It was just a year later.  Fair to say your memory of

2    events was better back then than it is today?

3    **A.**  My memory of events, period, sucks, to be honest with

4    you.

5    **Q.**  Fair enough, but was your memory better of the events

6    closer in time than it is today?

7    **A.**  Of course.

8    **Q.**  And back then, you estimated that compliance came in

9    about May of 2014, right?

10   **A.**  Yeah, and I was estimating.

11   **Q.**  Fair enough.  You recall being shown -- listening to

12   tapes of your conversations with at least two insurance

13   companies on Friday.  Do you remember that?

14   **A.**  Yes.

15   **Q.**  And in both of those examples, you testified -- you

16   answered the question that you were calling with -- that you

17   were with a doctor's office, correct?

18   **A.**  I believe so.

19   **Q.**  And that was before compliance came in, wasn't it?

20   **A.**  I don't know.

21            MS. MINER:  Could we see what's in evidence as

22   Exhibit 1319.02.

23   BY MS. MINER:

24   **Q.**  This is one of the transcripts.  And if you can see the

25   date of the recording mentioned, it's 2/13/14?

1  **A.**  Okay.

2  **Q.**  And that was before compliance came in, right?

3  **A.**  No, because the system that we used to put in our notes

4  came in after compliance came in.

5  **Q.**  This is a recording -- this is a transcript of a

6  recording that was dated 2/13/14 by the insurance company?

7  **A.**  Correct.

8  **Q.**  And it's your testimony that compliance had already come

9  in by February 2014.

10  **A.**  The only way I recognize that is because of the way it

11  was documented.

12  **Q.**  And that was because there was at least some computer

13  information attached to it at some point?

14  **A.**  Yes.  Because that system didn't come into play until

15  compliance came in.

16  **Q.**  So at least by February of 2014, you were answering the

17  question that you were with the doctor's office, not from the

18  doctor's office; is that right?

19  **A.**  I believe so, yes.

20  **Q.**  As evidenced by the two calls that they came up with,

21  right?

22  And back at the time, you didn't believe that you

23  were misleading anybody when you said that you were calling

24  with the doctor's office, or that you were with the doctor's

25  office, right?

1    **A.**   It's still misleading either way you look at it.

2    **Q.**   I'm asking you if, back then, if you can place yourself

3    back then when you were making the calls, you didn't believe

4    it was misleading at the time, correct?  You may have

5    different feelings today.

6    **A.**   No, I still believed it was misleading back then.

7    **Q.**   Well, could you turn to your deposition at page 66.  And

8    lines 23 to 27, page 66.  And the examiner asked you, "You

9    would agree that the statement that you were with Dr. So and

10   so's office was a misleading statement to the question of

11   'Where are you calling from?'"

12          "ANSWER:  As of today.

13          "Objection."

14          "QUESTION:  As of today?

15          "ANSWER:  Yes.  Back then, no."

16          That's how you testified under oath --

17   **A.**   What page are you on?  Because that's not the same as

18   what I'm looking at.

19   **Q.**   Page 66.

20          MS. MINER:  May I approach?

21          THE COURT:  You may.

22          THE WITNESS:  I'm on 66.

23          MS. MINER:  We're back on defendant.  I'm sorry.  I

24   know it's confusing having two.

25   BY MS. MINER:

1   **Q.**  So in July of last year, when asked the question as to

2   whether you would agree that the statement you were with

3   Dr. So and so's office was misleading.

4             You said, "As of today, yes.  Back then, no."

5             Do you see that?

6   **A.**  I do.

7   **Q.**  And you were under oath back then, too, correct?

8   **A.**  Yes.

9   **Q.**  And compliance blessed with language; is that right?

10  **A.**  I'm sorry.  Repeat the question.

11  **Q.**  Saying you were calling with a doctor or working with a

12  doctor was something that compliance blessed at Insys, right?

13  **A.**  Yes.

14  **Q.**  They changed it from -- the "from" to the "with"?

15  **A.**  Yes.

16             MR. LAZARUS:  Your Honor, objection.  Vague.  I ask

17  who "they" in compliance are.

18             THE COURT:  Overruled.

19  BY MS. MINER:

20  **Q.**  And back then, you relied on compliance to determine if

21  the statements you were making were acceptable, correct?

22  **A.**  We were supposed to go off compliance, yes.  However,

23  when I went to compliance, I was yelled at for it.

24  **Q.**  You went to compliance, being Yoshi Jamison, correct?

25  **A.**  Yes.

1    **Q.**  And Yoshi Jamison said that you could say that you were

2    working with a doctor's office, correct?

3    **A.**  Yes.

4    **Q.**  And that's what you did after she told you to do that,

5    right?

6    **A.**  Yes.

7    **Q.**  And you were relying on Yoshi Jamison as a compliance

8    officer to determine if that was a reasonable thing to say,

9    correct?

10   **A.**  Correct.

11   **Q.**  Now, I understand that Ms. Gurrieri did not want you to

12   go to compliance, correct?

13   **A.**  Yes.

14   **Q.**  And, in fact, you were yelled at one time when you did go

15   directly to compliance, right?

16   **A.**  Yes.

17   **Q.**  And you were yelled at by Ms. Gurrieri?

18   **A.**  Yes.

19   **Q.**  Now, you were asked questions on direct as to whether you

20   knew the IRC phone line was blocked, so that the recipient

21   wouldn't know who you were calling from, correct?

22   **A.**  Yes.

23   **Q.**  And you testified, I believe, that you knew that because

24   Liz Gurrieri told you that; is that right?

25   **A.**  Yes.

1  **Q.**  Again, when you gave your deposition, you said you didn't

2  know.

3  Do you want to go to page 68, lines 9 to 12?

4  **A.**  It's not that one.

5  **Q.**  Do you see the question "Did you know that outgoing call

6  number from the Insys prior authorization unit was blocked?"

7  "ANSWER:  No."

8  **A.**  Yeah, I put "not that I can remember."

9  **Q.**  But the answer that you gave in July of 2018 was "no,"

10  correct?

11  **A.**  That's correct.

12  **Q.**  Now, you testified on direct examination that

13  Ms. Gurrieri told you to tell the insurance companies, on

14  every single time, that the patient suffered from dysphagia,

15  right?

16  **A.**  Yes.

17  **Q.**  And did you do that every single time?

18  **A.**  I can't recall.  A majority, I would say yes.

19  **Q.**  Did you stop doing it once compliance came in?

20  **A.**  We were not allowed to.

21  **Q.**  Well, do you, again, recall the two recorded

22  conversations that were played on Friday?

23  **A.**  Correct.

24  **Q.**  And in neither one of those conversations, did you

25  mention dysphagia, did you?

1    **A.**  No, because I'm going against my boss's -- what she told

2    us to do.

3    **Q.**  But you didn't do it.  You listened to compliance, not

4    your boss, right?

5    **A.**  I tried most of the time, yes.

6    **Q.**  Now, you testified that there would be a weekly gate or

7    goal for the number of prior authorizations as a group,

8    right?

9    **A.**  Yes.

10   **Q.**  By the way, did you work on some self-pay files when you

11   were at Insys?

12   **A.**  Maybe.  I can't recall for sure.

13   **Q.**  If you could turn to your sworn statement, page 88.

14   **A.**  Which one?

15           MS. MINER:  May I approach?

16           THE COURT:  You may.

17           MS. MINER:  If you could read line 10 to the

18   bottom.  Page 88.

19           THE WITNESS:  Okay.

20   BY MS. MINER:

21   **Q.**  Does that refresh your recollection that you would see

22   self-pay files?

23   **A.**  Yes.

24   **Q.**  What's a self-pay file?

25   **A.**  It's a patient that doesn't have insurance.

1    **Q.**   So even though the patient didn't have insurance, they

2    would have a file that went through the IRC; is that right?

3    **A.**   Yes.

4    **Q.**   And you saw quite a few of those, correct?

5    **A.**   Probably, I can't recall.

6    **Q.**   And they would still be counted as approvals in your --

7    to meet your weekly goal or gate?

8    **A.**   I believe so.

9    **Q.**   Now, once you hit the weekly gate, each prior

10   authorization specialist would share in a bonus for every one

11   over that gate; is that right?

12   **A.**   We each received a bonus for each one, yes.

13   **Q.**   As a group, right?

14   **A.**   I believe that's how it worked.

15   **Q.**   And you don't know who set the goal or the gate for any

16   given week, do you?

17   **A.**   Our boss said it came from Mike every week.

18   **Q.**   Could you look at your deposition transcript?

19   **A.**   Sure.

20   **Q.**   Page 123 to 124.

21            MS. MINER:  May I approach, Your Honor?

22            THE COURT:  You may.

23            THE WITNESS:  Okay.  So that's just asking how

24   those numbers were developed.  They're not asking me who set

25   them.

1    BY MS. MINER:

2    **Q.**  Turn to the next page, ma'am.  Do you recall being

3    asked, "Do you know who developed those numbers?"

4            And your answer was --

5            MR. LAZARUS:  Your Honor, objection.  Improper

6    impeachment.

7            THE COURT:  That's sustained.

8            MS. MINER:  Your Honor, may we approach?

9            THE COURT:  Yes.  I mean, you can get to it, but

10   you have to ask the --

11           MS. MINER:  Okay.

12   BY MS. MINER:

13   **Q.**  On direct, you testified that Liz Gurrieri told you that

14   Mike Gurry set the gate, correct?

15   **A.**  Yes.

16   **Q.**  And in July 2018, when asked under oath, who developed

17   those numbers, you said something different; is that right?

18   **A.**  I said it's between my supervisor and him, but honestly,

19   for sure I don't know.

20   **Q.**  So for sure, you don't know.  Isn't that fair?

21   **A.**  I'm going off what I remember.

22   **Q.**  And as you sit here today, you don't know who set the

23   gate.  Isn't that fair?

24   **A.**  I'm going off of what I was told by our supervisor.

25   **Q.**  And you now recall specifically that she told you that?

1   **A.**   Yes.  When I have to sit here and actually think about

2   it.

3   **Q.**   Did you have to sit there and actually think about it

4   when you were under oath at a deposition a year ago?

5   **A.**   Considering I was on pain meds and under a lot of pain, I

6   was trying to answer the question so I can get out.

7   **Q.**   I understand that you want out, you want out of here

8   today, too, don't you, ma'am?

9   **A.**   It doesn't matter.

10   **Q.**   Now, you testified that the goal or the gate was set

11   initially at around 50 a week, correct?

12   **A.**   That's what I remember, yes.

13   **Q.**   And at that time, there were four or -- there were three

14   or four prior authorization specialists, correct?

15   **A.**   If I remember correctly, yes.

16   **Q.**   And you, yourself, could handle ten to 20 authorizations

17   a day, correct?

18   **A.**   Depending on the ones I got, yes.

19   **Q.**   And you actually worked harder than some of the other

20   specialists at the time, did you not?

21   **A.**   I don't know.  I don't -- I try not to compete with my

22   other co-workers.  It's not who I am.

23   **Q.**   Did you ever complain that you were -- to Liz Gurrieri

24   that you were working harder than at least your office mate?

25   **A.**   It's possible.

1  **Q.**  And you regularly received bonuses when you were at the

2  IRC?

3  **A.**  Everybody did.

4  **Q.**  Fair enough.  But so did you, right?

5  **A.**  Yes.

6  **Q.**  In fact, there was never a week when you didn't receive a

7  bonus, isn't that fair?

8  **A.**  I don't recall.

9  **Q.**  You don't recall that there was ever a week where you did

10  not get one, correct?

11  **A.**  Not towards the end when I wasn't there.

12  **Q.**  Okay.  Fair enough.

13  **A.**  I mean, I'm being honest.

14  **Q.**  We can agree on that.

15       Now, you testified on direct that if you didn't

16  meet your numbers, you were written up by Liz Gurrieri,

17  correct?

18  **A.**  Yes, we were reprimanded.

19  **Q.**  And you, yourself, were never written up by Liz Gurrieri

20  for not hitting your numbers, were you?

21  **A.**  I was spoken to.

22  **Q.**  But were you written up, ma'am?

23  **A.**  I don't recall, but I remember being spoken to.

24  **Q.**  Can you turn to your sworn statement, page 135.

25  **A.**  Okay.

1  **Q.**  And do you recall testifying at that point that you were

2  never formally written up?

3            MR. LAZARUS:  Objection, Your Honor.  May we

4  approach sidebar?

5            THE COURT:  Yes.

6            (The following discussion held at the bench.)

7            MR. LAZARUS:  Your Honor, I'm going to object to

8  the continued crossover between improper impeachment and

9  improper refreshing of the recollection.  Ms. Miner keeps

10  crossing back and forth between the two and she's reading

11  things that are not in evidence when the witness doesn't need

12  to be refreshed.  I don't care about the information, but the

13  way she is doing it is completely improper and I would

14  object.

15            MS. MINER:  Your Honor, it's prior inconsistent

16  statements under oath.

17            MR. LAZARUS:  That last one wasn't inconsistent

18  with her testimony, Your Honor.

19            THE COURT:  I didn't hear where she was going with

20  that, but it was -- I was anticipating that it was

21  inconsistent.

22            MS. MINER:  It is.

23            MR. LAZARUS:  We can wait and see.

24            MS. MINER:  All I'm saying is it's an inconsistent

25  statement when it's under oath and it's a prior statement.

1          MR. LAZARUS:  And I would agree with that.  I would
2     just ask --
3          THE COURT:  Her last answer was I remember being
4     spoken to.
5          MS. MINER:  But not written up.
6          THE COURT:  Right.
7          MR. LAZARUS:  And that's what's in the transcript
8     that you were about to read.
9          MS. MINER:  No, she said she remembers being spoken
10    to, but she didn't know if she was written up and now she's
11    saying -- back then she said that she was never written up.
12    I can do it as refreshing recollection.
13         MR. LAZARUS:  Your Honor, saying you don't remember
14    today is not inconsistent.
15         THE COURT:  So that refreshing recollection
16    where --
17         MS. MINER:  Okay.
18         THE COURT:  First you said it was an inconsistent
19    statement, you were going to show it was inconsistent, and
20    now you're saying you're refreshing recollection.  I think
21    that's exactly his point.
22         MS. MINER:  Okay.  I'm happy to do it that way.
23         (Bench conference concluded.)
24    BY MS. MINER:
25    Q.  Ma'am, having read your sworn statement, does that

1   refresh your recollection that you were never written up for

2   not meeting your goal?

3   **A.**   Yes.

4   **Q.**   Now, at some point Mike Gurry -- during your tenure at

5   the IRC, Mike Gurry was no longer responsible for the IRC.

6   Do you remember that?

7   **A.**   No.

8   **Q.**   Could you look at your sworn statement and read to

9   yourself page 42, lines 12 to 14, and see if that refreshes

10  your recollection?

11  **A.**   Okay.

12  **Q.**   Do you now recall that Mr. Gurry's role changed sometime

13  in 2014?

14  **A.**   It looks like I mentioned that, yes.

15  **Q.**   Now, you never had a one-on-one meeting with Mr. Gurry,

16  did you?

17  **A.**   Not that I can recall.

18  **Q.**   There were two group meetings where Mr. Gurry spoke,

19  correct?

20  **A.**   Yes.

21  **Q.**   And one was after Dr. Awerbuch was charged with a crime?

22  **A.**   Correct.

23  **Q.**   And that was early May of 2014, about, correct?

24  **A.**   Possibly.

25  **Q.**   And Mr. Gurry spoke to you as a group and said that these

1    things happen in the industry, or words to that effect?

2    **A.**   Yes.

3    **Q.**   And that you had nothing to worry about?

4    **A.**   Yes.

5    **Q.**   And that you should keep doing what you were doing,

6    right?

7    **A.**   Maybe.

8    **Q.**   Do you recall him saying that you were doing things

9    correctly, just keep doing what you're doing?

10   **A.**   I don't recall.  I just -- I remember bits and pieces of

11   it.

12   **Q.**   Could you turn to your deposition, page 93.

13   **A.**   Sure.

14   **Q.**   And read that and see if it refreshes your recollection.

15   **A.**   What line?

16   **Q.**   Lines 14 through 18.  Or 14 through 19, depending on

17   how...

18   **A.**   You said page 93?

19   **Q.**   Page --

20              MS. MINER:  May I approach, Your Honor?

21              THE COURT:  Yes.

22   BY MS. MINER:

23   **Q.**   Does that refresh your recollection?

24   **A.**   Yes.

25   **Q.**   Where Mr. Gurry said that you were doing things correctly

1   and just keep doing it?

2   **A.**   Yes.  And that was regarding the sales team.

3   **Q.**   Yes.  You were the sales team, correct?

4   **A.**   No.  The sales team which was separate from us.

5   **Q.**   So it's your testimony that he said the sales team was

6   doing the right thing, even though --

7   **A.**   No, it states we were doing everything correctly.  It was

8   in regards to the sales team, meaning that's what the

9   investigation was regarding.

10   **Q.**   Well, he didn't tell you guys to change any -- the way

11   you were doing anything, did he?

12   **A.**   Apparently not, if that's what I said.

13   **Q.**   Well, I'm trying to get your recollection, as you sit

14   here.  As you sit here today, you don't recall Mr. Gurry ever

15   telling you to do anything differently, do you?

16   **A.**   Not that I can recall.

17   **Q.**   And he didn't ask you to destroy any documents, did he?

18   **A.**   Not that I can recall.

19   **Q.**   And he didn't tell you not to talk to investigators if

20   they called you, did he?

21   **A.**   Not that I can recall.

22   **Q.**   Then the next time you recall Mr. Gurry talking to the

23   group was when he was upset, I think you testified, that the

24   weekly goal had not been met?

25   **A.**   Correct.

1  **Q.**  And that was after the conversation about Dr. Awerbuch,
2  fair enough?
3  **A.**  Yes.
4  **Q.**  And this was after, again, compliance had already been
5  there?
6  **A.**  Correct.
7  **Q.**  Mr. Gurry didn't actually yell, did he?
8  **A.**  He raises his voice very loudly, very intimidating.  To
9  us, it was yelling.
10  **Q.**  Wasn't he just speaking in a harsh tone?
11  **A.**  It's possible, but each person takes it differently.
12  **Q.**  Fair enough.  And he didn't specifically threaten to fire
13  anyone, did he?
14  **A.**  Specifically, no.
15  **Q.**  He did discuss attendance issues, correct?
16  **A.**  Maybe.
17  **Q.**  A number of people were having attendance issues at about
18  that time?
19  **A.**  I can't recall that.
20  **Q.**  Well, do you recall you, yourself, had been spoken to
21  about attendance issues --
22  **A.**  Yes.
23  **Q.**  -- by Ms. Gurrieri?
24         Now, there was never any back-and-forth between the
25  prior authorization specialists and Mike Gurry, explaining

1    the reason why it was difficult to get authorizations, was

2    there?

3              MR. LAZARUS:  Objection as to vague.  Foundation.

4              THE COURT:  Sustained.

5    **Q.**  Was there any discussion between any of the prior

6    authorization specialists at that meeting and Mr. Gurry at

7    all?

8    **A.**  I don't know.  I don't remember.

9    **Q.**  Now, you resigned from Insys in November of 2014,

10   correct?

11   **A.**  Yes.

12   **Q.**  And you testified that there were two reasons that you

13   left, right?

14   **A.**  Correct.

15   **Q.**  One was your daughter was ill?

16   **A.**  Yes.

17   **Q.**  And then the second was that you were uneasy about what

18   was going on in the company --

19   **A.**  Yes.

20   **Q.**  -- correct?

21             I'm going to focus on the second issue.  You

22   testified that you lied to insurance companies every day when

23   you were working at the IRC, correct?

24   **A.**  Yes.

25   **Q.**  And that that made you uncomfortable, correct?

1   **A.**  Yes.

2   **Q.**  And that there was constant pressure from Liz Gurrieri to

3   get prior approvals approved, correct?

4   **A.**  Yes.

5   **Q.**  And that that made you uneasy?

6   **A.**  Yes.

7   **Q.**  But you didn't say any of that when you left Insys, did

8   you?

9   **A.**  Why would I?

10  **Q.**  The answer [sic] is did you.

11  **A.**  No.

12  **Q.**  In fact, you said that you loved working there and it was

13  an awesome place to work and the people were amazing people,

14  right?

15  **A.**  I don't recall that.

16          MS. MINER:  Can I have Exhibit 6114 on the screen.

17  BY MS. MINER:

18  **Q.**  Do you recognize this as an e-mail from you to Shawna

19  Baillargeon?

20  **A.**  Yes.

21  **Q.**  On November 5, 2014?

22  **A.**  Yes.

23  **Q.**  This was your resignation letter, was it not?

24  **A.**  Yes.

25          MS. MINER:  I'd offer it.

1           MR. LAZARUS:  Objection, hearsay.

2           THE COURT:  Overruled.

3           MS. MINER:  If we could have it published.

4           (Exhibit No. 6114 admitted into evidence.)

5    BY MS. MINER:

6    **Q.**  When you resigned, you said, "I enjoyed the opportunity

7    to work with my amazing co-workers in the company."  Correct?

8    **A.**  Well, you're not going to badmouth a company when you're

9    giving a resignation letter.

10   **Q.**  Well, after you resigned, you received an exit interview,

11   correct?

12   **A.**  No.

13   **Q.**  Do you recall receiving in the mail a question-and-answer

14   form from Insys?

15   **A.**  Not that I can recall.

16          MS. MINER:  Could I have Exhibit 6125 for the

17   witness and counsel.

18   BY MS. MINER:

19   **Q.**  Do you recognize this as a letter to you from Shawna

20   Baillargeon?

21   **A.**  I vaguely remember something like that.

22   **Q.**  It was in response to your resignation, correct?

23   **A.**  Yes.

24   **Q.**  And it's dated November 5, 2014, actually the same day as

25   your resignation, correct?

1    **A.**   Yes.

2              MS. MINER:  I'd offer it.

3              MR. LAZARUS:  I'm going to object to the relevance,

4    Your Honor.

5              THE COURT:  Can you scroll down for me, please?

6              Overruled.

7              MS. MINER:  If we could publish it.

8              (Exhibit No. 6125 admitted into evidence.)

9    BY MS. MINER:

10   **Q.**   And this is a letter to you saying acceptance of

11   resignation, correct?

12   **A.**   Yes.

13   **Q.**   And attached, it says, near the bottom, "attachment exit

14   interview," do you see that?

15   **A.**   Yes.

16   **Q.**   And if you turn to the next page, there is a form that

17   you could have filled out to provide Insys with information.

18   You never filled that out and sent it back in, did you?

19   **A.**   I never read past that initial page.  I was sitting in a

20   hospital room with my daughter, who was a little more

21   important than this.

22   **Q.**   I understand the importance, ma'am.  I'm just asking, did

23   you ever send it back in?

24   **A.**   Not that I can recall, no.

25             MS. MINER:  Thank you.  I have nothing further.

| 1 | THE COURT:  Anybody else?  Mr. Horstmann? |
| 2 | MR. HORSTMANN:  No. |
| 3 | THE COURT:  Any redirect? |
| 4 | MR. LAZARUS:  Yes, Your Honor, thank you. |
| 5 | **REDIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF** |
| 6 | BY MR. LAZARUS: |
| 7 | **Q.**  Good morning, Ms. Fordham. |
| 8 | **A.**  Good morning. |
| 9 | **Q.**  I'm going to follow up on some of the questions that you |
| 10 | were asked this morning and on Friday during |
| 11 | cross-examination.  At some point you testified on |
| 12 | cross-examination your memory of events, period, sucks.  Do |
| 13 | you remember saying that? |
| 14 | **A.**  Yes. |
| 15 | **Q.**  So can you explain to the jury what your memory is like |
| 16 | of the misstatements and the lies you made to the insurance |
| 17 | companies on a daily basis?  Do you have any trouble |
| 18 | recalling that? |
| 19 | **A.**  Some of it, yes. |
| 20 | **Q.**  You have trouble recalling whether or not you lied to the |
| 21 | insurance companies? |
| 22 | **A.**  No.  Well, no. |
| 23 | **Q.**  And did you? |
| 24 | **A.**  Yes. |
| 25 | **Q.**  You testified on direct and cross about what you |

1    characterized as Mr. Gurry yelling at you and just most

2    recently you described it as speaking harshly is how you took

3    it.  Do you remember that line of questioning generally?

4    **A.**  Yes.

5    **Q.**  Do you remember Mr. Gurry doing that?

6    **A.**  Yes.

7    **Q.**  How did you feel as a result of that?

8    **A.**  Literally, I remember sitting there shaking, wondering if

9    I had a job or not.

10   **Q.**  Why?

11   **A.**  Because it was -- it came across as yelling at us.  Like

12   we didn't know -- I mean, he basically said, if you can't

13   do -- obtain authorizations, we'll find somebody that can.

14   **Q.**  You testified this morning on cross-examination that you

15   were yelled at for going to compliance.  Do you remember

16   generally those questions and answers?

17   **A.**  Yes.

18   **Q.**  Who yelled at you?

19   **A.**  That was Elizabeth Gurrieri.

20   **Q.**  And who had you gone to see?

21   **A.**  Yoshi Jamison, the compliance officer.

22   **Q.**  Do you remember what Yoshi did at Insys?

23   **A.**  She changed wording that was supposed to be more

24   compliant.

25   **Q.**  So that's what you knew her job to be, was to change

1    wording?

2    **A.**   I really don't know what her job was.   I just remember

3    certain things that came out of it, such as the system and

4    the word changes.

5    **Q.**   And you testified on Friday that before compliance came

6    and after compliance came, you misled and lied to insurance

7    companies, do you remember that testimony?

8    **A.**   Yes.

9    **Q.**   You were asked on cross-examination a little bit about

10   that.  Do you remember that?

11   **A.**   Yes.

12   **Q.**   So is it the case that before and after Yoshi came, you

13   still lied and misled insurance companies?

14   **A.**   Yes.

15   **Q.**   Are you on any pain medicine or anything now that's

16   interfering with your ability to explain to this jury the

17   things that you participated in?

18   **A.**   No.

19   **Q.**   Are you telling this jury, the answers that you're

20   giving, just so you can get out of here?

21   **A.**   No.

22   **Q.**   You were asked a lot of questions about who set the gate.

23   Can you provide context for that and just explain what you

24   remember about who set the gate and how you formed that

25   memory and what you know?

1    **A.**   I just remember, my supervisor, Elizabeth Gurrieri,

2    stating that the gate was set every week by Mike Gurry, that

3    she had no control over the gate whatsoever.

4    **Q.**   Why did you care who set the gate?

5    **A.**   It didn't matter to us, we just had to do what we were

6    told to do.

7    **Q.**   Did you set the gate?

8    **A.**   No.

9    **Q.**   When you were asked whether, during a deposition in July

10   of 2018, you didn't remember who set the gate and you were

11   asked a number of questions about that.  Do you remember

12   that?

13   **A.**   I do.

14   **Q.**   As you sit here today, do you have any question about who

15   you were told set the gate?

16   **A.**   No.

17   **Q.**   That understanding that you have, as to who set the gate,

18   based on what you were told, approximately when did you form

19   that?

20   **A.**   I think I pretty much knew that from day one, when it was

21   originally said to us.

