IN  THE  UNITED  STATES  DISTRICT  COURT
FOR  THE  DISTRICT  OF  MASSACHUSETTS

UNITED STATES OF AMERICA

v.

RICHARD M. SIMON

No. 16-cr-10343-ADB

LEAVE TO FILE GRANTED
ON AUGUST 6, 2019
ECF #951

LEAVE TO FILE EXCESS PAGES
GRANTED ON SEPTEMBER 10, 2019
ECF #973

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
DEFENDANT RICHARD M. SIMON'S MOTION FOR NEW TRIAL
(RE: COUNSEL'S CONFLICT OF INTEREST)**

William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

*Counsel for Defendant Richard M. Simon*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

ARGUMENT ............................................................................................................................ 15

I.      Rule 33 Legal Standard.................................................................................................... 15

II.     This Court should order a new trial for Mr. Simon because trial counsel's conflict of interest violated Mr. Simon's Sixth Amendment right to counsel.................................... 15

        A.      Representation by conflicted counsel violates a defendant's Sixth Amendment right to counsel.................................................................................................... 16

        B.      Weil's concurrent representation of Insys created a conflict............................... 18

        C.      The conflict between Insys and Mr. Simon was not waivable. ........................... 23

        D.      Even if the conflict were waivable, Mr. Simon never provided the requisite informed, written consent to Weil's concurrent representation of Insys. ............. 24

        E.      The conflict precluded trial counsel from pursuing viable alternate strategies. ... 27

CONCLUSION........................................................................................................................... 35

CERTIFICATE OF SERVICE ................................................................................................... 36

# **TABLE OF AUTHORITIES**

## **Cases**

*Altova GmBH v. Syncro Soft SRL*, 320 F. Supp. 3d 314 (D. Mass. 2018) .............................. 20, 22

*Brady v. Maryland*, 373 U.S. 83 (1963) ..................................................................................... 18

*Brien v. United States*, 695 F.2d 10 (1st Cir. 1982) ................................................................... 17

*Bryan Corp. v. Abramo*, 474 Mass. 504 (2016) ......................................................................... 20

*Celgene Corp. v. KV Pharm. Co.*, 2008 U.S. Dist. LEXIS 58735 (D.N.J. July 29, 2008) .......... 27

*Cheney v. United States District Court*, 542 U.S. 367 (2004) .................................................... 31

*Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384 (2d Cir. 1976) ................................................ 21

*Crane v. Kentucky*, 476 U.S. 683 (1986) ................................................................................... 30

*Harris v. Blodgett*, 853 F. Supp. 1239 (W.D. Wash. 1994) ....................................................... 16

*In re Cendant Corp. Sec. Litig.,* 124 F. Supp. 2d 235 (D.N.J. 2000) .......................................... 21

*In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del.) ............................................... 7, 8

*Mickens v. Taylor*, 535 U.S. 162 (2002) .................................................................................... 16

*Murdoch v. Castro*, 365 F.3d 699 (9th Cir. 2004) ..................................................................... 30

*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987) ............................................................................. 30

*SEC v. Present*, 2015 U.S. Dist. LEXIS 170245 (D. Mass. Dec. 21, 2015) ................................ 31

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................................ 20

*Taylor v. Illinois*, 484 U.S. 400 (1988) ..................................................................................... 30

*United States v. Brown*, 623 F.3d 104 (2d Cir. 2010) ............................................................... 16

*United States v. Burgos-Chapman*, 309 F.3d 50 (1st Cir. 2002) ............................................... 16

*United States v. Calipari*, 368 F.3d 22 (1st Cir. 2004) ............................................................. 28

*United States v. Cardona-Vicenty*, 842 F.3d 766 (1st Cir. 2016) .............................................. 17

*United States v. Casseire*, 4 F.3d 1006 (1st Cir. 1993) ............................................................. 28

*United States v. Culp*, 934 F. Supp. 394 (M.D. Fla. 1996) ........................................................... 20

*United States v. De Falco*, 644 F.2d 132 (3d Cir. 1980) ............................................................. 17

*United States v. DeCologero*, 530 F.3d 36 (1st Cir. 2008) ........................................................... 17

*United States v. Dugerdas*, 735 F. Supp. 2d 113 (S.D.N.Y. 2010) ............................................... 20

*United States v. Fergeson*, 246 F.3d 129 (2d Cir. 2001) ............................................................. 15

*United States v. Foster*, 469 F.2d 1 (1st Cir. 1972) ............................................................. 17, 25

*United States v. Indelicato*, 611 F.2d 376 (1st Cir. 1979) ........................................................... 15

*United States v. Insys Therapeutics, Inc. et al.*, No. 19-cr-10191-RWZ (D. Mass.) ................. 7, 9

*United States v. Mazzaferro*, 865 F.2d 450 (1st Cir. 1989) ..................................................... 18, 20

*United States v. Mix*, 2012 U.S. Dist. LEXIS 88044 (E.D. La. June 26, 2012) .......................... 30

*United States v. Nixon*, 418 U.S. 683 (1974) ............................................................................. 31

*United States v. Ortiz-Vega*, 860 F.3d 20 (1st Cir. 2017) ........................................................... 15

*United States v. Ponzo*, 853 F.3d 558 (1st Cir. 2017) ................................................................ 16

*United States v. Rainone*, 32 F.3d 1203 (7th Cir. 1994) ............................................................. 30

*United States v. Ramirez-Benitez*, 292 F.3d 22 (1st Cir. 2002) ................................................. 17

*United States v. Reyes-Vejerano*, 276 F.3d 94 (1st Cir. 2002) ................................................... 22

*United States v. Rothrock*, 806 F.2d 318 (1st Cir. 1986) ........................................................... 15

*United States v. Schwarz*, 283 F.3d 76 (2d Cir. 2002) ............................................................... 23

*United States v. Sidoo et al.,* No. 19-cr-10080-NMG (D. Mass.) ............................................... 18

*United States v. Stryker Biotech*, No. 09-cr-10330-GAO (D. Mass.) .......................................... 31

*United States v. Vicaria*, 12 F.3d 195 (11th Cir. 1994) ............................................................. 15

*United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006) .................................... 30, 33

*United States v. Watts*, 35 Fed. Appx. 576 (9th Cir. 2002) ........................................................ 23

*United States v. Weisberg*, 2011 U.S. Dist. LEXIS 37221 (E.D.N.Y. Apr. 5, 2011) .................. 31

*United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558 (S.D.N.Y. 2015) ....................... 31

*United States v. Wilkerson*, 251 F.3d 273 (1st Cir. 2001) ........................................................... 15

*Wheat v. United States*, 486 U.S. 153 (1988) ....................................................................... 16, 17

## Statutes and Rules

28 U.S.C. § 2255 ..................................................................................................................... 16

California State Bar Formal Opinion 2011-182 (Jan. 2011) ...................................................... 35

D.C. Bar Ethics Opinion 309 (Sept. 2001) .............................................................................. 25

Federal Rule of Criminal Procedure 33 .................................................................................... 15

Massachusetts Rule of Professional Conduct 1.7 ............................................................... *passim*

Massachusetts Rule of Professional Conduct 1.9 ....................................................................... 23

Massachusetts Rule of Professional Conduct 1.10 ..................................................................... 23

Massachusetts Rule of Professional Conduct 3.8 ...................................................................... 18

New York City Bar Association Formal Opinion 2001-3 (2001) ......................................... 22, 35

New York City Bar Association Formal Opinion 2005-2 (2005) ............................................... 21

New York City Bar Association Formal Opinion 2017-6 (2017) ............................................... 35

U.S. District Court for the District of Massachusetts, Local Rule 83.6(4) ................................. 19

## Other Authorities

Anne Bowen Poulin, *Conflicts of Interest in Criminal Cases:  Should the Prosecution Have a Duty to Disclose?*, 47 AM. CRIM. L. REV. 1135 (2010) .................................................. 18

Insys Therapeutics, Inc. SEC Form 10-K (Mar. 12, 2019) ............................................ 7

Insys Therapeutics, Inc. Press Release (Dec. 12, 2013) ......................................... 27, 34

Insys Therapeutics, Inc. Press Release (Aug. 8, 2018) ........................................... 4, 19

Monroe Freedman, *The Ethical Illusion of Screening*, LEGAL TIMES (Nov. 20, 1995)............... 22

Neil W. Hamilton & Kevin R. Coan, *Are We A Profession or Merely a Business?:  The Erosion of the Conflicts Rules Through the Increased Use of Ethical Walls*, 27 HOFSTRA L. REV. 57 (1998) ......................................................................... 23

P. Brickley, *Insys Bankruptcy Raises Conflicts Issues for Weil Gotshal*, THE WALL STREET JOURNAL (July 15, 2019) ........................................................... 10

Stephen G. Huggard and Hilary B. Dudley, "The Sword, a Shield, and Severance: The Corporate Attorney-Client Privilege in White Collar Criminal Prosecutions," BLOOMBERG LAW (Sept. 11, 2012) ........................................... 32

Thomas D. Morgan, *Screening the Disqualified Lawyer:  The Wrong Solution to the Wrong Problem*, 10 UNIV. OF ARKANSAS AT LITTLE ROCK L. REV. 37 (1987) ................ 22

USAO Press Release (June 5, 2019) .............................................................. 7

**INTRODUCTION**

The United States Attorney has spoken out forcefully, in the "Varsity Blues" prosecution, to protect the constitutional right of criminal defendants to representation by conflict-free counsel:

> The dangers associated with representing defendants in the same case, or in different but related cases, are well recognized. For example, one client may stand to gain through negotiations with prosecutors that will injure another, raising concerns of loyalty; or information obtained in the representation of one client may be potentially useful to another, raising concerns of confidentiality. These risks are heighted—significantly—where one defendant is cooperating against the other. . . . Such dangers pose a threat to a defendant's right to a defense conducted by an attorney who is free of conflicts of interest, as well as to the court's institutional interests in preserving the fairness and integrity of the judicial process.

