UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| RICHARD M. SIMON, | ) |
| | ) |
| Defendant. | ) |

Court No.:  16-cr-10343-04-ADB

_____

## UNITED STATES' SENTENCING MEMORANDUM
## IN AID OF SENTENCING FOR RICHARD M. SIMON

The United States of America hereby submits this memorandum in aid of sentencing for defendant Richard M. Simon.

### I.   Introduction

Simon's conviction on May 2, 2019, followed the admission of stunning and overwhelming evidence against him at trial demonstrating his role as a trusted leader in the conspiracy.  The bribes paid to prescribers in this case, "facilitated the execution of the fraudulent scheme by incentivizing prescriptions from high-volume practitioners." *Memorandum And Order On Defendants' Motions For Judgment of Acquittal and For a New Trial*, ECF 1028, at 29.   As evidence demonstrated at trial, Richard Simon played an important role in executing that scheme.  Simon served both as a District Manager and as National Sales Director at Insys during the course of the conspiracy.  In that capacity, he directed his subordinates to reach and enforce quid pro quo agreements with doctors.

Simon also practiced what he preached, personally offering bribes to Dr. Mahmood

Ahmad, a physician in Arkansas,[1]  and Dr. Judson Somerville, a pain specialist in Texas[2]

Accordingly, the United States recommends that the Court sentence Richard Simon

to a period of incarceration of not less than eleven years (132 months).

II.  Simon's Criminal Conduct

A.  Simon's Leadership Role

In August 2012, Alec Burlakoff recruited Rich Simon to become a manager at

Insys.  03/05 Tr. 152: 8.  In endorsing Simon for the position, Burlakoff identified his

friend as a "born leader," and predicted that Simon would become, "a tremendous asset

to Insys."  Ex. 1920.

Burlakoff had good reason to know that Simon would serve the conspiracy well.

The two men were old friends, who had worked together as sales reps for Janssen

Pharmaceuticals.  03/01 Tr. 124:2-11; Ex. 1912 at INS-BOS-08744461.  With

Burlakoff's blessing, and Kapoor's approval, the company hired Rich Simon as a

Regional Sales Manager for the Central Sales District in September, 2012.  02/13 Tr. 64:

9-65:22; Ex. 1490.

The scheme to bribe doctors began and prospered between 2012 and 2013.  02/21

Tr. 212:24-214:4.  During that time, as described in more detail below, Rich Simon

actively recruited high prescribing doctors to join the conspiracy.  In May 2013, less than

a year after Simon joined the company and with the bribery scheme taking hold, Alec

---

[1] 02/22 Trial Tr. 56: 9-19 & Ex. 004.
[2] 03/14 Tr. 186:10-190:7 & Ex. 1525; 03/15 Tr. 26:1-8.

Burlakoff sent an email to Mike Babich, in which he recommended Rich Simon for promotion:

> As you know, Insys sales are flourishing. ….
>
> Rich Simon is an instrumental part of my future plans for the Insys sales force. We are constantly strategizing together on how to proceed forward. I need a layer in between VP of sales and the sales force. Rich Simon as a field based director of sales is exactly what I need.

Ex. 240.

Simon was promoted from District Manager to National Sales Director in June 2013.  02/21 Tr. 168:4-10; 03/11 Tr. 54:3-6.  Immediately following his promotion, Simon directly supervised three regional sales directors (two of whom are Sunrise Lee and Joe Rowan) and nine sales districts.  Ex. 2339; 03/07 Tr. 226:16-20.  In the year that followed his promotion, as the conspiracy profited and the sales force grew, Simon would come to manage three regional sales directors, including Rowan and Lee, and 25 different sales districts nationwide.  Ex. 2208.

B. Simon and Bribes

Evidence demonstrates that Rich Simon was not just comfortable leading the bribery and fraud scheme, he was in fact incredibly aggressive in carrying it out.[3] Whether serving as a manager, or as a corporate executive, Rich Simon became one of

---

[3] Despite his conviction on May 2, 2019, Simon may still be willingly committing fraud.  The pre-sentence report indicates that Simon "and his wife have approximately $2,659,610 in assets, including: $787,390 in bank accounts; $435,170 worth of securities; two motor vehicles with a total fair market value of $106,600; their residence, which has a total assessed value of $1,329,900; art work valued at $250; and $300 cash on hand." Simon PSR at ¶ 20.  Nevertheless, ███████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████

the most vocal leaders of the conspiracy, who actively fostered, and thereafter enforced,

explicit agreements with co-conspirator doctors.

