IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

v.

RICHARD M. SIMON

No. 16-cr-10343-ADB

**DEFENDANT RICHARD M. SIMON'S
SENTENCING MEMORANDUM**

William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

*Counsel for Defendant Richard M. Simon*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

    A.    Childhood and Education .................................................................................. 3

    B.    Sales Experience Prior to Insys .......................................................................... 3

    C.    Family Life and Challenges ................................................................................ 5

    D.    Work at Insys from 2012 to 2015 ...................................................................... 6

    E.    Employment After Insys ................................................................................... 10

ARGUMENT ..................................................................................................................... 11

    A.    The "Organizer or Leader" Enhancement Is Inapplicable. .................................. 12

    B.    The "Loss" Guideline Yields an Excessive Advisory GSR ................................. 13

    C.    Just Punishment Does Not Require Any Lengthy Period of Incarceration. ......... 15

        1.    Felony Conviction, Supervised Release, Restitution, and Forfeiture Are, Themselves, Substantial Punishment. ................................................ 15

        2.    Incarceration Would Cause Substantial Harm to Mr. Simon's Mother, Wife, and Children. ................................................................................. 18

    D.    Neither Specific nor General Deterrence Requires Incarceration ........................ 22

    E.    Imprisonment Would Not Facilitate Any Required "Treatment." ........................ 23

CONCLUSION .................................................................................................................. 23

CERTIFICATE OF SERVICE .......................................................................................... 24

Defendant Richard M. Simon respectfully submits this Memorandum and accompanying letters from family, colleagues, and friends[1] to assist the Court with sentencing.

## INTRODUCTION

Rich Simon is a devoted husband, father, son, and brother. He is truly the anchor of his family, providing daily care for his terminally ill mother, Susan; critical support to his wife, Lauri, through her years of recurrent, debilitating anxiety; and stable guidance for his vulnerable young sons, both of whom have struggled with emotional and cognitive challenges. He has no criminal record. Following in his father's footsteps, Mr. Simon built an honorable career in sales, working for a series of well-established and respectable companies. Co-workers, many of whom have remained lifelong friends, uniformly describe Mr. Simon as a mentor and colleague who was consistently generous, honest, and ethical.

In 2012, Mr. Simon made the worst decision of his life — to accept a job at Insys. At the time when he joined the company as a district manager, the key elements of what the Court has described as "reprehensible" corporate conduct — the Insys Speaker Program ("ISP") and the Insys Reimbursement Center ("IRC") — had already been developed and implemented by more senior executives and officers, such as co-defendants Michael Babich and Alec Burlakoff, who have both sought to minimize their own criminal conduct and avoid personal accountability by "cooperating down" against subordinates, like Mr. Simon, whom they recruited and managed at Insys. Notably, when Mr. Simon joined the company, Insys did not provide him with any management or compliance training, nor did it even have a compliance department or other infrastructure until very late in his tenure.

---

[1] Home addresses and contact information, as well as the names of children, have been redacted from the publicly filed letters. Counsel can provide unredacted copies to the Court upon request.

Despite the pervasive problems at Insys, Mr. Simon genuinely believed in Subsys and the tremendous relief that it could bring to patients suffering from breakthrough cancer pain. He even encouraged his own father to ask his doctor about Subsys, as a possible way to ameliorate the terrible pain of COPD in the years before his death. Mr. Simon worked diligently, comported himself professionally, and marketed Subsys for its therapeutic benefits.

Although Mr. Simon was ultimately promoted to "National Sales Director," he never served as an officer of the company, attended board meetings, worked from its headquarters, or exercised meaningful corporate authority. And now, he stands convicted of racketeering conspiracy, to sharing a collective intent to violate the law with others much more culpable, including the most senior executives and officers at Insys, even as it remains unclear what, exactly, Mr. Simon actually *did* to further those unlawful aims.

Mr. Simon understands that he stands before the Court adjudged guilty of a very serious offense. But with all respect to the jury's verdict and the Court's decision upholding it, Mr. Simon should not be sentenced as the "face" of Insys, much less as a meaningful contributor to the broader national opioid crisis that understandably commands public attention and outrage. In the circumstances presented here, any sentence more severe than one year of incarceration for Mr. Simon would far exceed what is necessary to accomplish the purposes of sentencing, given his history, characteristics, and actual role at Insys. Probation supervision, mandatory restitution, and appropriate forfeiture would, even by themselves, supply ample punishment.[2]

---

[2] Mr. Simon will separately address the government's position on restitution, set forth in its filing dated December 13, 2019 [DE 1035], which was supported by voluminous documentation that the government disclosed by electronic file transfers made available on December 6, 9, and 13. Mr. Simon will also separately address the government's position on forfeiture, set forth in its filing dated December 17, 2019 [DE 1050].

# BACKGROUND[3]

## A.    Childhood and Education

Mr. Simon is 49 years old. Born and raised in New Jersey, he and his older brother, Andrew, enjoyed a middle-class childhood in a comfortable home with both parents present. When Mr. Simon was in sixth grade, he was diagnosed with ADHD and prescribed Ritalin to reduce hyperactivity and help him to focus.

Mr. Simon eventually "outgrew" those symptoms, overcame his learning disabilities, and went on to graduate from high school in 1988 and college in 1993.

