UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>MICHAEL L. BABICH, ALEC BURLAKOFF, MICHAEL J. GURRY, RICHARD M. SIMON, SUNRISE LEE, JOSEPH A. ROWAN, and JOHN KAPOOR,<br><br>Defendants. | Criminal Action No. 16-cr-10343-ADB |

# MEMORANDUM AND ORDER
# ON THE GOVERNMENT'S MOTION FOR RESTITUTION

BURROUGHS, D.J.

On May 2, 2019, a jury convicted Defendants Michael Gurry, Richard Simon, Sunrise Lee, Joseph Rowan, and John Kapoor of conspiring to violate the Racketeer Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1962(d). [ECF No. 841]. Separately, Defendants Michael Babich and Alec Burlakoff both pled guilty. [ECF Nos. 543, 664].

Presently before the Court is the Government's motion for mandatory restitution. [ECF No. 1035]. For the reasons stated below, the motion, [ECF No. 1035], is GRANTED in part and DENIED in part.[1] Restitution is awarded in the amount of $56,686,731.53.

---

[1] The Government asks that the Defendants be jointly and severally liable for this amount. [ECF No. 1035 at 1–2]. "If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). The parties will be afforded the opportunity to provide further briefing regarding how they believe the Court should apportion liability among the Defendants.

## I. LEGAL STANDARD

"[R]estitution is designed to compensate the victim, not to punish the offender. To this end, the [Mandatory Victim Restitution Act ("MVRA")] mandates that a defendant convicted of certain federal crimes, including those 'committed by fraud or deceit,' must make restitution to victims commensurate with the victims' actual losses." United States v. Naphaeng, 906 F.3d 173, 179 (1st Cir. 2018) (quoting 18 U.S.C. § 3663A(c)(1)(A)(ii)). "When determining restitution, a sentencing court is not expected to undertake a full-blown trial" and is not held to a standard of "absolute precision." Id. (quoting United States v. Mahone, 453 F.3d 68, 74 (1st Cir. 2006)).

The parties agree that restitution is mandatory in this case under the MVRA, [ECF No. 1035 at 2–3; ECF No. 1121 at 6], but disagree as to the amount of restitution and whether certain claimed losses were caused by their conduct. The Government must establish, by a preponderance of the evidence, the amount of loss suffered by victims. 18 U.S.C. § 3664(e).

The First Circuit has adopted "a 'but for' standard of causation for restitution that requires the government to show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)." United States v. Corey, 77 Fed. App'x 7, 10 (1st Cir. 2003); see also United States v. Vaknin, 112 F.3d 579, 590 (1st Cir. 1997) (explaining that the "watchword is reasonableness"). "[U]nforeseeable consequential damages are beyond the scope of the MVRA . . . ." Corey, 77 F. App'x at 10. Restitution may not include harms that do "not flow directly and immediately from the act of the

[defendant], but only from some of the consequences or results of such act." Id. at 9–10 (citation omitted).

In a conspiracy case, "the district court may order restitution to every victim directly harmed by the defendant's conduct . . . that is an element of the offense of conviction, without regard to whether the *particular criminal conduct* of the defendant which directly harmed the victim . . . was even charged in the indictment." United States v. Hensley, 91 F.3d 274, 277 (1st Cir. 1996);[2] see also United States v. Acosta, 303 F.3d 78, 86–87 (1st Cir. 2002) ("[T]he district court may order restitution without regard to whether the conduct that harmed the victim was conduct underlying the offense of conviction.").

## II. DISCUSSION

The parties agree that there are individual victims as well as institutional victims, but disagree as to who should be compensated, for how much, and based on what conduct. In determining the losses caused by the scheme at issue here, the Court begins with the indictment to determine the offense of conviction. Hensley, 91 F.3d at 277. Following the post-trial motions, the surviving convictions were based on the predicate acts of mail and wire fraud in connection with the Insys reimbursement center ("the IRC") and the prior authorization requests that went through the IRC. [ECF No. 1028 at 85]. According to the indictment, "[t]he defendants used the bribes and kickbacks to [inter alia] fraudulently cause insurers to pay for new prescriptions, as well as for increases in dosages and units of new and existing prescriptions" and "[h]ad the insurers known that the defendants gave bribes and kickbacks to the targeted practitioners, the insurers would not have authorized payment for Subsys . . . ."