22   **Q.**   You were asked questions about whether or not you knew at

23   the time you worked there that what you were doing was wrong

24   or illegal.  Do you remember those questions on

25   cross-examination?

1   **A.**  Yes.

2   **Q.**  Did you?

3   **A.**  I did.

4   **Q.**  Can you explain to the jury?

5   **A.**  We misled insurance companies, we added diagnosis codes

6   to patients in order to get the medications approved.

7   **Q.**  How would you describe your feelings about admitting

8   that?

9   **A.**  Ashamed.

10  **Q.**  What was the deposition like?

11  **A.**  Gruelling.

12  **Q.**  Can you explain like where is it?  Was it in a courtroom

13  like this?  Was it in a conference room?  Where did you go?

14  **A.**  It was in a conference room with Mr Yeager, an FBI agent,

15  a court reporter.

16  **Q.**  That's the sworn statement you're talking about?

17  **A.**  Yes.

18  **Q.**  You were also asked questions on cross-examination about

19  a deposition you gave, right?

20  **A.**  The deposition was a lot more intimidating.  It was with

21  the Blue Cross Blue Shield -- sorry.  Blue Cross of

22  California Insurance Company.  There was an Insys

23  Therapeutics lawyer there.  They were videotaping it.  There

24  was three or four different people from Blue Cross of

25  California sitting on the left-hand side, Insys lawyer was on

1  the right, and then I had the video person right in front of

2  me.

3  Q.   What made that more intimidating than when you gave a

4  sworn statement to Mr Yeager?

5  A.   Probably the fact that I didn't feel like myself.  I

6  wasn't feeling good.  I was on pain meds.  I was in a lot of

7  pain from a back injury.  I had just had injections.

8  Q.   So Ms. Fordham, you were asked questions about -- a lot

9  of questions on cross-examination about Liz Gurrieri and

10  about her role there and you testified on direct and on

11  cross-examination about a time you sent an e-mail to Mike

12  Gurry, because you had concerns after Dr. Awerbuch was

13  arrested.  Do you remember generally those questions?

14  A.   Yes.

15  Q.   So when you had concerns about what was going on at the

16  company and the legality and the future of things and one of

17  the doctors getting arrested, who was it you reached out to?

18  A.   Mike Gurry.

19  Q.   How come you reached out to Mike Gurry and not Liz

20  Gurrieri?

21  A.   Because I thought that he would give me a straight

22  answer.  He was over her.  He was over all of us.

23  Q.   Finally, you were asked a number of questions about

24  estimating how many of the files you worked on to get an

25  insurance company to agree to pay for Subsys for cancer

1   diagnosis versus noncancer diagnosis.  Do you remember those

2   questions about your ability to estimate things?

3   **A.**  Yes.

4   **Q.**  So you testified on direct examination about how often

5   you would see those types of files.  Do you remember that

6   generally?

7   **A.**  Generally, yes.

8   **Q.**  Tell the jury, please, when you go to work on a daily or

9   weekly basis, how often would you see and be asked to work on

10  files for patients who were other than breakthrough cancer

11  pain in cancer patients?

12  **A.**  I had more charts that were just regular breakthrough

13  pain and back diagnosis.  I rarely saw a cancer pain patient.

14  **Q.**  And for the noncancer pain patients, I believe you

15  testified that you did, basically, what you had to do to get

16  those approved by the insurance companies, right?

17  **A.**  Yes.

18  **Q.**  And that included lying?

19  **A.**  Yes.

20  **Q.**  On a daily basis?

21  **A.**  Yes.

22          MR. LAZARUS:  Nothing further, Your Honor.

23          MS. MINER:  Can I do it from here, Your Honor?

24          THE COURT:  Yes, that's fine.

25          MS. MINER:  Thank you.

```
 1              THE COURT:  Make sure you're near a microphone.
 2        RECROSS-EXAMINATION BY COUNSEL FOR DEFENDANT GURRY
 3   BY MS. MINER:
 4   Q.  Ms. Fordham, you worked at Insys for approximately
 5   18 months, correct?
 6   A.  About.
 7   Q.  And you testified that your -- that IRC offices were
 8   right across the street from headquarters, isn't that right?
 9   A.  Yes.
10   Q.  And during that -- you would consider yourself a pretty
11   strong person.  Isn't that fair?
12   A.  In what terms?
13   Q.  Well, you're having three jobs, correct?
14   A.  Yes.
15   Q.  You raised a daughter, correct?
16   A.  Yes.
17   Q.  You've been through really serious medical issues, right?
18   A.  Yes.
19   Q.  But never in 18 months did you walk across the street
20   from the IRC to headquarters and complain to anybody in
21   management that you were being told to lie to the insurance
22   companies on a daily basis, did you?
23   A.  We were not allowed over at headquarters.
24   Q.  You didn't send an e-mail, either, did you?
25   A.  In terms of my concerns?
```

1    **Q.**   Yes.  Other than the Dr. Awerbuch one.

2    **A.**   Not that I can recall.

3    **Q.**   You did send an e-mail to Mike Babich, did you not?

4    **A.**   I don't remember.

5    **Q.**   Who is Mike Babich?

6    **A.**   The CEO.

7           MS. MINER:  Could I have Exhibit 6129 on the

8    stand -- excuse me, for counsel and the witness, please.

9           MR. LAZARUS:  Your Honor, I'm going to object as

10   outside the scope and hearsay.

11          THE COURT:  Overruled.

12          MS. MINER:  Could it be published, please.

13          (Exhibit No. 6129 admitted into evidence.)

14   BY MS. MINER:

15   **Q.**   This is an e-mail from you, correct?

16   **A.**   Yes.

17   **Q.**   To Mike Babich, correct?

18   **A.**   Yes.

19   **Q.**   The CEO, correct?

20   **A.**   Correct.

21   **Q.**   And you complained about Liz Gurrieri and Angel Alercon,

22   correct?

23   **A.**   Yes.

24   **Q.**   That they treat you like children, correct?

25   **A.**   Yes.

1   **Q.**  You don't say anything about lying to insurance

2   companies, do you?

3   **A.**  No.

4           MS. MINER:  Nothing further.

5           THE COURT:  You're excused.  Thank you.

6           Next witness, please.

7           MR. LAZARUS:  The United States called Heather

8   Alfonso.

9           THE COURT:  If you guys want to stretch while

10  they're switching places, go ahead.

11          (The witness was duly sworn.)

12          THE CLERK:  Can you please state your name and

13  spell your last name for the record.

14          THE WITNESS:  My name is Heather Alfonso,

15  A-l-f-o-n-s-o.

16          MR. LAZARUS:  May I proceed, Your Honor?

17          THE COURT:  Yes.

18          MR. LAZARUS:  Thank you.

19                        **HEATHER ALFONSO**

20        having been duly sworn, testified as follows:

21        **DIRECT EXAMINATION BY COUNSEL FOR PLAINTIFF**

22  BY MR. LAZARUS:

23  **Q.**  Good morning, Ms. Alfonso.

24  **A.**  Good morning.

25  **Q.**  You just adjusted it, but if you need to move that

1   microphone, just try to keep it nice and close to your mouth,

2   so everybody can hear you, okay?

3   **A.**   Okay.

4   **Q.**   And there's a pitcher of water to your right, if you need

5   some.

6   **A.**   Thank you.

7   **Q.**   Ms. Alfonso, where do you live?

8   **A.**   I live in Conway, South Carolina.

9   **Q.**   And about how long have you lived in South Carolina?

10  **A.**   One year.

11  **Q.**   Where did you live before that?

12  **A.**   Monroe, North Carolina.

13  **Q.**   At some points did you live in New England?

14  **A.**   Prior to that, I lived in Connecticut, Middlebury,

15  Connecticut.

16  **Q.**   About how long did you live in Middlebury, Connecticut?

17  **A.**   I lived in Middlebury, Connecticut for a long time,

18  since -- well, I was raised there.

19  **Q.**   And how old are you?

20  **A.**   46.

21  **Q.**   Do you have any children?

22  **A.**   I have five children.

23  **Q.**   How far did you go in school?

24  **A.**   I have a master's degree in nursing.

25  **Q.**   When did you get your master's degree?

1    **A.**   2011, I believe.

2    **Q.**   And what did you have to do to obtain your master's

3    degree in nursing?  Tell the jury a little bit about the

4    course of study.

5    **A.**   So I did didactic work, so work on -- classwork online.

6    I also did clinical work, in a clinical setting, and then I

7    got a master's degree when I completed all the requirements.

8    After that, I had to continue by getting a -- taking an exam

9    through the American Nurses Credentialing Center and that --

10   that kind of allowed me to apply for the licensure to become

11   an APRN.

12   **Q.**   And did you, in fact, apply and become an APRN?

13   **A.**   I did eventually, yes.  Not right away.

14   **Q.**   About how long did it take you?

15   **A.**   I don't recall.  But it did take me a little while, not

16   for any other reason other than I was content with my job

17   working as an RN.

18   **Q.**   What does APRN stand for?

19   **A.**   Advanced practice registered nurse.

20   **Q.**   When you obtained your master's, did that give you the

21   ability to prescribe controlled substances?

22   **A.**   No, I didn't have the ability to prescribe controlled

23   substances until after taking the exam afterwards and then

24   applying with the Connecticut DEA.

25   **Q.**   And at some point did you take the exam and apply with

1    the DEA to become authorized to prescribe controlled

2    substances?

3    **A.**   Yes.

4    **Q.**   Do you recall about when that was?

5    **A.**   You know what?  I think that was in 2011.  I think I got

6    the master's degree in '08 or '09.

7    **Q.**   Tell us a little bit about your career, before you went

8    and got your master's.

9    **A.**   Before I got my master's degree, I was -- I started as a

10   CNA, and then I got my LPN license, licensed practical nurse.

11   And then I -- that was in 1995, I believe, and I worked in

12   these fields and then I got my RN, associate's degree, in

13   1998, maybe, and worked as an RN.  I worked in psychiatry,

14   I've worked in gerontology, and I've worked in women's

15   health.

16   **Q.**   As an RN, what was your day-to-day job responsibility?

17   **A.**   My last job?

18   **Q.**   Did you work as an RN multiple places?

19   **A.**   I did.  But the -- so what I did before being a nurse

20   practitioner, I was working in women's health on a labor and

21   delivery unit, so I worked night shift there.

22   **Q.**   And what would you do there?

23   **A.**   I would help the physicians and the midwifes deliver

24   babies.

25   **Q.**   Did you prescribe medication at that job?

1   **A.**   No.

2   **Q.**   About how long were you there?

3   **A.**   Maybe four years.  I don't recall.

4   **Q.**   Did you ever work in pain management prior to obtaining

5   the ability to prescribe controlled substances?

6   **A.**   No.

7   **Q.**   By the way, you said a word earlier, what does didactic

8   mean?

9   **A.**   That's the online -- the classwork.

10   **Q.**   On the computer?

11   **A.**   Yeah.

12   **Q.**   So you sat and you worked online?

13   **A.**   Yes.

14   **Q.**   And you also did clinical work you said?

15   **A.**   Correct.

16   **Q.**   At some point you testified that you obtained the ability

17   to prescribe controlled substances.  Are you familiar with a

18   DEA number?

19   **A.**   No, I'm not.

20   **Q.**   With an MPI?

21   **A.**   I mean, I have those, but I don't know what the numbers

22   are.

23   **Q.**   Right, but you're familiar with the concept of one?

24   **A.**   Oh, yes.  Yes.

25   **Q.**   And you were provided with a number that allowed you to

1  prescribe controlled substances?

2  **A.**  Correct.

3  **Q.**  Where did you first work in the capacity as an APRN?

4  **A.**  I worked at Comprehensive Pain and Headache Treatment

5  Centers.

6  **Q.**  What type of practice was Comprehensive Pain and Headache

7  Treatment Centers?

8  **A.**  That was a chronic pain management practice, an office

9  setting.

10  **Q.**  Where is it located?

11  **A.**  They have two offices, one in Derby, Connecticut and one

12  in Meriden, Connecticut.  And they also have -- an interest

13  in a surgery center in North Haven, Connecticut, but I wasn't

14  there.

15  **Q.**  So there was Derby, Meriden, and a surgery center.  Where

16  did you work?

17  **A.**  In Derby and Meriden fairly equally.

18  **Q.**  Can you describe the practices, what type of practice

19  they were in each location?

20  **A.**  Okay.  They were primarily the same.  I would see

21  patients in an office setting to reassess and reevaluate

22  their medication regimen and oftentimes suggest or refer them

23  to have procedures done at the surgery center.

24  **Q.**  Were there other practitioners, other doctors, physicians

25  assistants or nurse practitioners or APRNs who worked at your

1    practice?

2    **A.**  Yes.  When I first started, there was the doctor who

3    owned the practice, Dr.  Mark Thimineur.  There was

4    Dr. Daniel Feldman, and there was Dr. Rakesh Patel.  Shortly

5    after I started, Dr. Patel left and we had to absorb his

6    patients.  And a little while later, Dr. Feldman quit

7    abruptly, so we absorbed his patients, as well.  And it took

8    a little bit of time for them to hire additional APRNs.  So

9    after a little while, they brought on one, two -- a few other

10   APRNs.

11   **Q.**  Did the other APRNs also prescribe controlled substances?

12   **A.**  Yes.

13   **Q.**  What was the active caseload like for the practice, in

14   terms of number of patients?

15   **A.**  When I was hired, I was to see one patient every 30

16   minutes, between the hours of 8:00 a.m. and 5:00 p.m., with a

17   half hour lunch break.  During the period where the other

18   doctors had left and we were either without APRNs or training

19   them, naturally, that caseload was a little bit more during

20   those times.

21   **Q.**  So somewhere around one patient every 30 minutes or

22   slightly more?

23   **A.**  Correct.

24   **Q.**  Describe a typical -- well, is there such thing as a

25   typical interaction with a patient at that practice?

1  **A.**   I would say there is.  Typically, when you would see

2  patients, they would come in.  I would do a physical

3  reassessment on them, certainly ask them if they had any new

4  issues in regards to their pain, how their medication regimen

5  was working for them.

6  **Q.**   Physical reassessment, is that the same as a physical

7  exam?

8  **A.**   It wasn't a complete physical exam that you would get if

9  you go to a primary care physician.  There was no undressing,

10  taking off of clothes, or anything like that.

11  **Q.**   How would you perform your assessment?

12  **A.**   With visual assessment or palpation, touching, having

13  them move, their range of motion.

14  **Q.**   What are some of the types of treatments that you would

15  provide for your patients?

16  **A.**   Other than medication management, we would refer them for

17  stimulator trials, so either a spinal cord stimulator, or an

18  occipital stimulator, which is implanted up higher in the

19  back of the head.  Epidural injections, which are steroid

20  injections.  We would do trigger point injections in the

21  office to their muscles.  Occasionally, physical therapy.

22  But by that point, most of those patients have already run

23  the gamut and gone through those sort of treatments, the

24  physical therapy.

25  **Q.**   What do you mean by that?

1    **A.**  Well, they've already done that.  These are patients

2    that, when I got there, anyway, they had been on fairly large

3    doses of narcotics for quite some time.  So they had already,

4    you know, tried and failed with physical therapy or aqua

5    therapy, or the typical first line therapies.

6    **Q.**  So can you explain, so there's typical first line

7    therapies for pain, and then is there a progression?

8    **A.**  Yes.

9    **Q.**  How does that work?

10   **A.**  A lot of times when you go to your -- you can go to your

11   primary care doctor and they would prescribe physical therapy

12   or water therapy for somebody with back pain, before they

13   even got to the point of surgery or any kind of invasive,

14   more invasive therapy.

15   **Q.**  And then in terms of medications, were there different

16   types and classes of medications you were using?

17   **A.**  There were -- well, yes, there were different types of

18   medications.  But generally, I would say, probably 90 to

19   95 percent of the patients were on, by the time I got there,

20   multiple long-acting narcotics, several short-acting

21   narcotics, and occasionally some rapid onset.

22   **Q.**  Rapid onset what?

23   **A.**  Opioids, such as -- well, in that practice, Actiq

24   lollipop and fentanyl lollipop.

25   **Q.**  And Subsys at some point?

1   **A.**   Subsys at some point, yes.

2   **Q.**   So 90 to 95 percent of the patients, you said, when you

3   got there, you said were already on various types of

4   narcotics?

5   **A.**   Correct.

6   **Q.**   When patients were referred to comprehensive pain, was

7   there a process for completing their intake or their initial

8   examination or evaluation?

9   **A.**   Yes.   Initially, the doctor would always see the new

10   patients and do the full examination and start them on an

11   opiate.

12   **Q.**   During the majority of the time you were there, was there

13   a particular doctor that that would have been?

14   **A.**   Dr. Thimineur.

15   **Q.**   At what point would you get involved in care for a

16   patient?

17   **A.**   Any visit after that initial visit.

18   **Q.**   Have you heard of medication visits?

19   **A.**   Yes.

20   **Q.**   What is a medication visit?

21   **A.**   Because the practice was so large, patients would be seen

22   on average every three months, but they needed their

23   medication in between that.   So they would come in to the

24   practice, say the second -- you know, the second month and

25   have a medication visit with the medical assistant, where she

1    did a blood pressure check and double-checked their

2    medications that may have been prescribed by other doctors,

3    and the prescriptions would be signed generally by me and

4    given to the patient.

5    **Q.**   So in other words, if a patient needed to get a refill

6    for their pain medication?

7    **A.**   Right.

8    **Q.**   They came in and in between other clinical visits?

9    **A.**   Correct.

10   **Q.**   Are you able to estimate about what percentage of the

11   patient population at Comprehensive Pain had to have those

12   types of visits, as well, the medication visits?

13   **A.**   Nearly all of them.  There were some patients where they

14   would not have a medication visit, because they would be

15   given three months of prescriptions signed already, that were

16   dated appropriately, so that they could fill them.

17   **Q.**   Was there a reason that certain prescriptions could be

18   dated for three months and certain were not?

19   **A.**   I think all of them could, but it was more about the

20   patient than about the actual prescription.

21   **Q.**   What do you mean by that?

22   **A.**   If they were longstanding patients and this was

23   Dr. Thimineur's typical practice with them, to give them

24   three months of prescriptions, then that's what we did.

25   **Q.**   When prescribing narcotics like the ones that were being

1  prescribed at Comprehensive Pain, are there concerns at all

2  about prescribing those types of medications to patients?

3  **A.**   There are always concerns with prescribing those types of

4  medications to patients, because they are strong medications.

5  **Q.**   Did you or did the practice take any steps to ensure the

6  patients were complying with their prescriptions?

7  **A.**   There were urinalysis done.  Initially, they were done I

8  would say intermittently.  There was no set schedule.  And at

9  some point they started checking the online -- I think PMP is

10  what it's called, the online record of what narcotics were

11  filled.

12  **Q.**   At some point did the State have a database that, as

13  practitioners, you could look at?

14  **A.**   Correct.

15  **Q.**   Is that what you mean by PMP?

16  **A.**   Correct.

17  **Q.**   You heard the term pill count?

18  **A.**   Yes, pill counts were done as well, occasionally.

19  **Q.**   What's a pill count?

20  **A.**   The pill count is when the patient will come in and would

21  be told in the morning to bring their medications with them

22  and then the medical assistant would count how many pills

23  were there and, you know, do the math to figure out if it is

24  equal to what should be there.

25  **Q.**   Why?

1   **A.**   To make sure, well -- it's one way -- you can't really

2   make sure, but to try to see if they're taking them as

3   prescribed, rather than overtaking them, or maybe not taking

4   them at all and having extra.

5   **Q.**   So how does a pill count help you figure out if they're

6   overtaking them, or not taking them at all?

7   **A.**   Well, in theory, if they are -- how does it -- well,

8   because if the count is accurate, then you will know that it

9   looks like they're taking them as prescribed.

10   **Q.**   And I believe you said that the practice would conduct

11   urinalysis on patients periodically?

12   **A.**   Correct.

13   **Q.**   Why?

14   **A.**   Because -- not really urinalysis.  It's a urine drug

15   screen and that would determine if the medications they are

16   prescribed are in their system and also if there are any

17   other medications or illegal drugs in their system.

18   **Q.**   Why, if at all, do you care if there's other medications

19   or illegal drugs in your patient's system?

20   **A.**   Because if they're not -- because that would really mean

21   they're not taking them as prescribed, if they're adding

22   other medications that they're buying on the street or

23   getting from another doctor, or if they're taking -- you

24   know, if they're using marijuana or cocaine, that's not going

25   to have a good interaction, naturally.

1  **Q.**  And what types of interactions, if any, were you

2  concerned about, in particular with narcotics and illegal

3  drugs like cocaine?

4  **A.**  Death.

5  **Q.**  Did you have any responsibilities as a prescriber if you

6  thought your patient was diverting their controlled medicine?

7  **A.**  In the practice, if we suspected that somebody was

8  diverting controlled medications, then what they would do was

9  increase the number of urine drug screens, increase random

10  pill counts, and see them more frequently.

11  **Q.**  What does it mean if a patient is diverting their

12  medication?

13  **A.**  It means they're not taking them as prescribed and they

14  are either giving them to somebody else or possibly selling

15  them.

16  **Q.**  Did your practice have something called a pain contract

17  with patients?

18  **A.**  Yes.

19  **Q.**  What's a pain contract?

20  **A.**  A pain contract is a -- basically a paper that the

21  patient signs that says that they are -- like our

22  responsibilities to treat you and treat your pain and your

23  responsibility as a patient to take them appropriately and,

24  you know -- you know, get the random drug screens and come in

25  for pill counts.

1  **Q.**  So it's a piece of paper in the file?

2  **A.**  I believe it is.

3  **Q.**  What's your understanding, if at all, as to how common

4  these pain contracts were with pain management practices?

5  **A.**  As I understand it, all pain practices should have it.

6  **Q.**  You testified a few minutes ago that about 95 percent of

7  the patients at the practice were already on some kind of

8  narcotic medication when you arrived there; is that right?

9  **A.**  Correct.

10  **Q.**  Of those, can you give us a sense of how many were on

11  more than one type of narcotic at the same time?

12  **A.**  Almost all of them.

13  **Q.**  So almost all of the patients at the practice were on

14  multiple narcotics?

15  **A.**  Correct.

16  **Q.**  By the way, Ms. Alfonso, do you still practice medicine?

17  **A.**  I do not.

18  **Q.**  Have you pled guilty to a federal crime?

19  **A.**  I did.

20  **Q.**  In what district?

21  **A.**  State of Connecticut.

22  **Q.**  Is that in federal court there?

23  **A.**  Yes.

24  **Q.**  What crime did you plead guilty to?

25  **A.**  Violating anti-kickback laws.

1   **Q.**   And what did that mean to you?  What did you do?

2   **A.**   I accepted money in exchange for prescribing certain

3   medication.

4   **Q.**   And what was the medication?

5   **A.**   Subsys.

6   **Q.**   What is Subsys?

7   **A.**   Subsys is a very, very rapid onset fentanyl product.

8   **Q.**   Are you testifying today pursuant to a plea agreement?

9   **A.**   I am.

10   **Q.**   Have you been sentenced yet?

11   **A.**   No.

12   **Q.**   How much jail time are you facing?

13   **A.**   Up to five years.

14   **Q.**   Do you know what your sentence is going to be?

15   **A.**   No, I do not.

16   **Q.**   Are you hoping for leniency?

17   **A.**   Of course.

18   **Q.**   Let's turn back to your practice.  With respect to the

19   patients who came in who were on these different kinds of

20   medication, what are some of the more common narcotics that

21   your patients were on at the practice?

22   **A.**   Duragesic patch, which is fentanyl, long-acting.

23   OxyContin, which is a long-acting oxycodone.  Exalgo, which

24   is a long-acting form of Dilaudid.  Nucynta, oxycodone,

25   Percocet, Dilaudid.

1    **Q.**   You mentioned several what you said were long-acting

2    opioids?

3    **A.**   Yes.

4    **Q.**   And you said there was a Duragesic patch.  I think you

5    said that was fentanyl?

6    **A.**   Yes.

7    **Q.**   And that was a long-acting opioid?

8    **A.**   Yes.

9    **Q.**   How does that work?

10   **A.**   They put the patch on and the patch stays on for 48 to 36

11   hours.  So two or three days, and then they change it with a

12   new one.

13   **Q.**   And what's your understanding of how the medication is

14   released to the patient during the time they're wearing that

15   patch?

16   **A.**   It is released slowly over that period of time.

17   **Q.**   And I believe you also mentioned Exalgo and OxyContin?

18   **A.**   Correct.

19   **Q.**   And are those also long-acting opioids?

20   **A.**   Those are long-acting, as well.

21   **Q.**   Are you familiar with short-acting opioids?

22   **A.**   Yes.

23   **Q.**   Were any of the patients on short-acting opioids?

24   **A.**   Yes.

25   **Q.**   What is a short-acting opioid?  What are some examples?

1   **A.**   Percocet, oxycodone, Dilaudid.  Those are some --

2   **Q.**   By the way, is there a difference between Roxicodone,

3   Oxycodone, OxyContin?  Are those just all different drugs?

4   **A.**   OxyContin is the long-acting, oxycodone is the

5   short-acting, Roxicodone is just the brand name, I believe,

6   of the oxycodone.

7   **Q.**   So another short-acting?

8   **A.**   Correct.

9   **Q.**   Why would patients be on a long-acting opioid and a

10  short-acting opioid?

11  **A.**   The long-acting opioid is meant to kind of bring their

12  pain levels from say a ten down to a six, okay, and keep it

13  there at the high point.  And then the short-acting that

14  would be added would be for any spikes in their pain

15  throughout their day.

16  **Q.**   And what's your understanding as to how long, typical, if

17  there is such a thing, you'll let us know, a short-acting

18  opioid might last for a patient?

19  **A.**   Three to four hours.

20  **Q.**   And what about a long-acting opioid?

21  **A.**   12 hours to up to three days with the patch.

22  **Q.**   And now you've told us about long-acting opioids and

23  short-acting opioids, what about rapid onset opioids, what is

24  that?

25  **A.**   Rapid onset opioids act even faster than short-acting

1   opioids, but they don't last as long.  And that would be the

2   Actiq or the fentanyl lollipop, the Fentora tablet, or the

3   Subsys spray.

4   **Q.**   So the lollipop, the tablet, Fentora, those are

5   competitors to the Subsys spray?

6   **A.**   Yes.

7   **Q.**   About when did you first get introduced to Subsys?

8   **A.**   Shortly after I started working at the practice.  I was

9   introduced to Subsys by one of the drug reps who came in to

10  tell me about it.

11  **Q.**   Do you remember his name?

12  **A.**   Eddie Recchia.

13  **Q.**   At that time, had you been prescribing any rapid onset

14  opioids like Fentora or any of the others?

15  **A.**   I had definitely been prescribing the pops, the

16  lollipops.  I think the Fentora, as well.

17  **Q.**   For about how long had you been practicing there when you

18  first met this rep from Insys?

19  **A.**   Less than a year, a few months.

20  **Q.**   How many months?

21  **A.**   A few.

22  **Q.**   And during those few months, were those the first few

23  months of your career that you were actually prescribing

24  controlled substances?

25  **A.**   Yes.

1   **Q.**   So in all of your past experience in the medical field,

2   until you went to Comprehensive Pain, you were not

3   prescribing any of these narcotics?