*United States v. Sidoo*, No. 19-cr-10080-NMG (D. Mass.), ECF #400 at 8-9 (internal citations and quotations omitted). These same principles require a new trial for defendant Richard M. Simon.

In August 2018, Weil, Gotshal & Manges LLP ("Weil"), the law firm defending Mr. Simon against criminal charges related to his work for Insys Therapeutics, Inc. ("Insys"), accepted a multimillion-dollar engagement to assist Insys with restructuring and bankruptcy matters. This concurrent representation created a clear conflict of interest, because at that time and throughout the trial, Insys was actively assisting in the prosecution of Mr. Simon. Weil could not be loyal to both clients. Mr. Simon never provided his informed, written consent to this arrangement. Worse, when he asked his trial counsel, Weil partner Steven Tyrrell, what the Insys engagement would mean for him, Tyrrell responded, "*nothing, really.*"

In fact, the conflict precluded Weil from taking any action adverse to Insys in defending Mr. Simon. For example, Weil could not seek to obtain or use exculpatory materials over which Insys claimed attorney-client privilege to present a defense that Mr. Simon acted in good faith reliance on company executives and an internal investigation by outside counsel. Consequently, as a matter of law, prejudice must be presumed, and Mr. Simon is entitled to a new trial.

# BACKGROUND

1.      On or about January 13, 2017, Mr. Simon executed an engagement letter with

Attorney Steven Tyrrell, a partner of Weil, Gotshal & Manges LLP ("Weil"), as his defense

counsel in this case. *See* Ex. A. The letter incorporated by reference an appended document titled

"Additional Terms of Engagement," which included a section captioned "Conflicts of Interest":

> You understand that Weil is a general service law firm that represents clients from
> a broad range of industries in a wide variety of national and international matters.
> As used herein, the term "clients" means Weil's current and future clients. Our
> website at www.weil.com lists our practice areas and many of our recent
> representations. Importantly, Weil's other clients may include your or your
> affiliates' debtors, creditors, direct competitors, or adversaries (in transactions or
> litigation or other matters). For example, when Weil's restructuring and bankruptcy
> practice represents a debtor in financial distress, Weil could be called on to act
> against certain of the debtor's creditors or other parties in interest. Given the
> complexity of the financial restructuring process and the large number of parties
> typically involved, the firm's other current or future clients in unrelated matters,
> including you or your affiliates, could be creditors or parties in interest of the
> debtor.
>
> Without a binding conflicts waiver, conflicts of interest might arise that could
> deprive you or others of the right to select Weil as their counsel. Therefore, as an
> integral part of our agreement, you agree that Weil may represent other clients
> (including any adversary in a matter in which we represent you) against you or any
> of your affiliates in other current or future litigation, transactional, advisory, or
> restructuring (see below) matters, as long as those matters are not substantially
> related to the legal services that Weil has rendered, is rendering, or will render to
> you or any of your affiliates ("Allowed Adverse Representations").
>
> A "restructuring" matter means Weil's representation of one or more debtors,
> creditors, or other parties in interest in (i) a refinancing, recapitalization,
> restructuring, renegotiation, or other out-of-court workout of a debtor's financial
> obligations, (ii) any matter or proceeding arising in or related to a case under title
> 11 of the United States Code or similar laws, rules, or regulations in any applicable
> US or foreign jurisdiction, including the claims allowance process in such a case,
> (iii) an in-court or out-of-court foreclosure or exercise of creditor remedies, or (iv)
> a winding-up, dissolution, or liquidation of a debtor. But a "restructuring" matter
> does not mean a lawsuit alleging actual fraud or willful misconduct by you in
> connection with a debtor.
>
> You also agree that you will not, for yourself or any other entity, including any of
> your affiliates, assert (or cause any other entity to assert) that either (a) Weil's
> representation of you or any of your affiliates in any past, present, or future matter

or (b) Weil's actual, or possible, possession of confidential information belonging to you or any of your affiliates is a basis to disqualify Weil from representing other clients in Allowed Adverse Representations. You further agree that Weil's representation of other clients in Allowed Adverse Representations does not breach any duty that Weil owes to you or any of your affiliates.

We are not currently aware of any such circumstance, but it may transpire that in the future, stock or other specific assets for which you are bidding, and in which we are representing you, could also be the subject of a bid by one or more of our other clients. Should that occur, Weil will set up a screen between those representing you with respect to your bid and all lawyers and other personnel representing any other bidder, to prevent information from passing from one side of the screen to the other, and to prevent all screened-off personnel from gaining any access to your documents, strategies, or other confidences. You hereby consent to these screening procedures and to our representation of such competing bidders.

We wish to make sure that you have sufficient information, and that we have explained to you the risks involved, in agreeing to the advance waivers described above. Please do not hesitate to contact us if you have any questions.

*Id*.

2.      Tyrrell did not specifically discuss the lengthy "conflicts" provision of the engagement letter with Mr. Simon, nor did he describe any types of foreseeable conflicts which might arise or any risks such conflicts might pose to Mr. Simon. *See* Ex. B (Declaration of Richard M. Simon ("Simon Decl.")), ¶ 10.

3.      More than a year-and-a-half later, on August 3, 2018, Ronit Berkovich, another Weil partner, sent an e-mail to others in the firm (including Tyrrell) with the subject line, "RE: Request for Approval of new Matter:  Insys Therapeutics." Ex. C. The email stated:

We have been asked to represent Insys Therapeutics, a public pharmaceutical company with exposure to opioid litigation (including hundreds of current litigations) and no funded debt, in connection with advice on restructuring matters. I received a cold call last week from the company's in-house counsel, who subsequently revealed that he reached out to me because of our work on Takata. Gary Holtzer, Fred Green, and I met with the company Wednesday. We expect the company to sign our standard engagement letter and pay our standard rates (although we will obtain approval from Derek Smyth if that changes). Conflicts are clear. Separately, Weil (Steve Tyrrell and others) represents a former executive of the company in connection with a federal criminal proceeding (defense costs are

3

being paid by the company). That engagement letter has the standard conflict waiver, as will ours, and the matters are not substantially related. We will likely institute a screen just to be on the safe side, and both clients will be informed of the other representation (Insys knows about our representation of the executive). We expect to get a fee advance. Gary has approved. Please approve.

*Id.*

4.      On August 8, 2018, Insys announced that it had "reached an agreement in principle

with the Department of Justice ("DOJ") to settle the DOJ's civil and criminal investigation into

inappropriate sales and commercial practices by some former company employees:

 [T]he terms of this agreement in principle call for INSYS to pay $150 million over five years, with the potential for contingency-based payments associated with certain events, that, if they were to occur, management estimates would require additional payments ranging from $0 to $75 million. INSYS also expects that a final settlement would include other material non-financial terms and conditions which will also be subject to negotiation.

Insys Press Release (Aug. 8, 2018), *available at* <https://insysrx.gcs-web.com/news-

releases/news-release-details/insys-therapeutics-reaches-agreement-principle-settle-department>.

5.      Also on August 8, 2018, Tyrrell spoke by phone with Mr. Simon. Prior to their call,

Tyrrell e-mailed Mr. Simon a list of "agenda items," including "Company Settlement" and "Insys

Restructuring Engagement." Ex. D. During the call, Tyrrell mentioned to Mr. Simon the

"settlement in principle" between Insys and the DOJ. Simon Decl., ¶ 11. He also informed Mr.

Simon that Weil might be engaged to assist Insys with "restructuring." *Id.* Mr. Simon asked Tyrrell

what this development would mean for him, and Tyrrell responded, "nothing, really." *Id.* Tyrrell

briefly explained that the restructuring work could entail representation of Insys in bankruptcy

proceedings. *See id.* Tyrrell advised that Mr. Simon could consult with another lawyer if he wished

and that his defense team would be "walled off" from Insys's restructuring team. *Id.*

6.      During the call, Tyrrell did *not* explain to Mr. Simon that Insys had been actively

assisting the DOJ with its investigation of Mr. Simon and the other defendants in this case or that

Insys would likely continue to cooperate in the prosecution of its former employees in the hope of securing a corporate settlement. *See id.*, ¶ 12. Tyrrell did *not* advise Mr. Simon that Weil's representation of Insys would preclude the firm from taking any action on behalf of Mr. Simon that would be adverse to Insys, and Tyrrell did *not* disclose or explain any other specific risks or problems that the concurrent representation of Insys might entail. *See id.* The entire discussion of Insys's settlement and Weil's anticipated restructuring engagement lasted no more than a few minutes as part of a long call that focused on other subjects related to Mr. Simon's case. *See id.*

7.      Handwritten notes of the August 8, 2018, call provided by Weil to undersigned counsel confirm the substance of the brief conversation, including Tyrrell's statement that Weil's concurrent representation of Insys "means . . . *nothing really*" to Mr. Simon:



Ex. E (emphasis added).