1.  Simon and Dr. Mahmood Ahmad

When Simon started at Insys, working as a sales manager for the Central Sales

District, his territory included a high decile prescriber named Dr. Mahmood Ahmad.

03/11 Tr. 117:9-14.  Ahmad owned and managed a pain management clinic near Little

Rock, Arkansas.  03/13 Tr. 215: 19-20.  Ahmad also owned and operated a pharmacy,

which was located in the same building as his pain management clinic.   03/13 Tr. 244:

18-19.

In or about September 2012, the sales representative assigned to Arkansas sent a

weekly territory update to Simon, Babich, and Burlakoff, in which he mentioned Ahmad:

> 9/7 – Spoke to staff and they informed me Dr. Ahmad  would like to be
> taken off my call list.  They would not give reason and I have been unable
> to reach Dr. Ahmad or his office manager for at least a month.  The
> pharmacy which is located in the same stand alone building was shut
> down due to the high percentage of opioids being dispensed.  It has
> recently been opened but is unable to stock opioids. I spoke to … [a
> former sales manager] and we are both under the opinion that they may be
> under investigation.  I will follow up in 3-4 weeks to let things settle
> down.

Ex. 004 (INS5288808-09).

While Simon was newly hired when he learned that Ahmad might be under

investigation, the revelation did not inhibit him in any way.  To the contrary, Simon

immediately traveled to Arkansas and took Ahmad to dinner, during which he attempted

to bribe the doctor using both the Insys Speaker program and the possibility of finding a

wholesaler to provide access to schedule II narcotics.  On October 3, 2012 Simon sent an

email to an email to Babich, Burlakoff, Gurry and others, reporting on his dinner with

Ahmad and seeking a way to ensure that the doctor's pharmacy receive schedule II

narcotics:

> Dr. Ahmad (D-7) largest prescriber in the state of Arkansas and registered
> speaker, after last nights dinner has given a commitment to be a major supporter
> of … [his Insys Sales rep] and Subsys.
> His challenge is getting Subsys to his pharmacy as McKesson and Cardinal won't
> ship to his pharmacy as he writes so many schedule 2's.
>        …
> Solutions:
> I.Ship Subsys direct to his pharmacy (most preferred option)
> 2. Find alternative wholesaler to provide Subsys.

Ex. 009.

    A follow up email from the sales rep, sent to Babich, Simon, and Burlakoff

leaves no doubt as to what Simon meant when he informed Babich and others that

Ahmad had "given a commitment to be a major supporter of Subsys."   On or about

October 8, 2012, the sales representative assigned to Ahmad sent Mike Babich another

update:

> 10/5-RSM Rich Simon and I took … Ahmad and his office
> manager to dinner and turned things around 180 degrees.  We set
> out a plan to conduct dinner programs for Dr. Ahmad to speak at
> his request.  Dr. Ahmad was not able to receive schedule two drugs
> in his buildings [sic] pharmacy which prevented his writing our
> drug.  Rich Simon and I have been speaking to [the] pharmacist, …
> [the Company Director of Trade and Distribution] &  Dr. Ahmad
> to resolve the issue but have a guarantee from Dr. Ahmad to have
> "more scripts than we can handle" once the pharmacy issue is
> resolved and begins to speak."

Ex. 004 (INS5288809).

2.  Simon and Quid Pro Quo Agreements

    For Simon, gaining a "commitment" from Ahmad in exchange for resolution of

the "pharmacy issue" and speaker programs, was not an accident; nor was the fact that

Simon and his sales rep informed company leadership of the agreement.  Simon *expected*

his sales reps to reach specific and enforceable agreements with doctors signed up as speakers. He also encouraged his reps to unabashedly notify him regarding the specifics of those agreements. In April 2013, Simon sent an email to a server list of sales reps. In it, Simon's instructions to his subordinates about reaching a quid pro quo agreement with doctors were unequivocal:

> THIS IS TASK NUMBER ONE
>
> 1. I WANT EXAMPLES ON OUR NEXT CALL OF THE <u>PLAN</u> YOU HAVE CREATED WITH YOUR TOP CUSTOMERS TO GET A SPECIFIC NUMBER OF SCRIPTS PER WEEK THAT IS MUTUALLY AGREED TO AND AN OUTLINE OF HOW YOU WILL HOLD YOURSELVES AND YOUR CUSTOMERS TO THIS PLAN.