## B.    Sales Experience Prior to Insys

After college, Mr. Simon followed in his father's footsteps to work in sales. According to his brother, Andrew:

> Throughout our lives our father was our moral compass. He had a strong position on good and bad, right and wrong, and dos and dont's. After college graduation, Richard worked side by side with our father for a number of years and it is my observation that he became more and more like our father and that's one of the highest compliments I can give.
>  . . .
> I do not see my brother through rose colored glasses and I know his faults. A lack of honesty and integrity are not among his faults. He is true to his word.

Andrew Simon Letter (A11).

With that training, Mr. Simon went on to hold sales positions in a number of established companies, including Bard Medical, Johnson & Johnson, and a medical device company called Early Sense. Colleagues from those years remember him with affection and respect. Jessica Kroll, who first met Mr. Simon at Johnson & Johnson, recalled:

> When I first met Richard at Johnson & Johnson, he was a sales representative and was involved in part of my interviewing process along with his manager. The

---

[3] The narrative in this section is a cursory synopsis based on the more extensive social history contained in the PSR and accompanying letters.

position I was interviewing for was to be Richard's counterpart, so he was given the opportunity to be involved in the interviews, give his opinion and approval of who he thought should be offered the position and ultimately recommended me for the job. We worked together for the better part of two years and during that time I found Richard to be a tremendous mentor for me with respect to learning the internal day to day requirements of the position, ensuring I provided the appropriate clinical benefits to psychiatrists in Southern California and that I continued to grow and improve my skill set as a sales representative, always resulting in positive reviews from our manager and HR team. Rich was always considered a mentor for our entire team and many of our teammates looked to him for advice and suggestions on how to be the best representatives we could be. We were a successful team that achieved top national rankings promoting our products for Johnson & Johnson doing things in a way that was always within the ethical and compliance rules we were taught.

Kroll Letter (A23). Jason Voegele, another colleague from Johnson & Johnson, expressed

similar sentiments:

I currently work for Alkermes. I have been in the Pharma/Biotech industry for 24 years. I worked with Rich in the first company, J&J. Rich became an immediate influence on me not just with his wit and humor but more so with his kindness and integrity.

Rich and I worked together on multiple projects in which we were often faced with difficult people and plenty of opportunities to be selfish. Yes Rich is a nice guy, smart, funny, but what really stood out is his unwillingness to take shortcuts and/or to do anything that might be perceived as unethical.

I could provide many examples of this but one clear case that I recall was when we had an opportunity to get a provider group to fully endorse [our] product thus increasing our sales. Being young and wanting to realize the benefits for us I never thought for a second beyond what looked like a sure thing for us. However Rich recommended that the organization take the time to evaluate the opposing view – our competition!

I would tell you I couldn't believe it but I was so overcome by the character of the act that I felt its impact much greater than the financial rewards I would certainly receive. There was nothing illegal about [seeking an endorsement from a provider group, but] he just made it a point to be overly ethical.

Voegele Letter (A26).

A prominent theme in the letters from his former colleagues is that Mr. Simon was an

effective and dedicated salesperson, because he believed in the pharmaceutical products and

medical devices that he sold, often based on his own personal or family experiences. For example, Patrick Watson, a former colleague from Johnson & Johnson, recalled Mr. Simon's commitment to marketing Risperdal as a treatment for schizophrenia, because he knew it "had a better side effect profile," "was more efficacious than any of the other products" on the market, and "would make difference in the lives of patients" who suffered from mental illness. Watson Letter (A33). Similarly, Michael Hawley, Mr. Simon's former boss at C.R. Bard, described Mr. Simon as "passionate about improving patient outcomes" and credits his successful sales of silver-coated Foley catheters with avoiding countless infections "which saved lives and reduced significant pain and suffering" for bedridden hospital patients. Hawley Letter (A31).

###### C.    Family Life and Challenges

Mr. Simon met his wife, Lauri in the mid-2000s at Johnson & Johnson. They started dating and lived in Denver, Colorado. The pair later moved to Seal Beach, California, where they now reside. They have two sons, Z (aged 11) and E (aged 7).

Z has been diagnosed with ADHD, like his father before him. E was born after a difficult pregnancy, during which Lauri was hospitalized for three months, and Mr. Simon was the primary caregiver for Z. Possibly as result of his premature birth, E was slow to speak and has struggled with certain developmental and emotional challenges. Mr. Simon plays an integral role in the care and development of both boys.

Over the years, Lauri, who also works in pharmaceutical sales, has suffered debilitating episodes of major depressive disorder, generalized anxiety disorder, and panic attacks. One of the primary reasons that Mr. Simon took the district sales manager job at Insys, which offered higher pay than his prior position, was that Lauri's anxiety became so debilitating that she was unable able to work and needed to stay home. Mr. Simon had to support the entire family, financially and emotionally. Since Mr. Simon's indictment, despite her ongoing mental health struggles and while

undergoing extensive psychiatric treatment, Lauri has had to return to full-time work in order to support the family.

Mr. Simon's father passed away in 2014 after a long illness. Mr. Simon took many weeks off work at Insys so that he could personally care for his sick father in Florida. After his father died, Mr. Simon helped his mother to move to California so that he could care for her as well. She is now battling terminal cancer, and Mr. Simon is her primary support.

### D.      Work at Insys from 2012 to 2015

Mr. Simon went to work for Insys in 2012. Notwithstanding the verdict, the Court should bear in mind that Mr. Simon genuinely believed in the efficacy and value of Subsys. And not all of his day-to-day interactions with fellow Insys employees and doctors were tainted by fraud, bribery, or other illegal conduct. Far from it. Indeed, Rich encouraged former colleagues and close friends to work at Insys — something he never would have done had he thought the company was crooked to its core.  These people attest to his day-to-day diligence, professionalism, and good faith.