---

[2] Though Hensley was considering victims under the Victim and Witness Protection Act and not the MVRA, "[t]he definition of 'victim' is the same in both statutes . . . ." United States v. Donaghy, 570 F. Supp. 2d 411, 420 (E.D.N.Y. 2008) (citing Hensley, 91 F.3d at 277).

[ECF No. 419 ¶¶ 30, 31]. This language clearly links the insurance fraud to the bribes and the bribed practitioners.

Later in the indictment, there is a separate section describing the manner and means used for the fraudulent prior authorization requests. [Id. ¶ 63]. The second paragraph of this section says "[t]he defendants and their co-conspirators recognized that the potential for profits generated by their bribes and kickbacks could not be fully realized unless insurers authorized payment for Subsys prescriptions. To increase the rate of payment authorization for Subsys prescriptions, Kapoor, Babich, Gurry, and other co-conspirators known and unknown to the Grand Jury, created and operated a special unit within Insys [the IRC] that was dedicated to obtaining prior authorization of Subsys prescriptions directly from insurers." [Id. ¶ 64]. This again links the insurance fraud to the bribes and the bribed practitioners. Of the eight or so paragraphs in this section, however, this is the only one that directly links the bribes to the IRC. See, e.g., [id. ¶¶ 63–70]. The remaining paragraphs describe aspects of the prior authorization scheme more generally and without reference to the bribes, therefore suggesting that the insurance fraud scheme was not wholly linked to the bribes.

This inconsistency in the parameters of the insurance fraud creates some ambiguity as to the scope of the offense of conviction and gives the Defendants a basis to argue that the offense of conviction is limited to doctors that received bribes and kickbacks. As a result, they claim that restitution may not include the losses from every Subsys prescription, but must be limited to prescriptions from those doctors that received kickbacks and bribes. [ECF No. 1121 at 13]. The Government, also with support from the language of the indictment, argues that the offense of conviction is broad enough to encompass all prior authorization requests that went through the

IRC, even from doctors that were not identified in the indictment as having been bribed. [ECF No. 1191 at 7].

### A.   Individual Victims

The Government originally sought $10,198.20 in restitution for six identified individual victims to reflect "the amount of actual out-of-pocket copay costs related to Subsys." [ECF No. 1035 at 2, 6]. This initial request was uncontested by Defendants. [ECF No. 1121 at 6]. Thereafter, Victim No. 5431212 increased her request for restitution and three new victims submitted requests: Victim No. 6002800, Victim No. 6192691, and Victim No. 5431204. [ECF No. 1191 at 3]. With regard to these increased and more recent claims, the Defendants argue that many of the new losses claimed by individual victims have not been proven to be directly caused by the Defendants' RICO violation.[3] The Court addresses the claims of these four victims individually.[4]

#### 1.   Victim No. 6002800

Victim No. 6002800 seeks $48,816.00 to account for her dental costs, including dental implants, that she claims were necessary due to tooth decay that was caused by Subsys. [ECF

---

[3] It remains uncontested that the other five originally identified Victims are entitled to the amount they requested. Specifically, Victim No. 5632738 is entitled to $1,140.00 in restitution; Victim No. 6002801 is entitled to $1,231.41 in restitution; Victim No. 6002802 is entitled to $965.00 in restitution; Victim No. 5431216 is entitled to $2,006.00 in restitution; and Victim No. 5431207 is entitled to $3,041.23 in restitution. [ECF No. 1035 at 7; ECF No. 1121 at 6; ECF No. 1191 at 3; ECF No. 1210 at 20].