4   **A.**   Correct.

5   **Q.**   So you met Eddie Recchia, did he seem experienced to you

6   in pharmaceutical sales?

7   **A.**   Oh, no.

8   **Q.**   What do you mean?

9   **A.**   He was young.  He was a little bit timid, overdressed for

10   the situation.

11   **Q.**   How was he dressed?

12   **A.**   In like a three-piece suit with, what do you call it?  A

13   vest underneath the jacket, as well.  I mean, he looked

14   sharp, but --

15   **Q.**   Had you met reps from other drug companies?

16   **A.**   Yes.

17   **Q.**   How often in your practice would a rep from any drug

18   company be in the office?

19   **A.**   They were in a lot, because we were a large drug -- a

20   large pain practice and so they would always be in.

21   **Q.**   Weekly, monthly, daily?

22   **A.**   Definitely weekly.  Sometimes daily, depending.

23   **Q.**   So compared to the other pharmaceutical reps that you

24   encountered, Eddie Recchia was overdressed, you said?

25   **A.**   Correct.

1  **Q.**  How did you first meet him?

2  **A.**  He came into the office in Meriden and a lot of times --

3  when I first started, because I was a new practitioner there,

4  they all wanted to tell me about their drug.  And so he was

5  in the break room kitchen, waiting for me in between

6  patients, and I met him that way.  It was very brief.

7  **Q.**  So you walked into the break room and he was in there?

8  **A.**  Yes.

9  **Q.**  Describe that interaction, what happened?

10  **A.**  It was very brief.  He introduced himself, he told me he

11  was with Subsys, had I heard of it.  Of course, no, and he

12  told me a little bit about it, I believe, and that was it.

13  It was very, very brief, and I think I only met him maybe

14  twice.

15  **Q.**  And at some point did you meet another representative

16  from Insys?

17  **A.**  Yeah.  Abe Rosenberg was the rep.

18  **Q.**  So at Comprehensive Pain, can you estimate about what

19  percentage or approximately how many of the patients you

20  would see on a daily basis were being treated for

21  breakthrough pain related to their cancer?

22  **A.**  Far less than 10 percent, I think.  Very, very few.

23  **Q.**  Would oncologists or other doctors or medical

24  professionals periodically refer patients to the practice who

25  had pain related to their cancer?

1    **A.**   Occasionally.  Other doctors, regardless of specialty,

2    would always refer patients.  However, the percentage that

3    had cancer-related pain, specifically, was minute.  The large

4    bulk of our patient population was low back pain, neck pain,

5    neuroleptic pain, so like nerve pain.

6    **Q.**   And judging by the title of the practice, did you also

7    see migraine patients?

8    **A.**   Yes, we did.

9    **Q.**   What types of treatment would migraine patients typically

10   receive?

11   **A.**   Migraine patients, when I first started, were almost all

12   on -- oh -- Fioricet and large amounts of it.

13   **Q.**   What is --

14   **A.**   Fioricet is a migraine medication that you take at the

15   onset of a migraine, but it also has the effect, if you take

16   too much of it, to cause rebound headaches.  So in effect,

17   that medicine is going to give you a headache, as well,

18   afterwards.  So it was a process to kind of wean people,

19   because they were very dependent on that and it was a process

20   to wean them off and try other medications.

21   **Q.**   Are there specific medications intended to be used to

22   treat migraines?

23   **A.**   Yes.

24   **Q.**   And Fioricet is one of those?

25   **A.**   Yes.

1   **Q.**   Are there others?

2   **A.**   Yes.

3   **Q.**   Are rapid onset opioids typically used for that purpose?

4   **A.**   No.

5   **Q.**   Who trained you when you started at Comprehensive Pain?

6   **A.**   Dr. Mark Thimineur.

7   **Q.**   What was your training like?

8   **A.**   I was in the office with him, for several weeks to a

9   month, seeing patients with him or alongside him.

10   **Q.**   And then after that, you began seeing patients on your

11   own?

12   **A.**   Correct.

13   **Q.**   Were they your patients?

14   **A.**   No.

15   **Q.**   What do you mean by that?

16   **A.**   Dr. Thimineur made it very clear that all the patients in

17   the practice were his patients.

18   **Q.**   And he would do the intake on the patients?

19   **A.**   Until the end.  At the end of my time there, there was a

20   time when he started letting the APRNs see patients for the

21   first time.

22   **Q.**   When did you leave there?

23   **A.**   2015.

24   **Q.**   Do you recall about when in 2015?

25   **A.**   I believe my technical departure date was sometime in

1    April, but I had stopped working in March.

2    **Q.**   I'll come back to it, but why did you stop working?  Did

3    something happen?

4    **A.**   The DEA came into the office and requested to take my DEA

5    licensure away, due to the -- I believe the amount of

6    narcotics that my signature was on.

7    **Q.**   And did you agree to the DEA's request to give up your

8    license?

9    **A.**   Yes, I did.

10   **Q.**   Do you remember whether it was that day or another day?

11   **A.**   It was the following day.

12   **Q.**   That was March of 2015, you said?

13   **A.**   Yes.

14   **Q.**   I'm going to go back a little bit.  You said that Eddie

15   Recchia you saw a few times and then you got a new rep, Abe

16   Rosenberg?

17   **A.**   Correct.

18   **Q.**   Tell us about meeting Abe Rosenberg.

19   **A.**   I believe I met him in the same fashion, in the break

20   room, and he also was young and inexperienced.  He was also

21   very timid.  Uh-huh.

22   **Q.**   At that point, were you still prescribing Actiq, Fentora,

23   or other rapid onset opioids?

24   **A.**   Yes.

25   **Q.**   Had you recalled whether you had prescribed Subsys at

1  that point?

2  **A.**   I don't know if I had -- if I had actually written any

3  prescription for it at that point.

4  **Q.**   Were you speaking for any pharmaceutical companies?

5  **A.**   I spoke for the company that makes Fentora.

6  **Q.**   Do you remember what that company's name was at the time

7  or now?

8  **A.**   No, but if you gave me a multiple choice.

9  **Q.**   Have you heard of Fentora Pharmaceuticals?

10  **A.**   Yes, that's it.

11  **Q.**   And so would you say you were speaking for them.  About

12  when did you start speaking for Fentora?

13  **A.**   I don't recall, but I believe I spoke for them -- I know

14  I spoke for them before I spoke for Subsys.

15  **Q.**   What did they pay you to speak for Fentora?

16  **A.**   $500 per event.

17  **Q.**   How many events did you do before you spoke for Subsys,

18  if you remember?

19  **A.**   I do not remember.

20  **Q.**   What were the events like for Fentora?

21  **A.**   For Fentora the events were -- I think on two occasions,

22  I actually spoke to very large audiences of nurses, oncology

23  nurses.  One was at like an oncology nurse dinner, where, you

24  know, it was full of oncology nurses and APRNs.  One was a

25  different nursing society, I can't recall.  And then the rest

1  of the events that I spoke with Fentora were small dinners

2  with a prescriber present.

3  **Q.**  And at the Fentora events, the large ones or the smaller

4  dinners, did you present information relating to prescribing

5  Fentora to patients?

6  **A.**  Yes.

7  **Q.**  Where did you get the information that you provided?

8  **A.**  From the company.

9  **Q.**  What type of information did you have?

10  **A.**  It was a PowerPoint presentation.

11  **Q.**  And did you actually present that to the participants?

12  **A.**  Yes.

13  **Q.**  Do you recall about how many presentations you gave a

14  year for Fentora?

15  **A.**  I did not give that many per year.  I don't recall an

16  exact number, but I would say, I mean, somewhere in the range

17  of maybe four.

18  **Q.**  Per year?

19  **A.**  Yeah.

20  **Q.**  You seem like you're struggling.  Are you estimating?

21  **A.**  I am estimating, because I don't know the exact answer.

22  But it wasn't -- in the time that I spoke for them, it wasn't

23  a lot, at all.

24  **Q.**  How much were you making at Comprehensive Pain?

25  **A.**  When I started, I think I was making $80,000 a year.

1  **Q.**  And was your spouse, your significant other, working at

2  the time?

3  **A.**  He was not.  He was working part-time with my father

4  installing ceramic tile, but he wasn't really bringing in a

5  paycheck.

6  **Q.**  At some point did you have a discussion with Abe

7  Rosenberg about becoming a speaker for Insys Therapeutics

8  regarding Subsys?

9  **A.**  Yes.

10  **Q.**  What were the circumstances around that?

11  **A.**  I asked Abe Rosenberg if I could speak for Subsys.

12  **Q.**  Why?

13  **A.**  Because I wanted to make extra money.

14  **Q.**  And at that point, when you asked him, had you been

15  prescribing other rapid onset opioids like the lollipop and

16  other ones that you had been talking about?

17  **A.**  Yes.

18  **Q.**  And those were all fentanyl, right?

19  **A.**  Correct.

20  **Q.**  What was Abe Rosenberg's reaction to you?

21  **A.**  He said I needed to get some prescribing under my belt.

22  **Q.**  And about how long had you been prescribing any kind of

23  medication at that point, if you recall?

24  **A.**  Maybe two or three months.  He meant -- well, I can --

25  **Q.**  In terms of him telling you you need to get more

1    prescribing under your belt, what was your understanding of

2    what he was telling you?

3    **A.**   To prescribe Subsys.

4    **Q.**   And how did you form that understanding?

5    **A.**   (No response.)

6    **Q.**   Did you have further conversations with him at other

7    times?

8    **A.**   Yes.

9    **Q.**   Eventually, did you become a speaker for Insys?

10   **A.**   I did.

11   **Q.**   And did you begin to prescribe Subsys at any point?

12   **A.**   I did.  I began to prescribe it, I believe, before I

13   became a speaker.

14   **Q.**   And do you recall whether that was before or after you

15   talked to Abe Rosenberg and he told you you needed more

16   experience?

17   **A.**   After I spoke to him.

18   **Q.**   And why did you start prescribing Subsys?

19   **A.**   So that I can become a speaker.

20   **Q.**   I'm going to show you Exhibit 1839 and the attachment,

21   which is 1839.2.  Ms. Alfonso, take a look at the monitor in

22   front of you.  I'm not having so much luck with technology,

23   so if for some reason the monitor stops working, please just

24   let us know.

25            Can you see that okay?

1    **A.**   I do.

2    **Q.**   What is that?

3    **A.**   It's an e-mail from me to Abe with my resume attached.

4    **Q.**   And what's the date on the e-mail?

5    **A.**   October 8, 2012.

6    **Q.**   If we could go to the attachment, please, which is

7    Exhibit 1839.2.

8            Can you see this all right?

9    **A.**   Yes.

10           MR. LAZARUS:  It's a few pages, so if you can just

11   slowly scroll through, just so the witness has a chance to

12   review it, please.

13   BY MR. LAZARUS:

14   **Q.**   Do you recognize this?

15   **A.**   I do.

16           MR. LAZARUS:  Your Honor, I would offer

17   Exhibit 1839 and 1839.2.

18           MR. STOJILKOVIC:  No objection.

19           THE COURT:  It's admitted.  They're admitted, I

20   should say.

21           (Exhibit Nos. 1839 and 1839.2 admitted into

22           evidence.)

23           MR. LAZARUS:  Thank you, Your Honor.  If we could

24   please publish Exhibit 1839.  If you could enlarge the

25   header, please.

1  BY MR. LAZARUS:

2  **Q.**  So Ms. Alfonso, is that your hotmail e-mail address?

3  **A.**  It's one of them.

4  **Q.**  And in October of 2012, about how long had you been with

5  Comprehensive Pain?

6  **A.**  Um --

7  **Q.**  Would it help to go to the resume on the next page?

8  **A.**  Yeah.

9        MR. LAZARUS:  Okay.  If we could go back, please.

10  And if you could enlarge it, please.  Thank you.

11  BY MR. LAZARUS:

12  **Q.**  So there at the top, under work experience, does it

13  indicate about when you started at Comprehensive Pain and

14  Headache?

15  **A.**  Yes, I started in May of 2012.  And actually, when I

16  started there, I started part-time until June.  So yes, until

17  May.

18  **Q.**  And then it's October, on the previous exhibit, when you

19  were asking to become a speaker?

20  **A.**  Uh-huh.  Correct.

21  **Q.**  So if we could just scroll down the resume a little bit

22  slowly, are these some of the other experiences that you

23  testified about earlier?  In terms of your resume, are these

24  some of the other jobs that you had?

25  **A.**  Yes.

1    **Q.**   Did you ever teach?

2    **A.**   I did.

3    **Q.**   What kind of teaching did you do?

4    **A.**   I taught RNs and I taught LPNs.

5    **Q.**   In what context?

6    **A.**   I don't know what you mean.

7    **Q.**   Classroom?

8    **A.**   Oh, both.

9    **Q.**   Clinical?

10   **A.**   Yes, classroom and clinical.

11   **Q.**   Was that prior to your time at Comprehensive Pain?

12   **A.**   Yes.

13   **Q.**   I want to show you Exhibit 1836 and 1836.2.  Starting

14   with 1836, take a look at the top here, please.  If you look

15   in the "to" section, do you recognize this document?  Is this

16   an e-mail that you received from Matt Napoletano?

17          MR. LAZARUS:  Can we scroll down through the rest?

18          THE WITNESS:  It appears to be.

19   BY MR. LAZARUS:

20   **Q.**   Well, at some point did you become a speaker for Insys?

21   **A.**   Yes.

22   **Q.**   And did you receive training on speaking for Insys?

23   **A.**   Yes.  I had to go to speaker training once a year.

24   **Q.**   What did the speaker training entail?

25   **A.**   The speaker training entailed going through the slide

1    deck.

2    **Q.**   And what was the slide deck?  What did that mean?

3    **A.**   That was the educational component, which explained what

4    Subsys was, and why it was fabulous.

5    **Q.**   And did you get trained?

6    **A.**   I did.

7    **Q.**   And your e-mail address in October of 2012, one of them

8    was Heather.alfonso@hotmail.com?

9    **A.**   Yes.

10           MR. LAZARUS:  And if we could show the attachment

11   at 1836.2.

12   BY MR. LAZARUS:

13   **Q.**   Do you recognize this?

14   **A.**   I do.

15   **Q.**   What is this?

16   **A.**   That's the slide deck, it looks like.

17           MR. LAZARUS:  Your Honor, I would offer

18   Exhibits 1836 and 1836.2.

19           MR. STOJILKOVIC:  No objection.

20           THE COURT:  They're admitted.

21           (Exhibit Nos. 1836 and 1836.2 admitted into

22           evidence.)

23           MR. LAZARUS:  If we could, please, publish

24   Exhibit 1836.

25   BY MR. LAZARUS:

1    **Q.**  So you see your e-mail on the "to" section, Ms. Alfonso?

2    **A.**  Yes.

3    **Q.**  Do you know who these other people are in the CC line?

4    **A.**  I am familiar with the name Alec Burlakoff.

5    **Q.**  Did you meet him at some point?

6    **A.**  Yes.  I am familiar with Michael Babich.

7    **Q.**  Did you meet him at some point?

8    **A.**  Yes.

9    **Q.**  And did you hear those individuals speak?

10   **A.**  Yes.  I believe so, because they spoke at the training.

11          The other names, though, I am not familiar.

12   **Q.**  Larry Dillaha, Richard Simon, Frank Serra, Joseph Rowan,

13   Teresa Grasso?

14   **A.**  Correct.

15   **Q.**  If you can read the first paragraph, please, just

16   starting at "thank you."

17   **A.**  "Thank you for your interest in participating in the

18   Insys speaker bureau program.  The training session, which

19   will be led by Larry Dillaha, MD, will begin on Thursday,

20   10/18 at 7:00 p.m. Eastern Time and will last approximately

21   one hour.  The dial-in number is as follows."

22   **Q.**  And then in the full paragraph, after the dial-in number,

23   if you can read from "within the next few days," please, just

24   that sentence there.

25   **A.**  "Within the next few days, you will be receiving a

1    speaker agreement from SciMedica Group."

2    **Q.**  Did you remember -- have you heard of SciMedica Group?

3    **A.**  Do I remember what?

4    **Q.**  Did you have any dealings with SciMedica Group?

5    **A.**  I do not even recognize that name.

6    **Q.**  Did you receive a speaker agreement at some point?

7    **A.**  Yes.

8    **Q.**  And eventually, did you begin receiving payments for

9    speaking for Insys?

10   **A.**  Oh, yes.

11   **Q.**  How did you receive those payments?

12   **A.**  By check, in the mail.

13   **Q.**  And do you know where the check came from?  In other

14   words, was it issued by Insys all the time, or were there any

15   third parties?

16   **A.**  They were different.

17   **Q.**  And I'll come back to those in a moment.

18          MR. LAZARUS:  If you could go to exhibit -- the

19   attachment, please, Exhibit 1836.2.

20   BY MR. LAZARUS:

21   **Q.**  So is this the slide deck that you reviewed at some point

22   in training?

23   **A.**  It appears to be the first page of a slide deck.

24          MR. LAZARUS:  Scroll through it, please.  Okay.

25          THE WITNESS:  Yes.

1          MR. LAZARUS:  Okay, let's stop there, please.

2    BY MR. LAZARUS:

3    Q.  I'm going to show you Exhibit 1838, I believe.

4          Is this one in evidence here?

5          THE COURT:  1838?

6          MR. LAZARUS:  Yes.

7          THE CLERK:  I don't have it.

8    BY MR. LAZARUS:

9    Q.  Okay.  If you can take a look at the screen, please,

10   Ms. Alfonso.  Do you recognize this?

11   A.  No.  But --

12   Q.  Do you see your name on there?

13   A.  Yes.

14   Q.  And is this an e-mail that you sent to Matt Napoletano in

15   October of 2012?

16   A.  It appears to be.

17         MR. LAZARUS:  I'd offer it, Your Honor.

18         MR. STOJILKOVIC:  No, objection, Counsel, I think

19   this might have been admitted under a different number.

20         MR. LAZARUS:  I think so, counsel.

21         THE COURT:  It's admitted under this number now.

22         MR. LAZARUS:  Thank you, Your Honor.  We'll confer

23   and clean that up.

24         (Exhibit No. 1838 admitted into evidence.)

25   BY MR. LAZARUS:

1   **Q.**  This speaker training, it says from the e-mail that you

2   were on the phone for.  Is that correct?

3   **A.**  Yes.

4   **Q.**  Did you have in-person speaker training at all?

5   **A.**  Wait.  I had in-person speaker training and I don't know

6   if this was technically speaker training that's being

7   referred to here or if that --

8   **Q.**  Would you like us -- let's scroll down through the rest

9   of the e-mail and see if this refreshes you at all as to what

10  was happening.

11          So you don't recall this phone conference on

12  October 18, 2012?

13  **A.**  No.

14  **Q.**  Did you have in-person speaker training at some point?

15  **A.**  Yes.

16  **Q.**  About when was that?

17  **A.**  I had it three times, one each year, and I believe it was

18  towards the end of each year.

19  **Q.**  And where did that take place?

20  **A.**  You were able to choose which location you wanted to go

21  to.  I went to Chicago once and San Diego twice.

22  **Q.**  And what went on at these speaker trainings, the one in

23  Chicago and the two in San Diego?

24  **A.**  You arrived on a Friday evening and there usually was a

25  reception, a welcome reception.  And then Saturday, everyone

1    would meet in a conference-type room and they would go

2    through the slide deck and answer any questions.

3    **Q.**   Who was making the presentations at the trainings?

4    **A.**   Various Insys management people.  Some doctors.

5    **Q.**   Do you recall any specifics of who spoke to you at these

6    various events?

7    **A.**   I remember speaking with Matt Napoletano.  As I said, I

8    remember Alec Burlakoff and also Michael Babich.

9    **Q.**   And who paid for your travel and your hotel during this?

10   **A.**   Insys.

11   **Q.**   And were you also compensated for your time?

12   **A.**   Yes.

13   **Q.**   Do you remember how much?

14   **A.**   $2,500, I believe.

15   **Q.**   Each time?

16   **A.**   Yeah, but I think that the last one was more.  It was in

17   the range of $3,000, I believe.

18   **Q.**   And that was for the whole weekend?

19   **A.**   Correct.

20   **Q.**   Are you familiar with the term "off-label"?

21   **A.**   Correct, yes.

22   **Q.**   When you were at the speaker trainings, do you recall

23   whether there was any discussion about prescribing Subsys

24   off-label?

25   **A.**   There was some discussion about that.  Generally, as far

1    as I recall, amongst -- kind of in the break time, when

2    people were sitting and talking or standing and talking.  And

3    it was always made clear that as a prescriber, you're allowed

4    to prescribe anything you want off-label.

5    **Q.**   And when you said it was made clear, who made that clear

6    to you?

7    **A.**   I don't recall who made it clear when it was spoken about

8    at speaker training, because I honestly didn't really get

9    involved with who was who, for the most part, but the drug

10   reps also made that very clear.

11   **Q.**   The Insys drug reps?

12   **A.**   Yes.

13   **Q.**   So you said you had Eddie Recchia and then Abe Rosenberg

14   was your Insys sales rep, right?

15   **A.**   Correct.

16   **Q.**   And did Abe Rosenberg remain your sales rep?

17   **A.**   No.  After Abe, he introduced me to Natalie Levine, who's

18   Natalie Babich now, and she took over.

19   **Q.**   Do you recall about when you met Natalie Levine?

20   **A.**   I do not.

21   **Q.**   Do you recall the circumstances of meeting her?

22   **A.**   Yes.  Abe took Natalie, myself, and my significant other,

23   Joe, to dinner to meet her.

24   **Q.**   Do you recall who paid for the dinner?

25   **A.**   Insys.

1    **Q.**  And after you were trained by Insys and you began

2    speaking, was it -- was Abe Rosenberg your rep when you

3    started speaking?

4    **A.**  Yes, when I started speaking, he was the rep.

5    **Q.**  And while he was your rep, about how often would you

6    speak?

7    **A.**  Not very often.

8    **Q.**  And what were those speaking events like, when Abe was

9    your rep?

10   **A.**  Sadly, no prescribers would come.  I think maybe one

11   time.

12   **Q.**  And so what would happen at those events?

13   **A.**  It would be me and Abe or me and Abe and Joe.  Or me and

14   Abe and Jeff Pearlman, his boss.

15   **Q.**  Jeff Pearlman was Abe's boss?

16   **A.**  Uh-huh.

17   **Q.**  From Insys?

18   **A.**  Yes.

19   **Q.**  And would you go through any sort of educational content

20   there?

21   **A.**  No.

22   **Q.**  Would you get paid?

23   **A.**  Yes.

24   **Q.**  And how would you get paid?

25   **A.**  By check.

1   **Q.**   And how would the check be delivered to you?

2   **A.**   In the mail.

3   **Q.**   Would you go through this slide deck when you were there

4   and there were no prescribers there and it was Abe and

5   others?

6   **A.**   No.

7   **Q.**   And Joe, was that your significant other?

8   **A.**   Yes.

9   **Q.**   I'm going to show you Exhibit 1837.  Do you recognize

10  this as an e-mail that you received in December of 2012 from

11  Insys?

12  **A.**   I don't remember it, but I recognize my e-mail.

13  **Q.**   And is that your e-mail address on there?

14  **A.**   Yes.

15  **Q.**   And do you recognize Desiree Hollandsworth, Lindsay

16  Clancy, or Matthew Napoletano, any of those names?

17  **A.**   Desiree.  I never met her, but...

18  **Q.**   Did you deal with her periodically?

19  **A.**   She would e-mail.  I didn't deal with her.

20          MR. LAZARUS:  Your Honor, I would offer this

21  exhibit.

22          MR. STOJILKOVIC:  No objection.

23          THE COURT:  It's admitted.

24          (Exhibit No. 1837 admitted into evidence.)

25  BY MR. LAZARUS:

1    **Q.**   Generally, how quickly were you paid after each speaking

2    event you did for Insys?

3    **A.**   Usually, it was within a week, I believe.  I always kept

4    track on my phone of when I did -- when I had events and make

5    sure -- like kind of check off if I got paid for that one or

6    not.

7    **Q.**   And this year, this e-mail reads, "Dr. Awerbuch, I

8    apologize, it's taken longer than normal to be paid for your

9    December program.  The check will be sent out after the

10   Christmas holiday."

11           And did you get paid for all the events that you

12   spoke at or attended?

13   **A.**   I believe so.

14   **Q.**   After Abe Rosenberg left and was replaced by Natalie

15   Levine, did you continue speaking for Insys?

16   **A.**   I did.

17   **Q.**   Do you have any sense of how much Subsys prescribing you

18   did while Abe Rosenberg was your rep, compared to Natalie

19   Levine?

20   **A.**   I did more prescribing when Natalie was the rep.

21   **Q.**   Did you have conversations with either of them about the

22   need for you to prescribe Subsys?

23   **A.**   Yes.  I was told that I needed to do one to two scripts

24   per week.

25   **Q.**   One to two scripts of Subsys?

1   **A.**   Correct.

2   **Q.**   Who told you that?

3   **A.**   It was either Abe or Natalie and I cannot recall right

4   now.

5   **Q.**   And did it happen on one occasion that you were told?

6   **A.**   I remember one specifically.  I remember whoever it was

7   being -- I was in the office and they were standing outside

8   the office door and I didn't have time to talk to them and I

9   remember that being said.

10   **Q.**   And did you, in fact, start writing Subsys at that rate?

11   **A.**   I don't -- I think.

12   **Q.**   Did you have more conversations at any time with Natalie

13   or Abe about the need to prescribe Subsys?

14   **A.**   Further conversations would be -- so after I started

15   prescribing a fair amount of it, it then became where I

16   was -- it was suggested to me to increase the dosages,

17   because they would get paid more for higher dosages.

18   **Q.**   Who suggested that?

19   **A.**   I -- I believe it was Natalie.

20   **Q.**   Natalie Levine?

21   **A.**   I believe so.

22   **Q.**   About how often would you speak for Subsys, for Insys,

23   while Natalie Levine was your sales rep?

24   **A.**   I spoke a lot for Subsys while she was the rep.  She

25   would set up quite a few speaking events, dinners, and

1  sometimes lunches in our office.  I would say at -- it went

2  to, like, maybe twice a month and then it became like once a

3  week.

4  **Q.**  And did you have any understanding about what, if

5  anything, you needed to do to keep up the volume of those

6  dinners from Insys?

7  **A.**  Keep writing prescriptions and increase the dosages.

8  **Q.**  And how did you have that understanding?

9  **A.**  Because I was told that if I want more dinners, I would

10  have to keep writing.  I was told -- I can't remember who --

11  **Q.**  Just keep that microphone close to you, ma'am.

12  **A.**  Oh, sorry.  They would -- like Natalie would say, "You

13  haven't had a script in a few weeks," or --

14  **Q.**  And what did you understand that to mean?

15  **A.**  I needed to write some prescriptions if I wanted to have

16  the dinner events.

17  **Q.**  What was your understanding would happen if you stopped

18  writing Subsys?

19  **A.**  I would not get dinner events and I would either no

20  longer be a speaker, or not be a speaker who's getting dinner

21  events, thus not getting paid.

22          MR. LAZARUS:  Your Honor, perhaps this might be an

23  okay time?