8.      On or about August 22, 2018, Weil and Insys executed an engagement letter for Weil "to represent the Company [Insys] in connection with the Company's evaluation of and ultimate execution of various strategic alternatives, which could include, among other things, one

or more restructuring transactions, as well as representation of the Company regarding issues related thereto as directed." Ex. F. The engagement letter further stated:

> As you know, Weil represents Mr. Richard Simon in connection with *US. v. Babich, et al.*, Case No. 16 CR 10343 (D. Mass.). We intend to let Mr. Simon know that Weil has been engaged to represent the Company in matters unrelated to our representation of him. *We will not, however, inform Mr. Simon of the nature of the engagement for the Company or of the Weil attorneys responsible for it.*

*Id.* (emphasis added).

9.      After Insys formally engaged Weil, Tyrrell did not inform Mr. Simon of that development, revisit the issue of a potential conflict, or ask if Mr. Simon was satisfied with Weil's ability to fulfill its duty of loyalty to him. *See* Simon Decl., ¶ 13.

10.     By memoranda dated September 12 and 13, 2018, Weil established a "conflict screen" to prevent the sharing of confidential information among lawyers working on Mr. Simon's criminal case and Insys's restructuring matters, respectively. *See* Ex. G.

11.     After Insys implemented its screen, Tyrrell did not inform Mr. Simon or ask whether he was satisfied with Weil's internal efforts to protect his confidential information. *See* Simon Decl., ¶ 13.

12.     The trial in this case commenced on January 17, 2019.

13.     On February 11, 2019, at a sidebar conference, counsel for defendant Dr. John Kapoor advised the Court:

> Your Honor, I just want to make one thing clear for the record. *Insys is cooperating with the Government. Insys is adverse to the defendants at this point.* And that – and we have seen a drastic shift in Insys's position.

2/11/19 Tr. at 19 (emphasis added). Among other things, Kapoor's counsel noted that Insys "has largely asserted privilege" over various materials, including materials related to an internal investigation conducted at the behest of the Insys board. *Id.* at 10.

14.     On March 12, 2019, in its annual SEC report for the 2018 fiscal year, Insys stated:

If we fail to finalize our agreement in principle with the DOJ or comply with the final terms contained in the final written agreements with the DOJ and OIG, our results of operations and financial condition will be materially and adversely affected.

Insys Form 10-K (Mar. 12, 2019), *available at* <https://insysrx.gcs-web.com/static-files/8a0565f6-a6db-447e-92e5-4f8947ddb74b>.

15.     On May 2, 2019, the jury in this case returned guilty verdicts against Mr. Simon and the other defendants.

16.     On June 5, 2019, the U.S. Attorney's Office announced:

Opioid manufacturer Insys Therapeutics agreed to a global resolution to settle the government's separate criminal and civil investigations, the Department of Justice announced today. As part of the criminal resolution, Insys will enter into a deferred prosecution agreement with the government, Insys's operating subsidiary will plead guilty to five counts of mail fraud, and the company will pay a $2 million fine and $28 million in forfeiture. As part of the civil resolution, Insys agreed to pay $195 million to settle allegations that it violated the False Claims Act.

USAO Press Release (June 5, 2019), *available at* <https://www.justice.gov/usao-ma/pr/insys-therapeutics-agrees-enter-225-million-global-resolution-criminal-and-civil>; *see also United States v. Insys Therapeutics, Inc. et al.*, No. 19-cr-10191-RWZ (D. Mass.).

17.     On June 10, 2019, Insys Therapeutics, Inc. and six affiliated companies filed petitions in the United States Bankruptcy Court for the District of Delaware seeking relief under Chapter 11 of the United States Bankruptcy Code. *See In re Insys Therapeutics, Inc.*, No. 19-11292 (Bankr. D. Del.) ("Insys bankruptcy case"). Weil represents Insys in the bankruptcy case.

18.     On June 13, 2019, Mr. Simon saw a news article stating that Weil was representing Insys in its bankruptcy case. Mr. Simon emailed Tyrrell to inquire whether this was a conflict of interest. *See* Ex. H. Tyrrell responded:

I did inform you when we were engaged to assist the company with restructuring advice which now has led to the filing of a Chapter 11 reorganization. If you need me to do so, I will locate our notes and/or memo to the file about this conversation and tell you the date. I also explained to you at the time that there is a "wall" between me and my team on our case and the team that is doing the restructuring work. Thus, there is no sharing of information or interaction between the teams. *From my perspective, there is no conflict of interest as you and Insys currently are not adverse.* If Insys ever tries to "clawback" the $750,000 that it advanced for your fees, my understanding is that Weil would not perform that work for the company (and that would be outside the scope of our engagement too). They and you would have to engage other counsel to deal with that issue.

*Id.* (emphasis added).

19.     On June 17, 2019, in the Insys bankruptcy case, Weil filed an "Application of Debtors for Authority to Retain and Employ Weil, Gotshal & Manges LLP as Attorneys for Debtors Effective as of the Petition Date." *In re: Insys Therapeutics, Inc.*, No. 19-11292-KG (Del. Bankr.) (ECF #81). The Application disclosed that in the 90 days prior to the Petition Date, Weil received payments and advances from Insys totaling $8,400,000. *See id.* The appended declaration of Weil partner Gary Holtzer stated:

Weil currently represents Richard Simon, former Director of Sales of Insys, as a defendant in a criminal action commenced by the United States Attorney's Office for the District of Massachusetts, involving SUBSYS®. In connection with an undertaking agreement executed by Mr. Simon, prior to the Petition Date, the Debtors paid $750,000 (the capped amount under the undertaking agreement) to Weil on account of legal fees incurred by Mr. Simon. Mr. Simon was convicted in May 2019. Mr. Simon's sentencing is currently set for September 12, 2019 at 2:00 p.m. The Simon matter is unrelated to the Debtors' Chapter 11 Cases, the Debtors do not believe that Mr. Simon is a creditor of the Debtors in these Chapter 11 Cases, and Mr. Simon was never an officer of the Debtors. Nevertheless, out of an abundance of caution and to avoid even the appearance of a conflict, since the very beginning of Weil's representation of the Debtors, Weil instituted and has maintained an ethical screening wall between the Weil attorneys working on the Simon matter (generally a small group of attorneys in Weil's white collar group in Boston and Washington D.C.) (the "Screened Attorneys") and the Weil attorneys representing the Debtors. The Screened Attorneys have not been involved and will not be involved in the representation of the Debtors and have not had and will not have any discussions of any aspect of Weil's representation of the Debtors with attorneys involved in the representation of the Debtors. In addition, with respect to

8

any matters involving Mr. Simon in these Chapter 11 Cases or otherwise, the Debtors will be represented in such matters by RLF or separate counsel. Weil also will not represent Mr. Simon in any matter related to these Chapter 11 Cases.

*Id*.

20.    On July 10, 2019, at the sentencing hearing for Insys Pharma, Inc. (the operating subsidiary of Insys Therapeutics, Inc. that pleaded guilty as part of the company's global resolution of all criminal and civil charges), the prosecution lauded Insys's active cooperation against its former employees, including Mr. Simon:

> Very early on in our discussions with Insys, they recognized the wrong-doing and began cooperating with our investigation. They assisted – they provided substantial assistance in our – in our prosecution of eight individuals, executives with the company, all of whom – five were convicted after trial.

7/10/19 Tr. at 9-10, *United States v. Insys Therapeutics, Inc. et al.*, No. 1:19-cr-10191-RWZ (D. Mass.) (ECF #24).

21.    Both the timing and the substantive terms of the DOJ settlement were closely coordinated with the bankruptcy filing. At the July 10, 2019 hearing, attorneys from Covington & Burling LLP, who represented Insys in the criminal and civil DOJ matters, explained that the DOJ settlement included specific understandings between Insys and the government about the treatment of financial penalties in the bankruptcy proceedings:

> [Insys] filed bankruptcy within days of pleading guilty and the parties, the United States and Insys, the Insys corporate entities, have reached an agreement that the $2 million fine, the $28 million forfeiture, and any restitution shall be treated as pre-petition nonpriority general unsecured claims by the United States in the bankruptcy proceeding and paid as such under the Chapter 11 plan or Chapter 7 distribution. So I just wanted to put that agreement on the record.

*Id.* at 14-15. Although the plea agreement for Insys Pharma, Inc. provided for payment of $28 million in annual installments over five years, *see* Plea Agreement, *Insys Therapeutics, Inc. et al.*, No. 1:19-cr-10191-RWZ (D. Mass.) (ECF #3), ¶ 8, the government told the sentencing judge that

she did not "need[] to include anything about the five years because upon Insys's filing of bankruptcy, the whole amount becomes immediately due and payable, and it's resolved in the Bankruptcy Court," and that Insys Therapeutics, Inc. would be jointly and severally liable for all payments, 7/10/19 Tr., *Insys Therapeutics, Inc. et al., supra*, at 13-14.

22.     On July 15, 2019, *The Wall Street Journal* published an article concerning "conflict issues for Weil Gotshal" arising from the firm's dual role in this criminal case and the related Insys bankruptcy. *See* P. Brickley, *Insys Bankruptcy Raises Conflicts Issues for Weil Gotshal*, THE WALL STREET JOURNAL (July 15, 2019), *available at* <https://www.wsj.com/articles/insys-bankruptcy-raises-conflicts-issues-for-weil-gotshal-11563222129>. The *WSJ* reported:

> While one team of lawyers at Weil Gotshal & Manges LLP was guiding opioid maker Insys Therapeutics Inc. through a thicket of legal and financial troubles, others at the firm were defending a former Insys sales director against federal racketeering charges in Boston.
>
> *Now Insys is in bankruptcy, former sales chief Richard Simon has been convicted, and Weil Gotshal is still representing both the company, which helped to get Mr. Simon convicted, and Mr. Simon, who is trying to win a post-trial acquittal. . . .*
>
> Fordham University School of Law Professor Howard Erichson said ethics rules allowing a lawyer to represent an organization and its employees require that other rules about conflicts of interest be heeded. If one client is cooperating with the government, and the other isn't, "you would never call that not a conflict of interest," he said. . . .
>
> Weil Gotshal said that going forward, any matters involving Mr. Simon will be handled by a different law firm.