Ex. 224 (INS-BOS-08793474-75)(emphasis in original).

3. Simon and Dr. Judson Somerville

In November 2012, in an email entitled "$$$$$," Simon instructed all of the sales reps in his district that by increasing the dose prescribed, and by increasing the number of units prescribed, e.g. the number of times per day that the drug could be taken, there was "serious money to be made." Ex. 1500. In the email, Simon went further, attaching a spreadsheet that calculated "payout" for the sales rep when a prescription was written for "120 units, under each strength." Ex. 1501.

In late 2012, Dr. Judson Somerville, a pain specialist licensed to practice medicine in Texas, was recruited by Simon as a speaker. 03/14 Tr. 166:1-6.; 171:13-174:7 & Ex. 1503. Over the course of 2013 Simon authorized using payment for more than 50 speaker programs as bribes paid in exchange for Subsys prescriptions. 03/15 Tr.29:22-24. Somerville quickly became one of the highest prescribers of Subsys in the United States. Ex. 219.

In April 2013, however, after growing frustrated with the number of units

prescribed by Somerville, Simon emailed the assigned sales rep, revealing the lengths to

which he was willing to go in order to profit from the bribery scheme:

> Please cut and paste Dr. Somerville's scripts on this report and use them to
> show that 3 out of 4 scripts he wrote were refills and were still LOW units.
> Drill into … [his office manager's] head that every refill has to be 180-240
> etc. and that Dr. Somerville agreed to do this."

Ex. 1513.  The email provides a glaring example of the arrogance and depravity

underlying the conspiracy in this case.


C.  Simon and the IRC

Simon's leadership role in the conspiracy demonstrates the symbiotic relationship

between bribes paid for prescriptions, IRC fraud, and profits produced by the crime.

Simon, like most of the defendants indicted in this case, participated in the 8:30

call.  03/05 120:17-19.   During the call, Simon and his co-conspirators were briefed

about the corrupt strategies used by the IRC to defraud insurers.  02/14 Trial Tr. 74:20-

75:2; 86:2-3, 87:16-25-88: 1-2, 91:17-18.  As a senior leader, Simon was also kept

informed by email of significant matters involving the IRC.  Ex. 419.

But Simon's role with regard to the IRC was not limited to passive listening.  As a

Sales Manager and as National Director of Sales, Simon was required to deal with the

prior authorization process on a daily basis.  03/05 Trial Tr. 122:4-8.  If bribed doctors

wrote prescriptions, but insurance companies refused to pay, no one made money. 03/05

Trial Tr. 121:22-122:8.  In fact, the success of the prior authorization process was so

important to Simon that he ordered the creation of something called the "Charts in

Progress ("CIP") Report.   02/25 Tr.  43:3-4.  The CIP Report, which was circulated first

on a weekly, then on a biweekly basis, informed sales managers of whether the IRC had

appealed an insurer's denial of authorization, and if the IRC was waiting on additional information, such as letters of medical necessity, signatures, diagnoses, or other data necessary for the IRC to gain approval.  02/25 Tr. 43:2-45:1.  As such, the term "Charts in Progress," was a misnomer.  Simon and his co-conspirators were not tracking the progress of patient medical "charts."  They were tracking the progress of obtaining payment from insurers.   In that way, they were tracking the success of their bribes.

III. The Impact of Simon's Crimes

Rich Simon embraced the use of bribes to generate profits, commanding from his subordinates the same outrageous quid pro agreements that he personally arranged.  The audacity of the defendant's conduct speaks to the seriousness of the offense for which he was convicted.  The court is not left to speculate about the impact of his efforts.  At trial, the court heard directly from patients of both Mahmood Ahmad and Judson Somerville. 03/20 Tr. 158:1-2, 165:23-166:17; 03/21 Tr. 192: 1-25; 03/28 Tr. 193:24-25.  While the court limited such evidence, the testimony of these patients reveals the enduring impact of Rich Simon's criminal conduct.

IV.  Conclusion

For all of these reasons, the government respectfully requests that the defendant be sentenced to a term of incarceration of ten years (120 months).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: December 18, 2019          by:     /s/ K. Nathaniel Yeager
                                          K. NATHANIEL YEAGER (BBO 630992)
                                          DAVID G. LAZARUS (BBO 624907)
                                          FRED WYSHAK, JR. (BBO 535940)

## **Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

|  |  |
|---|---|
| Dated: December 18, 2019 | /s/ *K. Nathaniel Yeager*<br>Assistant U.S. Attorney |