For example, Andrew Byars has been a friend of Mr. Simon for ten years and was a colleague at Insys for two.  Mr. Byars wrote:

> In 2011, I was hit by a car in Seal Beach and suffered a severe head injury. Rich observed the accident through a window while sitting with his wife in a restaurant and immediately rushed to help. Although I have no memory of the event, I understand from witnesses that I became disoriented and agitated after the injury. The paramedics relayed to me that Rich was able to calm me and help get me into the ambulance. Rich saved my life that day, and my family and I owe him a great debt of gratitude for his help. He was also the first person to visit me in the ICU after I woke from surgery and assisted me through nine months of grueling recovery.

> Rich and I stayed in frequent contact after I moved to Ohio in 2012. I recall several conversations in which Rich expressed excitement about working at Insys. He knew I had survived a battle with cancer in 2005, and suggested on several occasions that I consider applying for a job at Insys where I would be able to help cancer patients. He secured an interview for me, and I got the job starting as a District Manager. I

6

was later promoted to Director of Marketing and worked at the corporate office after Rich had left the company. In a professional capacity, I never heard Rich suggest anything that could be deemed noncompliant. I started my job the same month that our first compliance officer was hired. As the compliance department began to develop oversight, policies were constantly changing to reflect circumstances or issues that arose. I observed Rich reinforce those emerging policies and mirrored them through his direction to the salesforce on conference calls and in one-on-one meetings. During conference calls, I frequently heard Rich defer and refer employees to the compliance department. One particular incident comes to mind in which I had a conversation with a physician who received a call from an insurance company and suspected some type of malfeasance that had occurred in the Insys reimbursement department. Concerned about the incident, I called Rich and he immediately urged me to report the event to the compliance department, which I did immediately by calling our compliance officer Danielle Davis. She indicated that an investigation would ensue and it would be handled internally.

In private, we frequently talked about the DOJ investigation and he always advised me to stay compliant, emphasizing that the company was doing good things. The entire sales force were continuously reassured by our compliance department and the C-suite executives that the company was doing things by the books, and that we had nothing to be concerned about, despite what we may have read in the papers. It is the many conversations we had over the years discussing the right way to do things that makes it difficult to reconcile the Rich I know with a convicted felon.

Byars Letter (A21-22).

Mr. Simon also recruited Jessica Kroll, his former colleague from Johnson & Johnson, to join Insys. She explained:

In 2013, Richard contacted me as he was being promoted to Director of Sales with Insys Therapeutics and as a result, his Regional Sales Manager position would be available. He called me and shared what an exciting opportunity it would be to work for Insys. Insys was marketing an amazing product for the treatment of Breakthrough Cancer Pain. This was very important to me as my sister was suffering from Stage 4 breast cancer at the time and I thought it would be a huge opportunity for me, in a small way, to help many patients like her. He believed I would make a great sales manager as well and would recommend me for an interview if I was willing to make that step in my career.
. . . .
Upon my hire, Richard once again acted as a mentor to me in my first management role. He helped me with product knowledge, getting up to speed with my new team and provided me daily support so I could perform at the highest level. He at no time ever put me in a situation where I felt I was compromising myself, my team or the company ethically in any way. With over 15 years of experience in medical device

and pharmaceutical sales I believe I would have known if I was being directed to do anything that would be outside the lines in any way.

I was heartbroken and devastated to learn he was indicted and later convicted of RICO for his part in working at Insys. I know firsthand from my interactions with Richard both with J&J and Insys that his goal was always to do what was best for our physicians and their patients and to never try to harm anyone for his own benefit.

Kroll Letter (A23-24).

Toni Paskoski, hired by Insys in December 2014, went on to fill Rich's role as National

Sales Director. He recalled:

Never once did Richard direct, advise anyone on conference calls or email correspondence with our sales team to commit any of the allegations presented in the case against him. He attended meetings with my team of which he conducted himself with integrity . . . .

My background is 20 years in the Pharmaceutical industry, 5 years in Finance prior . . . Rich and I had exchanges of one on one meetings discussing my progress and tactical ideas of successfully managing my direct reports. Every conversation was within compliance of normal practice within our industry.

Pakoski Letter (A27).

Treatment providers have expressed similar respect for Mr. Simon's professionalism and

ethics. For example, Philip R. Matthews, DO, of Integrative Pain Management in Bellevue, WA,

wrote:

I was on the speakers' bureau for Insys in 2013-2014. I got to know Mr. Simon since he was regional sales manager for the area where I work.

I had several professional meetings with him when the sale of Subsys, the sublingual fentanyl spray, was discussed. As a sales manager, he, at no time, communicated, directly or indirectly, that I should prescribe Subsys for any reason other than for which it was FDA approved. . . for breakthrough pain in opioid tolerant cancer patients. Nor did he ever communicate that Insys would reward me in any way if I were to increase my prescribing of Subsys.

Mr. Simon has always been appropriately professional with me. If there had been any effort by him to incentivize me to increase my prescription writing for Subsys,

or to prescribe it for other medical indications, I would have refused and quit the
job. I never had to.

Matthews Letter (A40).

Bonnie Wilensky, a Clinical Nurse Specialist in pain management who interacted with Mr.

Simon over the course of two years, wrote:

> Although my contact with Richard Simon was limited, all of our interactions were
> professional. I was never pressured by Mr. Simon to over prescribe or consider
> prescribing Subsys inappropriately outside the labeled recommendations.   My
> experience with Richard Simon was considerate of my practice and the safest use
> of Subsys for the management of severe breakthrough pain related to cancer.