[4] The Court's discussion of the individual victims' claims should not be taken as an evaluation of their merit for purposes of any proceedings outside of this case.

5

No. 1191 at 3; ECF No. 1191-1 at 10–11, Filed Under Seal]. As evidence in support of her claim for restitution, she originally provided a doctor's letter, which indicated that her dental problems began "in the early 2000's," roughly fourteen years before she began taking Subsys. [ECF No. 1191-1 at 3, Filed Under Seal]. After "the government noted the date," [ECF No. 1191 at 3 n.1], however, the dentist amended his letter to indicate that the problems began in 2014, [id. at 2].

There has been no scientific evidence or evidence beyond the anecdotal presented to the Court to suggest, let alone prove by a preponderance of the evidence, that Subsys causes tooth decay. Therefore, the Court cannot determine by a preponderance of the evidence that Victim No. 6002800's dental costs were directly caused by the Defendants' conspiracy in this case such that they would be losses subject to restitution. Her claim for restitution is therefore denied.

### 2. Victim No. 5431212

The Government originally sought $1,815.00 in restitution for Victim No. 5431212, which reflected the Victim's out-of-pocket copay expenses. [ECF No. 1035 at 7]. Defendants did not originally and do not now contest this amount. [ECF No. 1121 at 6]. Victim No. 5431212 now additionally requests $42,839.70 to account for anticipated dental work as well as her husband's lost wages. For the reasons previously discussed, the Court is unable to find by a preponderance of the evidence that Victim No. 5431212's dental costs were directly caused by the Defendants' conspiracy at issue in this case. Regarding her husband's alleged lost wages, although she provides voluminous medical records, she fails to provide any evidence that would demonstrate that her husband's lost wages were directly caused by the Defendants' conspiracy. See generally [ECF No. 1191-2, Filed Under Seal]. Similarly, although she estimates that her husband's lost wages would total $10,098.00, there is no evidence in the record of his wages.

See generally [id.]. Therefore, the Court orders the originally requested restitution amount of $1,815.00 and otherwise denies her claim.

3. <u>Victim No. 6192691</u>

Victim No. 6192691's estate seeks restitution for the pecuniary value of "compensable companionship, advice, guidance, support, and services" that her family would have received from their daughter had she not passed away while using Subsys in 2016. [ECF No. 1191-3 at 22, Filed Under Seal]. Her estate requests "a conservative total loss estimate in the range of $930,000.00 . . . ." [Letter from the Estate of Victim No. 6192691 to the Parties, at 2 (Jan. 30, 2020)]. The Government makes no argument in support of the estate's claim. See [ECF No. 1191 at 3, Filed Under Seal].

"[I]n the case of an offense resulting in bodily injury that results in the death of the victim," the MVRA requires that the defendant "pay an amount equal to the cost of necessary funeral and related services . . . ." 18 U.S.C. § 3663A(b)(3); <u>see, e.g.</u>, <u>United States v. Amador-Huggins</u>, 799 F.3d 124, 133–34 (1st Cir. 2015) (upholding a district court's award of funeral expenses for a carjacking victim and travel expenses for family members to attend the funeral). Additionally, under 18 U.S.C. § 3663A, "the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section" in the case of a deceased victim. 18 U.S.C. § 3663A(a)(2). In this case, Victim No. 6192691's estate not only seeks to recover for her loss, but also for her parents' losses.

Victim No. 6192691 was prescribed Subsys by a Dr. Vivienne Matalon, who has not been accused of accepting bribes or kickbacks to increase Subsys prescriptions. [ECF No. 1191-3 at 18, Filed Under Seal]. Therefore, the estate must demonstrate that the parents' losses were otherwise caused by the Defendants' conduct in this case. The Victim's estate argues that "causation is not an issue," but makes no argument to support causation. [ECF No. 1191 at 3, Filed Under Seal; Letter from the Estate of Victim No. 6192691 to the Parties, at 2]. The letter from Victim's counsel is insufficient to establish by a preponderance of the evidence that it was foreseeable that the Victim could overdose due to Defendants' conspiracy or, by extension, that the parents' losses were foreseeable. The Court is therefore unable to aware restitution. Her remedy may more appropriately lie with Dr. Matalon.