24          THE COURT:  That's fine.

25          MR. LAZARUS:  Thank you.

1          THE COURT:  45 minutes for lunch.  You all maybe

2      think about the schedule for the rest of the week, given the

3      weather, et cetera.

4               See you at a quarter to 1:00.

5               THE CLERK:  All rise for the jury.

6               (The jury exits the courtroom.)

7               THE COURT:  All right.  See everyone a quarter of.

8               (Court in recess at 11:59 a.m.)

1          **** AFTERNOON SESSION ****

2                  [No jury present.]

3          MR. STOJILKOVIC:  Your Honor, there is one thing

4   I'd rather raise now than at sidebar.  I just discussed this

5   with Mr. Lazarus over the lunch break.  He's going to ask

6   Ms. Alfonso about certain patients.  We have gotten those

7   records.  We've worked out with the government which patients

8   he's going to go into, and then if the door is open, there's

9   some others.  But we have about ten records of patients.

10  There's no complaint about that.

11         My concern is that last Saturday or the Saturday

12  before last Ms. Alfonso told the government for the first

13  time that 25 percent of the patients she put on Subsys were

14  legitimate.  75 percent that she put on Subsys was because

15  she was getting paid.

16         We don't have any patient records from her beyond

17  the ten we have.  We don't have any way to cross her on these

18  percentages, and she wasn't reviewing any other patient

19  records beyond the ten that the parties have jointly been

20  focused on.  And so in light of that, I'd ask the Court to

21  preclude her from trying to put a percentage on it.

22         THE COURT:  She's just going to give an estimate?

23         MR. LAZARUS:  Yes.

24         THE COURT:  She didn't look at patient records to

25  come up with that?

1          MR. LAZARUS:  She looked at the ten that we had

2     that were produced some of them over a year ago to counsel.

3     We disclosed her as an expert timely in August and said that

4     she was going to talk about her medical decision-making.

5          She's going to estimate, and they can cross-examine

6     her where she's coming up with that estimate and how she's

7     coming up with it.  But with respect to what she's basically

8     going to say, the records she looked at and her memory and

9     what her prescribing was like.  So the idea that somehow

10    because we turned over some patient records or some

11    information about patients precludes her from testifying as a

12    fact witness about what she did, I just don't think that

13    tracks.

14          THE COURT:  I'm going to let them have that.  You

15    did a very effective job with the last witness on

16    cross-examining her with regards to percentages.  I'm sure

17    you'll do the same with her is.

18          MR. STOJILKOVIC:  I just want to clarify, Your

19    Honor.  My complaint is not to the ten records we do have.

20    She prescribed hundreds of Subsys prescriptions.

21          THE COURT:  Look, if she's gone through all those

22    records and separated them into piles and said yes, no, yes,

23    no, I might look at it differently.  It's just an estimate

24    off the top of her head.

25          MR. STOJILKOVIC:  We'll cross her on it, Your

1    Honor.

2              THE COURT:  Ms. Miner will help you.

3              MS. WILKINSON:  She was very effective.

4              THE COURT:  Yes, she was.

5              MR. LAZARUS:  I have a stack here, Your Honor, of

6    six patient records that I plan to discuss with the witness.

7    I don't think the entire things need to be into evidence.

8              So I'd ask, much like we did with Dr. Awerbuch, if

9    would could -- I'll lay a foundation for them and then if we

10   can confer and agree to parts of those to admit subsequently

11   in redacted form.

12             THE COURT:  I'll just give the jury an instruction

13   about that.  Are you going to show them individual pages?

14             MR. LAZARUS:  I may show one or two individual

15   pages, Your Honor.  Thank you.

16             THE COURT:  Go get them.

17             The Fisher, they are refusing to pay him.  Jim

18   spoke to him.  I don't know if it was Friday or Monday.  It's

19   Number 11.  He did not think it was worthwhile, given their

20   position, that I do a follow-up phone call.  So maybe at the

21   end of the day we can discuss what to do with him.  I'm also

22   happy to colloquy him individually in light of the answers

23   that he gave to the earlier questions.  A way to do that, we

24   could obviously have a regular colloquy.  We could also jut

25   have one representative from each side to make it sort of

1    less intimidating for him.

2              MR. KENDALL:  I take it he's asking to go.

3              THE COURT:  Yes, he's asking to go.  I wouldn't say

4    so much that he's asking to go but reiterating on a daily

5    basis that he's not getting paid and this is very hard.  He

6    said initially that whether or not he was paid would make a

7    difference.  That was what the original colloquy was.  We

8    could follow up on that.  I'm open to suggestions on him.  We

9    don't have to do it now.  He's here today obviously.

10             MR. KENDALL:  What may be helpful is, Nat, have you

11   changed your estimates how long the government's case will

12   go?  Do you have a more precise estimate at this point?

13             MR. WYSHAK:  We're up to July at this point.

14             (Off the record.)

15             THE CLERK:  All rise for the jury.

16             (The jury enters the courtroom.)

17             THE CLERK:  Court is in session.  Please be seated.

18             THE COURT:  When you're ready, Mr. Lazarus.

19             MR. LAZARUS:  Thank you, Your Honor.

20   BY MR. LAZARUS:

21   **Q.**  Good afternoon, Ms. Alfonso.

22   **A.**  Good afternoon.

23   **Q.**  So before the break you were testifying about some of

24   your different speaking events.  And I just want to go back

25   and ask you about your prescribing practices.  So you

1    testified earlier that Mr. Rosenberg said you needed to get

2    more prescribing under your belt?

3    **A.**   Correct.

4    **Q.**   And at some point you started prescribing more Subsys,

5    right?

6    **A.**   Correct.

7    **Q.**   Can you explain how you went about in the beginning

8    choosing patients or finding patients to prescribe Subsys?

9    **A.**    Initially I was looking for patients that had cancer.

10   However, there weren't very many of those patients in our

11   practice.  So then I broadened my search to patients that had

12   a history of cancer.  And eventually it came where I would

13   prescribe it to a patient regardless of whether they had

14   cancer or not.

15   **Q.**   Let me unpack that a little bit.  You said in the

16   beginning you were looking for patients who had cancer,

17   right?

18   **A.**   Correct.

19   **Q.**   Why?

20   **A.**   Due to the indication for breakthrough cancer pain.

21   **Q.**   And after you looked for patients who had cancer, you

22   started looking for patients with a history of cancer.  Can

23   you explain that?

24   **A.**   I thought that it would get covered by insurance so long

25   as there was at least a history of cancer, even if that

1    particular pain may or may not have been as a result of that

2    cancer.

3    **Q.**   And how did you get that thought?

4    **A.**   Because we were told, number one, that we could use it

5    off-label.  But also because it was made clear -- and I can't

6    recall to who -- that I believe the indication says -- and

7    I'm not 100 percent certain on the wording -- breakthrough

8    pain with cancer maybe.  So it was stated and also implied

9    that the two may not necessarily have to be mutually

10   exclusive.  So in other words, breakthrough pain with cancer.

11   **Q.**   Stated or implied by whom?

12   **A.**   I can't remember.

13   **Q.**   Was it somebody from your practice?

14   **A.**   No.  It was somebody through Insys, and I can't recall

15   right now, but -- so in other words, as opposed to I have

16   cancer pain and it's stronger right now, moving towards I

17   have cancer, and I also have hip pain not related to the

18   cancer.

19   **Q.**   And so with those types of patients, the ones who had in,

20   your example, hip pain and cancer or a history of cancer,

21   meaning cancer some time in their past?

22   **A.**   Correct.

23   **Q.**   Is that the type of thing you would look for?

24   **A.**   Yes, sir.

25   **Q.**   So how did that -- what did you do with that information

1    once you had it in terms of if you prescribed Subsys to a

2    patient who had hip pain and cancer or hip pain and had had

3    cancer ten years ago, would you write that information down

4    anywhere?  Would you --

5    **A.**   Yes.  When I filled out the prior authorization sheet,

6    the sheet that was sent to insurance to get it approved, I

7    would put those diagnoses on there.

8    **Q.**   What diagnoses?

9    **A.**   All of them, including the cancer diagnosis from before.

10   **Q.**   So in your scenario, did the cancer actually have

11   anything to do with the pain that you were using Subsys to

12   treat?

13   **A.**   Not necessarily.

14   **Q.**   So why did you write down the cancer diagnosis on the

15   form in that instance?

16   **A.**   So that it would get approved by insurance.

17   **Q.**   And how did you decide to do that or know to do that?  Is

18   that something you thought up?

19   **A.**   I don't know.  I don't think so.

20   **Q.**   Did you have conversations with anybody --

21   **A.**   This was through conversations with the reps and also

22   conversations with other providers in the things like the

23   advisory board meeting and the phone meeting.

24   **Q.**   So you understood that if your form said the word

25   "cancer," it might have some impact on the insurance?

1    **A.**   Correct.

2    **Q.**   The third group you said you started prescribing to were

3    people regardless of whether cancer was involved, correct?

4    **A.**   Correct.

5    **Q.**   Could you explain to the jury what that means?

6    **A.**   So a patient who maybe had diabetes or dental issues and

7    needed a different medication, needed a faster-acting

8    medication.  So they didn't have cancer, so it was used

9    off-label, but they had maybe another issue that would make

10   it so that it could potentially get approved by insurance.

11   **Q.**   Is there a difference between off-label and medically

12   unnecessary?

13   **A.**   Yes.

14   **Q.**   What's the difference?

15   **A.**   Well, off-label is, I'm using it, it's still medically

16   necessary for this patient, but it's not what it's FDA

17   approved for.  And not medically necessary as far as I know

18   is this patient did not need this medication at all.

19   **Q.**   Did you have a duty to your patients with respect to

20   prescribing medications?

21   **A.**   I did, yes.

22   **Q.**   What did you understand that duty to entail?

23   **A.**   To advocate for my patients.

24   **Q.**   With respect to prescribing medications, what was your

25   understanding about your duty to your patient with those

1    medications?

2    **A.**   To do my due diligence and prescribe appropriately.

3    **Q.**   Is "appropriately" synonymous with "medically necessary"?

4    **A.**   Correct.

5    **Q.**   And were there times you broke that duty to your

6    patients?

7    **A.**   There were many times I broke that duty.

8    **Q.**   Why?

9    **A.**   Ultimately it stems from greed, I guess, and it stems

10   from the need to -- the desire to make more money.

11   **Q.**   From whom?

12   **A.**   The speaking engagements through Insys.

13   **Q.**   What did the speaking engagements and getting paid by

14   Insys have to do with your decision to prescribe medications

15   that were medically unnecessary?  How were the two connected?

16   **A.**   Because I needed -- I had come to rely on that extra

17   money and needed it to live, not really for anything lavish

18   by any means.

19   **Q.**   If you stopped prescribing, would you continue getting

20   speaker money?

21   **A.**   No.

22   **Q.**   How much were you getting paid per speaking event?

23   **A.**   $1,000.

24   **Q.**   Do you recall about how much you made speaking for Insys?

25   **A.**   I believe my tax records showed in the range of 83,000.

1   Q.   Over what period of time?

2   A.   From when I started to when I ended, end of 2012 to the

3   very beginning of 2015.

4   Q.   So somewhere around or just over $80,000?

5   A.   Yes.

6   Q.   Is that a lot of money for you?

7   A.   Yes.

8   Q.   Let's talk about some of the Subsys speaking events that

9   you were the speaker.  Where did they take place, these

10  events?

11  A.   They took place typically at nice restaurants in

12  Connecticut, New Haven, West Hartford.

13  Q.   Who would schedule them?

14  A.   The drug rep.

15  Q.   The Insys drug rep?

16  A.   Correct.

17  Q.   So what would that be?

18  A.   Either Abe, Natalie, or Jessica Crane.

19  Q.   Who is Jessica Crane?

20  A.   She was the -- she started out as Natalie's assistant.  I

21  can't remember what her title was specifically.  And then

22  when Natalie left, she became the rep.

23  Q.   Who would attend these speaking events that you were the

24  speaker at?

25  A.   Occasionally there would be other doctors there.  There

1     were doctors that we knew.  And mostly it would be office

2     staff and their spouses or friends.

3     **Q.**   Did any of your friends or family go to these dinners?

4     **A.**   My significant other went.

5     **Q.**   How often would -- you said his name was Joe?

6     **A.**   Joe.

7     **Q.**   How often would Joe attend?

8     **A.**   Almost all of them.

9     **Q.**   Who would pay for the dinners?

10    **A.**   Insys.

11    **Q.**   Was there alcohol served?

12    **A.**   Oh, yes.

13    **Q.**   You say "Oh, yes."

14    **A.**   A lot.

15    **Q.**   Who paid for that?

16    **A.**   Insys.

17    **Q.**   Was there educational content?

18    **A.**   There was if there was a new provider at that dinner.

19    **Q.**   What do you mean by that?

20    **A.**   If it wasn't an office staff member, if, for example,

21    Dr. Patel had hired -- and this is just an example -- if he

22    had hired a new nurse practitioner and she came, then there

23    would be education.

24    **Q.**   How often during the time you were a paid speaker for

25    Insys would that happen?

1    **A.**   Rarely.

2    **Q.**   Did you ever have repeat attendees?

3    **A.**   Often.

4    **Q.**   Can you elaborate on that?  Who would come?

5    **A.**   The primary attendees would be members of the office

6    staff that I worked at and Dr. Patel's office staff after he

7    left.

8    **Q.**   Prescribers?

9    **A.**   No.  Lab draw workers, the urinalysis collectors, the

10   receptionist, medical assistants.

11   **Q.**   And who paid for their meals and alcohol?

12   **A.**   Insys.

13   **Q.**   Who chose the restaurants?

14   **A.**   The drug reps, I believe.

15   **Q.**   So the events other than those where there was a new

16   prescriber and you were giving some kind of educational

17   content, how would you describe the other events?

18   **A.**   They were fun.  They were social events.  Everyone would

19   eat and drink and talk socially.

20   **Q.**   Did you bring your laptop?

21   **A.**   No.

22   **Q.**   Did you have a slide deck to present with you at those

23   events?

24   **A.**   No.

25   **Q.**   You mentioned that you spoke for Fentora.  Did Joe attend

1   any of the Fentora meals?

2   **A.**   No.

3   **Q.**   So when you'd go to the Insys speaking events, was there

4   paperwork that you had to complete or that was completed?

5   **A.**   Yes.   There was attendance sheets essentially.

6   **Q.**   Did you sign those?

7   **A.**   Sometimes.

8   **Q.**   And other times you did not sign them?

9   **A.**   I signed my name.

10   **Q.**   Did you sign any other names?

11   **A.**   Occasionally.

12   **Q.**   What would you sign on those other occasions?

13   **A.**   When there were people that were at the dinners that were

14   not either providers or office employees, we would put on

15   their name -- say, for example, if Dr. Patel wasn't in

16   attendance, then his office medical assistant, Brianne, who

17   brought her boyfriend would sign him in as Dr. Patel.   And

18   that would go for all of the significant others or spouses

19   that were brought.

20   **Q.**   You said "we."   Who is we?   Who would do that?

21   **A.**   I did it for Joe on occasion or the drug rep would do it.

22   **Q.**   Which drug rep?

23   **A.**   All of them.

24   **Q.**   So Abe Rosenberg, Natalie Levine, Jessica Crane?

25   **A.**   Yes.   Eddie Recchia, I never had any -- just the two

1   meetings with him.  Never had a dinner.

2   **Q.**  You mentioned somebody named Brianne.

3   **A.**  Yes.

4   **Q.**  Who is that?

5   **A.**  She is Dr. Patel's medical assistant.  She used to work

6   in our office and she left when he did.

7   **Q.**  What's her last name?

8   **A.**  Plont.

9   **Q.**  Could she prescribe controlled substances?

10   **A.**  No.

11   **Q.**  Was there ever a time where an outside monitor came to

12   one of your Insys speaking program events?

13   **A.**  Yes.  There is one time when an outside monitor came to

14   observe the speaking event.

15   **Q.**  Do you recall where that took place?

16   **A.**  I forget the name of the restaurant.  It was in New

17   Haven, I think.  Zinc, maybe.  It was a nice restaurant.  It

18   was a loud restaurant.  It was a little bit loud.  When we

19   had that dinner, it was made really clear that, okay, only

20   these particular people are going to be invited, and they

21   were given questions by the drug rep to ask about Subsys

22   during the presentation, which of course there was a

23   presentation at that time.  It was staged.

24   **Q.**  What was staged?

25   **A.**  The entire evening.

1    **Q.**   Did you give the Subsys -- the Insys-approved Subsys

2    presentation?

3    **A.**   Yes, I did.  At that time Jon Roper, Roper, was the boss

4    or guy above Jessica or Natalie.  Jessica, I think it was.  I

5    can't remember.  And he brought it with him.

6    **Q.**   You didn't have it and he brought it with him?

7    **A.**   I didn't have it because when I had gone to that speaker

8    training that year, like the little changes, the little

9    updates, they said, oh, we'll mail it to you, mail you a

10   flash drive.  And I never got that, so I didn't have the

11   updated version.

12   **Q.**   Jonathan Roper you said you understood was Jessica

13   Crane's boss or Natalie's boss?

14   **A.**   Yes.  After Pearlman.

15   **Q.**   And was Jonathan Roper at that dinner with the monitor?

16   **A.**   Yes, he was.  Along with a female, a girl who I think was

17   a rep.

18   **Q.**   Do you remember her name?

19   **A.**   No.

20   **Q.**   Did your significant other, Joe, attend the monitor

21   dinner?

22   **A.**   Well, he attended, but he sat at the bar.  Jonathan Roper

23   said he would pay for his meal at the bar.  Joe ended up

24   paying for his own meal, but then he come over -- Joe had

25   come over after the presentation and was talking with

1   Jonathan Roper and the monitor.

2   **Q.**   Came over to where you were seated?

3   **A.**   Yes.

4   **Q.**   Who was at the event in the audience, the monitored

5   event?

6   **A.**   Jean Vulte, who is a nurse practitioner in our office.  I

7   think she was there.  Oh, Dr. Porrello, he was there.  I

8   can't remember who else, but it was very limited.

9   **Q.**   The attendance was limited?

10  **A.**   Yes.

11  **Q.**   About how long did your presentation last?

12  **A.**   30 minutes maybe.

13  **Q.**   Was that the only event that you attended with a monitor?

14  **A.**   Yes.

15  **Q.**   How far in advance did you know the monitor was coming

16  approximately?

17  **A.**   A few weeks maybe, a week.

18  **Q.**   Was it like minutes as you were driving there?

19  **A.**   Oh, no, no, no.  It was in advance enough where the

20  specific people were invited and that was it.  It was a few

21  weeks at least, I believe.

22  **Q.**   And after that monitored event, did you continue to

23  receive speaking events and payments from Insys?

24  **A.**   Yes.

25  **Q.**   Did you ever attend any events in Boston?

1   **A.**   Two events in Boston.

2   **Q.**   Where did those take place?

3   **A.**   One was at -- it's right down the street.

4   **Q.**   Do you recognize the name Empire?

5   **A.**   Yes.   Empire.   And the other one was at a place, I think

6   Bricco.   I vaguely remember.

7   **Q.**   Was that here in Boston?

8   **A.**   Yes.

9   **Q.**   Those two events that took place in Boston, let's talk

10   first about the one at Bricco.   Who was at that one that you

11   recall?

12   **A.**   I do not recall.

13   **Q.**   Did you do any speaking event there?

14   **A.**   Did I speak?

15   **Q.**   Did you present the slide deck or present the medical

16   education components?

17   **A.**   No.

18   **Q.**   What about at Empire?

19   **A.**   No.

20   **Q.**   What was the event like at Empire?

21   **A.**   Well, I think that -- the event at Empire, we ate and

22   then we had drinks.

23   **Q.**   Did you present any sort of medical education component

24   there?

25   **A.**   No.

1    **Q.**  Did you get paid?

2    **A.**  Yes.

3    **Q.**  How much?

4    **A.**  $1,000.

5    **Q.**  Who paid for the event at Empire?

6    **A.**  Insys.

7             MR. LAZARUS:  If I could have Exhibit 18, please.

8    This is in evidence, Your Honor.

9    **Q.**  Do you see that in front of you on the monitor?

10   **A.**  I do.

11   **Q.**  Do you recognize that photograph?

12   **A.**  I do.

13   **Q.**  Are you in it?

14   **A.**  I am.

15   **Q.**  Where are you?

16   **A.**  I am the first person on the left.

17   **Q.**  In the green top?

18   **A.**  Yes.

19   **Q.**  And who are the other people in the photograph?

20   **A.**  So the next person is -- I think she's a nurse

21   practitioner.  I don't remember her name.  She worked -- I

22   think she worked in like the psych field, if I recall.

23   **Q.**  Do you recall whether she was at any other speaking

24   events?

25   **A.**  I think she might have been at the Bricco one.

1   **Q.**  And who else is in the picture?

2   **A.**  So then it's I believe her friend who is an RN.  As I

3   understand it, I think she also works in psych.  And then

4   Brianne Plont and then Jessica Crane and Natalie Levine.

5   **Q.**  Were there any other people at this event who were not in

6   the photograph?

7   **A.**  As I recall, it was Joe who took the picture.  Because I

8   don't drive in the city, and I certainly didn't drive to

9   Boston by myself.

10  **Q.**  So Joe was also at this Insys event?

11  **A.**  Yes, mm-hmm.

12  **Q.**  Was it a true speaking event?

13  **A.**  No.

14  **Q.**  Did you ever receive any gifts or other payments or

15  anything from anybody else from Insys?

16  **A.**  In December of 2014, so before I left, Jessica Crane

17  stopped at the office and she gave me gifts -- first of all,

18  I had received a shirt from Natalie.  But this particular

19  time Jessica stopped and gave me some gifts for my children

20  for Christmas, along with a card.  And when I opened the card

21  after Christmas or what-have-you, there was $600 cash in the

22  card.

23  **Q.**  From Jessica?

24  **A.**  Yes.

25  **Q.**  Had you given her any gift?

1    **A.**   No.

2    **Q.**   Did you ever discuss that with her?

3    **A.**   No.  It was really awkward.

4    **Q.**   Were you prescribing Subsys still at that point?

5    **A.**   Yes.

6    **Q.**   You mentioned something earlier about the dose, about

7    titrating patients.

8    **A.**   Correct.

9    **Q.**   What does that mean?

10   **A.**   So increasing the dose.  Typically patients would start

11   out on 100 or 200 micrograms, which is one of the lower

12   doses.  And then titrating them means to increase them to a

13   higher dosage.

14   **Q.**   Was it your understanding was there a legitimate medical

15   reason to titrate patients?

16   **A.**   Are you asking if there was a legitimate medical reason

17   for me to titrate my patients or in general?

18   **Q.**   I'm going to ask you that next.

19           But first, are you generally familiar with the idea

20   of titrating patients on Subsys?

21   **A.**   I am familiar with the concept of titrating patient's

22   dosages for medications upwards, yes.

23   **Q.**   Did you titrate your patients on Subsys in particular?

24   **A.**   I did.

25   **Q.**   Why?

1    **A.**   Because I was told that it looks better if I titrate the

2    patient's dosages and they get paid more.

3    **Q.**   Who is "they"?

4    **A.**   I suppose Insys, because I didn't get paid more.

5    **Q.**   Who told you this?

6    **A.**   Either Jessica or Natalie.  And I want to say Natalie.

7    **Q.**   Why do you want to say Natalie?  Do you remember?

8    **A.**   Because Jessica was the rep at the very end, and by that

9    time I think I had already been -- I don't remember.   There

10   was that period where they both worked there.  They were both

11   coming in.

12   **Q.**   Did you have a closer relationship with one versus the

13   other?

14   **A.**   No.

15   **Q.**   You'd speak with each of them?

16   **A.**   Yes.

17   **Q.**   Just to be clear, you said that you titrated your

18   patients because they told you it would be better for them.

19   Were there some patients that you titrated legitimately

20   because that was your medical judgment?

21   **A.**   Of course.

22   **Q.**   Can you explain to the jury how you'd make that decision?

23   What happened?

24   **A.**   Well, if the patient came in and said they were doing

25   well on it but maybe it didn't last or it wasn't, you know,

1    taking the pain away very well during those episodes, then I

2    would titrate.  And of course, I mean, I thought, yes, that's

3    good because I'm titrating legitimately.

4              And then other times if patients were still on the

5    100 or the 200 microgram dose, then I would ask them if they

6    wanted to go up to the maybe 4 or 6.

7    **Q.**  And would you raise their dose?

8    **A.**  Yeah.  There was also -- the 100-microgram dose only came

9    in a smaller packet, as I recall.  I think that they -- so it

10   was always recommended to get them off of that dose quickly

11   because I think it only came with maybe -- the other boxes

12   had 30 in them, and this one only had 10 or something.

13   **Q.**  Who recommended to get the patients offer the

14   100-microgram dose quickly?

15   **A.**  It was one of the reps because, I mean, I didn't know --

16   I don't see those things.  I was told this.

17   **Q.**  What things don't you see?

18   **A.**  I didn't see -- initially I didn't see what a box of

19   Subsys looks like until patients that had been on it brought

20   it in.

21   **Q.**  Was it your understanding did any of your patients find

22   relief with the 100 microgram, 200 microgram, the lower doses

23   of Subsys?

24   **A.**  I don't recall, but I imagine some may have.

25   **Q.**  And so with respect to some of the patients that you

1    titrated up, what, if anything, what impact did money that

2    Insys was paying you for prescriptions have on your medical

3    decision to titrate those?

4    **A.**   A significant impact.

5    **Q.**   Why?  How?

6    **A.**   Because if I titrated them up a little bit, they're still

7    getting relief, and I was still guaranteed to get paid.

8    **Q.**   Do you believe you violated your duty to your patients

9    when you titrated them because of the money?

10   **A.**   Absolutely 100 percent.

11   **Q.**   And did you do that?

12   **A.**   Yes.

13   **Q.**   During the course of your preparation to testify, did you

14   have a chance to look at just a few of your patient files

15   from Comprehensive Pain?

16   **A.**   Yes.

17             MR. LAZARUS:  Your Honor, may I approach the

18   witness?

19             THE COURT:  You may.

20   BY MR. LAZARUS:

21   **Q.**   Ms. Alfonso, I've put in front of you manila folders

22   containing Exhibits 754, 755, 1004, 1006, 1057, and 1854.  Do

23   you see those there in front of you?

24   **A.**   Yes.

25   **Q.**   So if you could take one of them, please, and let us know

1    the patient's name and the exhibit number.  It should be

2    either written on the folder or right inside the first page

3    of the exhibit.

4    **A.**  Exhibit 0754, Michelle Kamzyuk.

5    **Q.**  Was that a patient of yours?

6    **A.**  Yes.

7    **Q.**  Take your time.  Take a look through that exhibit.  You

8    don't have to look through the whole thing at this point, but

9    look through enough so you can let us know whether you're

10    familiar with it.

11    **A.**  I'm familiar with it.

12    **Q.**  Is that a medical file from your former practice,

13    Comprehensive Pain, and medicine?

14    **A.**  Yes.

15    **Q.**  Is that a true and accurate copy of the medical record?

16    **A.**  It appears to be.