*Id.* (emphasis added).

23.     Mr. Simon had not provided permission for Weil to make any public statements (whether to the media or in bankruptcy court pleadings) about his representation, client relationship, or termination thereof, nor did anyone from Weil contact Mr. Simon to advise him of

the *WSJ* inquiry, the eventual publication of the article, or the filings in the Insys bankruptcy case.

*See* Simon Decl., ¶ 16.

24.     On July 19, 2019, four days after the *WSJ* article ran, Mr. Simon e-mailed Tyrrell:

> Steve,
>
> The Wall Street Journal is reporting that Weil is "representing the company that helped to get Mr. Simon convicted, and Mr. Simon, who is trying to win a post-trial acquittal." Somebody from Weil also apparently told the Journal that "going forward, any matters involving Mr. Simon will be handled by a different law firm."
>
> Can you please let me know what is going on?

Ex. I. Tyrrell replied by e-mail a short time later:

> Not sure how the company helped get you convicted. Moreover, as I have explained to you before, my firm's representation of the company in the bankruptcy proceedings happened long after the company had conducted its internal investigation and is unrelated to the criminal case. There also has been and will be a wall between my team and the bankruptcy team such that no confidential information is shared.
>
> Finally, we already have discussed the fact that Weil was not engaged to represent you on appeal and will not be doing so.

*Id.*

25.     On July 29, 2019, the undersigned filed appearances in this case as successor

counsel for Mr. Simon.

26.     By letter to Weil's general counsel, Mindy Spector, dated July 31, 2019,

undersigned counsel requested, in addition to Mr. Simon's client file:

- Documents sufficient to show when Weil pitched to, or otherwise solicited from, Insys or its affiliates any restructuring, bankruptcy, or other work;

- Documents sufficient to show when Insys or its affiliates first engaged Weil for any restructuring, bankruptcy, or other work;

- All communications between Weil and Insys, its affiliates, or its agents (including attorneys from Covington & Burling LLP) concerning the

government's criminal or civil investigation of Insys (including Insys's cooperation with that investigation or any related prosecution);

- All communications between Weil and Insys, its affiliates, or its agents (including attorneys from Covington) concerning Insys's negotiation or acceptance of the deferred prosecution agreement with the DOJ;

- All communications between Weil and Insys, its affiliates, and its agents concerning Mr. Simon;

- All communications between Weil and the Wall Street Journal or any other media outlet concerning the firm's representation of Mr. Simon and/or Insys; and

- All documents and information concerning Weil's analysis of, and actions in connection to, any potential conflict between the firm's representation of Mr. Simon in his criminal matter and its concurrent representation of Insys in any restructuring, bankruptcy, or other matter.

Ex. J.

27.     By letter dated August 5, 2018, Spector denied the existence of any conflict:  "As I am sure you must be aware, for there to be a conflict there must be adversity. There was no adversity between the criminal defense of Mr. Simon and Weil's representation of Insys in connection with corporate and restructuring matters." Ex. K. Spector also denied that Weil made any statements to the *Wall Street Journal*. *See id*. She further stated:

> With regard to your requests for documents, to the extent there are any responsive documents, we will not produce documents relating to our representation of Insys that are privileged. We will, however, produce our engagement letter with Insys, provided you agree such production will not be used as a basis to argue waiver of any applicable privilege. It will take us some time to search our files for any responsive emails. As we conduct and complete our search, I will provide you a further response to each of your seven requests for documents.

*Id*.

28.     Also on August 5, 2019, Mr. Simon filed his Motion for Leave to Supplement his pending Motion for New Trial on the basis that Weil had a conflict of interest that violated his

Sixth Amendment rights. *See* ECF #950. This Court granted the motion the next day, setting a deadline of September 9, 2019, for the submission of this memorandum. *See* ECF #951.

29.     By letter dated August 14, 2019, Spector transmitted certain documents to undersigned counsel and stated: "In light of this documentation, we request that you supplement the motion [for leave to brief the conflict issue] so that the Court has the accurate factual record." Ex. L. Undersigned counsel responded to Spector's letter the same day, noting that Spector's letter failed to "identify any factual misstatement [in the motion for leave] that requires correction" and discussing relevant facts and legal authority concerning the conflict issue. Ex. M.

30.     By letter dated August 15, 2019, Spector stated, *inter alia*:

> This letter is to briefly respond to your letter of yesterday. Your letter is riddled with misstatements of fact. At this stage, there is no reason for me to correct each of them. Suffice it to say, they will be corrected for the Court at the appropriate time. . . .
>
> [E]nclosed are the remaining non-privileged documents concerning the so-called conflict issue. As you may recall, I advised you that we would be prepared to produce our engagement letter with Insys provided you agree such production would not constitute a waiver of privilege. You have not yet so agreed. Any other documents that might be responsive to the requests in your July 31, 2019 letter are subject to privilege which will not be waived. The only exception are the emails and two telephone messages we received from the Wall Street Journal. As I previously advised you, we did not respond and did not have any communications of any nature with the Journal. In this regard, any public statement we have made has not disclosed any confidential information whatsoever. With regard to the case file, it is my understanding that other Weil attorneys are gathering and providing you the documents relating to our substantive defense of Mr. Simon.

Ex. N. In follow-up communications, Weil also produced its engagement letter with Insys, referenced *infra* as Ex. F.

31.     On August 16, 2019, Weil filed a "motion to intervene . . . for the limited purpose of correcting certain misleading and inaccurate claims regarding counsel's representation of defendant Richard M. Simon and to ensure that the Court has an accurate and complete factual

record regarding defendant Simon's allegations of a conflict of interest." ECF #968. Mr. Simon

filed an opposition the same day. *See* ECF #966. On August 20, 2019, the Court entered an order

permitting Weil to submit a responsive affidavit by September 16, 2019, following submission of

Mr. Simon's supplemental memorandum. *See* ECF #970.

32.     In a series of electronic file transfers between August 18 and 29, 2019, Weil

produced voluminous materials from Mr. Simon's client file:  over 150 gigabytes of unindexed

data, including over 30,000 Weil emails and over 150,000 other electronic files of various types.

Undersigned counsel's review of this material is ongoing.

33.     By letter to the government dated July 31, 2019, undersigned counsel requested:

- All communications between the government and Insys Therapeutics, Inc., its affiliates (including Insys Pharma, Inc.), and its agents (including attorneys associated with Weil or Covington & Burling LLP) concerning Insys's restructuring and bankruptcy;

- All communications between the government and Insys, its affiliates, and its agents concerning Weil's representation of Insys or its affiliates in any matter;

- All communications between the government and Insys, its affiliates, and its agents concerning Insys's cooperation in this prosecution or the investigation of Insys's employees (including its former employees);

- All communications between the government and Insys, its affiliates, and its agents concerning Mr. Simon; and

- All documents and information that Insys, its affiliates, and its agents provided to the government concerning Mr. Simon.

Ex. O. Undersigned counsel explained the requested information was "potentially exculpatory in

that it would tend to support a motion for new trial by Mr. Simon based upon his counsel's conflict

of interest." *Id.* (citing *United States v. Ponzo*, 853 F.3d 558, 574 (1st Cir. 2017) ("The Sixth

Amendment guarantees the right to conflict-free counsel.")).

14

34.     On September 3, 2019, in response to a follow-up inquiry from undersigned counsel, the government responded: "Your letter requesting documents and information does not provide an adequate factual or legal basis for discovery or disclosure. This is particularly true given the allegations of lack of candor made by Weil, Gotshal & Manges LLP." Ex. P. Thus, as of this filing, the prosecution has not produced any documents that establish when it became aware that Weil was representing both Mr. Simon and Insys, which was acting as a cooperating witness.

## ARGUMENT

### I.     Rule 33 Legal Standard.

Pursuant to Fed. R. Crim. P. 33, this Court "may vacate any judgment and grant a new trial if the interest of justice so requires." A motion for new trial is directed to "the broad discretion" of the District Court. *United States v. Indelicato*, 611 F.2d 376, 387 (1st Cir. 1979); *see United States v. Wilkerson*, 251 F.3d 273, 278 (1st Cir. 2001). Given that broad discretion, the power to order a new trial is "broader" than the power to direct an acquittal. *See United States v. Rothrock*, 806 F.2d 318, 321 (1st Cir. 1986). Moreover, the interest-of-justice standard in a post-trial context is more expansive than the reversible-error standard on appeal. *See United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *United States v. Fergeson*, 246 F.3d 129, 134 (2d Cir. 2001).

### II.    This Court should order a new trial for Mr. Simon because trial counsel's conflict of interest violated Mr. Simon's Sixth Amendment right to counsel.