Wilensky Letter (A41).

Finally, even Dr. Judson Somerville, whom the government did not call as a witness but

sought to vilify from afar, presents more favorably than the caricature painted at trial. In his lengthy

letter to the Court, Dr. Somerville offers the following observations and comments, which merit

special attention:

> Richard Simon is an honest, hardworking, and caring person.  In all my interactions
> with Richard, when he worked for Insys and marketed Subsys, he never did
> anything that I considered illegal, unethical, or detrimental in any way to my
> patients.
> . . . .
> With rare exception patients who came to see me had previously been prescribed
> opioids for chronic pain, and many had used Actiq, a major competitor of Subsys.
> (Both were expensive, branded drugs.)  Actiq is essentially a lollipop with fentanyl,
> the same active ingredient in Subsys.  Before Subsys came to market, I considered
> Actiq to be the best option, because it (like Subsys) allows the transmucosal
> delivery of opioids directly into the bloodstream through the membranes in the
> mouth cavity.  That process avoids initial metabolism in the liver, providing more
> medication to the blood stream with faster and more powerful relief.  But Actiq also
> had many problems.  First, putting a potentially dangerous drug in lollipops that
> children may be tempted to try (especially when they see their parents using them)
> is not something that I wanted to promote.  Indeed, there have been deaths reported
> from accidental ingestion of Actiq by children.  Second, the lollipops were loaded
> with sugar and causing significant damage to the teeth of patients, many of whom
> were too poor to afford any dental care.  Third, after prolonged use, many of my
> patients found that they could not tolerate Actiq, which irritated the insides of their
> mouths.  Other doctors who prescribed Actiq had the same issues.

Subsys did not have any of these same problems.  It was also much more effective, because it had a much higher bioavailability (absorption) of fentanyl in the blood stream.  As a result, I could prescribe a lower dose of Subsys and provide the same (or better) pain relief than a higher dose of Actiq.  Many of my Subsys prescriptions were Actiq switches.  All the patients for whom I prescribed Subsys had tried other opioid pain medications and had inadequate pain relief or side effects at doses need to achieve adequate pain relief.  In fact, that was Richard's primary pitch for Subsys.  Richard never did any "hard sell" for Subsys, and he never pressured me to prescribe – much less to prescribe in a way that I felt was illegal, unprofessional, or not in the best interest of my patients.  In our discussions, he was always balanced and truthful.  Richard believed in Subsys, championed its benefits, and encouraged me to use it instead of Actiq, which he and I both considered an inferior product.

Of importance, I frequently prescribed Subsys long before Insys asked me to be a speaker.

That it was so effective and safe when prescribed correctly is why I agreed to speak for Insys.  Over the years, I have had many opportunities to speak for pharmaceutical companies, including manufacturers of opioid products.  I mostly declined those invitations, because I did not believe in the products, even some that I prescribed for lack of any better options.  I chose to speak about Subsys, because in my experience, it helped my patients to control their chronic pain.  Insys paid me to talk about Subsys, but I never said anything that I did not believe, and Richard never encouraged me to say anything untrue or misleading.  I used the money that I earned from Insys to support my medical practice.  Operating two offices and paying staff is expensive.  Additional revenue allowed me to spend more time with more patients.

Somerville Letter (A42-45).

### E.   Employment After Insys

After being charged in this case, Mr. Simon found it difficult to secure employment. He devoted substantial time to caring for his sons while his wife works but also started a home-based consulting business, initially providing services to a company owned by friends called BeBG (Bedore Business Group) and more recently assisting Marketplace Managers, a startup that seeks to help brands to rid themselves of counterfeit competitors on Amazon and other marketplaces.

\* \* \*

This information, and the additional letters submitted with this Memorandum, demonstrate that Mr. Simon and the conduct underlying his conviction are both far more complex and nuanced than the evidence presented at trial, much less the bare verdict.

## ARGUMENT

A criminal penalty must be "sufficient, but not greater than necessary, to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). Here, fair consideration of the offense in light Mr. Simon's history and characteristics compels the conclusion that any substantial period of incarceration would be unwarranted.

The Court is required to compute the Guideline Sentencing Range ("GSR") as a "starting point and the initial benchmark." *Gall v. United States*, 528 U.S. 38, 49 (2007). Based on the calculations in the draft PSR, adjusted to account for the Court's decision to vacate the Controlled Substance Act predicates, Probation will likely take the position that the advisory GSR is 121-151 months (level 32, CHC I), while Mr. Simon contends that the properly calculated GSR is 78-97 months (level 28, CHC I).

Whatever GSR the Court adopts, the Guidelines are not the sole factor, nor even the first among the many factors, that Congress has commanded the courts to apply in section 3553(a). The Court "may not presume that the Guidelines range is reasonable," rather it must "make an individualized assessment based on the facts presented." *Id.* at 50. Indeed, "the Guidelines are only one of the factors to consider . . . and 3553(a) directs the judge to consider sentences other than imprisonment." *Id.* at 59. The Supreme Court has emphasized that the "Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam) (emphasis in original).

Thus, district courts are now required to consider whether the Sentencing Commission's underlying policy results in an advisory GSR that is unreasonably high. *See United States v.*

*Kimbrough*, 552 U.S. 85, 109 (2007); *United States v. Boardman*,  528 F.3d 86, 87 (1st Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93-94 (1st Cir. 1998).