    4.    Victim No. 5431204

Victim No. 5431204 was also prescribed Subsys by a doctor who has not been accused of accepting bribes or kickbacks as part of this conspiracy. He seeks either between $622,156 and $622,381 or between $1,340,706 and $1,357,748 to cover two possible medical care options to address the lifelong effects of his Subsys addiction. [ECF No. 1191 at 14]. This Victim provides a report from the Program Director of the Stanford Addiction Medicine Fellowship and Assistant Professor of Psychiatry at Stanford University School of Medicine, [ECF No. 1191-4 at 2, Filed Under Seal], which maintains that the Victim should never have been prescribed Subsys in the first place and that his provider deviated from standard medical practices, including in relation to evaluating the Victim's risk of developing an addiction, [id.]. Because of his addiction and associated brain damage from "chronic heavy opioid exposure under [his doctor's] care," Victim No. 5431204 will require lifelong treatment. [Id. at 6].

The Court must determine whether Victim No. 4321204 was "directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy or pattern." 18 U.S.C. § 3663A(a)(2). Though the Court is not limited to the specifically charged conduct, it may only consider the effects of the relevant conduct in the conspiracy at issue. See Hensley, 91 F.3d at 274. The Victim has provided evidence that his provider deviated from safe and ethical practices in prescribing Subsys, but has not alleged nor provided evidence that his provider prescribed Subsys because he was receiving kickbacks and bribes from the Defendants. Similarly, there is no evidence to suggest that an IRC employee misrepresented that the Victim had breakthrough cancer pain in requesting that his Subsys prescription be covered. The Court is therefore unable to find by a preponderance of the evidence that Victim No. 5431204 suffered his harm as a direct consequence of the conspiracy at issue in this case.

### B. Insurance Providers

Under 18 U.S.C. § 3663A(b)(1), Defendants must pay each insurer an amount equal to the loss incurred by the insurer due to the RICO conspiracy. There is no question that this is a complicated issue with a myriad of decisions that need to be made to arrive at an accurate and fair restitution amount.

The Defendants argue that the Government is impermissibly asking the Court to consider all paid Subsys claims nationwide, as opposed to the claims related to prescriptions from the thirteen bribed practitioners. [ECF No. 1121 at 6]. The Government maintains that 80.9% of Subsys prescriptions were processed through the IRC. [ECF No. 1035 at 9]. The Defendants assert that the government cannot rely on the unproven assumption that every claim processed by the IRC was illegitimate, [ECF No. 1121 at 15], and the Government agrees that it cannot prove that every call that went through the IRC was fraudulent, see [2/28/19 Tr. at 134:4–13] ("There's

9

no assertion here that every single time the IRC called an insurance company that there was fraud."). Further, although some of the off-label prescriptions were undoubtedly authorized as a result of misrepresentations made by the IRC, the fact that Subsys was prescribed off-label is in and of itself insufficient to establish that a prescription was fraudulent. Like the jury, the Court "may not conclude that a particular prescription was outside the usual course of professional practice, not for a legitimate medical purpose, or in violation of a healthcare practitioner's fiduciary duty solely because it was prescribed for an off label use." [4/4/19 Tr. at 56:24–57:4]. Likewise, the mere fact that a call came from the IRC is insufficient to establish that it was fraudulent. As the Court explained to the jury, "[e]stablishing such a department, if done in accordance with applicable law, is . . . not in and of itself illegal." [Id. at 57:15–17].