17    **Q.**  Now, with respect to that patient, take a look at the

18    medical record and let us know when did Michelle Kamzyuk

19    first present at Comprehensive Pain?

20    **A.**  She first presented to Comprehensive Pain January 6,

21    2012.

22    **Q.**  And by the way, are there post it's on some of those

23    files?

24    **A.**  Are there what?

25    **Q.**  Are there post-it notes stuck on the side of those

1  records?

2  **A.**   There's just the blue tabs and the red tabs and the green

3  tabs.

4  **Q.**   Do you know who put those there?

5  **A.**   I put them there.

6  **Q.**   What do they signify?

7  **A.**   They signify the patient's start date in the practice, if

8  there is one, and also I tabbed where they were put on

9  Subsys.

10  **Q.**   Are these very lengthy records in some instances?  Are

11  these long records, a lot of paper?

12  **A.**   Yeah.  Oh, yes.

13  **Q.**   So you put the tabs on to help you quickly flip to the

14  places you're talking about?

15  **A.**   Yes.

16  **Q.**   In preparation for your testimony today?

17  **A.**   Yes.

18  **Q.**   You said that Michelle Kamzyuk presented at Comprehensive

19  Pain on January 6, 2012.  Is that what the record indicates?

20  **A.**   Correct.

21  **Q.**   Is that before you were employed there?

22  **A.**   Yes.

23  **Q.**   What does the record indicate in terms of why she

24  presented there?

25  **A.**   Low-back and neck pain.

1    **Q.**  Did you prescribe her Subsys?

2    **A.**  I did.

3    **Q.**  When?

4    **A.**  I prescribed her Subsys January 24, 2014, it looks like.

5    **Q.**  When you say "it looks like," what are you looking at

6    that makes you believe that?

7    **A.**  I'm looking at the date.

8    **Q.**  In the medical record?

9    **A.**  Yes.

10   **Q.**  At that point, what was going on with her treatment?

11   **A.**  So she had some sort of surgery removing muscle flaps

12   from her thighs that were reattached to her abdomen, and --

13   hang on.  So her pain was increased for that reason.  Her

14   pain was increased when she was walking, and that I

15   documented that she stated that the oxycodone does work, but

16   that she can feel by the third hour that she needs the next

17   dose.  And she sometimes was taking Advil with it.

18        So I added the Subsys and Fentora as needed to her

19   regimen, with the indication that she has gastric issues

20   because she had previously a gastric bypass, and that she had

21   cancer genes and had a hysterectomy to remove the ovaries due

22   to positive cancerous genes.

23   **Q.**  So let me just stop you.  Help us understand a little bit

24   about what you said.

25        First of all you said she was taking oxy, right?

1   **A.**   Yes.

2   **Q.**   Is that a long-acting or a short-acting?  What kind of

3   medicine is that?

4   **A.**   Short-acting.

5   **Q.**   Was she taking other medications?

6   **A.**   Yes.

7   **Q.**   What else was she taking at that time?

8   **A.**   It appears that she was taking Opana ER, which is a

9   long-acting medication.

10  **Q.**   What kind of medication?  A pain medicine?

11  **A.**   Yes.

12  **Q.**   So she was on a long-acting Opana ER.  Does that stand

13  for extended release?

14  **A.**   Yes.

15  **Q.**   And she was on a short-acting oxy?

16  **A.**   Correct.

17  **Q.**   And she was taking Advil sometimes?

18  **A.**   Correct.

19  **Q.**   Is that ibuprofen?

20  **A.**   Yes.

21  **Q.**   What other medications was she on?

22  **A.**   It looks like she was on Valium, Zofran, Lyrica.

23  **Q.**   Any other pain medicines?

24  **A.**   Well, Lyrica can be used for pain as well.

25  **Q.**   But Valium.  And what was the original one you said?

1   **A.**   Valium can be used for spasms.  That was often that that

2   was given for.

3   **Q.**   Muscle spasms?

4   **A.**   Mm-mm.  Zofran is for the stomach.

5   **Q.**   You also said when you put her on Subsys that she was

6   precancerous?

7   **A.**   I did.

8   **Q.**   And tested positive for a cancer gene?

9   **A.**   Yes.

10   **Q.**   What does that mean?

11   **A.**   She had some testing done where it showed that she had

12   the genes that were -- the same genes that in her family

13   history that went on to cancer.

14   **Q.**   Were you treating her pain for her cancer genes?

15   **A.**   No.

16   **Q.**   Did the fact that she had that gene have anything to do

17   with why you prescribed Subsys?

18   **A.**   It helped, I think, to get the insurance to cover it.

19   **Q.**   Did it weigh into your medical decision-making at all,

20   notwithstanding the insurance?  In terms of deciding what

21   drug to give her, did the fact that she had this precancer

22   gene, is that why she got Subsys, to help with the precancer

23   gene?

24   **A.**   No.

25   **Q.**   Why did you give her Subsys?

1   **A.**   Because I got paid by Insys.  So if I were going to

2   choose between one drug or another, I would choose the Subsys

3   because that's the one that I was getting paid from.

4   **Q.**   And you said you also gave her Fentora?

5   **A.**   Yes.

6   **Q.**   Why both?

7   **A.**   I don't recall why I did that, but it seems I did that on

8   a few patients.  The only thing I can think of in retrospect

9   as to why I did it, since I didn't document it, is because I

10  suspected that one or the other would not get covered by

11  insurance.  And when patients didn't get the medications that

12  were prescribed to them, particularly due to insurance

13  reasons, they weren't very happy.

14  **Q.**   Did she need a rapid-onset opioid?

15  **A.**   No.

16  **Q.**   Why do you say no?  What makes you say no?

17  **A.**   Well, because there's other things that could have and

18  should have been done instead.  In this case, I think her

19  Opana ER, the extended release, should have been increased a

20  little bit instead.

21  **Q.**   Instead of adding a rapid-onset opioid?

22  **A.**   Correct.

23  **Q.**   Do you know is it medically advisable for patients to

24  take both Fentora and Subsys at the same time?

25  **A.**   Probably not.

1   **Q.**   Did you counsel her on that?

2   **A.**   All patients got counseled on any of those rapid-onset

3   medications because you had to talk to them about it and have

4   them do the --

5   **Q.**   Have you heard of the TIRF REMS program?

6   **A.**   That program.  Sorry.

7   **Q.**   That's what you did it for?

8   **A.**   The TIRF REMS required that you counsel these patients on

9   these particular medications, this class, and there were

10  things you had to go over.  It was self-explanatory when you

11  look at it, and the patient is supposed to sign it, you're

12  supposed to sign it.  It goes in the chart.

13           MR. LAZARUS:  If we could pull up, please, for the

14  witness page 56 of Exhibit 754, please.

15           Your Honor, as we stated earlier, the records are

16  voluminous and contain a lot of personal information.  We'd

17  move to offer them subject to redaction agreement by the

18  parties later.

19           MR. STOJILKOVIC:  No objection.

20           THE COURT:  Yes.  That's fine.

21           (Government Exhibit No. 754 admitted.)

22  BY MR. LAZARUS:

23  **Q.**   Do you see this page on the screen in front of you?

24  **A.**   I do.

25  **Q.**   Take a look --

```
 1              MR. LAZARUS:  Your Honor, I would ask -- let's hold
 2    off on publishing it for a minute because of the personal
 3    information.
 4    Q.  Ms. Alfonso, at the top, what's the date of service for
 5    this?
 6    A.  February 20, 2014.
 7    Q.  What does that mean, the date of service?
 8    A.  What does that mean?
 9    Q.  The day the patient saw you?
10    A.  Yes.
11              MR. LAZARUS:  If we can scroll down, please.  If we
12    could publish, please.
13    Q.  Okay, Ms. Alfonso, take a look -- do you see where it
14    says DOS 1/24/2014 at the bottom of the page?
15    A.  Yes, sir.
16    Q.  Do you know who writes this narrative or who wrote this
17    narrative?
18    A.  I did.
19    Q.  If you look towards the bottom of it, about four lines up
20    it says, "She states that the oxycodone does work."
21              Do you see that there?
22              THE COURT:  We don't have any of this up in front
23    of the jury, right?
24              MR. LAZARUS:  Your Honor, I believe that the
25    portion that we're publishing right now does not contain --
```

1          THE COURT:  Do you want this portion up?

2          MR. LAZARUS:  Yes, please.  Thank you, Ms. Folan.

3     **A.**   Yes.  I see it says, "She states that the oxycodone does

4     work, but she can feel by the third hour that she needs the

5     next dose."

6     BY MR. LAZARUS:

7     **Q.**   And that she takes Advil with it?

8     **A.**   Correct.

9     **Q.**   And then you say you're going to add Subsys and Fentora.

10    What's PRN mean?

11    **A.**   As needed.

12    **Q.**   And you say she has gastric issues and she also has

13    cancer genes.

14    **A.**   Correct.

15    **Q.**   Why did you write that in here?

16    **A.**   Because when -- what happens is -- what happens was after

17    a prescription for Subsys was written, we had to fax the

18    prior authorization form, the face sheet which has all the

19    patient's information, insurance information, and the last

20    office note to the prior authorization department so that

21    they can get it approved.

22    **Q.**   And so what was your understanding about putting the word

23    "cancer" in here in all caps?  Did you understand whether

24    that would help or you believed that it would help get it

25    approved?

1   **A.**   Yes.

2          MR. LAZARUS:  So if we could just for the witness,

3   please, scroll down to the entry for 2/20/14.  There it is.

4   **Q.**   Was Ms. Kamzyuk able to obtain Fentora?

5   **A.**   According to the note, she was not able to obtain Fentora

6   because there was a high copay.

7   **Q.**   And with respect to the Subsys, did she give any

8   indication as to whether or not that was working?  If you

9   could look at the second sentence there.

10  **A.**   It says, "She has been using the Subsys with a good

11  effect noted."

12  **Q.**   What does that mean?

13  **A.**   That means it was working well for her.

14  **Q.**   And then towards the bottom of that paragraph it says,

15  "Discussed the need to decrease oxycodone, will titrate Opana

16  and Subsys.  I'm paraphrasing what's on the screen.

17         Do you see that?

18  **A.**   Correct.  So we had to decrease the number of oxycodone

19  tablets.  So I don't recall what she was getting.

20         Oh, it was maximum of six tablets per day as needed

21  is what she was on previously.  And so we decreased that to

22  four per day per guidelines.  Essentially means per the

23  guidelines set in the office due to the increased scrutiny of

24  looking -- you know, the high narcotic usage, we were

25  instructed to decrease.

1           So in response to that, the long-acting was

2    increased to 40 milligrams twice a day and the Subsys was

3    increased to 400 micrograms as needed.

4    **Q.**  So she was titrated up on the Subsys, among other things?

5    **A.**  Correct.

6           MR. LAZARUS:  If you could scroll down, Ms. Stein.

7    Go up a little bit, please.

8    **Q.**  When you were completing your office notes, were you

9    using electronic medical record software?

10   **A.**  Yes.

11   **Q.**  Was there a place where you would discuss medication

12   management or would enter in the prescriptions that were

13   being provided on a given day?

14   **A.**  Yes.

15   **Q.**  Take a look at your screen in front of you, please.

16          MR. LAZARUS:  Just for the witness, please,

17   Ms. Folan.  Thank you.

18   **Q.**  And so if you can tell from here -- and if you need us to

19   scroll somewhere else, just let us know.

20          What medication did the patient receive on this

21   date?  And what date was it?

22   **A.**  On this date, which I believe was --

23   **Q.**  Do you want us to scroll up a little bit?

24   **A.**  No.  Had 2/20.  It looks like it was 2/20.  She received

25   Subsys -- she didn't receive -- the Subsys 400 micrograms as

1     needed, and she got a quantity of 120 of those so she could

2     have four per day.  Oxycodone, 30 milligrams, a maximum of

3     four per day.  Opana ER, 40 milligrams twice a day.

4     **Q.**  Now, it says under Subsys it says "Spray PRN Q4H."  That

5     means as needed every four hours?

6     **A.**  Correct.

7     **Q.**  And then it says in parentheses, One spray and then

8     breakthrough cancer pain?

9     **A.**  It does say that.

10    **Q.**  Did you write that there?

11    **A.**  I must have written that.

12    **Q.**  Why?

13    **A.**  I don't know.

14    **Q.**  Were you treating breakthrough cancer pain in this

15    patient?

16    **A.**  No.

17    **Q.**  If we could go to page 260 of Exhibit 754.  Do you see

18    the portion of this medical record on your monitor in front

19    of it you, ma'am?

20    **A.**  Yes, I do.

21    **Q.**  Do you recognize any of the handwriting on there?

22    **A.**  Yes, I do.

23    **Q.**  Whose handwriting do you recognize?

24    **A.**  I recognize my handwriting.

25              MR. LAZARUS:  If we could publish this, please, for

1    the jury, Ms. Folan.  And if you could enlarge the prescriber

2    portion, please, Ms. Stein, on the top right.

3    **Q.**  What kind of form is this?

4    **A.**  This is the prior authorization form that had to be

5    filled out.

6    **Q.**  For whom?  Like what company?

7    **A.**  For Insys.

8    **Q.**  Whose handwriting is on the screen now under "prescriber

9    information"?

10   **A.**  That is the drug rep.

11   **Q.**  Okay.  If you could close this and scroll down.  Where do

12   you see your handwriting on here?

13   **A.**  So my handwriting is my signature, the date, and the

14   stuff about diagnosis.

15         MR. LAZARUS:  If you could enlarge, Ms. Stein, from

16   diagnosis -- yup, from right there.

17   **A.**  Yeah.  That is my handwriting.

18   **Q.**  Where it says "diagnosis," can you read that for us,

19   please, your handwriting?

20   **A.**  Breast and ovarian cancer.

21   **Q.**  Was that actually the diagnosis for this patient?

22   **A.**  No.

23   **Q.**  Why did you write that?

24   **A.**  So it would get approved for the insurance.  And I did

25   write at the bottom -- yeah.  I put that at the bottom,

1    hysterectomy for ovarian cancer and positive BRCA genes for

2    breast cancer.

3    **Q.**   How did you know to write this in here?  Did you discuss

4    that with anybody from Insys?

5    **A.**   This was discussed prior to this patient.  If there was a

6    cancer diagnosis, then in theory there is no reason it would

7    get denied.

8    **Q.**   That's what one of the drug reps told you?

9    **A.**   Correct.

10   **Q.**   So this diagnosis that's here, is that accurate?

11   **A.**   No.

12   **Q.**   Where it says breast and ovarian cancer?

13   **A.**   Oh, no.  That's not accurate.

14   **Q.**   The part down on the bottom right where it says

15   hysterectomy for ovarian cancer, plus BRCA genes for breast

16   cancer, is that accurate?

17   **A.**   It's an accurate fact but not what I was treating her

18   for.

19   **Q.**   Okay.  If you could please take another folder.  You can

20   close that one.  Well, before we move on to the next one, did

21   you violate your duty to Michelle Kamzyuk?

22   **A.**   Yes, I did.

23   **Q.**   Did you prescribe her Subsys outside the ordinary course

24   of medicine and not for a legitimate reason?

25   **A.**   Yes, I did.

1    **Q.**  What's the next folder in front of you that we can talk

2    about?

3    **A.**  Patient name, Marvin Sachs.  I don't see a number on it.

4    It.

5              MR. LAZARUS:  Bear with me for one moment, Your

6    Honor.

7    **A.**  Do you want me to pick a different one?

8    **Q.**  No.  That's all right, ma'am.  Bear with me for a moment,

9    please.

10             MR. LAZARUS:  Your Honor, may I have one moment?

11             THE COURT:  Yes.

12   BY MR. LAZARUS:

13   **Q.**  If you could, take a look at the last page of the exhibit

14   at the bottom of the pile -- at the bottom of the folder, is

15   the exhibit number there?

16   **A.**  Oh, yes.  Yeah, yeah, yeah.

17   **Q.**  So what exhibit number are you looking at there?

18   **A.**  1057.

19   **Q.**  Okay.  And if you could tell us again the name of the

20   patient, please?

21   **A.**  Marvin Sachs.

22   **Q.**  And when did Marvin Sachs present at Comprehensive Pain?

23   **A.**  April 18, 2013.

24   **Q.**  And why was Mr. Sachs there?

25   **A.**  Low-back pain.

1    **Q.**  What's a problem list in your medical records mean?

2    **A.**  The problem list was essentially what we were treating

3    them for with the diagnoses codes.

4    **Q.**  And what does past medical history mean?

5    **A.**  Past medical history is other issues that they've had in

6    the past or have.

7    **Q.**  And did Mr. Sachs have cancer?

8    **A.**  He had lymphoid leukemia in remission.

9    **Q.**  And did you prescribe Mr. Sacks Subsys?

10   **A.**  I did.

11   **Q.**  On what date?

12   **A.**  7/5/2013.

13         MR. LAZARUS:  So on July 5, 2013, if we could put

14   up for the witness and counsel, please, page 47 of

15   Exhibit 1057.  Scroll up a little bit, please.

16   **Q.**  So what medications was Mr. Sachs already taking when you

17   prescribed him Subsys?

18   **A.**  So it looks like he was already taking a lot of

19   medications.  He was taking OxyContin 20 milligrams twice a

20   day.  He was taking oxycodone 30 milligrams.  He was getting

21   12 tablets per day.  Duragesic patch 50 micrograms every two

22   days.  OxyContin 40 milligrams twice a day.  I think that's

23   it.

24   **Q.**  The Duragesic, that's that fentanyl patch, the long

25   acting?

1  **A.**  Yes.

2  **Q.**  And the other medications you just named, are those

3  short-acting or long-acting?

4  **A.**  OxyContin 40 milligrams and 20 milligrams are both

5  long-acting.  Oxycodone 30 milligrams is short-acting.

6  **Q.**  And he was on all those medications?

7  **A.**  Yeah.

8  **Q.**  And then you added Subsys?

9  **A.**  Yes.

10  **Q.**  Why?

11  **A.**  It looks like -- wait a second.  Just going back.  So he

12  wasn't getting 12 per day.  He was taking like eight or

13  something per day, I think.  Anyway.  Why?  I documented once

14  daily Subsys for fast-acting pain relief to get out of bed in

15  the morning.

16  **Q.**  Do you know whether that was necessary?

17  **A.**  Do I know why what was necessary?

18  **Q.**  Was the medication necessary for him?

19  **A.**  No.

20  **Q.**  Why not?

21  **A.**  Well, for one thing, he was already on a boat load of

22  medications.  This man was very old.  And there were other

23  options.

24  **Q.**  When you say "other options," what do you mean?

25  **A.**  Honestly -- I mean, other medications that could have

1    been given.

2    **Q.**  Are you talking rapid-onset opioids, or other types?

3    **A.**  Other types.  Yeah, not necessarily rapid onset at all,

4    actually.

5    **Q.**  Were you treating the cancer pain?

6    **A.**  No.

7    **Q.**  Okay.  If you could turn to the next folder that you have

8    there, please.  And let us know that patient's name.

9    **A.**  Exhibit No. 0755, Thomas Kobierowski.

10   **Q.**  Was Mr. Kobierowski a patient at Comprehensive Pain?

11   **A.**  Yes, he was.

12   **Q.**  Why was he referred?

13   **A.**  He was referred for chronic low-back pain and leg pain.

14   And that looks like that was on 2/27/2012.

15   **Q.**  That was the referral date?

16   **A.**  Correct.

17   **Q.**  And did you see Mr. Kobierowski and prescribe Subsys on

18   some future date?

19   **A.**  Yes, I did.

20   **Q.**  When was that?

21   **A.**  I saw him on 6/21/2013, and I prescribed Subsys to him.

22   **Q.**  Why?

23   **A.**  For sharp, shooting pain to his flank.  That's this area.

24   **Q.**  You indicated kind of like around the right hip area?

25   **A.**  I don't know if it was right or left, but --

1   **Q.**   You're just indicating with your hand just for the record

2   the flank is at the side of the body?

3   **A.**   Oh, yeah.  Yes, sorry.

4   **Q.**   What else was he on?

5   **A.**   He was on Exalgo, 12 milligrams once at night, which is a

6   long-acting.  He was on Percocet 10 milligrams, four per day

7   as needed.  He was on morphine, 30 milligrams twice a day,

8   and some creams.

9   **Q.**   Pain creams?

10   **A.**   Yes.

11   **Q.**   Like topical pain creams?

12   **A.**   Correct.

13   **Q.**   Was he on any other rapid-onset opioid?

14   **A.**   No.

15   **Q.**   Can you tell from the records, are you familiar with

16   something called dysphagia?

17   **A.**   Difficulty swallowing.

18   **Q.**   And so can you tell from the records whether he had been

19   diagnosed with dysphagia?

20   **A.**   First of all, I cannot see that in the record.  And also

21   I remember him, and I don't believe he had dysphagia.

22   **Q.**   And those other medications, except for the topical

23   creams, how are those administered?

24   **A.**   By mouth.

25   **Q.**   Pills?

1    **A.**   Correct.

2    **Q.**   In your medical opinion, did he need a rapid-onset

3    opioid?

4    **A.**   No.

5    **Q.**   Why did you give him one?

6    **A.**   Why did I choose Subsys?

7    **Q.**   Yeah.  Why did you give him Subsys?

8    **A.**   Because Subsys was paying me to write prescriptions.  And

9    I was wrong and should have chosen something different for

10   him.

11   **Q.**   Like what?

12   **A.**   Like his long-acting should have been increased or -- I

13   mean, it looks like he was referred for an epidural injection

14   and he should have just waited for that.

15   **Q.**   Do you believe you broke your duty to Mr. Kobierowski?

16   **A.**   I know I did.

17   **Q.**   Did you provide him Subsys outside the ordinary course of

18   medicine and not for a legitimate medical purpose?

19   **A.**   Yes.

20   **Q.**   If you could take the next file in front of you, please.

21   **A.**   Exhibit 1854.  Patient name Sara K. Dawes.

22   **Q.**   Ms. Alfonso, take a look at that medical record, and when

23   you've had a chance just let us know, please, when Ms. Dawes

24   first presented at Comprehensive Pain?

25   **A.**   Her initial office note wasn't in the records because she

1    was a very long-term patient.  So when they started with this

2    medical -- this electronic medical record, he -- he meaning

3    the doctor -- did the HPI, the history and physical portion,

4    to kind of compile all those old records.  So there's no

5    initial note in here, but I can tell you that according to

6    this record she was seen in the practice in early 2001.

7    **Q.**  And for what purpose?

8    **A.**  Acute episode of trigeminal neuralgia.

9    **Q.**  What's that mean?

10   **A.**  Facial pain.

11   **Q.**  Now, you mentioned that the records aren't present there.

12   At some point did the practice transition, if you know, from

13   paper records to electronic records?

14   **A.**  Transition from paper records to electronic records well

15   before I got there, and then it transitioned again from the

16   old electronic record to a new updated electronic record.

17   And the records weren't exactly -- it wasn't easy to do that.

18   **Q.**  To go from one to another if you needed to see an old

19   record, for example?

20   **A.**  You had to go onto the old system.  It wasn't -- when

21   they did the new system, it was when the government mandated

22   that they have specific systems in place, and the old system

23   wasn't one of those systems.  So it was kind of --

24   **Q.**  Just to be clear, that was like a national push for

25   electronic medical records, right?

**A.**   Yes.

**Q.**   Not just Comprehensive Pain?

**A.**   No.   It was everywhere.

**Q.**   And when you were working at Comprehensive Pain, did you rely on the medical records as accurate, the information in there when you would go in and see a patient?

**A.**   Yes.

**Q.**   Did you prescribe Subsys to Ms. Dawes?

**A.**   I did.

**Q.**   When?

**A.**   November 18, 2013.

**Q.**   So on November 18, 2013, medically speaking, what was happening with Ms. Dawes?   What medicines was she on?   Why was she there?

**A.**   She was on OxyContin 80 milligrams and 40 milligrams, four times a day each.   She was on oxycodone 30 milligrams and 15 milligrams, four per day each.   Some topical creams.

**Q.**   Was that long- and short-acting opioids?

**A.**   Yes.   And she -- let's see.   On that date, we resumed Duragesic patches.   And for the eye pressure and facial pain, again I started Fentora and Subsys, but I don't think she got both.

**Q.**   So she was there for eye pain and eye pressure?

**A.**   Correct.

**Q.**   Was that cancer-related?

1    **A.**  No.

2    **Q.**  And you prescribed -- you added a long-acting fentanyl

3    patch.  Is that what it says?

4    **A.**  Correct.  According to this, it looks like it.  According

5    to the note, it looks like it.

6    **Q.**  And Subsys and Fentora?

7    **A.**  Yes.

8    **Q.**  In addition to the oxy?

9    **A.**  Yes.

10    **Q.**  What dose Subsys did you put her on?

11    **A.**  20 micrograms.

12    **Q.**  Why did you prescribe Subsys to Ms. Dawes?

13    **A.**  Well, in the chart there's really no reason for it.

14    Because Subsys was paying me and -- there's no other real

15    indication.

16          MR. LAZARUS:  If you could go to page 859, please,

17    for the witness, of Exhibit 1854.

18    **Q.**  Can you see this on the monitor in front of you?

19    **A.**  I do.

20    **Q.**  Do you recognize any of the handwriting on here?

21    **A.**  I do.

22          MR. LAZARUS:  Ms. Stein, can you enlarge again from

23    the diagnosis portion down through the signature.

24    BY MR. LAZARUS:

25    **Q.**  Do you recognize the signature on here, Ms. Alfonso?

1    **A.**   Yes.  My signature.

2    **Q.**   And is any of the rest of this your handwriting?

3    **A.**   In the box, that's my handwriting.

4    **Q.**   Where it says prediabetic, congenital defect of artery

5    resulting in --

6    **A.**   Yes.

7    **Q.**   Can you read the rest of that for us, please.

8    **A.**   Congenital defect of artery resulting in trigeminal

9    neuralgia symptoms, sharp pain.

10   **Q.**   From your review of the records, do you know whether

11   Ms. Dawes had malignant cancer pain?

12   **A.**   From my review of the records, she did not have malignant

13   cancer pain.

14   **Q.**   Did she have a diagnosis -- are you familiar with ICD-9

15   codes generally?

16   **A.**   I know what they are, but I'm not --

17   **Q.**   You're not versed in the specific of different codes?

18   **A.**   No.

19   **Q.**   But if there was a code written down for her for

20   malignant cancer pain, would that be accurate, medically

21   speaking?

22   **A.**   Probably not.

23   **Q.**   Well, do you see in the record anything?

24   **A.**   No.  There's nothing in the record that says anything

25   about -- you know what it says in her record?  Her paternal

1   grandfather had cancer.

2   **Q.**   If we could go -- well, do you have --

3   **A.**   This is 11/18/2013.  It above says 400 micrograms.

4   **Q.**   I'm sorry.  Where does it say 400 micrograms?  Further up

5   on this form?

6   **A.**   Yeah.

7   **Q.**   Can you scroll up, please, to the medication towards the

8   middle.  Do you recognize that handwriting?

9            MR. LAZARUS:  Ms. Folan, could we publish this

10  portion, please?