"[W]hen a claim of ineffective assistance of counsel," including a conflict claim, "is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding," and "the failure to do so may constitute an abuse of discretion." *United States v. Ortiz-Vega*, 860 F.3d 20, 30 (1st Cir. 2017) (holding "the district court abused its discretion by failing to rule on the merits of [the defendant]'s ineffective

assistance claim before sentencing" and remanding for further proceedings) (quoting *United States v. Brown*, 623 F.3d 104, 112-14 (2d Cir. 2010)). Moreover, it would serve the interests of justice and judicial economy for this Court to rule on the conflict issue now rather than require Mr. Simon to proceed through sentencing, complete his direct appeal, and only then, seek post-conviction relief – based on the same conflict issue – from this Court under 28 U.S.C. § 2255.

**A.    Representation by conflicted counsel violates a defendant's Sixth Amendment right to counsel.**

"The Sixth Amendment guarantees the right to conflict-free counsel." *Ponzo*, 853 F.3d at 574. Accordingly, with constitutional rights at stake, this Court should strictly construe and apply the conflict rules, because "the need to protect the criminal defendant from conflict of interest is greater than in a civil case," *Harris v. Blodgett*, 853 F. Supp. 1239, 1272 (W.D. Wash. 1994), and because this Court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession," *Wheat v. United States*, 486 U.S. 153, 160 (1988).

"Unlike ineffective assistance claims governed by *Strickland v. Washington* – a case requiring the defendant to show that counsel's performance was deficient and that this defective representation prejudiced the case's outcome – prejudice is presumed if a defendant" can "show that 'a conflict of interest actually affected' the lawyer's 'performance.'" *Ponzo,* 853 F.3d at 575 (quoting *Mickens v. Taylor*, 535 U.S. 162, 168, 171 (2002)). In other words, "a lesser showing of prejudice is enough where ineffectiveness is traced to a conflict of interest . . . that was not identified and properly waived." *United States v. Burgos-Chapman*, 309 F.3d 50, 52 (1st Cir. 2002) (citing *Mickens,* 535 U.S. at 168).

To show an "adverse effect," a defendant need only "show that [his attorney] might plausibly have pursued an alternative defense strategy, and that the alternative strategy was in conflict with, or may not have been pursued because of, [the attorney's] other loyalties or

interests." *United States v. DeCologero*, 530 F.3d 36, 77 (1st Cir. 2008) (quoting *United States v. Ramirez-Benitez*, 292 F.3d 22, 30 (1st Cir. 2002)).

It is irrelevant whether trial counsel consciously or intentionally eschewed an alternative strategy due to the conflict. Unlike a typical *Strickland* claim, trial counsel's actual, subjective, strategic decision-making is beside the point. Even if trial counsel's choices might be strategically defensible or reasonable, a conflict inherently taints those judgments and triggers the presumption of prejudice. *See United States v. De Falco*, 644 F.2d 132, 135 (3d Cir. 1980) ("[A]pparently legitimate decisions are rendered suspect if made by counsel with conflicting loyalties[.]").

Moreover, it does not matter whether "the [alternative] defense would necessarily have been successful if it had been used," so long as the alternative "possessed sufficient substance to be a viable alternative." *United States v. Cardona-Vicenty*, 842 F.3d 766, 773 (1st Cir. 2016) (quoting *Brien v. United States*, 695 F.2d 10, 15 (1st Cir. 1982)).

Finally, because the government did not bring the apparent[1] conflict to this Court's attention, this Court had no opportunity to conduct a pre-trial colloquy pursuant to *United States v. Foster*, 469 F.2d 1 (1st Cir. 1972). Such a colloquy is critical, because "where a court justifiably finds an actual conflict of interest, there can be no doubt that it may decline a proffer of waiver, and insist that [parties] be separately represented." *Wheat*, 486 U.S. at 162. Thus, at this stage, "the government has the burden of persuasion of demonstrating that prejudice to the defendant was improbable." *United States v. Mazzaferro*, 865 F.2d 450, 454 (1st Cir. 1989).

---

[1] While the government has declined to produce any documents that could help to establish the date on which it learned of Weil's restructuring work for Insys, *see* Exs. O & P, it strains credulity to believe that it was unaware of Weil's involvement (and thus, the conflict) through the end of the trial, given that the settlement and associated mutual understandings concerning financial penalties and bankruptcy was announced within weeks of the guilty verdicts after years of negotiations between Insys and the DOJ.

The government's conspicuous silence about Weil's concurrent representation of a criminal defendant and a cooperating witness in this case stands in stark contrast to its aggressive and repeated demands for *Foster* hearings in the so-called "Varsity Blues" cases arising from alleged college admissions fraud. *See generally United States v. Sidoo et al.,* No. 19-cr-10080-NMG (D. Mass.), ECF #400 (Government's Motion for Hearing Regarding Conflicts of Interest (June 6, 2019)), and ensuing briefs and hearing. Relatedly, scholars have suggested that the government should bear an enforceable, affirmative legal burden to bring apparent conflicts to the court's attention. *See, e.g.,* Anne Bowen Poulin, *Conflicts of Interest in Criminal Cases:  Should the Prosecution Have a Duty to Disclose?*, 47 AM. CRIM. L. REV. 1135 (2010).

Certainly, once the government became aware that, at the same time, Weil was representing both Mr. Simon in this criminal case and also Insys in restructuring or bankruptcy work (which directly related to plea negotiations with Insys), it should have taken immediate, appropriate steps – as it has in the "Varsity Blues" cases – to ensure that Mr. Simon received a fair trial with the effective assistance of unconflicted counsel. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("Society wins . . . when criminal trial are fair," and the criminal justice system "suffers when any accused is treated unfairly."); Mass. R. Prof. C. 3.8, cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of any advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice[.]"). Instead, by failing to alert this Court, the prosecution cast itself "in the role of an architect of a proceeding that d[id] not comport with standards of justice." *Brady*, 373 U.S. at 88.

## B.     Weil's concurrent representation of Insys created a conflict.

The interests of Insys and Mr. Simon were and are adverse:  Insys provided "substantial assistance" to the government in the prosecution of Mr. Simon. In addition, Insys has continued to assert privilege over documents that, as explained below, could have provided support to a "good

faith" defense by Mr. Simon and a basis to seek severance from other defendants. Given this direct

adversity, Weil's concurrent representation of Insys and Mr. Simon created an unwaivable conflict

even accepting, for the sake of argument, Weil's assertion that its restructuring and bankruptcy

work was not "substantially related" to its defense of Mr. Simon.

The Massachusetts Rules of Professional Conduct adopted by the Supreme Judicial Court

govern the ethical obligations of attorneys in this District. *See* D. Mass. Local Rule 83.6(4). Mass.

R. Prof. C. 1.7 provides:

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the
> representation involves a concurrent conflict of interest. A concurrent conflict of
> interest exists if:
>
>> (1) the representation of one client will be directly adverse to another
>> client; or
>>
>> (2) there is a significant risk that the representation of one or more clients
>> will be materially limited by the lawyer's responsibilities to another client,
>> a former client or a third person or by a personal interest of the lawyer.
>
> (b) Notwithstanding the existence of a concurrent conflict of interest under
> paragraph (a), a lawyer may represent a client if:
>
>> (1) the lawyer reasonably believes that the lawyer will be able to provide
>> competent and diligent representation to each affected client;
>>
>> (2) the representation is not prohibited by law;
>>
>> (3) the representation does not involve the assertion of a claim by one
>> client against another client represented by the lawyer in the same
>> litigation or other proceeding before a tribunal; and
>>
>> (4) each affected client gives informed consent, confirmed in writing.

As Chief Judge Saris recently explained, "Rule 1.7 serves as a prophylactic [measure] to

protect confidences that a client may have shared with his or her attorney . . . [and] safeguard[s]

loyalty as a feature of the lawyer-client relationship." *Altova GmBH v. Syncro Soft SRL*, 320 F.

Supp. 3d 314, 319 (D. Mass. 2018) (internal citations and quotation marks omitted) (brackets in

original). Indeed, "[l]oyalty and independent judgment are essential elements in the lawyer's relationship to a client." Mass. R. Prof. C. 1.7, cmt. 1. "By prohibiting the simultaneous representation of clients with adverse interests absent informed consent, Rule 1.7 fosters a sense of trust between the lawyer and client that promotes the lawyer's ability to competently represent the client's interests." *Bryan Corp. v. Abramo*, 474 Mass. 504, 511 (2016); *see also Strickland v. Washington*, 466 U.S. 668, 692 (1984) (explaining loyalty is "perhaps the most basic of counsel's duties"). "[T]he loyalty a lawyer owes to his client is so basic . . . it should not be sullied by even the appearance of a possible conflict." *Mazzaferro*, 865 F.2d at 456.

Courts have long recognized that concurrent representation of a defendant, such as Mr. Simon, and cooperating witness, such as Insys, poses a clear conflict. *See, e.g.*, *United States v. Dugerdas*, 735 F. Supp. 2d 113, 116 (S.D.N.Y. 2010) ("[T]he unusual circumstance of a law firm seeking to simultaneously represent a defendant and a cooperating witness in the same criminal proceeding . . . creates a clear conflict of interest."); *United States v. Culp*, 934 F. Supp. 394, 397 (M.D. Fla. 1996) ("[T]he simultaneous representation of clients with adverse interests is the most egregious form of a lawyer's conflict of interest."). It is difficult to imagine a more obvious example of adversity or a situation more fraught with risk for the defendant in a criminal case.