The First Circuit has elaborated on the meaning and breadth of the so-called "parsimony principle" in *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008). It stressed that the Supreme Court's ruling in *Kimbrough* requires a "more holistic inquiry" and that "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *Id*. at 228. That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should "consider all the relevant factors" and "construct a sentence that is *minimally sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

### A.     The "Organizer or Leader" Enhancement Is Inapplicable.

Mr. Simon objects to the proposed application of a 4-level "role" enhancement on the basis that he was an "organizer or leader of criminal activity that involved five or more participants." While Mr. Simon held supervisory *titles* at Insys, that is not what determines whether the enhancement applies. As the Commentary to the Guidelines makes clear, "title . . .  [is] not controlling" in this determination. U.S.S.G. § 3B1.1, cmt. 4. The key question is whether Mr. Simon was a manager or supervisor with respect to criminal conduct, specifically. *See United States v. Al-Rikabi*, 606 F.3d 11, 14 (1st Cir. 2010) (explaining that enhancement requires "*in committing the offense* . . . [defendant] exercised control over, managed, organized, or superintended the activities of at least one other participant") (emphasis added); *United States v. Prigmore*, No. 93-cr-10276, 1996 U.S. Dist. LEXIS 11695, at *1, *8-*9 (D. Mass. Aug. 7, 1996) (declining to apply enhancement and distinguishing "corporate control" from "criminal control"). He was not.

The evidence at trial showed that the true "leaders and organizers" of the conspiracy were Alec Burlakoff and Mike Babich, not Mr. Simon. Mr. Simon's admonitions for sales representatives to reach agreements with doctors about the number of prescriptions they expected to write were standard sales practices for any industry, and there was no evidence of intent or instruction to encourage bribes, fraudulent conduct, or medically unnecessary prescriptions. The government did not present testimony from any doctors or sales representatives who knew or worked with Mr. Simon that he engaged in any fraud. Nor was there any evidence that Mr. Simon had any managerial role relating to the IRC. Indeed, when upholding the verdict on the basis that a rational jury could have found that Mr. Simon "had knowledge of and approved the fraud being perpetrated by the IRC," the Court acknowledged the absence of evidence that he "directed or supervised IRC personnel" and explained that direct supervisory involvement "was unnecessary to find that he was a knowing and willing co-conspirator." DE 1028 at 32.

Accordingly, without the 4-level role enhancement, the total offense level should be 28, which yields an advisory GSR of 78-97 months (CHC I).

**B.    The "Loss" Guideline Yields an Excessive Advisory GSR.**

The proposed "loss" guideline in this case, driven by total Medicare claims for non-cancer patients from co-conspirator doctors, bears no rational relation to Mr. Simon's individual culpability.

More generally, the structure of the "loss" or "fraud" guideline, *see* U.S.S.G. § 2B1.1, and the decision to employ notions of financial loss to measure moral culpability have long been criticized by courts and commentators alike. *See, e.g., United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (concluding that the loss guidelines "have run so amok that they are patently absurd on their face" and imposing a sentence 25 years below the low end of the guidelines); *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (criticizing

"inordinate emphasis" on loss as measure of culpability unexplained by Sentencing Commission); *United States v. Ranum*, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005) (observing that "[o]ne of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (recognizing that the loss guidelines "place undue weight on the amount of loss involved in the fraud," which is "a relatively weak indicator of the moral seriousness of the offense or the need for deterrence").

The problem with high GSRs that have weak and unexplained correlations to the sentencing goals of section 3553(a) has been exacerbated by the "unplanned upward drift" of white-collar sentences in recent years. *See* Frank O. Bowman III, *Pour Encourager Les Autres? The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes-Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 Ohio State J. Crim. L. 373, 387 (2004). The loss guideline fails to measure a host of factors that may be important and serve as bases for mitigating punishment. *See* Allan Ellis, John R. Steer, Mark Allenbaugh, *At a Loss for Justice: Federal Sentencing for Economic Offenses*, 25 Crim. Just. 34, 37 (2011); *see also United States v. Ovid,* No. 09-CR-216 (JG), 2010 U.S. Dist. LEXIS 105390, at *4 (E.D.N.Y. Oct. 1, 2010) ("[T]he fraud guideline, despite its excessive complexity, still does not account for many of the myriad factors that are properly considered in fashioning just sentences, and indeed no workable guideline could ever do so.").

Sentencing Commission data also reflect what can only be described as broad judicial discomfort with guideline sentences in cases under the fraud guideline. In Q3 of 2019, for example, within-guideline sentences were imposed in just 43.6 percent of fraud cases. *See* Table 10, available at <https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-

sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_3rd_FY19.pdf>.

Meanwhile, sentences reflecting a downward variance comprised 33.2 percent of fraud cases. *See id.,* Table 18.

### C.     Just Punishment Does Not Require Any Lengthy Period of Incarceration.

Even a short sentence of incarceration in federal prison would be unnecessary to reflect the seriousness of Mr. Simon's role in Insys's illegal activities, to promote respect for the law, and to provide "just punishment" as required by § 3553(a)(2)(A).

### 1.     Felony Conviction, Supervised Release, Restitution, and Forfeiture Are, Themselves, Substantial Punishment.

While it is easy to become inured to enormous custodial sentences in the federal system, a federal felony conviction is, itself, a severe penalty, particularly for a non-violent offense by an individual with no criminal history whatsoever. Mr. Simon has endured, and will continue to suffer, humiliation, stress, and financial devastation that he scarcely could have imagined before. Courts have recognized that myriad severe collateral consequences attach to a federal felony conviction, which can amount to a kind of "civil death." *United States v. Nesbeth*, 188 F. Supp. 3d 179, 181 (E.D.N.Y. 2016) (lengthy opinion detailing collateral consequences of conviction in imposing non-incarceration sentence).