In order to accurately evaluate the entire amount of victims' losses in this case, the Court would need to review every claim that was processed by the IRC to determine whether the IRC made misrepresentations about the patient, including that the patient had breakthrough cancer pain or dysphagia when the patient did not, or that the patient had tried a number of other prescriptions before seeking out Subsys, when the patient had not. The Court would also need to determine which specific claims that passed through the IRC were fraudulent because they were prescribed by a bribed doctor, were for a patient who should not have received Subsys, or were titrated to an amount too high to be appropriate for the patient. For each insurer's claim, the Court would need to ascertain the insurer's policy at the time, whether the insurer would have covered an off-label prescription of Subsys, whether the prescription was appropriate despite it being off-label, and whether the IRC misrepresented the patient's diagnosis in order to get the prescription covered.

Under the Sentencing Guidelines, the Court need not award restitution in the full amount of victims' losses in the event that "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." U.S. Sentencing Guidelines Manual § 5E1.1 (U.S. Sentencing Comm'n 2018). Even when considering restitution under the MVRA, the First Circuit has instructed that "restitution should <u>not</u> be awarded when it is too difficult to estimate accurately. That is, where the facts are too difficult to discern, the sentencing court's option is to forgo restitution, not to fall back on a factually unsupported calculation method." <u>United States v. Vega-Martínez</u>, __ F.3d __, 2020 WL 502538, at *7 (1st Cir. Jan. 31, 2020).

Given the challenges in resolving the legal and factual issues raised by the parties, the Court finds that trying to quantify restitution beyond the thirteen identified medical professionals bribed would, as foreseen by the Guidelines, be too complicated and unduly prolong and burden the sentencing process. The Court further finds that any restitution number arrived at without reviewing individual files would be too speculative. Therefore, the Court will limit restitution to those losses for which there is either no dispute regarding restitution or for which the payments can be traced to the bribed co-conspirator doctors.

Although Defendants agree that the Court may order restitution based on prescriptions written by bribed doctors, [ECF No. 1210 at 4], they maintain that the losses from prescriptions provided by these bribed prescribers should be reduced to 80.9%, to account for only those claims that passed through the IRC, and by an additional 73%, to account for only those prescriptions made for non-cancer patients, [ECF No. 1121 at 12]. The Court declines to make these additional reductions. Although the Court finds the amount of restitution owed beyond the

11

thirteen co-conspirator doctors to be too complicated to calculate, it is clear that the amount that would be owed is at least equal to the total value of prescriptions written by the bribed doctors.[5] If anything, the amount of restitution being awarded by the Court underestimates the amount that should be paid and the Court will not reduce the award further.

The Court therefore finds restitution to be owed to the insurers, including Medicare, as more fully set forth below. The information included as to each insurer comes from materials provided by that insurer.

### 1. Medicare

Medicare paid approximately $169,058,169.00 for Subsys prescriptions for patients who had no principal diagnosis of cancer within a year before the prescription. [ECF No. 1035 at 8]. The Government is seeking $136,768,059.00, which represents payments for claims that originated in the IRC, [id. at 9], arguing that "Medicare would not have knowingly authorized payment for any Subsys prescription if the prescription was off-label (*i.e.*, not for breakthrough cancer pain)" or if it knew that the prior authorization request originated at the IRC rather than from a physician's office, [ECF No. 1035 at 8, 9]. The Court notes that despite this representation, there is evidence that Medicare covered off-label use of fentanyl products that were similar to Subsys. See [3/28/19 Tr. at 90:8–98:2].

Given the complex issues of fact related to the cause or amount of Medicare's losses, the Court limits the restitution award to $30,232,895.00, which represents the prescriptions

---

[5] The Court is not limited to the eleven bribed practitioners identified by the Defendants. [ECF No. 1210 at 6]. As discussed above, the Court may consider relevant conduct in furtherance of the conspiracy, not merely charged conduct. See Hensley, 91 F.3d at 277. Therefore, the Court may consider the prescriptions provided by each of the thirteen co-conspirator practitioners identified by the Government prior to trial.

12

attributable to the thirteen co-conspirator prescribers, as reflected in the PSR. See [ECF No. 1210 at 19–20].