11           THE COURT:  You haven't admitted it.

12           MR. LAZARUS:  Thank you, Your Honor.  I would move

13  for with the same limitations we discussed for the other

14  medical records, Your Honor.  I would move to admit

15  Exhibit 1854.

16           THE COURT:  I think you only moved the first one.

17           MR. LAZARUS:  Thank you, Your Honor.  If I may, for

18  purpose of the record I would move to introduce each of the

19  six medical records that are in front of the witness, subject

20  to the same limitations that we discussed earlier.

21           MR. STOJILKOVIC:  Subject to the same limitations,

22  no objection.

23           THE COURT:  All right.  So they are going to admit

24  the records.  They're just going to be redacted to take out

25  some of the personal information and just give you the

1    portions of the record that are relevant to you.  So you're

2    seeing excerpts now.  When you're deliberating, you'll get a

3    more fulsome file, though still not the whole file.  Okay?

4              MR. LAZARUS:  Thank you, Your Honor.  If we could,

5    please, publish, Ms. Folan, this portion here.  Thank you.

6              (Government Exhibit Nos. 755, 1004, 1006, 1057, and

7              1854 admitted.)

8    BY MR. LAZARUS:

9    **Q.**  This handwriting, Ms. Alfonso, are you able to recognize

10   it?

11   **A.**  I cannot guarantee that that's my handwriting right

12   there.  Where it says "ovarian cyst, hernia, endometriosis"

13   looks like mine.  But even where it says "Dilaudid,

14   erythromycin," that does not look like my handwriting.  And

15   neither does the upper portion where it says "Subsys

16   400 micrograms, 120 units."

17   **Q.**  So during your time --

18   **A.**  Because according to the record, it says only 30 units of

19   the 200 micrograms.

20   **Q.**  What are you saying?  That the record --

21   **A.**  I'm saying it doesn't -- something's wrong.

22   **Q.**  You're saying that the opt-in form that's on the screen

23   in front of you doesn't match the prescription information

24   elsewhere in the medical record?

25   **A.**  Correct.

1    **Q.**   So are you familiar with the Insys reimbursement center,

2    the IRC?  Did you deal with them at all?

3    **A.**   I mean, I didn't deal with them personally.  We submitted

4    the documents, and that's that.

5    **Q.**   Are you familiar with whether -- let me pull up for you

6    on Exhibit 1854, page 779, please.  If you could enlarge the

7    top third of this, please.

8              Do you see here on the screen it's dated April 22,

9    2014?  Are you familiar that Fentora also had some type of

10   reimbursement support services?

11   **A.**   I don't recall.

12   **Q.**   And do you know from -- well, I'll move on.  Ms. Dawes,

13   with respect to this prescription for Subsys that you

14   prescribed to Ms. Dawes, was that necessary medically?

15   **A.**   No.

16   **Q.**   Did you do it because you were paid to prescribe?

17   **A.**   Yes.

18   **Q.**   Do you believe you violated your duty to Ms. Dawes?

19   **A.**   Yes, I do.

20   **Q.**   You can move on to the next folder, please.

21   **A.**   Exhibit 1004, Maryellen Ovalle.

22   **Q.**   Thank you.  Take a look when you're ready, let us know

23   when Ms. Ovalle presented at Comprehensive Pain.

24   **A.**   This patient never had a -- there was no original office

25   note in her chart.  So I don't know when she came.

1   **Q.**  Are you able to tell what her pain was, what the reason

2   she was there?

3   **A.**  Chronic daily headache.

4   **Q.**  And how can you tell that that's the case?

5   **A.**  Because on the follow-up visit it says "chief complaint"

6   at the top, and it says "chronic daily headache."

7   **Q.**  And did you see Ms. Ovalle at some point?

8   **A.**  I did.

9   **Q.**  When did you see her?  Let me ask you this:  When did you

10  first prescribe her Subsys?

11  **A.**  8/13/2014.

12  **Q.**  And on August 13, 2014, medically what was happening with

13  Ms. Ovalle that day?

14  **A.**  So she had pain.  This woman had pain all over and a lot

15  of different conditions that were contributing to her pain,

16  most likely.  She was taking two tablets three times a day of

17  oxycodone, and I added Subsys to her medication regimen in

18  addition to increasing her Duragesic patch.

19  **Q.**  That's that long-acting fentanyl patch?

20  **A.**  Correct.

21  **Q.**  Did she have gastrointestinal issues?

22  **A.**  According to the record, it looks like I wrote that she

23  did.

24  **Q.**  And Subsys, is that different from some of the other

25  rapid-onset opioids in terms of how it's administered?

1    **A.**   They're all administered a little bit differently.

2    Subsys is a spray.   Fentora was a little dissolvable tablet.

3    And the Actiq or fentanyl lollipops naturally were lollipops

4    that you sucked on.

5    **Q.**   What led you to prescribe Subsys for Ms. Ovalle?

6    **A.**   I was getting paid very well by Subsys, actually.

7              MR. LAZARUS:   If we could show the witness page

8    111, please.   And if you could scroll down to the -- first of

9    all, stop there for one second.   Just show the footer of the

10   page.

11   **Q.**   Ms. Alfonso, if you could take a look at the footer of

12   the page, does this indicate to you that this is a date of

13   service and note that you completed, where it says signed by

14   HA?

15   **A.**   Yes.

16              MR. LAZARUS:   If we could go to the narrative for

17   9/24, please, Ms. Stein.   I believe it's just the previous

18   page.

19   **Q.**   Did you titrate her up to 1600 micrograms?

20   **A.**   Yes.

21   **Q.**   It indicates here she's been using Subsys but found that

22   she used only 400 micrograms with only minimal results?

23   **A.**   Correct.

24   **Q.**   So you went from 400 to 1600?

25   **A.**   Yes.

1    **Q.**  Are you aware whether there's doses in between?

2    **A.**  There are doses in between.

3    **Q.**  Why did you go all the way up to 1600, if you recall?

4    **A.**  I don't recall, but I know the larger doses they got paid

5    more.  And I don't think I had too many on the larger doses.

6    **Q.**  If we could go to page 143 of this record.

7          Now, at the bottom of this one it indicates signed

8    by MT, 4/28/15.  Do you know who MT is?

9    **A.**  Dr. Mark Thimineur.

10   **Q.**  Was that the doctor who worked in your program?

11   **A.**  Yes.

12   **Q.**  By 4/28/15, had you surrendered your license already at

13   this point?

14   **A.**  I was gone by then.

15   **Q.**  If we could look at the narrative here on 4/28/15.  Are

16   you familiar with the term "somatization"?

17          MR. STOJILKOVIC:  Your Honor, I'd object to this if

18   it's a diagnosis after she has left the practice.

19          MR. LAZARUS:  I'm happy to move on, Your Honor.

20          THE COURT:  Unless you have a response to it, I

21   think he's right.

22          MR. LAZARUS:  I'm happy to move on, Your Honor.

23          THE COURT:  Okay.

24   BY MR. LAZARUS:

25   **Q.**  I believe you have one more folder in front of you,

1    Exhibit 1006, Mary Werblin?

2    **A.**   Yes.

3    **Q.**   Take a look at that folder, please.  When did Ms. We

4    shall Lynn present at Comprehensive Pain and headache?

5    **A.**   Again with Ms. Mary Werblin, she was a very long-term

6    patient, and I don't believe that her original note were in

7    these records here.

8    **Q.**   In that version of the electronic medical chart?

9    **A.**   Correct.

10   **Q.**   So can you tell, however, why she's there, what kind of

11   pain she's getting treated for?

12   **A.**   Abdominal pain.

13   **Q.**   Was it cancer, breakthrough cancer pain?

14   **A.**   No.

15   **Q.**   Did you prescribe Subsys to her?

16   **A.**   Yes.

17   **Q.**   When?

18   **A.**   I prescribed Subsys to her on 10/16/2014.

19   **Q.**   What was happening on 10/16/2014?  What other medication

20   was Ms. Werblin on?

21   **A.**   She was on Dilaudid 4 milligrams as needed.  That's a

22   short-acting.  And she was on Duragesic 100 micrograms

23   every -- two patches every two days.

24   **Q.**   Is that it for pain medications?

25   **A.**   It looks like it.

1    **Q.**  So she's on a long-acting fentanyl patch, two of them,

2    and then a short-acting Dilaudid?

3    **A.**  Correct.

4    **Q.**  Was she on any rapid-onset opioid?

5    **A.**  No.

6    **Q.**  You didn't switch her from any other opioid or anything?

7    **A.**  That's correct, I did not.

8    **Q.**  And why did you give her Subsys?

9    **A.**  I think when I started her on it -- I gave her Subsys

10   ultimately because I was getting paid for it.  That's the

11   bottom line.  And I feel like with her, that may have been

12   when they had the get-the-first-month-free program, but I

13   don't remember.

14   **Q.**  Like a voucher?

15   **A.**  Yeah.

16   **Q.**  Is that something that some of your patients were able to

17   use to try the medication before the insurance got involved?

18   **A.**  Oh, yeah.

19   **Q.**  How would you get those vouchers?

20   **A.**  I'd get the vouchers --

21   **Q.**  Would you get them?

22   **A.**  I don't think that I did anything with a voucher.  It was

23   something where the first month was free.  I don't know.  I

24   wouldn't give it to the patient because they would get the

25   medication at the pharmacy in New York called Linden Care

1  that would mail it to them.  So we would just fax the

2  prescription over there along with the insurance information.

3  I don't remember what -- I didn't do it.  The girls at the

4  office did it.  You know what I mean?

5  **Q.**  And Linden Care was a mail order pharmacy.  That's what

6  you understood?

7  **A.**  Yeah.  They mailed the -- because the boxes were so large

8  with Subsys that they wouldn't fit into the safes at, say, a

9  CVS or Rite Aid, they wouldn't carry it.

10 **Q.**  You just had your hands spread out in front of you.  Can

11 you actually show the jury.  You said at some point you saw

12 the boxes?

13 **A.**  Yeah.  At some point I did see the boxes.  They were kind

14 of large.

15 **Q.**  How would they compare to a shoe box?

16 **A.**  Maybe not as deep, but a little bit larger than a shoe

17 box but not as deep maybe.

18 **Q.**  It was a bulky box?

19 **A.**  It was a bulky box, yeah.

20 **Q.**  Not a little pill bottle?

21 **A.**  Not what?

22 **Q.**  Not just a little pill bottle, for example?

23 **A.**  Oh, yeah.  No.

24 **Q.**  So you understood there was difficulty storing that at

25 pharmacies?

1   **A.**   Yeah.   And I know that because -- see, Medicaid in

2   Connecticut approved it.   Medicaid always approved pretty

3   much everything.   You just did their little prior-auth form,

4   which was nothing, and they would approve it just fine.

5          The problem is Linden Care as a pharmacy wouldn't

6   accept Connecticut Medicaid patient prescriptions, so the

7   Medicaid patients would have to go to a regular pharmacy.

8          And I had patients that would come in and tell me,

9   I cannot get this medication.

10          And I'd say, what do you mean you can't get the

11   medication?   It was approved.   I don't understand.

12          And they told me.   And I guess the pharmacy had

13   told them, you know, I think they were giving them the

14   runaround because they didn't want -- they had nowhere to put

15   it, basically, is what they said.   There was no -- their safe

16   wasn't big enough to store all of that.   Because if you're

17   ordering -- that's one box was for 30 of those sprays.   And

18   if people were on four a day, 120, that's four of those

19   boxes.   So like a box, you know, probably like -- maybe like

20   this or this one, four of them.   They had nowhere to put

21   that.   So the Medicaid patients really had a hard time

22   getting it.

23   **Q.**   You were just indicating two folders filled with paper as

24   the size?

25   **A.**   Yeah.

1    **Q.**  And so Ms. Werblin, you said she was on Dilaudid and

2    these Duragesic patches.  The Dilaudid, what form was that

3    being administered in?

4    **A.**  Pill.

5    **Q.**  Is there any indication that she was suffering from

6    dysphagia or difficulty swallowing?

7    **A.**  No.

8    **Q.**  Did she need to be on Subsys?

9    **A.**  Oh, no.

10   **Q.**  Why did you give her Subsys?

11   **A.**  Like I said, because I think she was getting -- it was

12   free.  And also I knew I was getting paid for the -- I was

13   getting paid in some aspect from Insys.

14   **Q.**  Do you know whether you renewed the prescription at some

15   point?

16   **A.**  I don't remember.

17           MR. LAZARUS:  If we could turn to Exhibit 1006,

18   page 29, please.  And we'll enlarge the narrative section for

19   you.  Let's go to page 45, please, Ms. Stein.  If you can

20   scroll down, please.  Stop right there, please.

21   **Q.**  I'm going to come back to this exhibit in a few moments,

22   Ms. Alfonso.

23           I want to talk to you about your prescribing

24   practices.  So did the money you were getting paid from Insys

25   affect your prescribing decisions?

1    **A.**   Yes.

2    **Q.**   Did you feel any pressure in terms of prescriptions you

3    needed to write?

4    **A.**   Oh, yes.

5    **Q.**   Can you explain?

6    **A.**   Like I said I think earlier, if I didn't maintain, you

7    know, a certain number of prescriptions, the reps would make

8    comments like, oh, you haven't had any new scripts in a

9    couple of weeks, or things like that.  So as I understood it,

10   that went hand in hand with how many dinner engagements that

11   I would get.  And of course dinner engagements equated to the

12   extra money.

13   **Q.**   Were they also fun events, going to the dinners?

14   **A.**   Sometimes, yeah.  I mean, there were at restaurants

15   that -- those of us that attended otherwise would not have

16   likely gone to those restaurants.

17   **Q.**   Why do you say that?

18   **A.**   Well, they're expensive.

19   **Q.**   And Insys was picking up the tab?

20   **A.**   Oh, yeah.

21   **Q.**   So in terms of your medical decision-making and your duty

22   to your patients, are you able to estimate about just how

23   much of an impact the money that Insys was paying in exchange

24   for scripts had on your medical decision-making?

25           When it came to prescribing Subsys, are you able to

1    estimate about how many of these patients you put on Subsys

2    and the time you were getting paid by Insys actually needed

3    it and how many were rather written by you prescriptions

4    outside the usual course of medicine not for a legitimate

5    medical purpose?

6    **A.**   I guess, I mean if I had to estimate, probably 10, maybe

7    20, 10 to 20 percent were legitimate.  The rest could

8    certainly and probably should have either had a different

9    medication or a different treatment.

10   **Q.**   So just to be clear, you're estimating.  You didn't

11   review all of your medical records before you testified,

12   right?

13   **A.**   No.

14   **Q.**   And so what are you basing your estimate on?

15   **A.**   I'm just basing my estimate on my recollection, which

16   isn't always fabulous either, but my recollection.  And I'm

17   not really great with numbers.  So I'm saying 10 to 20.  I'm

18   going to say 10 maybe because we didn't have really cancer

19   patients.  So --

20   **Q.**   But Subsys could be prescribed for people who didn't have

21   cancer as well, right, if you made a legitimate --

22   **A.**   Off-label.

23   **Q.**   And if you made a legitimate medical decision, you could

24   prescribe it off-label, right?

25   **A.**   Correct.

1   **Q.**   And I think you made a distinction earlier between

2   off-label and medically unnecessary.

3   **A.**   Right.

4   **Q.**   So in terms of medically unnecessary, how common of an

5   occurrence was that for you, as a result of the money that

6   that Insys was paying you?

7   **A.**   It was very common.

8   **Q.**   In terms of your patient population, when you were

9   prescribing Subsys to people without a legitimate medical

10  reason, were you switching them from one of the other

11  competitors?  Were you putting them on a rapid-onset for the

12  first time, if you recall?

13  **A.**   So for the most part, there was a period where they had a

14  switch program.  So if you would take a patient who was on

15  the lollipop and Actiq and switch them, there was some sort

16  of, I don't even remember, a voucher or something.  So for

17  that period there was some switching going on.

18          But primarily -- and actually as a representative

19  sample, if you look at these charts, which I don't know where

20  they were from, like how they were picked, but most of them

21  were not or had not been on a rapid-onset prior to being on

22  Subsys.

23  **Q.**   But some of them were?

24  **A.**   Oh, some were, but --

25  **Q.**   So in 2014, did you get reprimanded by the board of

1    medicine in Connecticut?

2    **A.**   Oh, yes.

3    **Q.**   What was that about?

4    **A.**   I don't remember.  If you show me the paper.  I can't --

5    I honestly don't remember.

6    **Q.**   Did it have to do with your prescription practices in

7    2012?

8    **A.**   Yes.  Like that whole period was just a bad scene.

9    **Q.**   Why?  Explain what you mean.

10   **A.**   As soon as I became an APRN and started working in pain

11   management, it was just one thing after another.

12   **Q.**   What was it you got in trouble for in 2014?

13   **A.**   Signing prescriptions, right?  Because how the patients

14   would come in, and I mentioned before the medication visits

15   when they would come in and pick up their prescriptions.  So

16   I got in trouble for signing those prescriptions and not

17   assessing the patients.

18   **Q.**   So who had assessed the patient?

19   **A.**   Nobody.

20   **Q.**   So they would show up and you would just sign their

21   prescriptions?

22   **A.**   No.  I would sign a stack of prescriptions in the office,

23   and they would show up whenever they showed up, and the

24   medical assistant would see them, do a blood pressure, maybe

25   get a urine and drug screen, and give them their

1    prescriptions.

2    **Q.**   So in 2014, you got in trouble for that?

3    **A.**   Yeah.

4    **Q.**   How was that resolved?

5    **A.**   I had to pay a fine.

6    **Q.**   And were you able to keep your license?

7    **A.**   I was.

8    **Q.**   All right.  So let's talk about early 2015.  You said

9    that the DEA came to see you in about March of 2015?

10   **A.**   Yeah.  I don't remember the exact date, but I believe so.

11   March.

12           THE COURT:  Is this a good time for the break,

13   Mr. Lazarus?

14           MR. LAZARUS:  Yes, Your Honor.  Thank you.

15           THE COURT:  2:35, please.

16           THE CLERK:  All rise for the jury.

17           (The jury exits the courtroom.)

18           THE COURT:  2:35.  They would like to go 9:00 to

19   1:00 tomorrow because of the weather, which is fine.

20           Do you all have some consensus on number 11?  Do

21   you want to colloquy him separately?  Do you want to think

22   about it?  Counsel talk about it at the close of business.  I

23   don't want to use your whole break on this.

24           (Court recessed at 2:19 p.m.)

25           MS. WILKINSON:  Your Honor, the government and

1    defendants agree that we should dismiss the juror you were

2    discussing this morning who is not able to obtain payment

3    from his employer.

4              MR. YEAGER:  The government conferred and we agree.

5              THE COURT:  Juror Number 11.  What I would propose

6    is that Karen talk to him privately or call him after the

7    other jurors have left today and then we'll talk to them

8    about it on the record tomorrow, not to speculate.  And they

9    can spread out a little bit over there.

10             THE CLERK:  All rise for the jury.

11             (The jury enters the courtroom.)

12             THE CLERK:  Court is in session.  Please be seated.

13             MR. LAZARUS:  May I proceed, Your Honor?

14             THE COURT:  Go ahead.

15   BY MR. LAZARUS:

16   **Q.**  Ms. Alfonso, you recognize you're still under oath,

17   right?

18   **A.**  Yes.

19   **Q.**  I just want to ask you about your payments from Insys.

20   I'm going to show you what's been marked for identification

21   as Exhibit 1908.

22             MR. LAZARUS:  Your Honor, may I approach the

23   witness?

24             THE COURT:  Yes.

25   BY MR. LAZARUS:

1    **Q.**   Ms. Alfonso, do you recognize that exhibit?

2    **A.**   Yes.

3    **Q.**   What do you recognize it to be?

4    **A.**   These are the checks that I was paid from Insys.

5    **Q.**   Do you recognize any of the signatures on any of those

6    checks?

7    **A.**   They're my signature.  I mean, I recognize my signature

8    and my mother and my father's signature because some of my

9    checks I signed over to them.

10           MR. LAZARUS:  Your Honor, I would offer

11   Exhibit 1908.

12           MR. STOJILKOVIC:  No objection.

13           THE COURT:  It's admitted.

14           (Government Exhibit No. 1908 admitted.)

15   BY MR. LAZARUS:

16   **Q.**   So, Ms. Alfonso, when you'd receive the checks in the

17   mail from Insys or on behalf of Insys --

18           Some of those checks, by the way, are they

19   third-party checks?  Are they not Insys checks?

20   **A.**   Yes.  Some are Insys and some are Plan 365, Inc.

21   **Q.**   And are all of those checks, once you received them, what

22   would you do with them?  You mentioned some family members

23   just now?

24   **A.**   Yeah.  I would either deposit them into my bank or I

25   would sign them over to my mother or father so they could

1    deposit it into their bank because they were the ones that

2    were really helping to take care of my children.

3    **Q.**   You can put that aside for now.   Thank you.

4             MR. LAZARUS:   If I could show the witness and

5    counsel, please, Exhibit 1906.

6    **Q.**   Ms. Alfonso, do you recognize this exhibit?

7    **A.**   Yes.

8    **Q.**   Did you have a chance to review this at some point before

9    you testified?

10   **A.**   Yes.

11   **Q.**   And what do you recognize this exhibit to be?

12   **A.**   These are text messages between myself and Jessica Crane.

13   **Q.**   This is some select text messages between the two of you?

14   **A.**   It appears to be, yes.

15   **Q.**   In other words, is this every text message you ever

16   exchanged with her, or is this just some of them?

17   **A.**   Oh, no.   I don't think it's every single message I ever

18   exchanged with her.

19   **Q.**   And the dates on these, are they between February and the

20   end of March 2015?

21   **A.**   Yes.

22            MR. LAZARUS:   Your Honor, I would offer this

23   exhibit.

24            MR. STOJILKOVIC:   No objection.

25            THE COURT:   It's admitted.

1      (Government Exhibit No. 1906 admitted.)

2           MR. LAZARUS:  If we could, please, publish it,

3    Ms. Folan.  Ms. Stein, if you could enlarge from 220 to 225,

4    please.

5    BY MR. LAZARUS:

6    **Q.**  Ms. Alfonso, the 203 number under the "From"?

7    **A.**  Yes.

8    **Q.**  Do you recognize that number?

9    **A.**  That's my phone number.

10   **Q.**  And the other number, the 830 number, whose is that?

11   **A.**  I believe that to be Jessica.

12   **Q.**  Do you periodically get emails from either somebody at

13   Insys or somebody on behalf of Insys to set up your speaker

14   dinners?

15   **A.**  I remember that in the beginning they would shoot out an

16   email, just an update, like you're scheduled for a dinner

17   this date, time.

18   **Q.**  Just to let you know what was going on?

19   **A.**  Yeah.

20   **Q.**  So in the beginning of 2015, can you read what it says

21   for extracted text on the far right column of this exhibit.

22   **A.**  "I'm in Derby.  Bad day."  And then there's an article

23   link.  And that article, I believe, was about me being a high

24   prescriber of narcotics.

25   **Q.**  Who wrote this text message?

1    **A.**   I did.

2    **Q.**   And you sent it to Jessica Crane at Insys?

3    **A.**   Yes.

4    **Q.**   Why?

5    **A.**   I don't remember the context of --

6    **Q.**   Were you still a speaker for Insys at this time?

7    **A.**   Oh, yes.

8    **Q.**   And that article, you said it had to do with you being a

9    high prescriber.  Do you have a sense of where your opioid

10   prescription habits fell in terms of prescribers in the State

11   of Connecticut?

12          MR. STOJILKOVIC:  Objection.

13   **A.**   I did not at the time.

14          MR. STOJILKOVIC:  Foundation.

15          THE COURT:  Sustained.

16   BY MR. LAZARUS:

17   **Q.**   Did you read this article?

18   **A.**   I did.

19   **Q.**   As a result of reading the article, did you have an idea

20   of where your prescribing practices fell in the State of

21   Connecticut?

22          MR. STOJILKOVIC:  Objection.  Hearsay.

23          THE COURT:  Sustained.

24   BY MR. LAZARUS:

25   **Q.**   Did you have conversations with Jessica Crane about the

1  content of this article?

2  **A.**  I believe I did.

3  **Q.**  And was she still working with Insys at that time?

4  **A.**  Yes.

5  **Q.**  Take a look at the next text message exchange on

6  February 24, 2015.  What did you write to Jessica Crane on

7  February 24?

8  **A.**  "Days just keep getting crappier.  FYI, feds at one of my

9  patient's homes today asking questions about me and Subsys."

10  **Q.**  And the next text message you sent?

11  **A.**  "Did you let corporate know about that?"

12  **Q.**  Do you recall whether or not you ever speak to Ms. Crane

13  about that?

14  **A.**  I believe she said afterwards -- not the in text message,

15  but when I saw her in person -- that she let them know.

16  And --

17  **Q.**  Did you have paid speaking events or paid dinners for

18  Insys after this text on February 24?

19  **A.**  Yes.  I had paid dinners until the day that the DEA came

20  in and questioned me.

21  **Q.**  So the DEA showed up at your office one day?

22  **A.**  Yeah.  We had that conversation.

23  **Q.**  You testified about it earlier?

24  **A.**  I think so.

25  **Q.**  When the DEA showed up at your office, were you expecting

1    them?

2    **A.**   No.

3    **Q.**   They showed up and they interviewed you and you testified

4    earlier they asked you to surrender your license, right?

5    **A.**   Right.

6    **Q.**   When was the next speaking event you went to in

7    relation --

8    **A.**   That night.

9    **Q.**   So the night the DEA had come and visited you, you went

10   and you did an event and got paid by Insys?

11   **A.**   Correct.

12   **Q.**   Was that your final event getting paid by Insys that

13   night?

14   **A.**   Yes.

15   **Q.**   What did you do the day after that?

16   **A.**   Surrendered my license.

17          MR. LAZARUS:  Now, if you could, Ms. Stein, scroll

18   down, please.

19   **Q.**   So here the blue looks like it's a message to you from

20   that 830 number.  Do you see that?

21   **A.**   Yes.

22   **Q.**   Where it says, "Hi.  Tomorrow is Grants in West Hartford,

23   3/18 and 3/26."

24          What did you understand those two dates and

25   locations to mean?

1    **A.**   Locations and dates for speaking events, dinner events.

2    **Q.**   For you to get paid by Insys?

3    **A.**   Oh, yes.

4    **Q.**   And then on 3/17, further down, there's a text, "Morning.

5    Here's Barcelona's address for tonight."

6                And then the final text message on the page looks

7    like it's from you.  Can you read that, please, the very last

8    text message on the page.

9    **A.**   "I can't speak for Subsys anymore as I am no longer a

10   prescriber since I surrendered my DEA license and am not

11   working as an APRN anymore."

12   **Q.**   And at some point after that, you pled guilty in federal

13   court?

14   **A.**   Yes.

15               MR. LAZARUS:  May I have one brief moment to confer

16   with counsel, Your Honor?

17               THE COURT:  Yes.

18               MR. LAZARUS:  Thank you, Your Honor.  I have

19   nothing further at this time.

20               THE COURT:  Cross?

21               MR. STOJILKOVIC:  Thank you, Your Honor.

22                       CROSS EXAMINATION

23   BY MR. STOJILKOVIC:

24   **Q.**   Ms. Alfonso, can you see that okay?

25   **A.**   Yes.