The fact that Insys is not a party in the criminal case before this Court is of no moment. Both Insys and Mr. Simon were prosecuted as part of the same investigation by the same prosecutors, and Insys (along with its current employees) are in effect cooperating witnesses against Mr. Simon. Multiple jurisdictions "have embraced the view adverse witnesses, in addition to parties, may be 'directly adverse within the meaning of Rule 1.7(a)." *In re Cendant Corp. Sec. Litig.*, 124 F. Supp. 2d 235, 242 (D.N.J. 2000). "The potential for conflict of interest in representing multiple defendants is so grave that ordinarily a lawyer should decline to represent more than one

codefendant, or more than one person under investigation by law enforcement authorities for the same transaction or series of transactions[.]" Mass. R. Prof. C. 1.7, cmt. 23.

Weil's claim that no conflict exists because there is "no adversity between the criminal defense of Mr. Simon and Weil's representation of Insys in connection with corporate and restructuring matters" is incorrect. The issue is not whether two Weil client teams are performing work on related matters that are directly in conflict, but whether two Weil *clients* – Insys and Mr. Simon – are adverse to each other. Due to that conflict, Weil cannot act with undivided loyalty to both clients. The Massachusetts ethical rules with which Weil agreed to comply when it appeared as counsel in this case address this precise situation:

> [A]bsent consent, a lawyer ordinarily may not act as an advocate in one matter against a person the lawyer represents in some other matter, *even when the matters are wholly unrelated*. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client.

Mass. R. Prof. C. 1.7, cmt. 6 (emphasis added); *see also* NYCBA Formal Op. 2005-2 (2005) (*citing Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976)) ("In general, a conflict of interest exists . . . when a lawyer represents one client in a matter that is directly adverse to a second client whom the lawyer or the lawyer's firm represents in another matter, *even if the two matters are unrelated*. The most typical example is when a lawyer represents a client in litigation against a party whom the lawyer's firm represents in another matter.") (emphasis added); NYCBA Formal Op. 2001-3 (2001) ("[A] lawyer is precluded, at least prima facie, from representing one client in a matter directly adverse to another current client.").

Contrary to Spector's assertion, Weil's use of a "screen . . . between those attorneys working on Mr. Simon's defense and those attorneys working on the Insys matter" cannot, like a magic wand, "avoid any issues." Ex. K. Many commentators have questioned whether such "screens" serve primarily to prioritize firm profits from new clients over professional duties to existing (or former) clients. *See, e.g.*, Thomas D. Morgan, *Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem*, 10 UNIV. OF ARKANSAS AT LITTLE ROCK L. REV. 37, 48 (1987) ("One need not be an unreformed cynic to see the success of screening depends almost entirely on the other side's confidence in the good faith and ability to control conduct within the firm[.]"); Monroe Freedman, *The Ethical Illusion of Screening*, LEGAL TIMES (Nov. 20, 1995) (noting that, despite ethical walls, "the temptations are still there, violations are virtually impossible to police, and the [client]'s ability to prove a violation is essentially nil").

While ethical screens may mitigate the risk of violating an attorney's duty of confidentiality, they cannot ensure compliance with the *separate* duty of loyalty. *See Altova GmBH*, 320 F. Supp. 3d at 319 (emphasizing distinct duties); *see also, e.g.*, *Reyes-Vejerano*, 276 F.3d at 100 (observing that "one client may stand to gain through negotiations with prosecutors that will injure another, raising concerns of loyalty; or information obtained in the representation of one client may be potentially useful to another, raising concerns of confidentiality"). Therefore, as with advance waivers, screens arguably have no place in criminal cases, where defendants have constitutional rights to the effective assistance of defense attorneys with undivided loyalties. *See United States v. Watts*, 35 Fed. Appx. 576, 577 (9th Cir. 2002) (raising but not resolving the question whether "screening" may be "appropriate in some criminal cases).

Moreover, screens originated as a way to avoid imputed disqualification of entire firms due to individual lawyer migration (initially, from government service to private practice), not as a

side-door giving firms carte blanche to take on concurrent, adverse representations. *See generally* Neil W. Hamilton & Kevin R. Coan, *Are We A Profession or Merely a Business?:  The Erosion of the Conflicts Rules Through the Increased Use of Ethical Walls*, 27 HOFSTRA L. REV. 57, 90 (1998) ("[N]o court has ever allowed an ethical wall in a case where a personally disqualified lawyer had not moved and the firm simply switched sides.").  The typical, permissible deployment of "walls" as a means to screen migrating lawyers, rather than permitting new, concurrent, conflicting representations, is also reflected in the Rules, which only discuss "screening" in the context of lawyer migration, *see* Mass. R. Prof. C. 1.10, and limitations on "access to files" in the context of "duties to *former* clients," Mass. R. Prof. C. 1.9, cmt. 4-9 (emphasis added). But that is not this case. And Weil's obvious incentive to accept a multi-million-dollar bankruptcy engagement should not be permitted to inure to Mr. Simon's detriment.

> If you are the client . . . [y]our trust in the efficacy of an ethical wall is undermined by the fact that many lawyers and law firms increasingly see themselves as simply business maximizing income. . . . [T]he policy arguments against ethical walls are substantially stronger than the policy arguments for them.

Hamilton & Coan, *supra*, at 64.

### C.    The conflict between Insys and Mr. Simon was not waivable.

The Rules recognize that "some conflicts are nonconsentable, meaning that the lawyer cannot properly ask for such agreement or provide representation on the basis of the client's consent." Mass. R. Prof. C. 1.7, cmt. 14; *see United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir. 2002) ("An actual or potential conflict cannot be waived if, in the circumstances of the case, the conflict is of such a serious nature that no rational defendant would knowingly and intelligently desire that attorney's representation.").

Under "paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot reasonably conclude that the lawyer will be able to provide competent and diligent

representation." Mass. R. Prov. C. 1.7, cmt. 15. Separately, "paragraph (b)(3) describes conflicts that are nonconsentable because of the institutional interest in vigorous development of each client's position when the clients are aligned directly against each other in the same litigation or other proceeding before a tribunal." *Id*., cmt. 17.

Both ethical provisions render Weil's conflict nonconsentable in this case. Tyrrell and the other Weil attorneys should have concluded that they could not provide competent and diligent representation where their work would be materially limited by their firm's competing duty of loyalty to Insys. *See id*., cmt. 15. Mr. Simon and Insys were "aligned directly against each other" in the criminal case, with a potential for active litigation between the two, for example, in the event of a discovery dispute. *Id*., cmt. 17.

**D.     Even if the conflict were waivable, Mr. Simon never provided the requisite informed, written consent to Weil's concurrent representation of Insys.**

Even assuming, for the sake of argument, that the conflict between Mr. Simon and Insys could have been waived, Mass. R. Prof. C. 1.7(b)(4) requires that "each affected client gives informed consent, confirmed in writing," which did not occur here.

Informed consent requires the lawyer to explain all "the relevant circumstances and [ ] the material and reasonably foreseeable ways that the conflict could have adverse effects on [his] interests." *Id*., cmt. 18. Tyrrell's assurance to Mr. Simon that Weil's representation of Insys meant "nothing really" did the opposite. Weil's pledge in its engagement letter with Insys to conceal from Mr. Simon "the nature of the engagement for the Company or of the Weil attorneys responsible for it" further compounds Tyrrell's deficient disclosure. *Cf. id.*, cmt. 19 ("Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when  . . . one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent.").

Against this backdrop, Mr. Simon's apparent silent acquiescence, upon learning of Weil's concurrent Insys representation, was not tantamount to his informed, written consent. Put simply, Weil neither requested nor obtained Mr. Simon's effective, informed consent.

Nor does the advance conflict waiver in Weil's January 2017 engagement letter absolve the conflict that emerged more than 19 months later. Undersigned counsel have been unable to find any *criminal* case in which a court has upheld a prospective conflict waiver. To do so, moreover, would be inconsistent with *Foster*, which imposes a special judicial "duty" to conduct a colloquy on the record "to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of [the] risks, and to inquire diligently whether they have discussed the risks with their attorney . . ." 469 F.2d at 5.

While the ethical rules do not categorically prohibit prospective waivers, myriad authorities agree that they do not dilute the touchstone requirement of informed consent.

> The American Bar Association's Committee on Ethics and Professional Responsibility, the Restatement of the Law Governing Lawyers, the ABA's Ethics 2000 Commission, various courts, bar associations in other United States jurisdictions, and at least one respected academic figure have said that while advance waivers are not *per se* improper, they will be sustained only where the client can be said to have given informed consent.

D.C. Bar Ethics Opinion 309 (Sept. 2001), *available at* <https://www.dcbar.org/bar-resources/legal-ethics/opinions/opinion309.cfm>.

The Massachusetts Rules provide:

> The effectiveness of such waivers is generally determined by the extent to which the client reasonably understands the material risks that the waiver entails. The more comprehensive the explanation of the types of future representations that might arise and the actual and reasonably foreseeable adverse consequences of those representations, the greater the likelihood that the client will have the requisite understanding. Thus, if the client agrees to consent to a particular type of conflict with which the client is already familiar, then the consent ordinarily will be effective with regard to that type of conflict. If the consent is general and open-ended, then the consent ordinarily will be ineffective, because it is not reasonably

likely that the client will have understood the material risks involved. . . . In any case, advance consent cannot be effective if the circumstances that materialize in the future are such as would make the conflict nonconsentable . . . .

Mass. R. Prof. C. 1.7, cmt. 22.