Probation supervision as part of a required term of supervised release is also meaningful punishment. As the Supreme Court noted in *Gall v. United States*, 552 U.S. 38 (2007), probation supervision amounts to a "substantial restriction of freedom." *Id.* at 595. As one judge of this district observed in one of the first sentencing hearings conducted after *Gall*:

> *Gall* recognized for the very first time in a very long time that probation is not nothing, that there are substantial restrictions on an individual's freedom in probation, that we can structure a probationary sentence that meets all the purposes of sentencing, and that is entirely appropriate. This was one of the things that the guidelines ignored, and the guidelines dramatically changed from preguideline

practice and which the Supreme Court is essentially saying we can now look at again.

*United States v. Ramos*, 04-CR-10275 (D. Mass. 2008) (excerpt of sentencing transcript filed with Judgment, DE 62) (ordering probationary sentence for substantial oxycontin trafficking). The district court's observations at sentencing in *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012), also deserve attention:

> I think it is very difficult at times, for those of us who are judges or prosecutors or lawyers, to put ourselves in the shoes of a person with no prior experience with the criminal justice system who finds himself or herself accused of a crime. I do not think, sometimes, we fully recognize the anguish and the penalty and the burden that persons face when called to account, as these men are, for the wrong they have committed.

*Id*. at 343-44 (upholding sentence of probation with six months' home confinement and 1,000 hours of community service where the district court calculated the GSR as 87-108 months after conviction at a lengthy trial on over 100 felony counts of false statements and fraud related to the "Big Dig" project).

Notably, the Guidelines have been roundly criticized for always resulting in ranges that include incarceration and failing to include criteria to make an "in / out" determinations.[4] Post-

---

[4] The Sentencing Reform Act called for courts to consider probationary penalties as a distinct type of sentence with independent value, not merely a "lenient" option to be used only in extraordinary cases. Congress directed the Sentencing Commission to "promulgate . . . guidelines . . for use of a sentencing court in determining the sentence to be imposed in a criminal case, including . . . a determination whether to impose a sentence to probation, a fine, or a term of imprisonment." 28 U.S.C. § 994(a)(1)(A) (emphasis added). Congress further directed sentencing judges, "in determining whether to impose a term of imprisonment," to "consider the factors set forth in section 3553(a)." 18 U.S.C. § 3582(a) (emphasis added). Thus, Congress intended the courts to first determine whether to imprison, considering probation as one of the "kinds of sentences available." 18 U.S.C. § 3553(a). The Guidelines offer no option that does not include a term of imprisonment; no combination of offense level and criminal history category excludes the possibility of imprisonment. By contrast, the (now advisory) sentencing table excludes probation as an option in many cases. As a result, the percentage of federal defendants sentenced to a purely

*Booker*, the Court is now directed to consider all of "the kinds of sentences available" by statute, 18 U.S.C. § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" zones recommend only a prison term. *See Gall*, 552 U.S. at 59 & n.11. Congress directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," and the "general appropriateness of imposing a term of imprisonment on a person convicted of a crime of violence that results in serious bodily injury." 28 U.S.C. § 994(j). Congress issued this directive, because "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Mr. Simon is plainly not a "violent and serious offender" who "pose[s] the most dangerous threat to society."

Finally, the amounts of restitution and forfeiture likely to be imposed in this case will be many multiples of the total compensation paid to Mr. Simon by Insys, far exceeding the assets he

---

probationary sentence declined from approximately 48% in 1984 to 6.2% by 2007. U.S. Sentencing Commission, 2 *The Federal Sentencing Guidelines: A Report on the Operation of the Guidelines System and Short-Term Impacts on Disparity in Sentencing*, Use of Incarceration, and Prosecutorial Discretion and Plea Bargaining 376 fig. 14 (1991); U.S. Sentencing Commission, 2007 *Sourcebook to Federal Sentencing Statistics* 27 fig. D. (2007). Rather than providing courts with a range of prison and non-prison alternatives as Congress had intended, the Commission instead inexplicably dismissed probation as a "very lenient" punishment that rarely would be used, with predictable and unfortunate results evident in the United States' escalating incarceration rate.

has today or any conceivable future earnings. And because California is a "community property" state, Mr. Simon's wife has very limited options to protect her own assets and future earnings as an innocent spouse who is responsible for two young children. Simply put, this case will crush the Simon family financially, and the debt obligation that accompanies the judgment will burden them for the rest of their lives. This inevitable and devastating element of punishment warrants special weight and consideration in the Court's sentencing analysis.

### 2. Incarceration Would Cause Substantial Harm to Mr. Simon's Mother, Wife, and Children.

The Court should carefully consider the adverse impact that any period of incarceration would have on Mr. Simon's mother, wife, and children. While the Guidelines generally discourage departure or variance based on family ties and responsibilities, *see* U.S.S.G. § 5H1.6, the Court is not bound by that policy, and even that harsh provision recognizes an adjustment may be appropriate where, as in this case, incarceration "will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family." *Id.*, cmt. 1(B)(i).