        2.      <u>Aetna</u>

Aetna seeks $15,769,912.00 in restitution. [ECF No. 1035 at 10; ECF No. 1035-7 at 1–2]. It reviewed all reimbursements from 2012 until October 2018, [ECF No. 1191-12 at 5], and found that it had covered Subsys for 3,690 Aetna members, [<u>id.</u>]. Of those members, 1,894 received Subsys prescriptions despite not having a cancer diagnosis. [<u>Id.</u>]. Those prescriptions cost Aetna $15,772,637.00. [<u>Id.</u>; ECF No. 1035-7 at 6]. Applying the 80.9% threshold to represent claims that were processed through the IRC, all of which Aetna argues were fraudulent, Aetna estimates that it paid $12,760,063.00 in fraudulent claims. [<u>Id.</u> at 6]. Aetna separately calculates that it paid $1,193,479.00 to cover prescriptions from the bribed doctors in this case, including Mahmood Ahmad, Heather Alfonso, Gavin Awerbuch, Steven Chun, Michael Frey, Paul Madison, and Xiulu Ruan. [ECF No. 1035-7 at 4, Filed Under Seal]. Given the complex issues of fact related to the cause or amount of Aetna's losses, the Court limits the restitution award to $1,193,479.00, which represents the prescriptions attributable to the thirteen co-conspirator prescribers.

        3.      <u>Anthem Blue Cross Blue Shield</u>

Anthem Blue Cross Blue Shield ("Anthem") claims that it is owed $19,310,973.00. [ECF No. 1035 at 10; ECF No. 1035-8, Filed Under Seal]. Anthem identified 827 health plan members whose Subsys prescriptions were reimbursed. [ECF No. 1191-7 at 9]. It then determined that 391 of those members actually had demonstrable cancer diagnoses, which left 436 members without a cancer diagnosis. [<u>Id.</u> at 10]. By comparing its prior authorization records with the diagnoses, Anthem concluded that 248 members had prescriptions reimbursed

because of some misrepresentation, including a fraudulent cancer diagnosis or the caller reporting that they were calling from a doctor's office. [Id.]. It seeks $20,714,504.00 as restitution for claims it paid for those 248 members. [Id.].

Anthem has not provided sufficient evidence for the Court to find their calculations accurate by a preponderance of the evidence. Again, given the complex issues of fact related to the cause or amount of Anthem's losses, the Court would limit the restitution award to the prescriptions attributable to the thirteen co-conspirator prescribers. Because Anthem does not provide any quantification of its payments for prescriptions written by the thirteen bribed doctors identified by the Government, no restitution is awarded on this record. See generally [id.].

4. Cigna

Cigna estimates that it paid $16,647,642.22 for Subsys prescriptions. [ECF No. 1035-9 at 3, Filed Under Seal]. It claims that it would not have covered those prescriptions if it had known that the calls were coming from the IRC or if the prescriptions were not for patients suffering from breakthrough cancer pain. [Id. at 5]. Alternatively, Cigna calculates that it paid $1,838,768.07 to the specific medical providers involved in this case. [Id. at 3–4]. Given the complex issues of fact related to the cause or amount of Cigna's losses, the Court limits the restitution award to $1,838,768.07, which represents the prescriptions attributable to the thirteen co-conspirator prescribers.

5. Caremark

Caremark estimates that it paid $93,973,563.64 for Subsys prescriptions. [ECF No. 1191-10 at 3, Filed Under Seal]. Caremark uses the Government's 80.9% rate, based on the percent of prescriptions filled through the IRC and assumes that every prescription submitted by the IRC was illegitimate, to arrive at a total of $76,024,612.98. Caremark paid $15,072,543.35

14

for Subsys prescriptions written by the thirteen practitioners identified by the Government as having received bribes. [Id. at 3 n.1]. Given the complex issues of fact related to the cause or amount of Caremark's losses, the Court limits the restitution award to $15,072,543.35, which represents the prescriptions attributable to the thirteen co-conspirator prescribers.