1    **Q.**   I'll get to it in a minute.

2          MR. LAZARUS:  May I relocate so I can see it?

3          THE COURT:  Of course.

4    BY MR. STOJILKOVIC:

5    **Q.**   Ms. Alfonso, we've never met, have we?

6    **A.**   No.

7    **Q.**   My name is Kosta Stojilkovic.  Nice to meet you.

8          Ms. Alfonso, you pled guilty to a crime in July

9    of 2015, correct?

10   **A.**   I pled guilty to a crime.  I don't recall the date or

11   time.

12   **Q.**   Okay.  If I represent to you that I've looked at the

13   papers from your guilty plea and that it was in the summer of

14   2015, would you have any reason to dispute that?

15   **A.**   No.

16   **Q.**   And the crime you pled guilty to is something called the

17   Anti-Kickback Statute, right?

18   **A.**   Correct.

19   **Q.**   And that crime carries a sentence of up to five years in

20   prison, you told us, right?

21   **A.**   Correct.

22   **Q.**   And when you entered that guilty plea, you had to show up

23   to a federal court much like the court we're in today, right?

24   **A.**   Correct.

25   **Q.**   There was a judge there, right?

1   **A.**   Correct.

2   **Q.**   There was prosecutors there, and there was your own

3   defense attorney there, right?

4   **A.**   Correct.

5   **Q.**   And when you were pleading guilty, not only did you know

6   that the crime carries a maximum of five years in prison, but

7   you were informed about something called the sentencing

8   guidelines, right?

9   **A.**   Yes.

10   **Q.**   And those are advisory guidelines that give a suggestion

11   for what a sentence might be in your case, right?

12   **A.**   I suppose.

13   **Q.**   Is that consistent with your understanding of it?

14   **A.**   Yes.

15   **Q.**   And in your case, the advisory sentencing guidelines were

16   46 to 57 months in prison.  Does that sound about right?

17   **A.**   Yes.

18   **Q.**   Okay.  So that's almost four to five years, if we convert

19   the months to years, right?

20   **A.**   Yes.

21   **Q.**   But you have not served a single day in jail yet?

22   **A.**   Correct.

23   **Q.**   You haven't even been sentenced, I believe you told us

24   yesterday, right?

25   **A.**   I didn't speak to you yesterday.

1   **Q.**  Told us in the courtroom here.  I think Mr. Lazarus was

2   asking you and you indicated you had not yet been sentenced,

3   right?

4   **A.**  That's correct.

5   **Q.**  And the prosecutors in your case put off your sentence so

6   you can cooperate in the investigation and prosecution of

7   other people, right?

8   **A.**  That's correct.

9   **Q.**  And as part of that cooperation, you've spoken with

10  government agents and prosecutors multiple times, right?

11  **A.**  Yes, I have.

12  **Q.**  You first spoke with government agents in March of 2015.

13  Does that sound about right?  When the DEA showed up?

14  **A.**  Correct.

15  **Q.**  And they took notes of what you told them, right?

16  **A.**  I don't know.

17  **Q.**  You didn't observe any of them writing things down?

18  **A.**  I don't recall.

19  **Q.**  You later also spoke with agents of the FBI, correct?

20  **A.**  That's correct.

21  **Q.**  And agents of the Department of Health and Human

22  Services, right?

23  **A.**  Correct.

24  **Q.**  You spoke with prosecutors from the federal U.S.

25  Attorney's Office in Connecticut, right?

1   **A.**   Yes.

2   **Q.**   And you spoke with prosecutors from other offices, right?

3   **A.**   I don't know.

4   **Q.**   You spoke with prosecutors in New York at one point or

5   from New York?

6   **A.**   Yes.  Yes.

7   **Q.**   You spoke with the prosecutors in this case, who are from

8   Boston?

9   **A.**   Yes.

10  **Q.**   And each time you spoke with the government, there was at

11  least one agent there to memorialize what you were telling

12  them.  Did you know that?

13  **A.**   I do now.

14  **Q.**   And they wrote up a stack of reports on what you had been

15  telling them.

16          MR. STOJILKOVIC:  And if I may approach, Your

17  Honor, the easel.

18          THE COURT:  Yes.

19  BY MR. STOJILKOVIC:

20  **Q.**   Sometimes you also talked to agents by phone?

21  **A.**   I did.

22  **Q.**   Some of these were longer in-person meeting.  Some were

23  shorter telephone exchanges?

24  **A.**   Correct.

25  **Q.**   I've gone through the records of these write-ups,

1   Ms. Alfonso, and between May and June of 2015 you were

2   interviewed 11 times.  Does that sound about right, counting

3   in person and phone?  Ballpark.

4   **A.**  I don't know.  Probably.

5   **Q.**  Okay.  If I represent to you that that's what I

6   calculated by reviewing these memoranda, you wouldn't have

7   any reason to think I'm wrong?

8   **A.**  No.

9   **Q.**  Okay.  And so that was 11 times you talked to the feds

10   before your guilty plea, right?

11   **A.**  Correct.

12   **Q.**  And then on June 23, 2015, you pled guilty to the

13   Anti-Kickback Statute, right?  You told us about that.  You

14   don't remember the exact date, but you're not questioning my

15   identification?

16   **A.**  Correct.

17   **Q.**  And after you pled guilty, you continued to cooperate?

18   **A.**  Yes.

19   **Q.**  Okay.  And between June, after your guilty plea, and

20   going to September 2015, you had 10 more interviews.  Does

21   that sound about right?  You have no reason to dispute it?

22   **A.**  I have no reason to dispute it.

23   **Q.**  Okay.  And you were doing that because you understood

24   that you can help yourself in your own case by cooperating

25   with the government?

1   **A.**   Absolutely.

2   **Q.**   And then on September 15, 2015, as part of that

3   cooperation you went before the grand jury, right?

4   **A.**   Correct.

5   **Q.**   And you testified under oath?

6   **A.**   Yes.

7   **Q.**   Okay.  And so there was a big transcript of that

8   testimony.  So that was done as part of your cooperation,

9   right?

10  **A.**   Correct.

11  **Q.**   So I'm going to say grand jury testimony.  And then it

12  looks like they gave you a little bit of a break, but then

13  starting in January 2016 the government wanted to talk to you

14  more.  And so you continued cooperating with them, right?

15  **A.**   Of course.

16  **Q.**   Okay.  And I'll represent to you that between

17  January 2016 and December 2018, you met with the government

18  13 more times either in person or by phone.  If I represent

19  that to you, do you have any reason to doubt it?

20  **A.**   No.

21  **Q.**   No.  So all of those meetings, all of that cooperation

22  was before this trial here began.  And if I total up all the

23  interviews plus the grand jury plus the time you went to

24  court to address the judge and go through your plea hearing,

25  that's 36 separate interactions with the government.

1          Now, Ms. Alfonso, in all those meetings, you

2   understood that you had to tell the truth, right?

3   **A.**   Yes.

4   **Q.**   You understood that it's a crime to lie to federal

5   agents?

6   **A.**   Yes.

7   **Q.**   And the last thing you wanted to do after already getting

8   in trouble was to compound your trouble by lying to federal

9   agents, right?

10  **A.**   Of course.

11  **Q.**   And you certainly understood that lying to the grand jury

12  would also be a crime under oath, right?

13  **A.**   Of course.

14  **Q.**   And you certainly don't want to misrepresent or lie to

15  the federal judge in your own case, right?

16  **A.**   Correct.

17  **Q.**   Or to the prosecutor in your own case, right?

18  **A.**   Correct.

19  **Q.**   Okay.  And so you did your best on these 36 occasions to

20  tell the truth, right?

21  **A.**   Correct.

22  **Q.**   You told the jury something today that you have never

23  said in any of these 36 prior meetings.  Do you know what

24  that is?

25  **A.**   No.

1    **Q.**  You testified today that sometimes you prescribed Subsys

2    to patients who did not need it.  Do you remember that

3    testimony today?

4    **A.**  Yes.

5    **Q.**  And you said that you prescribed it when it was not

6    medically appropriate, right?

7    **A.**  Correct.

8    **Q.**  That's not something you ever told the government in

9    these 36 prior meetings, is it?

10   **A.**  I don't recall.

11   **Q.**  Let me see if I can help you.  You were interviewed by

12   federal agents, one of these interviews before your plea was

13   in April of 2015, April 8, 2015.  And I want to ask you about

14   what you told them.  Because according to the notes that --

15           MR. LAZARUS:  Objection.  Foundation.  Questioning

16   from the report.

17           MR. STOJILKOVIC:  I can rephrase, Your Honor.

18           THE COURT:  Please do.

19   BY MR. STOJILKOVIC:

20   **Q.**  On April 8, 2015, you met with federal agents and told

21   them that --

22           MR. LAZARUS:  Same objection.

23           MR. WYSHAK:  May we have a sidebar, Your Honor?

24           THE COURT:  Yes.

25           (The following was held at sidebar.)

1          MR. WYSHAK:  If he's going to impeach with a report

2     written by a government agent, first he's got to establish

3     that there's a prior inconsistent statement in the report.

4     The absence of such a statement is not a prior inconsistent

5     statement.

6          Secondly, he's got to show it to the witness and

7     ask the witness if she said that.  If she doesn't adopt it,

8     it's not her statement, she can't be impeached by it.  They

9     can call the agent later if they want to impeach the witness,

10    but they can't do it this way.

11         MR. STOJILKOVIC:  Your Honor, the prior

12    inconsistent statement that I'm going to cross her on from

13    the MOI is that she said if she did not feel that prescribing

14    Subsys for a particular patient was medically appropriate

15    that she would not prescribe Subsys for that patient.

16         MR. WYSHAK:  Okay.  Well, then I think he needs to

17    show it to her and ask her if she said that before reading it

18    into the record.

19         MR. STOJILKOVIC:  I'll be happy to show it to her.

20         (End of sidebar.)

21    BY MR. STOJILKOVIC:

22    **Q.**  Ms. Alfonso, you were interviewed by federal agents on

23    April 8, 2015, and I want to ask you some questions about

24    that and I want to begin by providing you a copy of the

25    interview that they wrote.

1          MR. STOJILKOVIC:  If I may approach, Your Honor?

2          THE COURT:  Yes.

3     BY MR. STOJILKOVIC:

4     Q.  So if I could ask you to look -- to turn to page 4 of

5     that report.  And if you look at that page, there's a

6     paragraph beginning, "Alfonso preferred to prescribe."

7          Can you just read that paragraph to yourself, not

8     out loud yet.  Let me know when you're ready.

9     A.  Ready.

10    Q.  Okay.  Did you tell federal agents in April of 2015 that

11    if you did not feel that prescribing Subsys --

12         MR. WYSHAK:  Objection.  He has to establish that

13    she said that.

14         MR. STOJILKOVIC:  Okay.

15    BY MR. STOJILKOVIC:

16    Q.  Having reviewed that paragraph, is it consistent with

17    what you told the agents, to the best of your recollection?

18    A.  I don't recall.

19    Q.  You don't recall whether you told them any of this?

20    A.  I don't recall if I made that statement exactly like

21    that.  If I did make that statement, then it appears to me

22    that it was talking about in the beginning of my prescribing.

23    Q.  Well, do you recall that when you met -- well, let me ask

24    you this:  Do you have a perfect recollection today of what

25    you told agents in April of 2015?

1    **A.**  No.

2    **Q.**  It wasn't a trick question.

3          Does reviewing this paragraph refresh your

4    recollection about what you told agents in general terms on

5    that date?

6    **A.**  I don't even remember that date, but I remember telling

7    agents things of this nature, naturally.

8    **Q.**  Okay.  And one of the things of that nature that you told

9    them was that --

10          MR. WYSHAK:  Objection.

11          MR. STOJILKOVIC:  -- if you did not feel --

12          MR. WYSHAK:  Objection.

13          THE COURT:  Mr. Wyshak, I heard you.  He heard you.

14   Once is sufficient.

15          MR. WYSHAK:  He's trying to read from a document

16   that's not in evidence.

17          THE COURT:  I understand the objection.  Sustained.

18   BY MR. STOJILKOVIC:

19   **Q.**  You told us today that you made lots of medically

20   inappropriate Subsys prescriptions, right?

21   **A.**  Correct.

22   **Q.**  When you met with the agents in April, you told them the

23   exact opposite, right?

24   **A.**  I don't recall saying that.

25   **Q.**  If I called the agent who wrote this to the stand and he

1    says that you told him the exact opposite, would you have any

2    reason to dispute it?

3              MR. WYSHAK:  Objection.

4              THE COURT:  Overruled.

5    BY MR. STOJILKOVIC:

6    **Q.**  You can answer.

7    **A.**  I may have reason to dispute it because it would be his

8    recollection versus mine.  So --

9    **Q.**  The thing is, Ms. Alfonso, you know full well that you

10   told the government that all your prescriptions were

11   medically appropriate, and the reason you know that --

12             MR. WYSHAK:  Could we have a sidebar, Your Honor.

13             THE COURT:  Yes.

14             (The following was held at sidebar.)

15             MR. WYSHAK:  Your Honor, now he's doing exactly

16   what he shouldn't be doing.  He hasn't been able to get the

17   witness to adopt the statement.  She's actually testified

18   that she doesn't think she said that in the way it's written.

19             THE COURT:  Keep your voice down, please.

20             MR. WYSHAK:  You can't use it to impeach her as a

21   prior inconsistent statement.

22             THE COURT:  Keep your voice down, please.

23             MR. WYSHAK:  So now he's just trying to read it the

24   into record.

25             MR. STOJILKOVIC:  I'm actually moving on to

1  different statements.  I'm moving on to sworn statements and

2  statements with a transcript.

3          MR. WYSHAK:  That's different.

4          MR. LAZARUS:  While we're up here, Your Honor.

5          I feel where he may go is to the Rule 11 transcript

6  where there was a colloquy between the court and counsel, not

7  the defendant, where there was a question about whether it

8  was an overprescribing case or an overutilization case.  And

9  that would in no way impeach anything she said.

10         MR. KENDALL:  Counsel is her agent.

11         MR. STOJILKOVIC:  She told the court in her

12 sentencing it was not medically inappropriate.

13         MR. LAZARUS:  The kickback charge that she was

14 pleading guilty to, they said that's our position.  They

15 asked her about the factual basis, and she said that's right.

16         MR. STOJILKOVIC:  She was there.  It was part of

17 her factual plea.

18         MR. LAZARUS:  I'd ask the Court to review, before

19 he reads it into the record, that --

20         THE COURT:  With the jury sitting here in the box?

21         MR. LAZARUS:  Seeing how he's been cross-examining

22 so far, Your Honor, I have no reason to think he's not going

23 to read it into the record.

24         THE COURT:  How long are you going to be on cross?

25         MR. STOJILKOVIC:  This is the key part that I need

1    to get in front of the jury about the dozens of times she

2    told the opposite of what she's told us today.

3              THE COURT:  You're allowed to impeach her, but you

4    have to do it in the proper way.

5              Now, why isn't the lawyer an agent?

6              MR. LAZARUS:  The way the colloquy, it's not as

7    simple as a yes-or-no answer.  They're talking about what

8    she's pleaded guilty to, and then the judge says, Is this a

9    medical necessity case?

10             I don't have it in front of me.  I have it at my

11   table, Your Honor.  And the prosecutor says, that's not our

12   position, it's an overutilization case.

13             And the lawyer says -- her lawyer says something,

14   and then at the end of the facts, they say to her, Is that

15   accurate?  She says yes.

16             As the Court is aware -- I can see the smirk, Your

17   Honor.  As the Court is aware, it's a colloquy on a Rule 11

18   to a specific anti-kickback charge.  The record just isn't

19   what they want it to be for that.

20             MR. STOJILKOVIC:  Your Honor, if I may respond,

21   that is not a winning argument for two reasons.  One, she is

22   there; it's her plea colloquy.  The judge tells her at the

23   beginning if you don't understand anything, I'll slow down.

24             But two, it is classic cross, *Giglio*.  I want to

25   cross her that she pled to a crime based upon a

1    representation of facts that is 100 percent inconsistent with

2    what she's testified to today.

3        THE COURT:  You're allowed to cross her on the

4    facts that she admitted at the colloquy.  What he's saying is

5    that that is not a fact she admitted to, whether it was

6    overutilization versus medical necessity.

7        MR. STOJILKOVIC:  Her lawyer did, and she stood

8    there and she accepted the plea.

9        MS. WILKINSON:  She was asked whether it was

10   correct at the end.

11       MR. STOJILKOVIC:  Yes.

12       MS. WILKINSON:  So how could she not be accepting

13   that as a fact?

14       THE COURT:  Someone get me the transcript, please.

15   Do you have the transcript?

16       MR. STOJILKOVIC:  Yes, I do.  I can bring it.

17       Your Honor, this is just the introductory statement

18   about we're going slow.  That's not the substance.  That's

19   her plea proceeding.

20       And then, Your Honor, if you pick up from here

21   through here, just for the record that's the court asking the

22   question.  Mr. Morabito is the prosecutor, and Mr. McGuigan

23   is her attorney.

24       MR. LAZARUS:  Elements of the charge, Your Honor,

25   but the elements of the kickback charge to prove at trial had

1    to do with the quid pro quo.  It has nothing to do with

2    medical necessity.

3           THE COURT:  He says she received remuneration, so

4    even whether or not there's utilization here.

5           MR. LAZARUS:  Right.  It's ambiguous.

6           THE COURT:  Hold on.  He doesn't take the position

7    on utilization.

8           MR. STOJILKOVIC:  But he does take the position --

9    this is the prosecutor.  I'm glad you asked.  That's not what

10   we're claiming as the medical necessity.  And then after all

11   this, he says that's essentially our understanding.

12          THE COURT:  He says that's what they're claiming,

13   not that it exists.

14          MR. LAZARUS:  It would be different if she were

15   asked to tell the court what she did.  That's not what

16   happened.  That's not this colloquy.

17          THE COURT:  You don't get that on this.  It's not

18   before me -- you can cross-examine on what she's told the

19   government before.  That's not an admission on her part.

20          MR. STOJILKOVIC:  Can I ask her that when she had

21   to plead guilty she was not required to admit --

22          Can I ask her when she had her plea colloquy before

23   the judge that she was not required to admit to medically

24   inappropriate prescriptions?

25          THE COURT:  Yes.

1          MR. STOJILKOVIC:  May I ask her that no one in that

2    plea colloquy told her, Judge, that her prescriptions were

3    medically inappropriate that she heard or saw or witnessed?

4          THE COURT:  Yes.

5          MR. STOJILKOVIC:  Thank you.

6          MR. LAZARUS:  Your Honor, may I just ask, either

7    counsel to do it or the Court do it, there's no element of

8    the Anti-Kickback Statute that requires that.  They're

9    totally different crimes.  The last two questions, I have no

10   issue with.

11         MR. KENDALL:  It's the promise-reward inducement.

12         MR. LAZARUS:  I don't have an objection to the last

13   two questions.

14         (End of sidebar.)

15   BY MR. STOJILKOVIC:

16   **Q.**  Ms. Alfonso, you remember when you went into federal

17   court to plead guilty to the Anti-Kickback Statute violation,

18   right?

19   **A.**  Correct.

20   **Q.**  And you remember you were not required to say that any of

21   your Subsys prescriptions were medically inappropriate?

22   **A.**  I don't understand what you're saying.

23   **Q.**  You stood there and you listened to everything that was

24   happening that day.  It was an important day in your life,

25   right?

1    **A.**  It was a life-changing day, but I stood there and

2    listened and --

3    **Q.**  And no one in that room, not you, not your lawyer, not

4    the prosecutor, ever told the judge that your Subsys

5    prescriptions were medically inappropriate?

6    **A.**  I don't recall exactly what they said to the judge.

7    **Q.**  Okay.  Wouldn't it have been kind of a big detail if the

8    judge thought that 80 or 90 percent of your prescriptions

9    were medically illegitimate?

10            MR. LAZARUS:  Objection.

11            THE COURT:  Sustained.

12   BY MR. STOJILKOVIC:

13   **Q.**  Ms. Alfonso, never in those 36 meetings with the

14   government before this trial began did you tell federal

15   agents that your Subsys prescriptions were medically

16   inappropriate, right?

17   **A.**  I don't know.

18   **Q.**  That would be kind of a big detail to leave out, don't

19   you think?

20   **A.**  Do I think it would be a big detail to leave out?  I

21   don't recall it being left out or not.

22   **Q.**  Do you realize that if you admitted to that detail you

23   could be facing 20 years rather than five?

24   **A.**  Well, I don't realize that because I don't know the law

25   like that.

1    **Q.**   Now, going back to April.  Remember I had asked you about

2    an interview with the government on April 8, 2015.  And I had

3    asked you about the statements, if any, that you remember

4    making at that time.  The very next day, April 19, 2015, you

5    gave a written sworn statement, an affidavit, to the State of

6    Connecticut.

7           Do you recall that?

8    **A.**   No.

9           MR. STOJILKOVIC:  Could we have for counsel and the

10   witness what's been marked for identification as

11   Exhibit 6022.  It's on the screen, but in case you want the

12   whole thing, there it is.

13   **Q.**   Do you recognize this as your affidavit?

14   **A.**   I recognize my signature on the back.

15   **Q.**   Okay.  And it says right under your signature that this

16   was subscribed and sworn on the 9th day of April 2015.  Do

17   you see that?

18   **A.**   Yes.

19   **Q.**   And in this document, you swore that the orders for

20   prescriptions that you made were based on what you believed

21   the patients needed for their pain.  Is that right?

22   **A.**   Where does it say that?

23   **Q.**   Page 2, Paragraph 7.

24   **A.**   Yes.  It says, "The orders I gave for the patient

25   medications were based upon what I believed the patients

1   needed for their pain and directions from Dr. Thimineur as to

2   how he believed the patients should be managed with pain

3   medications."

4   **Q.**   Okay.  Let's focus on that sentence.  So you swore that

5   the orders you gave for patient medications -- there were two

6   components of it -- number one, were based upon what you

7   believed the patients needed for their pain, right?

8   **A.**   Correct.

9   **Q.**   That was your sworn statement the day after you met with

10   federal agents, right?

11   **A.**   Yes.

12   **Q.**   And that is the opposite of what you told us today when

13   you said that most of your Subsys prescriptions were

14   medically inappropriate?

15          MR. LAZARUS:  Object, Your Honor.  To the

16   characterization.

17          THE COURT:  Overruled.

18   BY MR. STOJILKOVIC:

19   **Q.**   Please answer the question.

20   **A.**   What was the question?

21   **Q.**   That's the opposite of what you told us under oath today?

22   **A.**   It may appear that way, but I did believe that patients

23   needed pain medication.

24   **Q.**   But you didn't say just generally.  You said that -- you

25   swore in this affidavit that the orders you gave for patient

1    medications were based upon what you believed the patients

2    needed for their pain.  That's your sworn statement in April

3    of 2015?

4    **A.**  Mm-hmm.

5    **Q.**  And you also said, if you can turn to page 3,

6    Paragraph 9, that you converted patients from fentanyl pops

7    to Subsys as a preferred drug of choice for fast-acting pain

8    medication, right?

9    **A.**  That's correct.

10   **Q.**  So as of April 2015, after you had already started

11   talking to the government, you swore that you prescribed

12   based on what you believed the patients needed for their

13   pain, right?

14   **A.**  Correct.  That's what it says.

15   **Q.**  And you never told the government otherwise until after

16   this trial began and you met with them about a week ago.  In

17   your 37th meeting, you told them something new and different,

18   right?

19              MR. LAZARUS:  Your Honor, I object to the form.

20   Improper impeachment.  The question is whether she was ever

21   asked and what the answer was that she gave.

22              THE COURT:  He doesn't ask what she was asked.  So

23   it's overruled.

24   **A.**  I don't know if it was mentioned in previous meetings.

25   BY MR. STOJILKOVIC:

1   **Q.**   You don't remember mentioning it in any of the previous

2   36 meetings?

3   **A.**   I don't recall.

4   **Q.**   And you also told us today that you upped the dose of

5   Subsys sometimes when it was not medically necessary, right?

6   **A.**   Correct.

7   **Q.**   I want to ask you about another meeting you had with the

8   government.  You testified in the grand jury, about

9   September 15, 2015, if you take my representation.  Okay?

10          And the day before you went into the grand jury,

11   you met with agents, right?  Does that sound right?

12   **A.**   Yes.

13   **Q.**   And that was part of the preparation for what would be

14   your grand jury testimony, right?

15   **A.**   Correct.

16   **Q.**   Because agents wanted to make sure -- strike that.

17          And you certainly would have been careful to try to

18   tell agents the truth as you were preparing for your own

19   grand jury testimony, right?  Right?

20   **A.**   I was careful to tell the truth to the best of my

21   knowledge every time.

22   **Q.**   Every time?

23   **A.**   Every time I met with them.

24   **Q.**   All 36 times?

25   **A.**   Correct.

1     **Q.**  So let me show you this document here, which is a

2     write-up, and you can put those others aside so you don't

3     have too many papers in front of you.

4                You testified to the grand jury --

5                That was here in Boston, right?

6     **A.**  Correct.

7     **Q.**  -- the day before you met with prosecutors and agents in

8     this very case, right?

9     **A.**  Correct.

10    **Q.**  And one of the things they asked you about was about

11    upping Subsys dosage.  Do you remember that general topic

12    coming up?

13    **A.**  I believe so, yes.

14    **Q.**  Could you do me -- can you please turn to page 8 and just

15    to yourself read the paragraph titled "Upping the Dosage of

16    Subsys."  It's got a bold header, and it's one paragraph.

17    And let me know when you've had a chance to read it.

18    **A.**  Done.

19    **Q.**  Do you recall telling the government what is recounted

20    there in that paragraph?

21    **A.**  I do not.

22    **Q.**  Is what is recounted there in that paragraph consistent

23    with what you would have told the government in advance of

24    your grand jury testimony?

25                MR. LAZARUS:  Objection, Your Honor.  The witness

1    says she doesn't recall.

2            THE COURT:  It's sustained.  He can probe her

3    memory, but that question is sort of difficult to understand.

4            MR. STOJILKOVIC:  It is, Your Honor.  I'll ask a

5    simpler one.

6    BY MR. STOJILKOVIC:

7    **Q.**  Ms. Alfonso, you would only up the dosage of Subsys to a

8    patient if you felt it was appropriate for the patient,

9    right?

10   **A.**  It does not say that.  It does not say I would only up

11   the dosage if I felt it were appropriate for the patient.

12   **Q.**  You would up the dosage if you felt it were appropriate

13   for the patient?

14   **A.**  That is what is written here.  I didn't write this.

15   **Q.**  Are you suggesting the agents got it wrong?

16   **A.**  I am suggesting there may have been a difference in how

17   we heard things.  I would certainly try to up dosages on

18   patients that I saw were appropriate for it, but there were

19   also others that I upped it even though it may not have been

20   appropriate.

21   **Q.**  And that part you didn't tell the agents on September 14,

22   2015?

23   **A.**  Well, I don't know that I didn't tell them that on that

24   date.  I know that I don't see it written here.

25   **Q.**  Do you have a memory of telling them?

1   **A.**   I have a memory of telling them everything that I know

2   about everything that they asked me.

3   **Q.**   Ms. Alfonso, you were asked about a half-dozen times this

4   morning about medically inappropriate prescriptions, right?

5   And you were even asked to estimate how many, what percentage

6   of your Subsys prescriptions were medically inappropriate,

7   right?

8   **A.**   Correct.

9   **Q.**   Ms. Alfonso, in the 36 meetings from 2015 to the end of

10  2018, you never once said that a single Subsys prescription

11  you made was medically inappropriate.   Right?

12          MR. LAZARUS:   Is that a question?

13  **A.**   I don't recall that.

14  BY MR. STOJILKOVIC:

15  **Q.**   And you certainly never put a percentage on that until

16  after this trial began, right?

17  **A.**   I don't recall.

18  **Q.**   And the reason you didn't do that, Ms. Alfonso, is you

19  know that when it comes to your own case and what happens to

20  you, you want things to go well, right?

21  **A.**   Well, of course I want things to go well.

22  **Q.**   You don't want the judge to think you're a horrible

23  person, do you?

24  **A.**   I don't care if the judge thinks I'm a horrible person

25  because maybe I am a horrible person.   But the bottom line is

1    I have to tell the truth for my own case, and that's it

2    regardless of what kind of person I am.

3    **Q.**  As part of telling the truth, you never told -- let's

4    take it one at a time.

5         You've never told the judge in your case that you

6    made a single medically inappropriate Subsys prescription?

7    **A.**  I don't recall.

8    **Q.**  You never told the prosecutor in your case that you've

9    made a single inappropriate -- medically inappropriate Subsys

10   prescription?

11        MR. LAZARUS:  Objection, again, Your Honor.  He

12   hasn't asked her whether she was asked that question and gave

13   that answer.  It's improper impeachment.

14        THE COURT:  Overruled.

15   BY MR. STOJILKOVIC:

16   **Q.**  Never told the prosecutor in your case that, right?

17   **A.**  I don't recall.

18   **Q.**  Never told anyone, any federal agent that until about a

19   week and a half ago.  You understand -- well, let me ask it a

20   different way.

21        When you met with the government about a week and a

22   half ago, you were asked to look at some patient files,

23   right?

24   **A.**  Correct.

25   **Q.**  And that's when you were also asked to make estimates

1    about medically inappropriate prescriptions and try to put a

2    percentage on them, right?

3    **A.**   That, I recall.

4    **Q.**   And when you started saying that, did any of the people

5    you met with remind you of the consequences of lying to

6    federal agents?

7    **A.**   Just about every time I've spoken to a federal agent, I

8    am reminded of the consequences.

9    **Q.**   But nobody in that meeting a week ago said, hey, why

10   didn't you tell us this in the prior 36 meetings?

11   **A.**   I don't recall that anybody did say that to me.

12   **Q.**   And they didn't threaten to go to your judge and tell him

13   before he sentences you that you are now saying you made lots

14   of medically inappropriate prescriptions?

15   **A.**   Federal agents have never threatened me.

16              MR. LAZARUS:  Objection.

17              THE COURT:  Sustained.

18   BY MR. STOJILKOVIC:

19   **Q.**   Now, you also told -- let me strike that.

20              When you would put people on Subsys, if they had a

21   problem with it, you would take them off, right?

22   **A.**   I believe so.

23   **Q.**   All right.  So you're not testifying here that you kept

24   people on Subsys even after thinking that they were having

25   problems with the drug?

1    **A.**  I don't recall every single patient.  So I cannot say

2    definitively one way or another.

3    **Q.**  Well, so you cannot say that I ever kept a patient on

4    Subsys when you came to think that it was not right for them?

5    **A.**  I cannot say that I kept on a patient on Subsys that came

6    in with complaints about Subsys.

7    **Q.**  Ms. Alfonso, you would agree that it's not fair to tell

8    agents, prosecutors one thing when the case is about you and

9    something different when someone else's freedom is at stake?

10             MR. LAZARUS:  Objection.

11             THE COURT:  Basis?

12             MR. LAZARUS:  Fair, Your Honor?

13             THE COURT:  Overruled.

14   **A.**  Do I think it's fair?

15   BY MR. STOJILKOVIC:

16   **Q.**  Yes.

17   **A.**  No, not fair.

18   **Q.**  Ms. Alfonso, are you aware that the defendants in this

19   case have been charged with a racketeering conspiracy?

20   **A.**  I actually was not completely aware of what their charges

21   were.

22   **Q.**  Okay.  You did not plead guilty to a racketeering

23   conspiracy, right?

24   **A.**  That is true.

25   **Q.**  You didn't plead guilty to any kind of conspiracy, right?

1   **A.**   No.

2   **Q.**   My question is bad.

3               You did not plead guilty to a conspiracy, correct?

4   **A.**   Correct.

5   **Q.**   You did not plead guilty to making any medically

6   inappropriate prescriptions, correct?

7   **A.**   That is correct.

8   **Q.**   Now, I also want to clear up something you mentioned

9   towards the end of your testimony on direct that you got in

10   trouble with the State of Connecticut for not examining

11   certain patients.  Did I understand that correctly?

12   **A.**   That is correct.

13   **Q.**   That was unrelated to Subsys, right?

14   **A.**   Correct.

15   **Q.**   That's not something that Natalie Babich or Jessica Crane

16   put you up to?

17   **A.**   No.

18   **Q.**   But Natalie Babich and Jessica Crane did put you up to

19   sham speaker events, right?

20   **A.**   I wouldn't say they put me up to it, but I knowingly did

21   it.

22   **Q.**   And they knew you were doing it because they were there?

23   **A.**   I don't know what they knew.  I would assume.

24   **Q.**   Well, if Natalie Babich goes to 20 dinners with you and

25   there's not a slide deck and not an educational presentation,

1    do you think it's safe to venture that she realized you

2    weren't giving a real speech?

3    **A.**   Yes.

4    **Q.**   And same with Jessica Crane when she was there?

5    **A.**   Mm-hmm.

6    **Q.**   And they put pressure on you to prescribe?

7    **A.**   Yes.

8    **Q.**   And you knew that if they did what they wanted you would

9    get more money in speaker payments?

10   **A.**   Correct.

11   **Q.**   And you knew that if you did that, there would also be

12   more money going to Natalie Babich and Jessica Crane in

13   bonuses?

14   **A.**   I have no idea what they were paid or how they were paid.

15   **Q.**   Didn't you testify on direct that you had conversations

16   with them, and they'd try to get you to change your

17   prescription patterns because it would also financially help

18   them?

19   **A.**   They said "they get more money."  I don't know who "they"

20   was.  I don't know how they got paid.

21   **Q.**   And you don't get to choose who you cooperate against,

22   right?

23   **A.**   Correct.

24   **Q.**   You just come when the government asks you to come and

25   testify, right?

1    **A.**   Yes.

2    **Q.**   Fair to say that you have a lot more to tell us about

3    Natalie Babich and Jessica Crane than you do about any

4    defendant in this case?

5              MR. LAZARUS:  Objection.

6              THE COURT:  Sustained.

7    BY MR. STOJILKOVIC:

8    **Q.**   You told us on direct that you interacted with Mike

9    Babich, right?

10   **A.**   I have met him.

11   **Q.**   You heard him also give speeches, right?

12   **A.**   Correct.

13   **Q.**   And you know Alec Burlakoff, right?

14   **A.**   I've met him and heard him speak.

15   **Q.**   And you interacted with Matt Napoletano, right?

16   **A.**   Yes.

17   **Q.**   And he ran the speaker program at Insys, right?

18   **A.**   I'm not sure.  I know he was in marketing and I know that

19   I had small talk with him during speaker programs, during the

20   training.

21   **Q.**   In fact, Matt Napoletano is the Insys executive that you

22   interacted with the most, right?

23   **A.**   Out of all of them, yes.

24   **Q.**   But he's not a defendant in this case?

25   **A.**   No.

1    **Q.**   Now, you told us some on direct about your work at

2    Comprehensive Pain, and you said that Dr. Thimineur owned the

3    practice, right?

4    **A.**   Correct.

5    **Q.**   And for a time there were a couple of other doctors

6    there, but then they went away, right?

7    **A.**   Correct.

8    **Q.**   And there were other registered nurses there --

9    **A.**   One registered nurse and other APRN's.

10   **Q.**   I apologize.  And the APRN's like yourself were also

11   authorized to prescribe narcotics?

12   **A.**   Correct.

13   **Q.**   And Dr. Thimineur was authorized to prescribe narcotics?

14   **A.**   Correct.

15   **Q.**   And over time it might be the case that you would see a

16   patient for one visit and make a prescription, and then the

17   next time they come in, that patient is seen by a different

18   APRN?

19   **A.**   True.

20   **Q.**   And there would be times that you would either renew a

21   prescription that either Dr. Thimineur or another APRN would

22   have written for a patient, right?

23   **A.**   True.

24   **Q.**   And there would be times when it was the opposite, that

25   another APRN would renew another prescription that you had

1   written, correct?

2   **A.**   Correct.

3   **Q.**   But Dr. Thimineur was not in the Insys speaker program,

4   to your knowledge?

5   **A.**   Correct.

6   **Q.**   And neither were the other APRNs at Comprehensive Pain?

7   **A.**   Correct.

8   **Q.**   As far as you know, they had financially nothing to gain

9   from Subsys prescriptions?

10  **A.**   Correct.

11  **Q.**   Are you aware that they did, in fact, renew a number of

12  Subsys prescriptions that you originally made?

13  **A.**   It would stand to reason that they would have.

14  **Q.**   You're not testifying here today that they made medically

15  inappropriate prescriptions because of some kind of financial

16  arrangement with Insys?

17  **A.**   I am not testifying to that.

18  **Q.**   Now, the patients at Comprehensive Pain had a variety of

19  pain issues.  Fair?

20  **A.**   Correct.

21  **Q.**   You saw a lot of patients that had severe and intractable

22  pain?

23  **A.**   Yes.

24  **Q.**   It was the kind of pain that wasn't really being helped?

25  **A.**   Correct.

1    **Q.**   Some of them had surgeries in the past, but the surgeries

2    didn't resolve the pain issue?

3    **A.**   True.

4    **Q.**   And many patients in the practice had been in the

5    practice for a long period of time?

6    **A.**   Correct.

7    **Q.**   Many 10 or 20 years in the practice.  Fair?

8    **A.**   I believe so.

9    **Q.**   So they were already in the practice long before you

10   joined?

11   **A.**   Oh, yes.

12   **Q.**   And most of the patients in Comprehensive Pain were on

13   fairly high doses of narcotics?

14   **A.**   True.

15   **Q.**   And you treated patients with a variety of narcotics,

16   including opioids?  You prescribed opioids to a lot of

17   patients at Comprehensive Pain?

18   **A.**   Yes.

19   **Q.**   And you prescribed fentanyl, in particular, in various

20   delivery forms?

21   **A.**   Correct.

22   **Q.**   Including Duragesic, which is the fentanyl patch, right?

23   **A.**   Correct.

24   **Q.**   And you had done all of that before Subsys even came on

25   the market.  Fair?

1   **A.**   I don't know when -- when did it come on the market?

2   **Q.**   Subsys came on the market in the spring of 2012.

3   **A.**   Oh.  Then probably not because I didn't start until 2012

4   in May.

5   **Q.**   Are you sure you didn't start in 2011 in May?

6   **A.**   Start practicing?

7   **Q.**   Start part-time at --

8   **A.**   2012, I thought.

9   **Q.**   I might come back to that in a little bit.

10          You had certainly prescribed other opioids before

11   you first made a Subsys prescription?

12   **A.**   Correct.

13   **Q.**   And you talked on direct about a class of opioids called

14   ROO's, right?

15   **A.**   Correct.

16   **Q.**   And I just want to make sure we're using the same

17   terminology.  In this class, you would include Actiq, right?

18   **A.**   Yes.

19   **Q.**   Fentora?

20   **A.**   Yes.

21   **Q.**   Lazanda?

22   **A.**   I believe so.

23   **Q.**   Abstral?

24   **A.**   I believe so.

25   **Q.**   And then Subsys when it came out?

1   **A.**   Correct.

2   **Q.**   Okay.  And so we've also been calling those kinds of

3   opioids TIRFs.  Have you heard the term "TIRF" before?

4   **A.**   Yes.

5   **Q.**   So if I call them TIRFs, we understand each other?

6   **A.**   Yes.

7   **Q.**   You had prescribed other TIRFs before Subsys, right?

8   **A.**   Yes.

9   **Q.**   And one reason you did that is that you saw benefits in

10  certain cases to having a powerful but short-acting opioid,

11  right?

12  **A.**   That was one reason I would have done that, yes.

13  **Q.**   In other words, without short-acting opioids, the only

14  way to treat breakthrough pain is to raise the quantity of a

15  longer-acting opioid, and that's not ideal, right?

16  **A.**   I wouldn't say that's the only way, but --

17  **Q.**   Well, that's something that --

18  **A.**   Nor would I say that that's not ideal because sometimes

19  it is ideal depending on the patient.

20  **Q.**   Well, you understand what breakthrough pain is, right?

21  **A.**   Yes.

22  **Q.**   And so that's above and beyond the level of pain the

23  patient normally has.  They're spikes, right?

24  **A.**   Right.

25  **Q.**   And the patient needs something to help them deal with

1  that spike, right?

2  **A.**   Correct.

3  **Q.**   Now, a long-acting opioid stays in your system for

4  longer, right?

5  **A.**   Correct.

6  **Q.**   And so if you need the pain relief all the way to make

7  that spike not hurt through a long-acting opioid, you have to

8  raise the amount of the long-acting opioid the patient is on?

9  **A.**   Correct.

10 **Q.**   And a downside of that is because it's long-acting, then

11 they're kind of zonked out on it long after the spike passes.

12 Fair?

13 **A.**   Not fair.   Because that's not totally true.   They develop

14 a tolerance to the higher dosage, and they're not zonked out,

15 as you say.   So I would not agree to that.   I would agree

16 that it is not always the best option to raise the

17 long-acting.

18 **Q.**   High quantities of opioids can affect certain aspects of

19 how people function, right?

20 **A.**   Yes.

21 **Q.**   If somebody is on a high quantity of the fentanyl patch,

22 that does place some limitations on their functioning.   Fair?

23 **A.**   I think their pain probably placed limitations on their

24 functioning prior to the high quantity or high-dosage patch,

25 for example, because there are a lot of patients,

1    particularly the patients in that practice who are on large

2    quantities of opioids and were able to function better as a

3    result than what they were without it.  So that's not fair to

4    say.

5    **Q.**  Sure.  Pain meds better than no pain meds in a lot of

6    situations, right?

7    **A.**  That's an opinion.  I'm not sure.  It depends on the

8    patient.

9    **Q.**  Ms. Alfonso, you prescribed Fentora and Actiq to people

10   because you thought they needed it, right?

11   **A.**  Sometimes I did, yes.

12   **Q.**  Sometimes or all the time?

13   **A.**  No.  Sometimes.  Because a lot of times when I got into

14   that practice, a lot of patients were on Actiq already.  I

15   renewed their prescriptions.

16   **Q.**  And you did that because you thought they needed it or

17   you didn't care?

18   **A.**  Actually if you look at some of these, and I just read

19   it, sometimes I wanted to decrease medications, and I was

20   told by the doctor not to.

21   **Q.**  Did you ever prescribe Fentora to someone when you

22   thought they didn't need it?

23   **A.**  I don't recall.

24   **Q.**  That's not a very confident answer, is it?

25   **A.**  No, it's not.

1          MR. WYSHAK:  Objection.

2          THE COURT:  Sustained.

3     BY MR. STOJILKOVIC:

4     **Q.**  You were not bribed to prescribe Fentora, right?

5     **A.**  That's correct.

6     **Q.**  But you still might have prescribed it, you're telling us

7     now, to someone who didn't need?

8     **A.**  I don't recall.

9     **Q.**  And you were not bribed to prescribe Actiq, right?

10    **A.**  Correct.

11    **Q.**  But you still might have prescribed to someone who

12    doesn't need it?

13    **A.**  Correct.

14    **Q.**  You weren't bribed to put people on the Duragesic patch,

15    right?

16    **A.**  Correct.

17    **Q.**  But you still might have prescribed it to someone who

18    doesn't need it?

19    **A.**  Correct.

20    **Q.**  So you're just generally not very confident in the

21    medical decisions you made?

22    **A.**  Clearly I wasn't a very good APRN, which is why I'm no

23    longer practicing and going to prison.

24    **Q.**  And you're hoping the amount of time you do in prison

25    will be less because of what you're telling us here today?

1    **A.**   Wrong.   I'm hoping that the amount of time that I spend

2    in prison is less because I'm truthful.

3    **Q.**   And the truth is that sitting here today you don't have a

4    lot of confidence in the medical decisions you made either

5    about Subsys or about other drugs you prescribed?

6    **A.**   I don't recall all the other drugs I prescribed and what

7    my judgment was with those medications.

8    **Q.**   You started prescribing Subsys in 2012.   Fair?

9    **A.**   Yes.

10   **Q.**   And when you learned about Subsys, you learned that it

11   had a faster absorption rate than other TIRFs?

12   **A.**   Correct.

13   **Q.**   It was a spray delivery?

14   **A.**   Correct.

15   **Q.**   It didn't have sugar in it?

16   **A.**   Correct.

17   **Q.**   And so it wouldn't rot your teeth or have problems for

18   diabetic patients?

19   **A.**   Correct.

20   **Q.**   Long before anyone bribed you, you believed in Subsys,

21   right?

22   **A.**   I believed that it was good for some patients, yes.

23   **Q.**   If I were to ask you a simple yes-or-no question whether

24   you ever believed in Subsys, what's your answer?

25   **A.**   I can't answer that yes or no.   I just answered it.   I

1    said, yes, I believe that Subsys is as good a medication as

2    many of the others.

3    **Q.**  You did answer it yes or no when you met with federal

4    agents.

5            MR. WYSHAK:  Is that a question?

6    BY MR. STOJILKOVIC:

7    **Q.**  Do you remember telling federal agents how you would

8    answer that question?

9    **A.**  No.

10           MR. STOJILKOVIC:  Court's indulgence.

11   BY MR. STOJILKOVIC:

12   **Q.**  Do you remember being interviewed by federal agents in

13   November 15 of last year, so November 15, 2018?  Does that

14   sound about right?

15   **A.**  I don't remember it.

16   **Q.**  Do you have any reason to dispute that you had a

17   telephonic interview then?

18   **A.**  No.

19   **Q.**  And November 15, 2018, is more recent than some of the

20   other interviews we've talked about.  Fair to say?

21   **A.**  Yes.

22           MR. STOJILKOVIC:  If I may approach the witness,

23   Your Honor?

24           THE COURT:  Yes.

25   BY MR. STOJILKOVIC:

1  **Q.**  Do you remember text-messaging an agent around this time

2  and asking him to call you?

3  **A.**  No.

4  **Q.**  Did you ever text-message an agent about this case and

5  ask him to call you?

6  **A.**  I don't recall.

7  **Q.**  Take a look at this document, just to yourself, not out

8  loud.  Read the first paragraph.

9  **A.**  Okay.

10  **Q.**  Does that refresh your recollection on whether you texted

11  an agent?

12  **A.**  No.  No.  It's possible that I texted.

13  **Q.**  Ms. Alfonso, do you have memory problems?

14  **A.**  Clearly.

15  **Q.**  Do you recall ever having a phone call with Agent

16  Wisnaskas around this time?

17  **A.**  I had many phone calls with agents.

18  **Q.**  Do you recall having a call with Agent Wisnaskas because

19  you were concerned about something you would have to say at

20  trial?

21  **A.**  I don't remember it.

22  **Q.**  Look at the -- and read to yourself the last full

23  paragraph on that page.

24  **A.**  Mm-hmm.

25  **Q.**  Let me know when you've had a chance to do so.

1   **A.**  I've read it.

2   **Q.**  Do you recall wanting to bring up something to the agent

3   because you were afraid or you were concerned about getting

4   asked a certain question at trial?

5   **A.**  Correct.  I was concerned because I did believe in the

6   effectiveness of Subsys, much like I believe in the

7   effectiveness of most opiates.

8   **Q.**  Why does it concern you that you believed in the

9   effectiveness of Subsys?  Why was that a concern to you ahead

10  of your testimony?

11  **A.**  I don't remember.

12  **Q.**  Is it because you see your job here today as trying to

13  help the government and make the defendants look bad?

14          MR. LAZARUS:  Objection.

15          THE COURT:  Overruled.

16  **A.**  So no, it's not, actually.  If this was last year, as I

17  recall, it was a follow-up because I felt like I had said

18  something when I spoke to them in person and that it was

19  misheard or misunderstood.  And I wanted that to be

20  clarified.

21  BY MR. STOJILKOVIC:

22  **Q.**  And what you wanted to be clarified was that if you were

23  asked a simple yes-or-no question at trial about whether you

24  believe in Subsys, your truthful answer would be yes, you

25  did?

1    **A.**  I do believe in Subsys.

2    **Q.**  Okay.  You mentioned the TIRF REMS program on direct.  Do

3    you remember that?

4    **A.**  Yes.

5    **Q.**  Do you recall mentioning the TIRF REMS program?

6    **A.**  I said yes.

7    **Q.**  Oh, I'm sorry.

8              And you complied with the requirements of the TIRF

9    REMS program when you were prescribing Subsys, right?

10   **A.**  Yes.

11   **Q.**  Just like you did when you were prescribing Fentora or

12   Actiq?

13   **A.**  Yes.

14   **Q.**  You had a discussion with your patients about the topics

15   required to be covered under TIRF REMS?

16   **A.**  Correct.

17   **Q.**  You talked about the benefits and risks of the drugs?

18   **A.**  Yes.

19   **Q.**  And the patient had to signal their agreement to take the

20   medication, correct?

21   **A.**  Correct.

22   **Q.**  And you also had the patients, pursuant to the policy of

23   your employer, sign the pain contract, right?

24   **A.**  Correct.

25   **Q.**  And you gave patients toxicology screens at some interval

1   in time, right?

2   **A.**   Correct.

3   **Q.**   And if a patient told you that they were having trouble

4   with Subsys, you would reevaluate whether they should be on

5   it, right?

6   **A.**   Yeah, I suppose I would.

7   **Q.**   Some patients complained about irritation under the

8   tongue.  Do you remember that?

9   **A.**   Correct.

10  **Q.**   It was not a majority, but it was some percentage that

11  had that experience?

12  **A.**   Correct.

13  **Q.**   And that's because you spray it under the tongue, right?

14  **A.**   Right.

15  **Q.**   And when a patient would tell you about that, you would

16  switch them to a different drug, right?

17  **A.**   I don't know.

18  **Q.**   You knew back when you were testifying under oath in the

19  grand jury?

20  **A.**   Yeah.  I don't know if I did that with every patient is

21  what I'm saying.

22  **Q.**   You understood it was a crime to not testify truthfully

23  in the grand jury, correct?

24  **A.**   Mm-hmm.  Mm-hmm.

25           MR. STOJILKOVIC:  Could I have the grand jury

1    transcript, please?

2            THE COURT:  Let me know when you reach a good

3    stopping place.

4            MR. STOJILKOVIC:  Your Honor, I have just two

5    questions on this.

6            THE COURT:  That's fine.

7    BY MR. STOJILKOVIC:

8    **Q.**  I'm handing you your grand jury transcript of your sworn

9    testimony.

10   **A.**  Yes.

11   **Q.**  Can you please turn to page 96.  And I'd like to direct

12   your attention to the bottom of the page, starting at

13   line 24.

14           Were you asked and did you answer as follows:

15           "QUESTION:  Let's talk a bit about first, did you

16   know whether any of the -- about any adverse effects your

17   patients may have had with Subsys?

18           "ANSWER:  Some patients complained of irritation in

19   their, you know, like it was irritating under their tongue

20   when they sprayed it.

21           "QUESTION:  Okay.  Anything else?

22           "ANSWER:  That was the biggest complaint.

23           "How often would that happen?

24           "ANSWER:  Not very often.  But I mean maybe

25   10 percent, 20 percent of the time.

1     "QUESTION:  When you heard that complaint, did you
2 then switch the patients to a different drug?
3     "ANSWER:  Correct."
4     Do you see that?
5 **A.**  I do.  Then that is accurate because that was from 2015
6 and far closer than now.
7 **Q.**  Right.  Because your memory of the particular events of
8 prescriptions and circumstances was more accurate in 2015
9 than it is now?
10 **A.**  Certainly.
11     MR. STOJILKOVIC:  That's a good stopping point,
12 Your Honor.
13     THE COURT:  All right.  So we'll see you at 9:00
14 tomorrow morning.  And we'll have you out of here by 1:00,
15 hopefully ahead of the weather.  Keep an open mind.  Don't
16 talk to anyone about the case.  No social media.  No media
17 contact about it.  And no homework.  We'll see you all
18 tomorrow morning.
19     THE CLERK:  All rise for the jury.
20     (The jury exits the courtroom.)
21     THE COURT:  All right.  So see everyone at 9:00
22 tomorrow.  You're excused for the day.  How much longer do
23 you have with her?
24     MR. STOJILKOVIC:  Your Honor, I have a bit left,
25 including on the specific patients.

1          THE COURT:  Will we get beyond her tomorrow?

2          MR. YEAGER:  I hope so.

3          MR. LAZARUS:  I believe so.

4          MS. WILKINSON:  Babich?

5          MR. YEAGER:  Babich is after that.

6          (Court recessed at 4:03 p.m.)

1                    - - - - - - - - - - -

2                        CERTIFICATION

3

4           I certify that the foregoing is a correct

5    transcript of the record of proceedings in the above-entitled

6    matter to the best of my skill and ability.

7

8

9    /s/ Rachel M. Lopez

10   /s/ Joan M. Daly                    February 11, 2019.

11

12   _____              _____

13   Raichel M. Lopez, CRR
     Joan M. Daly, RMR, CRR             Date
14   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1              **TABLE OF CONTENTS -- Morning Session**

2

3                    **TRIAL WITNESSES**

4     On behalf of the Plaintiff:                          Page

5     KIM FORDHAM

6            By Ms. Miner                                    22

7            By Mr. Lazarus                                  61

8            By Ms. Miner                                    68

9     HEATHER ALFONSO

10           By Mr. Lazarus                                  70

11

12

13                      **EXHIBITS**

14                                                      Admitted

15    Number 1836 and 1836.2                               101

16    Number 1837                                          109

17    Number 1838                                          104

18    Number 1839 and 1839.2                                98

19    Number 6114                                           59

20    Number 6118                                           28

21    Number 6125                                           60

22    Number 6126                                           24

23    Number 6127                                           27

24    Number 6129                                           69

25

1    INDEX OF WITNESSES - Afternoon Session

2

WITNESS                                          PAGE

3

4    HEATHER ALFONSO

5       Cross Examination By Mr. Stojilkovic................  71

6

7

8

9

                         E X H I B I T S

10

11

     <u>Government Exhibit</u>                        <u>Received</u>

12

13      754         .....................................  30

        755         .....................................  49

14

        1004        .....................................  49

15

        1006        .....................................  49

16

        1057        .....................................  49

17

        1854        .....................................  49

18

        1906        .....................................  66

19

        1908        .....................................  65

20

21

22

23

24

25