Here, the complicated advance waiver provision in Weil's engagement letter was general and open-ended, and therefore, at least for a layperson like Mr. Simon, it was ineffective. The waiver provides specific examples arising in Weil's bankruptcy practice where Weil "could be called upon to act against certain of the debtor's creditors or other parties in interest." Ex. A. It warns that "[g]iven the complexity of the financial restructuring process and the large number of parties typically involved, the firm's other current or future clients in unrelated matters, including you or your affiliates, could be creditors or parties in interest of the debtor." *Id*. The waiver also describes a potential scenario in which a "stock or other specific assets for which [one Weil client is] bidding . . . could also be the subject of a bid by one or more of [Weil's] other clients." *Id*. In such situations, the waiver explains, "Weil will set up a screen between those representing [one client] . . . and all lawyers and other personnel representing any other [client]." *Id*.

It is implausible to suggest that Mr. Simon could have understood that an advance waiver illustrated by examples of pedestrian debt collection disputes and competitive bidding transactions would foreclose him from objecting to Weil's representation of his former employer, which is actively cooperating with the prosecution against him for serious federal felonies. And Tyrrell failed to adequately inform Mr. Simon of any other foreseeable risks. Thus, on this record, this Court cannot plausibly conclude that Mr. Simon knowingly and intelligently waived his right to defense counsel who would be able, without inhibition, to pursue discovery from Insys and mount a defense that might be adverse to the company. *See, e.g., Celgene Corp. v. KV Pharm. Co.*, No.

07-cv-4819 (SDW), 2008 U.S. Dist. LEXIS 58735 (D.N.J. July 29, 2008) (rejecting an advance waiver that was insufficiently specific about the particular conflict at issue).

Finally, the Massachusetts Rules provide that "a client who has given consent to a conflict may revoke the consent and, like any other client, may terminate the lawyer's representation at any time." Mass. R. Prof. C. 1.7, cmt. 21. Unfortunately, Mr. Simon was not in a position to revoke his purported advance waiver precisely because Tyrrell failed to apprise him of the risks and consequences of Weil's Insys engagement.

### E.     The conflict precluded trial counsel from pursuing viable alternate strategies.

Mr. Simon worked at Insys from September 2012 through March 2016, initially, as a Regional Sales Manager, and later, as the National Sales Director. *See* Simon Decl., ¶ 2. Early in Mr. Simon's tenure, in December 2013, Insys received a HIPAA subpoena from the DOJ concerning the company's marketing and sale Subsys. *See id.* ¶ 3; *see also* Insys Press Release (Dec. 12, 2013), *available at* <https://insysrx.gcs-web.com/news-releases/news-release-details/insys-therapeutics-receives-subpoena-office-inspector-general>. Days later, Insys hired Michael Loucks, a partner at Skadden, Arps, Slate, Meagher, & Flom LLP and the former acting U.S. Attorney for the District of Massachusetts, to conduct an internal investigation, identify any compliance issues, and advise the board how to remediate them. *See* ECF #678 at 4.

Skadden worked closely with Franc Del Fosse, an attorney who joined Insys as its General Counsel in February 2012, and Danielle Davis, another attorney who joined as the Director of Compliance in March 2014. Davis reported to Del Fosse, and she testified for the prosecution at Mr. Simon's trial. Along with in-house counsel, and Leslie Zacks, an attorney who had served as outside counsel to Insys since January 2012, Skadden interviewed numerous Insys employees, including Mr. Simon, and it reviewed a wide range of company practices, including the Speaker Program ("ISP") and Insurance Reimbursement Center ("IRC"). Skadden advised Insys's board

to make certain policy changes and take various employment actions. Simon Decl., ¶¶ 4-7. Notably, as far as Mr. Simon knows, "during the relevant period, post subpoena," Skadden did not advise Insys to shut down the ISP, to close the IRC, or to fire Mr. Simon. 3/25/19 Tr. at 10; *see* Simon Decl., ¶ 8. Nor did Skadden advise Insys to terminate its relationships with Dr. Judson Somerville in Texas and Dr. Mahmood Ahmad in Arkansas, the only physicians linked at trial to Mr. Simon. *See id*.

Evidence that, according to Skadden's investigation, neither the ISP nor the IRC were aspects of an ongoing "racketeering enterprise," that Mr. Simon had not intentionally engaged in any criminal activity, and that neither Dr. Somerville nor Dr. Ahmad had been bribed by Insys employees would have been relevant and exculpatory. It would have established that Mr. Simon acted in good faith. As this Court instructed the jury, to convict Mr. Simon, the prosecution had to prove beyond a reasonable doubt that he knowingly and willfully entered into a criminal conspiracy with the specific intent to commit two or more racketeering acts. *See* 4/4/19 Tr. at 32-33. Thus, the prosecution had to establish that Simon acted with "a bad purpose, either to disobey or disregard the law." *Id.* at 39. "Good faith" was "a complete defense," and the prosecution had the "burden to disprove it beyond a reasonable doubt." *United States v. Calipari*, 368 F.3d 22, 33 (1st Cir. 2004) (citing *United States v. Casseire*, 4 F.3d 1006, 1011 (1st Cir. 1993)); *see* 3/25/19 Tr. at 7 (Lazarus: "It's our burden . . . to prove lack of good faith," because "[i]t's not an affirmative defense," and no defendant "ha[s] a burden there.").

At trial, however, Mr. Simon was unable to present this exculpatory evidence of his good faith. Insys broadly asserted the attorney-client privilege over Skadden's entire internal investigation and all legal advice to the board, and the joint defense group, led by Dr. Kapoor's counsel, chose not to challenge the privilege. *See* 2/11/19 Tr. at 10 (Kapoor's counsel: "We're not

looking to pierce the privilege. We never have been[.]"); *id.* at 11 ("[W]e're not questioning the assertion of privilege by Mr. Hobart and by the company, and it's the company's call."); *see* ECF #627 at 2 ("The government correctly notes that Insys withheld materials on privilege grounds, but Defendants do not anticipate affirmatively using such privileged materials at trial.").

Although Dr. Kapoor may have had access to some of the privileged communications between Skadden, in-house counsel, and the board, because Dr. Kapoor served as chair of the board until his arrest in October 2017, Mr. Simon and the other defendants had none.

> TYRRELL: "Your honor, I'm just going to say one more time, with all due respect to Mr. Wyshak, I just don't think it's appropriate to say 'they' in this context. I think Ms. Wilkinson has made clear that Dr. Kapoor, as chairman of the board, rightly would have had access to certain things that were happening at the time, may have information in his head, or materials that he rightly retained. *That doesn't mean that the rest of the defendants have them, that does not mean that they've been shared, and that doesn't mean . . .*
>
> COURT:  I got it. I got it, Mr. Tyrrell. I got it.

2/11/19 Tr. at 13 (emphasis added); *see also* 3/20/19 Tr. at 213 (Court: "Regardless of what [privileged material] they have, . . . the only defendant that would have it is Dr. Kapoor."); 3/25/19 Tr. at 15-16 (Court: "The fact of it is . . . of the five defendants, the only one that has access to this information is Mr. Kapoor."). As a result, Mr. Simon was denied the opportunity to present his defense – to demonstrate his good faith to the jury.[2]

There was viable alternative, however. As a defense strategy, Mr. Simon could have challenged Insys's privilege, arguing that his constitutional rights to a fair trial trumped the company's common-law interest in the confidentiality of its attorney-client communications. "Whether rooted" in the rights of due process, compulsory process, or confrontation, "the

---

[2] To the extent Kapoor or other defendants did not want to challenge Insys's privilege, Mr. Simon's alternate strategy would have constituted an antagonistic defense, entitling him to severance, as in *W.R. Grace* and *Stryker Biotech*, discussed *infra*.

Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *see Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (holding the Sixth Amendment guarantees "the right to present the defendant's version of the facts"); *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987) (holding "criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt"). As a result, "[e]ven the attorney-client privilege . . . might have to yield in a particular case" if a defendant's constitutional rights "would be violated by enforcing the privilege." *United States v. Rainone*, 32 F.3d 1203, 1206 (7th Cir. 1994); *see United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006) (ruling "the attorney-client privilege could in certain circumstances yield to a defendant's Sixth Amendment rights") (citing *Murdoch v. Castro*, 365 F.3d 699 (9th Cir. 2004)).

In several cases, courts have concluded that, when in conflict, defendants' rights take precedence over corporations' privileges. In *United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D. Mont. 2006), the court allowed a motion by three defendants to use Grace's privileged documents in their defense at trial.

> Grace has asserted its legitimate interest in protecting its privileged communications unconditionally and in good faith. Still, the law requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights.

*Id.* at 1145; *see id.* at 1142 (recognizing that privileged material may be "of such probative and exculpatory value as to compel admission of the evidence over Defendant Grace's objection as the attorney-client privilege holder" and ruling admissibility determinations would be "made on a document-by-document basis at trial"). Similarly, in *United States v. Mix*, Crim. No. 12-171 Section "K"(1), 2012 U.S. Dist. LEXIS 88044 (E.D. La. June 26, 2012), the court ordered BP to disclose its privileged materials to the defendant and stated that, if necessary at trial, it would establish a protocol to determine which documents are subject to the attorney-client privilege and

whether any such documents should be admitted into evidence at trial," notwithstanding the privilege. *Id.* at \*8-\*9 (following *W.R. Grace*). In *United States v. Weisberg*, No. 08-CR-347 (NGG) (RML), 2011 U.S. Dist. LEXIS 37221 (E.D.N.Y. Apr. 5, 2011), the defendant sought a Rule 17(c) subpoena for documents from two law firms that asserted attorney-client privilege. Recognizing that such material may be "so important to the defense that its disclosure is constitutionally required," the court ruled that it would be "appropriate" to review in camera each privileged item. *Id.* at \*15.[3]

Encouraging precedent exists in this District for a strategy of piercing corporate privilege to support a "good faith" defense. In *United States v. Stryker Biotech*, No. 09-cr-10330 (D. Mass.), the former president of Stryker Biotech, Mark Philip, who had been indicted along with the company and three former sales executives, moved to sever his trial from the company's case so that he could present a good-faith defense based on his frequent communications with in-house and outside counsel who (according to Philip) had not raised any legal or compliance concerns. *See id.,* ECF #264-65. Philip argued that his constitutional right to use exculpatory material was incompatible with the company's attorney-client privilege. Stryker Biotech acknowledged that privileged material was exculpatory to Philip because it tended to negate the prosecution's proof

---

[3] In *civil* cases, court have generally declined to abrogate corporate privileges. *See, e.g.*, *United States v. Wells Fargo Bank, N.A.*, 132 F. Supp. 3d 558, 565 (S.D.N.Y. 2015) (distinguishing *W.R. Grace*, a criminal case, from a civil fraud action where "the Sixth Amendment – which is limited by its terms to '*criminal* prosecutions' – does not apply"); *SEC v. Present*, No. 14-cv-14692-LTS, 2015 U.S. Dist. LEXIS 170245, \*9-10 (D. Mass. Dec. 21, 2015) (following *Wells Fargo* and quashing subpoena by former executive for materials from former employer that were subject to "unwaived privilege" and that executive sought to establish "the legality of conduct which the government has charged as a violation of various non-criminal statutes"). Those results are hardly surprising, because "the right to production of relevant evidence in civil proceedings does not have the same 'constitutional dimensions.'" *Cheney v. United States Dist. Ct.*, 542 U.S. 367, 384 (2004) (quoting *United States v. Nixon*, 418 U.S. 683, 711 (1974)).

of specific intent, but the company objected to the admission of those materials, claiming they would prejudice the company's own right to a fair trial. *See id.,* ECF #267 at 1-2.[4] In order to protect Philip's right to present his defense and also respect Stryker's interest in the privilege, on the eve of trial, Judge O'Toole allowed Philip's motion to sever, ordering a separate trial at which Philip could use Stryker's privileged materials to present his good-faith defense. *See* Electronic Clerk's Note (Jan. 9, 2019); *see also* Stephen G. Huggard and Hilary B. Dudley, "The Sword, a Shield, and Severance: The Corporate Attorney-Client Privilege in White Collar Criminal Prosecutions," BLOOMBERG LAW (Sept. 11, 2012), *available at* <https://news.bloomberglaw.com/white-collar-and-criminal-law/the-sword-a-shield-and-severance-the-corporate-attorney-client-privilege-in-white-collar-criminal-prosecutions>. Ultimately, before the separate trial, the prosecution dismissed all charges against Philip. *See Stryker, supra,* ECF #309.

In this case, any effort by Mr. Simon to challenge Insys's privilege would have put the two parties in direct conflict. Indeed, when the prosecution unsuccessfully moved for an order requiring the defendants to give advance notice of an advice-of-counsel defense, it acknowledged the "potential conflict" between an individual defendant, such as Mr. Simon, and Insys.

> When a defendant asserts an advice-of-counsel defense based on advice given by corporate counsel, the assertion of such a defense poses *a potential conflict* between the policy favoring confidentiality of attorney-client communications and the right of a criminal defendant to present evidence in his or her defense.

---

[4] The prosecution lacked "sufficient information" to determine "whether defendant Philip's constitutional rights to a fair trial would be compromised by not being able to use various communications which defendant Stryker Biotech has withheld from both the government and apparently defendant Philip based on an assertion of the corporation's attorney client privilege." ECF #266 at 1-2. By taking no position, the prosecution impliedly conceded that, depending on the exculpatory nature of those communications, Philip's rights to present his defense *might* trump the company's privilege.

ECF #570 at 2-3 (quoting, without citation, *W.R. Grace*, 439 F. Supp. 2d at 1138) (emphasis

added). Insys made clear, throughout the trial, that it had no interest in waiving its privilege (at

least, not to assist the defendants). And the company had many good reasons to try to keep

confidential its privileged communications, including that disclosure could seriously prejudice the

company's efforts to defend itself in related civil litigation.

In setting the parameters for anticipated testimony from Insys's attorneys, Davis (who

testified for the prosecution) and Zacks (who did not), this Court also recognized that, Insys's

broad assertion of privilege over all legal advice to its board inevitably "impact[ed]" the

defendants' "ability to do a full and fair cross-examination of these witnesses." 3/25/19 Tr. at 8.

For the same reason, as this Court also noted, Insys's privilege claim also undermined Mr. Simon's

ability to present a potential defense case.

> [I]f the company waived privilege, [the defendants] might be able to put someone
> on the stand that said, hey, Skadden came in and said Danielle Davis' information
> was all screwed up, and we didn't have to stop the speaker program. We thought
> about it long and hard, we had a long discussion, we weighed the pros and cons,
> and decided for all these reasons not to stop the speaker program. Legitimate, legal
> reasons.

3/20/19 Tr. at 215.[5]

The government cannot dispute that Mr. Simon could have challenged Insys's privilege.

That fact is sufficient to show that Weil's performance was "adversely affected" by its concurrent

representation of Insys, Mr. Simon need only show this alternative strategy was a plausible or

---

[5] When Kapoor's counsel sought to elicit testimony from Jessica Bradley, a former Insys sales rep, that attorneys conducting the internal investigation had interviewed her on multiple occasions, the prosecution objected. At side bar, Kapoor's counsel (in the presence of Mr. Simon's counsel) stated that "[Bradley] was interviewed three times" and "did not tell those people the same thing she told the Court." 2/8/19 Tr. at 62-63. Put simply, there was reason to believe that Bradley had lied to investigators and denied any involvement in criminal activity at Insys. Of course, if Bradley and other sales employees misled Skadden about their conduct, they likely lied to Simon and others in management, too. Because Insys considered discussions with Skadden and/or in-house counsel to be privilege, the Court sustained the prosecution's objection.

viable one. Nevertheless, there is reason to believe the strategy would likely have succeeded. This Court expressed skepticism of Insys's privilege, especially given its selective disclosures to the prosecution, 3/25/19 Tr. at 16 ("[T]his whole idea of . . . the company maintaining its privilege is a little too cute for school."), and it may have entertained Simon's request to use privileged materials.

This Court made clear that, ideally, a jury should hear the full story. *See generally Nixon*, 418 U.S. at 710 (holding "exceptions to the demand for every man's evidence," such as the attorney-client privilege, should not be "expansively construed, for they are in derogation of the search for truth"). Nevertheless, due to the privilege issue, the limited evidence at trial "le[ft] the jury with a misleading impression," 3/25/19 Tr. at 31, and "an incomplete picture," 3/20/19 Tr. at 212; *see id.* at 5, 36 ("If there's one thing you guys should know, I would prefer to have this information go to the jury," because "I really don't like to leave a jury with incomplete information."). That problem was the direct result of Insys's decision not to waive its privilege.

> COURT: They want to say there was some compliance. Now, you want to say that compliance was a sham. . . the state of play so far allows both those arguments . . .
>
> WYSHAK: We're interested in the truth. That's what we're here for.
>
> COURT: You've got to talk to Mr. Hobart about that because we're all malconstrained with the universe we live in.

3/25/19 Tr. at 39. If Mr. Simon had taken an alternative approach, challenged Insys's privilege, and used material from Skadden's internal investigation to present a good-faith defense, this Court could have allowed the jury to hear all of the relevant evidence so that it could render a just verdict.

There is yet another, practical reason why Weil could not deploy this alternate strategy for Mr. Simon. Because Insys chose not to waive its privilege and refused to disclose material from its internal investigation, Mr. Simon would have had to subpoena Insys and, presumably, move to compel its compliance. Such a discovery dispute involves obvious adversity. Indeed, "a lawyer's

taking discovery, whether testimony or documentary, on behalf of one client, of a third party who is also a client, will present . . . direct adverseness, so as to be disqualifying under Rule 1.7(a).'" NYCBA Formal Op. 2017-6 at 3-4 (2001) (quoting NYCBA Formal Op. 2001-3 (2001)). The only exceptions are situations were "the subpoenaed client is not burdened and has no objection." *Id.* at 4; *see also* Cal. State Bar Formal Op. 2011-182 (Jan. 2011) (concluding that "discovery is coercion" and that serving discovery on a current client necessarily entails adversity). Impairment of Weil's ability to obtain discovery from Insys on Mr. Simon's behalf is just one concrete way in which the conflict affected the representation and prevented Weil from pursuing a viable alternative strategy in his case.

## <u>CONCLUSION</u>

For the foregoing reasons, as well as those set forth in defendants' other post-trial memoranda, this Court should grant a new trial to defendant Richard M. Simon. Mr. Simon respectfully requests oral argument on the issues raised herein. To the extent the Court concludes that further development of a factual record is necessary, Mr. Simon requests an evidentiary hearing and opportunity to seek appropriate compulsory process to obtain materials from the government and third parties, including Weil and Insys.

Respectfully submitted,

**RICHARD SIMON**

By his attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically

to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper

copies will be sent to those indicated as non-registered participants on September 10, 2019.

*/s/ William W. Fick*
William W. Fick