Mr. Simon's mother, Susan, is terminally ill. She described her situation and the importance of her son's constant presence and care:

> I am 76 years old and am living without a lobe of my right lung and without a bladder due to two major cancer operations. Richard takes me to my chemotherapy appointments, my surgeries and my visits with my surgeons and oncologist. He was instructed on how to care for my stoma and apply the bags that collect my urine now that I no longer have a bladder. He has done so on several occasions when I was unable to do so myself. After my most recent surgery to correct a complication from one of those operations, he stayed with me and was prepared to do anything necessary to care for me. He went with me to physical therapy and came daily to help me walk and attempt to regain my strength. I am severely hearing impaired even with 2 hearing aids. He is my second pair of ears at all important visits and conversations. I am dependent upon him for so many things that it will be an extreme hardship for me if he isn't here. He does my food shopping, puts my things away, helps with my laundry, picks up my medications that are ordered from a local pharmacy near his house, does most of my house cleaning, brings me meals, walks my service dog when I am unable, fixes my TV and computer, assists with my banking, visits with me so I have some company and conversation, and so many

other things it is impossible to list them all. I use City of Hope (a large Cancer Hospital here in California), and can't change venues at this late stage. I have many more nodules in my lungs that can change at any time, and have developed another recently. I now have new complications that will require major surgery and need his presence. My cancer was apparently in remission once my bladder and other internal organs were removed.  Unfortunately, my cancer has now spread to my lymph nodes and I am undergoing chemotherapy once again with only a 50% chance of it working to buy me some time.  There is no cure. Richard is my transportation to and from chemotherapy, and stays with me for the 7-8 hours of the infusions.  He is my caregiver and my emotional support.  He is a co-occupant of my apartment in order for him to be able to live with me to help with my care. Without him I wouldn't even try to extend my life.  I may have to die alone if he is sentenced to prison. He is my health care advocate. I trust no other. I know he will arrange for hospice for me and insure I get the care I will need to remain comfortable and pass peacefully. He is needed to settle my final affairs when I pass away. I know he will carry out my wishes. There is no one else I trust more . . . .

Although I have another son, Andrew, he lives in New Jersey with his wife and 3 children.  In the 5 years I have been in California, he has come here only a few times for a few days.  Our relationship was strained for years and was the cause of our move to Florida.  Our relationship can now be best described as cordial.  I cannot move to New Jersey, and he cannot and will not come here for any length of time. He works long hours as a partner in his own business and I would be left with no support system at all.

Susan Simon Letter (A08-09)

In addition, Mr. Simon's wife, Lauri, suffers from major depressive disorder, severe generalized anxiety disorder, and panic attacks. Sealed Ex. B (letters from Lauri's doctors). These conditions emerged earlier in Lauri's life and have periodically recurred.  *Id*. "Her symptoms affect work activities, ability to cope with stress, and other aspects of daily living." *Id*. Mr. Simon "has been an essential member of her support network." *Id*. Fears related to this case have "exacerbated Mrs. Simon's symptoms to the point that she required transcranial magnetic stimulation treatments" and "is at risk for worsening mental condition with additional stress." *Id*. Lauri elaborated:

> With so much uncertainty in our lives right now, my treatment resistant anxiety disorder has again spiraled out of control. I'm doing everything I can to get better knowing I'm the only one of us capable of earning income right now. I've switched

medications many times over the last 3 years, my psychiatrist has even added an antipsychotic to my anti-depressant in an attempt to better control my anxiety and depressive symptoms, and I recently completed 36 sessions of daily TMS therapy (trans magnetic deep brain stimulation) and 10 sessions of Neurofeedback therapy, to try to "keep it together."

Even with the incredible amount of stress Rich has experienced during the last 3 years since his indictment, and the extreme emotions he's been dealing with after the conviction, Rich has managed to be the strong one. He's the positive and hopeful partner in our marriage. He can't make the anxiety and depression go away; nothing seems to do that, but he helps me, and more importantly is now the primary caretaker for Z[ ] and E[ ]. Not only does he primarily care for them when I'm working in the afternoons and evenings, but also on some weekends when I just can't get out of bed due to my depression or I'm unintentionally quick tempered and hurtful due to my anxiety. When needed, which is often, Rich completely takes over parenting and household responsibilities until I'm either finished with work and/or emotionally available to parent them properly.
. . . .
If Rich is sentenced to prison time, I am very concerned about his mom's survival and quality of life. I am barely hanging on physically and emotionally trying to manage my full-time demanding career while parenting Z[] and E[] and Rich is still here offering his full support. There is no way I can take on the role Rich has as Susan's primary caretaker; I'm just stretched way too thin. I don't know how I will even manage to keep my job or parent Z[ ] and E[ ] intentionally like Rich and I have always done as a team.

Lauri Simon Letter (A05-06).

Finally, the Simons' young sons are uniquely vulnerable and needy, because they suffer from developmental and emotional issues, like Mr. Simon did when he was a child. Lauri explained:

Z[ ] (now age 10) has combined ADD/ADHD and due to this, has struggled in school and with developing close friendships. Since Rich also had severe ADHD as a child, when Z[ ] started exhibiting some of the symptoms, Rich was instrumental in Z[]'s early diagnosis. Because of this, we were able to intervene early, Rich helped develop a "Section 504 Plan" with Z[]'s school so that the teachers would know how to work with him best with specific written plans. Once Rich helped get this implemented at Z[ ]'s school, Z[ ] went from having a C- in Reading his 3rd Grade Year to having A's and B's in 4th Grade, and now Straight A's with 2 A+'s on his latest 5th Grade Report Card.

In addition to being instrumental in getting Z[ ]'s grades back on track, Rich worked and continues to work with Z[] to make sure he's no longer bullied at school. It's

amazing to me how Rich connects with Z[ ] so naturally and they talk so openly. Rich has helped Z[ ] learn how to stand up for himself and when Z[ ] started implementing Rich's advice, the kids who were bullying Z[ ] finally stopped. Rich connects with both Z[ ] and E[ ] in a way that somehow seems just perfect for whatever age and stage they're in. Z[ ] is our deep communicator, like Rich. Z[ ] opens up to Rich and tells him about his struggles at school, seeks Rich's help when he needs it. Z[ ] also enthusiastically opens up to Rich after school to tell him about the good parts of his day.

E[ ] (now age 7) is not our communicator, to say the least. Possibly due to him being born premature, E[ ] was slow to speak, had problems articulating his words correctly, and needed speech therapy for 3 years. Now his speech issues are minor, but he is still our quiet one, getting angry and acting out instead of communicating how he feels.

While Rich was in Boston at the trial, E[] significantly regressed with his communication. I could tell he was angry, but when I would try to talk with him, he would have temper outbursts. Neither Z[] nor E[] know about the case yet, so he wasn't dealing with anything painful. He was simply missing Rich's love and influence and not understanding why he had to be gone so long. Z[], who's our carefree, talkative, social one, started to withdraw emotionally and have anger outbursts at home.

When Rich came back home, even though Rich was dealing with the emotions of just having been found guilty and clearly was not his usual self, he was able to connect emotionally again with both Z[] and E[]. Z[]'s emotions became stable again almost immediately. He had his devoted Daddy back to talk to in depth about his feelings, his highlights from the day at school, and confiding about issues with friends that Rich had always helped him talk through. E[]'s anger outbursts became significantly less frequent.

. . . .

Rich has contributed so positively to Z[] and E[]'s childhood. Rich is truly an amazing father that connects with our kids in a way I can't. Especially since they are boys and they'll be entering the pre-teen years before we know it, I can't even imagine the negative impact a prison sentence will have on them during this crucial developmental phase of their young lives.

Lauri Simon Letter (A03-04).

Individually and together, these unusual family circumstances militate against any period of incarceration, certainly any prolonged sentence.

### D.       Neither Specific nor General Deterrence Requires Incarceration.

Imprisonment is not necessary to protect the public or to deter Mr. Simon from similar crimes in the future, as required by § 3553(a)(2)(B) and (C). Mr. Simon has no prior criminal history, and he will never work in pharmaceutical sales again.

The very fact of federal prosecution will also serve the interest in general deterrence. Nobody looking at what Mr. Simon has experienced, the pain inflicted on his family, and the obstacles he will face in the future could mistakenly conclude that his participation in Insys's crimes was anything other than extremely serious or that they should engage in similar conduct. To the extent the government contends that the Court must "send a message" given the severity of corporate misconduct at issue and the extensive resources devoted to its investigation, that "message" is broadcast loud and clear by the prosecution, convictions, and bankruptcy of the company itself, all of which received significant public attention. As a matter of basic fairness, the most severe punishment should be reserved for the most culpable individuals, those senior executives and officers who devised and directly benefitted from the scheme. It would be unjust for Mr. Simon to shoulder the brunt of that burden. Life as he knew it is already demolished, and no purpose would be served by prolonging his incapacitation gratuitously, especially at the expense of the vulnerable family members who depend on him.

Moreover, there are no data to suggest that a longer sentence would have any marginally greater general deterrent effect. Empirical research consistently has shown that "increases in the severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 CRIME & JUST. 1, 28 (2006). "Three National Academy of Science panels . . .reached that conclusion, as has every major survey of the evidence." *Id.*; *see also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm*, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a

far better deterrent than its severity."). Research regarding white-collar offenders in particular (presumably, the most rational of potential offenders) found *no difference* in the deterrent effect of probation and that of imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 CRIMINOLOGY 587 (1995); *see also* Gabbay, *supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). On the other hand, a substantial body of evidence establishes that "crime-reducing aspects of imprisonment are considerably negated by crime-enhancing ones." Todd Clear, *Backfire: When Incarceration Increases Crime, The Unintended Consequences of Incarceration* (Vera Inst. 1996).

### E.   Imprisonment Would Not Facilitate Any Required "Treatment."

Mr. Simon plainly does not require any "treatment" of the sort that a Bureau of Prisons placement would uniquely facilitate under § 3553(a)(2)(D). This factor, then, would counsel against any prison sentence. Indeed, as the Sentencing Commission staff has recognized, non-incarcerative sentences "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines 19 (Nov. 1996).

### CONCLUSION

For the foregoing reasons, if this Court is inclined to sentence Mr. Simon to any period of incarceration, rather than an extended term of probation, it should sentence him to no more than one year in custody to be followed by an appropriate term of supervised release, and it should impose mandatory restitution and forfeiture in amounts to be determined. No fine should be imposed because restitution and forfeiture obligations are likely to far exceed Mr. Simon's ability to pay.

Respectfully submitted,

**RICHARD M. SIMON**

By his attorneys,

*/s/ William W. Fick*
William W. Fick, Esq. (BBO #650562)
Daniel N. Marx, Esq. (BBO #674523)
FICK & MARX LLP
24 Federal Street, 4th Floor
Boston, MA 02110
(857) 321-8360
WFICK@FICKMARX.COM
DMARX@FICKMARX.COM

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 18, 2019.

*/s/ William W. Fick*