      6.     Silverscript

Silverscript originally filed a spreadsheet that claimed $7,983,771.48 in losses, with no argument or affidavit in support of the claim. [ECF No. 1035 at 10; ECF No. 1035-11, Filed Under Seal]. Silverscript then filed a declaration claiming that it paid $9,868,691.57 for Subsys prescriptions. [ECF No. 1191-9 at 2, Filed Under Seal]. The $7,983,771.48 figure therefore represents 80.9% of the processed claims. [Id. at 4]. Silverscript estimates that it paid $3,320,804.07 in claims for prescriptions written by the thirteen practitioners identified by the Government. [Id. at 2 n.1]. Given the complex issues of fact related to the cause or amount of Silverscript's losses, the Court limits the restitution award to $3,320,804.07, which represents the prescriptions attributable to the thirteen co-conspirator prescribers.

      7.     Horizon Blue Cross Blue Shield

Horizon Blue Cross Blue Shield ("Horizon") seeks $2,088,066.00 in reimbursement. [ECF No. 1035-12]. Horizon claims that it paid $2,088,066.00 in claims "for members who did not a have [sic] cancer diagnosis or had questionable prior authorization requests." [ECF No. 1191-11 at 4]. Alternatively, Horizon identifies six prescribers who were in the Insys Speaker Program and received payments in exchange for prescribing Subsys. [ECF No. 1035-12 at 4]. Horizon paid a total of $2,072,576.43 for Subsys prescriptions written by those bribed prescribers. [Id.]. Though Horizon's estimate tracks prescriptions written by allegedly bribed practitioners, only two are among the thirteen identified by the Government. Horizon paid

15

$9,926.75 to cover prescriptions from Steven Chun, [Id. at 7–8] and $94,766.59 for prescriptions from Heather Alfonso, [Id. at 4]. Given the complex issues of fact related to the cause or amount of the victim's losses, the Court limits the restitution award to $104,693.34, which represents the prescriptions attributable to Steven Chun and Heather Alfonso.

### 8. United HealthCare Services

United HealthCare Services ("United") assumes that all IRC-related calls included a misrepresentation about a cancer diagnosis and requests $28,318,856.50, which reflects claims processed through the IRC for patients who did not have a cancer diagnosis within six months of their Subsys prescription. [ECF No. 1191- 8 at 2, 3–4, Filed Under Seal]. United does not address what proportion of prescriptions may have been filled through the IRC. United also includes charges for the entirety of the 2016, claiming that its harm continued beyond the end of the conspiracy, as they were still paying for Subsys for patients who did not have a cancer diagnosis. [Id. at 4 n.1].

United paid $4,913,350.06 for Subsys prescriptions written by bribed doctors. [Id. at 5]. Again, given the complex issues of fact related to the cause or amount of United's losses, the Court limits the restitution award to $4,913,350.06, which represents the prescriptions attributable to the thirteen co-conspirator prescribers.

## III. CONCLUSION

Accordingly, for the reasons stated herein, the Government's motion for order of restitution, [ECF No. 1035], is <u>GRANTED</u> in part and <u>DENIED</u> in part. The Court will determine whether the Defendants are jointly and severally liable for the restitution amount or if it should be apportioned after the parties have had an opportunity to brief the issue. The

Government has demonstrated by a preponderance of the evidence that the victims are entitled to at least $56,686,731.53, which is broken down as follows:

(1) Medicare: $30,232,895.00

(2) Aetna: $1,193,479.00

(3) Caremark: $15,072,543.35

(4) Cigna: $1,838,768.07

(5) Horizon: $104,693.34

(6) Silverscript: $3,320,804.07

(7) United: $4,913,350.06

(8) Victim No. 5632738: $1,140.00

(9) Victim No. 6002801: $1,231.41

(10) Victim No. 6002802: $965.00

(11) Victim No. 5431216: $2,006.00

(12) Victim No. 5431207: $3,041.23

(13) Victim No. 5431212: $1,815.00

**SO ORDERED.**

February 14, 2020 /s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE